Case No. 23-5609

# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

COMMONWEALTH OF KENTUCKY *ex rel.* ATTORNEY GENERAL DANIEL CAMERON

*Intervening Defendant-Appellant*

and

WILLIAM C. THORNBURY, JR., in his official capacity *et al.*

*Defendants-Appellees*

v.

DOE 1, *et al.*

*Plaintiffs-Appellees*

_____

On Appeal from the U.S. District Court for the Western District of Kentucky, No. 3:23-cv-230

_____

## THE COMMONWEALTH OF KENTUCKY'S EMERGENCY MOTION FOR STAY PENDING APPEAL

_____

Daniel Cameron
 *Attorney General of Kentucky*
Victor B. Maddox
 *Deputy Attorney General*
Matthew F. Kuhn
 *Solicitor General*
Alexander Y. Magera
 *Assistant Solicitor General*

Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Alexander.Magera@ky.gov

*Counsel for the Commonwealth of Kentucky*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES...........................................................................ii

INTRODUCTION .........................................................................................1

STATEMENT OF THE CASE......................................................................3

ARGUMENT .................................................................................................4

    I.    The Commonwealth will prevail on the merits.................................5

        A.  The plaintiffs' parental-rights claim fails................................5

        B.  The plaintiffs' equal-protection claim fails. ...........................7

    II.    The other factors support a stay.....................................................16

    III.   The preliminary injunction is overbroad. ....................................18

CONCLUSION ............................................................................................19

CERTIFICATE OF COMPLIANCE...........................................................21

CERTIFICATE OF SERVICE.....................................................................22

ADDENDUM................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Abigail All. For Better Access to Developmental Drugs v. von Eschenbach,*
    495 F.3d 695 (D.C. Cir. 2007) ................................................................................... 6

*Adams v. Sch. Bd. of St. Johns Cnty.,*
    57 F.4th 791 (11th Cir. 2022) (en banc) ................................................................. 12

*Bostock v. Clayton Cnty.,*
    140 S. Ct. 1731 (2020) ........................................................................................ 9, 10

*Brandt v. Rutledge,*
    47 F.4th 661 (8th Cir. 2022) ................................................................................... 19

*Brandt v. Rutledge,*
    No. 21-2875, 2022 WL 16957734 (8th Cir. Nov. 16, 2022) ...................................... 9

*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993) ................................................................................................. 9

*Cameron v. EMW Women's Surgical Ctr., P.S.C.,*
    142 S. Ct. 1002 (2022) ........................................................................................... 16

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) ............................................................................................... 12

*Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin,*
    498 S.W.3d 355 (Ky. 2016) ................................................................................... 16

*Commonwealth v. Beshear,*
    981 F.3d 505 (6th Cir. 2020) ................................................................................... 4

*Commonwealth v. Biden,*
    57 F.4th 545 (6th Cir. 2023) ............................................................................. 18, 19

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ................................................................ 2, 6, 8, 10, 15

*Doe By & Through Doe v. Pub. Health Tr. of Dade Cnty.*,
   696 F.2d 901 (11th Cir. 1983) ................................................................ 6

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
   920 F.3d 421 (6th Cir. 2019) ................................................................ 16

*Geduldig v. Aiello*,
   417 U.S. 484 (1974) ................................................................ 8, 11

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ................................................................ 18

*Gonzales v. Carhart*,
   550 U.S. 124 (2007) ................................................................ 5, 15, 16, 17

*Jacobson v. Massachusetts*,
   197 U.S. 11 (1905) ................................................................ 5

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
   927 F.3d 396 (6th Cir. 2019) ................................................................ 5

*Kottmyer v. Maas*,
   436 F.3d 684 (6th Cir. 2006) ................................................................ 13

*Maryville Baptist, Inc. v. Beshear*,
   957 F.3d 610 (6th Cir. 2020) ................................................................ 4

*Moore v. Detroit Sch. Reform Bd.*,
   293 F.3d 352 (6th Cir. 2002) ................................................................ 7

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   138 S. Ct. 2361 (2018) ................................................................ 6

*Nken v. Holder*,
   556 U.S. 418 (2009) ..................................................................................5

*Ondo v. City of Cleveland*,
   795 F.3d 597 (6th Cir. 2015) ............................................................ 11, 12

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) ....................................................................9

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
   52 F.3d 1373 (6th Cir. 1995) ...................................................................13

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ..................................................................................11

*Pickup v. Brown*,
   740 F.3d 1208 (9th Cir. 2013) ...................................................................6

*Priorities USA v. Nessel*,
   978 F.3d 976 (6th Cir. 2020) ...................................................................13

*Smith v. City of Salem*,
   378 F.3d 566 (6th Cir. 2004) ...................................................................10

*Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard College*,
   --- S. Ct. ---, 2023 WL 4239254 (U.S. June 29, 2023) ...............................9

*Theile v. Michigan*,
   891 F.3d 240 (6th Cir. 2018) ...................................................................12

*Thompson v. DeWine*,
   976 F.3d 610 (6th Cir. 2020) ............................................................ 16, 17

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*,
   992 F.3d 518 (6th Cir. 2021) .....................................................................4

*Tuan Anh Nguyen v. INS,*
    533 U.S. 53 (2001)................................................................................10

*U.S. Citizens Ass'n v. Sebelius,*
    705 F.3d 588 (6th Cir. 2013) ...............................................................6

*United States v. Virginia,*
    518 U.S. 515 (1996) .....................................................................7, 8, 10

*Vacco v. Quill,*
    521 U.S. 793 (1997) ............................................................................12

*Warshak v. United States,*
    532 F.3d 521 (6th Cir. 2008) ...............................................................19

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................................13

**Statutes**

SB 150 § 4(2)(a)–(b) ............................................................................*passim*

SB 150 § 4(6) .........................................................................................3

Ky. Rev. Stat. § 15.020 ........................................................................16

Ky. Rev. Stat. § 205.617(1)(c) ...............................................................8

Ky. Rev. Stat. § 217.105(2) ....................................................................8

Ky. Rev. Stat. § 218A.274 ......................................................................8

Ky. Rev. Stat. § 311.715(2) ....................................................................8

Ky. Rev. Stat. § 311.772 .........................................................................8

**Other Authorities**

Ky. AG Op. 23-03....................................................................................3

## INTRODUCTION

Layla Jane has always struggled to fit in. Jane Decl., R.47-15, PageID#1527. She suffered trauma in elementary school, which led to depression, suicidality, and self-harm when puberty started. *Id.* At 11, she began identifying as a male. *Id.* at PageID#1528. She saw various medical providers and was eventually referred to a "pediatric transgender clinic" where she was diagnosed with gender dysphoria. *Id.* At 12, she was given puberty blockers, followed by testosterone. *Id.* And a month after she turned 13, she had a double mastectomy. *Id.*

None of these medical interventions actually helped Jane. *Id.* at PageID#1528–30. The puberty blockers made her mental health "worse," causing her to engage in self-harm. The testosterone did much of the same, and it caused irreversible physical damage to her body. *Id.* At 17, Jane stopped taking these drugs. After all of this, she views as "life-saving" laws that prohibit prescribing puberty blockers and cross-sex hormones to minors. *Id.* at PageID#1530–31.

Stories like Jane's are unfortunately all too common today as more is learned about the use of drugs to attempt to make a child the opposite sex. *See, e.g.*, Decls., Rs.47-13, -14, -16, PageID#1513–25, 1532–35 (detransitioner stories); *see also, e.g.*, Decls., R.47-17, -18, -19, -20, -21, -22, PageID#1536–63 (parents' stories); Reed Decl., R.47-23, PageID#1564–75 (whistleblower testimony); Resp. Pls.' Mot. PI Exs. 5 & 8, Rs.47-5 & -8, PageID#556–665, 966–1003 (lawsuits brought by detransitioners).

That is why the Kentucky General Assembly passed Senate Bill 150. It prohibits a health-care provider from prescribing or administering puberty blockers and cross-sex hormones "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex." SB 150 § 4(2)(a)–(b). Like other "health and welfare laws," SB 150 is "entitled to a 'strong presumption of validity'" and "must be sustained if there is a rational basis on which the legislature could have thought that [the law] would serve legitimate state interests." *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (citation omitted).

The plaintiffs, seven children and their parents, nevertheless sued to challenge SB 150. They claim that the law impermissibly discriminates based on sex in violation of the Equal Protection Clause. Compl., R.1, PageID#29–30. They also allege that parents have a substantive-due-process right to obtain cross-sex hormones and puberty blockers for their children notwithstanding SB 150's prohibitions. *Id.* at PageID#30–31.

These constitutional arguments are bound to fail. It is perfectly constitutional for Kentucky to protect its children from what its legislature reasonably determined are irreversible, long-term negative effects on children's mental and physical health. The district court, however, granted a preliminary injunction against enforcing these provi-

sions. Mem. Op., R.61, PageID#2313. The Court should stay the district court's preliminary injunction. At the very least, the Court should narrow the statewide preliminary injunction so that it applies only to the plaintiffs.

## STATEMENT OF THE CASE

In its 2023 session, the Kentucky General Assembly passed SB 150. The law does many things, but relevant here it prohibits health-care providers from prescribing or administering puberty blockers and cross-sex hormones "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex." SB 150 § 4(2)(a)–(b). The law also provides a mechanism for health-care providers to "systematically reduce[]" such treatments for minors who were receiving puberty blockers or cross-sex hormones before SB 150's passage. *Id.* § 4(6).

SB 150 passed Kentucky's General Assembly over Governor Andy Beshear's veto on March 29, 2023, and it was set to take effect on June 29. Ky. AG Op. 23-03. On May 5, seven children and their parents sued to challenge SB 150 and sought a preliminary injunction. Compl., R.2, PageID#11–32; PI Mot., R.17, PageID#115–39. Attorney General Daniel Cameron promptly intervened to defend SB 150 on behalf of the Commonwealth. Mot. Intervene, R.16, PageID#80–86; Order, R.38, PageID#452–54.

The day before SB 150 was to take effect, the district court granted a statewide preliminary injunction. Mem. Op., R.61, PageID#2299–2313. In applying the Equal

Protection Clause, the district court "agree[d] with Plaintiffs both that heightened scrutiny applies and that SB 150 cannot survive it." *Id.* at PageID#2303. The district court also found a "strong likelihood" that the parent plaintiffs will succeed on their substantive-due-process claim. *Id.* at PageID#2308–11. The district court determined that a statewide preliminary injunction was proper, rejecting the Commonwealth's argument that any relief should be limited to the plaintiffs. *Id.* at PageID#2312.

The next day, the Commonwealth appealed and sought an emergency stay pending appeal from the district court. Notice of Appeal, R.65, PageID#2415–16; Mot. Stay, R.66, PageID#2417–31. As of this filing, the district court has not resolved that emergency motion.[1]

## ARGUMENT

All four considerations governing whether the Court should stay the district court's preliminary injunction strongly favor the Commonwealth: (i) whether the Commonwealth has made a "strong showing" it will prevail on the merits; (ii) whether the

---

[1] Because of the irreparable harms it is experiencing, the Commonwealth informed the district court that it intended to seek relief in this Court no later than today. Mot. Stay, R.66, PageID#2417. The district court, however, set a longer briefing schedule. Text Order, R.68. To speed matters along, the Commonwealth waived its right to file a reply. Waiver, R.72, PageID#2456. As of this filing, the district court has yet to resolve the Commonwealth's June 29 emergency motion. This effectively denies the Commonwealth's requested relief and makes waiting any longer impracticable. *See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 992 F.3d 518, 521 n.2 (6th Cir. 2021); *see also Maryville Baptist, Inc. v. Beshear*, 957 F.3d 610, 612 (6th Cir. 2020) (granting emergency relief despite the district court having "not yet ruled"); *Commonwealth v. Beshear*, 981 F.3d 505, 508, 511 (6th Cir. 2020) (granting stay despite such relief not being sought in district court).

Commonwealth has established irreparable harm absent a stay; (iii) whether a stay will "substantially injure" other parties; and (iv) "where the public interest lies." *See Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted).

## I.    The Commonwealth will prevail on the merits.

### A.    The plaintiffs' parental-rights claim fails.

No one questions that "[p]arents possess a fundamental right to make decisions concerning the medical care of their children." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418 (6th Cir. 2019). But this is only a general right to make decisions among *legally available* medical treatments. More to the point, this general right does not supplant the role of Kentucky's General Assembly to examine the available medical evidence—even in areas of "medical and scientific uncertainty"—and reasonably conclude that certain treatments are not permitted. *See Gonzales v. Carhart*, 550 U.S. 124, 163 (2007); *see also Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905) (describing the "settled principle[]" that the States enjoy a police power to "protect the public health"). In fact, "limitations on parents' control over their children are particularly salient in the context of medical treatment." *Kanuszewski*, 927 F.3d at 419; *see also id.* at 419 n.12. So the district court could not have been more wrong to hold that the Commonwealth's recognition of a general constitutional right for parents "effectively concedes" that the plaintiffs' parental-rights claim will succeed. Mem. Op., R.61, PageID#2309.

As this Court has summarized, "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment . . . if the government has reasonably prohibited that type of treatment." *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 599 (6th Cir. 2013) (citation omitted); *see also Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 710–11 & n.18 (D.C. Cir. 2007). This rule applies with equal force in the parental-rights context. *Doe By & Through Doe v. Pub. Health Tr. of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983) ("[A parent]'s rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself."); *Pickup v. Brown*, 740 F.3d 1208, 1235–36 (9th Cir. 2013) (similar), *abrogated on other grounds by Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018). And as explained below, Kentucky's decision to prohibit puberty blockers and cross-sex hormones for children under SB 150 is not only reasonable, but it satisfies any level of scrutiny.

The parent plaintiffs' assertion of a substantive-due-process right also falls prey to the prohibition against framing the alleged right at too "high [of a] level of generality." *See Dobbs*, 142 S. Ct. at 2258. Properly framed, there is no fundamental right to obtain puberty blockers and cross-sex hormones for children under the circumstances addressed by SB 150. The district court did not even attempt to explain how such an alleged right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *See id.* at 2242 (citation omitted).

6

**B.   The plaintiffs' equal-protection claim fails.**

1. In the paradigmatic case about prohibited sex discrimination under the Equal Protection Clause, the Supreme Court considered the exclusion of women from an "incomparable military college." *United States v. Virginia*, 518 U.S. 515, 519 (1996). With Justice Ginsburg writing, the Court held that "official action denying rights or opportunities based on sex" is subject to intermediate scrutiny. *Id.* at 531, 533. Such scrutiny, the Court explained, is necessary when "official action . . . closes a door or denies an opportunity to women (or to men)." *Id.* at 532.

SB 150 could not be more different from the scheme in *Virginia*. Most notably, SB 150 applies equally to *both sexes*. The law prohibits medical providers from prescribing children of both sexes puberty blockers and cross-sex hormones to attempt to alter their appearance to that of the other sex. SB 150 § 4(2)(a)–(b). Put differently, no minor, regardless of sex, can obtain the prohibited treatments. As such, SB 150 does not "close[] a door or den[y an] opportunity" to just one of the sexes. *See Virginia*, 518 U.S. at 532. Rational-basis review therefore applies, *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 368 (6th Cir. 2002), which the challenged provisions readily satisfy.

2. The plaintiffs' counterarguments, many of which the district court sustained, cannot stand up to scrutiny.

First, the plaintiffs have argued, and the district court agreed, that SB 150 classifies based on sex because the challenged provisions prevent girls from doing something

that boys can, and vice versa. As the district court put it, "the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law." Mem. Op., R.61, PageID#2303 (citation omitted). But of course, only boys can take estrogen to try to change their male natal sex appearance to female, and only girls can take testosterone to try to change their female natal sex appearance to male. Biology, which gives rise to "enduring" "[p]hysical differences between men and women," *Virginia*, 518 U.S. at 533, therefore justifies that distinction. And the Supreme Court has squarely held that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)).

Stated differently, the Equal Protection Clause does not override the States' general authority to pass "health and safety measures" that relate to medical issues that affect only one sex. *See id.* After all, the States, Kentucky included, regularly pass such laws. *See, e.g.*, Ky. Rev. Stat. § 311.772 (abortion); Ky. Rev. Stat. § 311.715(2) (in-vitro fertilization); Ky. Rev. Stat. § 218A.274 (pregnancy); Ky. Rev. Stat. § 205.617(1)(c) (cervical cancer); Ky. Rev. Stat. § 217.105(2) (prostate gland disorders). So when dealing with laws like SB 150 that affect the sexes differently because of biology, a challenger faces a higher hurdle. In this context, the type of "[d]iscriminatory purpose" triggering

8

heightened scrutiny "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271–72 (1993) (citation and quotation marks omitted). No such invidious discrimination has been suggested here.

Second, the district court found that the reasoning of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), applies in the equal-protection context.[2] But *Bostock* arose in the employment context, and it interpreted Title VII, not the Equal Protection Clause. As this Court has held, "*Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). More to the point, "the rule in *Bostock* extends no further than Title VII." *Id.*; *see also Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing en banc) ("The Fourteenth Amendment predates Title VII by nearly a century, so there is reason to be skeptical that its protections reach so far.").

---

[2] *Bostock*'s author recently threw cold water on this argument by distinguishing a differently worded non-discrimination provision (Title VI) from the Equal Protection Clause. *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard College*, --- S. Ct. ---, 2023 WL 4239254, at *59 (U.S. June 29, 2023) (Gorsuch, J., concurring) ("That such differently worded provisions should mean the same thing is implausible on its face.").

9

On top of that, *Bostock*'s reasoning does not translate to the medical context, where males and females are not always similarly situated. In short, while "[a]n individual's homosexuality or transgender status is not relevant to employment decisions," *Bostock*, 140 S. Ct. at 1741, an individual's sex very often matters to medical decisions. If the Court were to extend *Bostock*'s statutory reasoning to the equal-protection context, it would all but nullify the recognition—reaffirmed in *Dobbs*, 142 S. Ct. at 2245–46—that regulating a procedure or treatment that only one sex can undergo is generally not sex discrimination.

Third, the district court held that sex-stereotype decisions like *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004) (employer firing an employee for "not being masculine enough"), apply here. But SB 150 has nothing to do with sex "stereotype[s], defined as a frame of mind resulting from irrational or uncritical analysis." *See Tuan Anh Nguyen v. INS*, 533 U.S. 53, 68 (2001). Biological differences between the sexes are "not a stereotype." *See id.* SB 150 concerns "enduring" "[p]hysical differences between men and women" that "remain cause for celebration." *Virginia*, 518 U.S. at 533. In effect, it is the plaintiffs who are trying to perpetuate sex stereotypes. They believe that when a child behaves in a sex-stereotypical way, there is a constitutional right to be given physically and mentally life-changing drugs to attempt to change the child's sex. Sex-stereotype decisions like *Smith* do not require this result.

3. Alternatively, the plaintiffs argued below that SB 150 discriminates based on transgender status, which they believe is a quasi-suspect classification afforded intermediate scrutiny.[3]

For starters, SB 150 does not distinguish based on transgender status. Not all transgender minors wish to receive puberty blockers or cross-sex hormones to attempt to change their sex. Levine Decl., R.47-11, PageID#1300–01. And no minor, transgender or not, can be prescribed those drugs to attempt to become the opposite sex. Resp. Pls.' Mot. PI, R.47, PageID#502 n.2 (outlining individuals who might fall into this category). So there is a "lack of identity" between transgender status and the prohibited use of drugs, which precludes application of heightened scrutiny. *See Geduldig*, 417 U.S. at 496 n.20; *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–72 (1979) ("Most laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law. . . . [U]neven effects upon particular groups within a class are ordinarily of no constitutional concern.").

The plaintiffs attempted below to use a four-factor test to establish protected-class status. Pls.' Mot. PI, R.17, PageID#130–32. That effort runs into binding precedent. *See Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015) ("[T]he [Supreme] Court has never defined a suspect or quasi-suspect class on anything other than a trait

---

[3] The district court did not reach this alternative argument. Mem. Op., R.61, PageID#2303 n.5.

that is definitively ascertainable at the moment of birth, such as race or biological gender."); *see also Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.5 (11th Cir. 2022) (en banc) ("[W]e have grave 'doubt' that transgender persons constitute a quasi-suspect class."). In addition, the plaintiffs can provide no reason to conclude that discrimination based on transgender status is more pervasive than that based on sexual orientation, to which only rational-basis review applies. *Ondo*, 795 F.3d at 609; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (holding that discrimination based on mental disability is not a quasi-suspect class despite "[d]oubtless" discrimination that was "in fact invidious"). And on this record, it is hard to believe that political powerlessness is associated with transgender status. Indeed, below the United States filed a brief in support of the plaintiffs, Statement of Interest, R.37, PageID#427–46, as did more than a dozen interest groups, Interest Group Amicus Br., R.19-2, PageID#319–38.

4. At best, the challenged provisions classify based on age and medical procedure, both of which receive only rational-basis review. *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018) (age); *Vacco v. Quill*, 521 U.S. 793, 800–01 (1997) (medical procedure). SB 150 prohibits only minors, not adults, from receiving drugs and only for the purpose of attempting to alter the minor's sex. And the plaintiffs have admitted—correctly— that puberty blockers and cross-sex hormones can be used for reasons other than attempting to alter a minor's sex. Pls.' Mot. PI, R.17, PageID#129; *see also* Laidlaw Decl., R.47-10, PageID#1209–28 (establishing as much). SB 150 thus classifies based on the use of drugs, not on who is using them.

12

In any event, Sections 4(2)(a)–(b) of SB 150 satisfy *any* level of constitutional scrutiny. To start, no one can dispute that Kentucky has a "compelling governmental interest in the protection of children," *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006), an interest "in protecting vulnerable groups . . . from abuse, neglect, and mistakes," *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997), and an interest "in protecting the integrity and ethics of the medical profession," *id.* So the only question is whether the challenged provisions sufficiently serve those interests. They do.

Those advocating for what they call "gender-affirming care" argue that without it children will have higher rates of anxiety, depression, and suicidality. Pls.' Mot. PI, R.17, PageID#119. That is wrong.[4] At the very least, it is vigorously disputed. As this issue is studied more, a consensus is emerging that such care is "experimental." Resp. Pls.' Mot. PI Ex. 1, R.47-1, PageID#518; Resp. Pls.' Mot. PI Ex. 2, R.47-2, PageID#526; Resp. Pls.' Mot. PI Ex. 3, R.47-3, PageID#539; Resp. Pls.' Mot. PI Ex. 4, R.47-4, PageID#545; Cantor Decl., R.47-9, PageID#1016–25, 1040–48, 1082–87; Laidlaw Decl., R.47-10, PageID#1246–48; *see also* Resp. Pls.' Mot. PI, R.47, PageID#491, 507–08. Even the primary interest groups that advocate for such treatment—WPATH, the Endocrine Society, and the American Academy of Pediatrics—

---

[4] Although the district court thought otherwise, at the stay stage the Court undertakes de novo review. *Priorities USA v. Nessel*, 978 F.3d 976, 982 (6th Cir. 2020). In any event, because the district court did not hold an evidentiary hearing, this Court is reviewing a cold record—the same as the district court. As a result, the Court is "in as good a position as the district judge." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995).

have recognized the evidentiary limitations supporting its efficacy. Cantor Decl., R.47-9, PageID#1049–54, 1074, 1084–87, 1111–16; Levine Decl., R.47-11, PageID#1304–13; Resp. Pls.' Mot. PI Ex. 6, R.47-6, PageID#700. So do many others. Cantor Decl., R.47-9, PageID#1013–54, 1076–97, 1111–37; Levine Decl., R.47-11, PageID#1283–84, 1297–1313, 1328–40, 1352–53, 1360–66; Laidlaw Decl., R.47-10, PageID#1208, 1220, 1231–42, 1256–57; Nangia Decl., R.47-12, PageID#1429–30, 1467–70; Resp. Pls.' Mot. PI, R.47, PageID#510.

In fact, record evidence shows that such treatments have the opposite effect— they lead to *higher* rates of mental illness and suicide. Levine Decl., R.47-11, PageID#1283–84, 1297–1313, 1331–46, 1361–63; Laidlaw Decl., R.47-10, PageID#1221, 1225, 1241–42; Cantor Decl., R.47-9, PageID#1020, 1070–80, 1088–97, 1104–10; Resp. Pls.' Mot. PI, R.47, PageID#492. Not only that, such care leads to physical and mental-health problems, many of which are irreversible, and many of which would have never befallen the child but for such treatment. Cantor Decl., R.47-9, PageID#1098–1110; Laidlaw Decl., R.47-10, PageID#1204, 1211–28, 1243–44, 1247, 1256–57; Levine Decl., R.47-11, PageID#1283–84, 1290, 1324–25, 1327–28, 1331, 1341–52; Resp. Pls.' Mot. PI Ex 7, R.47-7, PageID#926–65.

All of this shows that there is not an agreed-upon standard of care for treating children with gender dysphoria. Levine Decl., R.47-11, PageID#1282, 1300–13. And importantly, alternative treatments exist if one recognizes that gender dysphoria desists

in most children, unless the first step of gender-affirming care (social affirmation) occurs—then the odds are flipped. Cantor Decl., R.47-9, PageID#1059–63, 1065–68; Levine Decl., R.47-11, PageID#1282–83, 1297–1300, 1317, 1320–28, 1331, 1361–63; Laidlaw Decl., R.47-10, PageID#1207–09, 1243–44, 1256. Psychotherapy is an effective alternative form of treatment, so much so that other countries are prioritizing it. Levine Decl., R.47-11, PageID#1293–1300, 1306, 1308–09, 1358–64; Nangia Decl., R.47-12, PageID#1410, 1426–37, 1471–85, 1491–96; Cantor Decl., R.47-9, PageID#1016, 1032, 1035, 1061–62, 1076–80, 1088–97; Laidlaw Decl., R.47-10, PageID#1247; Resp. Pls.' Mot. PI, R.47, PageID#507–08, 511–12.

True, several interest groups disagree.[5] Interest Group Amicus Br., R.19-2, PageID#319–38. And the district court more or less adopted their views. Mem. Op., R.61, PageID#2307–08. The court, however, overlooked that Kentucky's legislature, not interests groups, makes such health and welfare decisions on behalf of Kentuckians. Kentucky's General Assembly has "wide discretion" to pass health and welfare legislation "in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163. More to the point, although "the position of the American Medical Association" and other interest groups may be relevant to a "legislative committee," their views do

---

[5] The record below gives ample reason to question the views of these interest groups. Levine Decl., R.47-11, PageID#1304–13, 1324–25, 1358–60; Cantor Decl., R.47-9, PageID#1013–14, 1084–87; Laidlaw Decl., R.47-10, PageID#1207, 1231–41; *see also* Resp. Pls.' Mot. PI, R.47, PageID#491, 511; Family Research Council Amicus Br., R.49-2, PageID#1591–1615; States Amicus Br., R.51-1, PageID#1638–43.

not "shed light on the meaning of the Constitution." *See Dobbs*, 142 S. Ct. at 2267. As this Court has held, Kentucky need not "surrender its authority to regulate" to protect its citizens simply because of what some "private party claims is the norm for the practice of medicine." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 439 (6th Cir. 2019). If the plaintiffs' favored interest groups want their views enshrined in Kentucky law, "they should address their arguments to [Kentucky's] elected representatives." *See id.*

## II.    The other factors support a stay.

1. The district court's preliminary injunction against enforcing SB 150 irreparably harms Kentucky and its citizens—its children in particular. Indeed, whenever "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (citation omitted); *see also Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1010–11 (2022). And as a matter of Kentucky law, it is Kentucky's Attorney General who represents those interests in court. *Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin*, 498 S.W.3d 355, 363 (Ky. 2016); *see also* Ky. Rev. Stat. § 15.020.

2. As to whether a stay will substantially harm others, the plaintiffs will argue that being unable to take puberty blockers and cross-sex hormones will harm them. *See* Mem. Op., R.61, PageID#2311 (adopting this argument). Two points in response.

16

First, Kentucky's General Assembly has decided on behalf of Kentuckians that what actually harms children is taking puberty blockers and cross-sex hormones in an attempt to change their sex. That decision is the legislature's to make despite the existence of "medical and scientific uncertainty." *See Gonzales*, 550 U.S. at 163. In fact, "[c]onsiderations of marginal safety, including the balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends." *See id.* at 166. In light of the extensive evidence catalogued above, it cannot be said that Kentucky's legislature acted unreasonably by determining that prohibiting puberty blockers and cross-sex hormones for transition treatments protects Kentucky's children.

Second, Kentucky's medical profession can manage children's health in ways other than prescribing puberty blockers and cross-sex hormones. Levine Decl., R.47-11, PageID#1293–1300, 1306–09, 1358–60, 1362–64; Nangia Decl., R.47-12, PageID#1410, 1426–37, 1475–85, 1492–96; Cantor Decl., R.47-9, PageID#1016, 1032, 1035, 1061–62, 1076–80, 1088–97; Laidlaw Decl., R.47-10, PageID#1247–56. In addition, for those plaintiffs currently using puberty blockers or cross-sex hormones, SB 150 contains an express carve-out allowing a "health care provider [to] institute a period during which the minor's use of the [drugs] is systematically reduced." SB 150 § 4(6).

3. As to the public interest, it favors "giv[ing] effect to the will of the people 'by enforcing the laws they and their representatives enact.'" *Thompson*, 976 F.3d at 619 (citation omitted). All the more so given the need—found by Kentucky's legislature in

passing SB 150—to protect Kentucky's children from experimental procedures with long-term, irreversible consequences.

## III.    The preliminary injunction is overbroad.

Even if the Court declines to stay the preliminary injunction in its entirety, it should at least stay the injunction as to non-parties.

The only parties who sought a preliminary injunction are the named plaintiffs in this case—seven children and their parents. And not all of the plaintiff children are currently taking cross-sex hormones, puberty blockers, or a combination of the two. Compl., R.2., PageID#16. Even still, the district court issued a statewide preliminary injunction prohibiting enforcement of Sections 4(2)(a)–(b) of SB 150—full stop. Mem. Op., R.61, PageID#2312. This even though the plaintiffs did not bring a class-action suit. Compl., R.2, PageID#13–17. As a result, under the preliminary injunction, the challenged provisions of SB 150 cannot be enforced against health-care providers who provide cross-sex hormones or puberty blockers to *non-party children* even if those children have *never taken such drugs.*

At a minimum, the district court's overbroad injunction should be narrowed while this appeal proceeds. It is black-letter law that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). This means that a preliminary injunction must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) (citation omitted). A district court "abuse[s] its

discretion" when it "extend[s] the preliminary injunction's protection to non-part[ies]" when "an injunction limited to the parties" would do. *Id.*; *see also Warshak v. United States*, 532 F.3d 521, 531 (6th Cir. 2008) ("Nor . . . was it appropriate … to grant a preliminary injunction in favor of persons other than [the plaintiff]. . . . [The plaintiff] did not seek class-action relief, and he has made no showing . . . why the injunction needed to run in favor of other individuals in order to protect him." (citation omitted)).

A preliminary injunction limited to only the plaintiffs gives them "complete relief" while this litigation proceeds. *See Biden*, 57 F.4th at 557. There is no record evidence establishing that a party-specific injunction will somehow limit the plaintiffs' ability to receive puberty blockers or cross-sex hormones in violation of SB 150. "[P]ure speculation" in this respect is not enough. *See id.* Yet the plaintiffs provided no evidence that Kentucky healthcare providers will provide prohibited treatment to them only if they can provide such treatment to all Kentucky children.[6]

## CONCLUSION

The Court should stay the district court's preliminary injunction pending appeal.

---

[6] In issuing a statewide injunction, the district court relied on the Eighth Circuit's non-binding decision in *Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022). But unlike there, Kentucky has offered "a more narrowly tailored injunction that would remedy Plaintiffs' injuries." *See id.* at 672. Even still, the Eighth Circuit's reasoning cannot be reconciled with this Court's case law about the proper scope of injunctions. *See Biden*, 57 F.4th at 557; *Warshak*, 532 F.3d at 531.

Respectfully submitted by,

*s/ Alexander Y. Magera*
Daniel Cameron                                    Office of the Kentucky Attorney General
 *Attorney General of Kentucky*        700 Capital Avenue, Suite 118
Victor B. Maddox                                Frankfort, Kentucky 40601
 *Deputy Attorney General*              (502) 696-5300
Matthew F. Kuhn                              Alexander.Magera@ky.gov
 *Solicitor General*
Alexander Y. Magera                       *Counsel for the Commonwealth of Kentucky*
 *Assistant Solicitor General*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation in Fed. R. App. P. 27(d)(2)(A) because it contains 4,942 words. This motion also complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(6) because it has been prepared in 14-point Garamond font using Microsoft Word.

*s/ Alexander Y. Magera*

## CERTIFICATE OF SERVICE

I certify that on July 7, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Alexander Y. Magera*

**ADDENDUM**

Exhibit 1    Kentucky Senate Bill 150

Exhibit 2    Opinion & Order, R.61, PageID#2299–2313

Exhibit 3    Notice of Appeal, R.65, PageID#2415–16

Exhibit 4    Resp. Pls.' Mot. PI, R.47, PageID#490–516

Exhibit 5    Declaration of James M. Cantor, PhD, R.47-9, PageID#1004–193

Exhibit 6    Declaration of Michael K. Laidlaw, M.D., R.47-10, PageID#1194–1275

Exhibit 7    Declaration of Stephen B. Levine, M.D., R.47-11, PageID#1276–1405

Exhibit 8    Declaration of Geeta Nangia, M.D., R.47-12, PageID#1406–1512

Exhibit 9    Declaration of Layla Jane, R.47-15, PageID#1526–31

Exhibit 10   Declaration of E.G., R.47-15, PageID#1536–40

Exhibit 11   Declaration of E.T., R.47-18, PageID#1541–43