No. 23-5609

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

◆

JANE DOE, et al.,
*Plaintiffs/Appellees*,

v.

WILLIAM C. THORNBURY, JR., et al.,
*Defendants*,

&

COMMONWEALTH OF KENTUCKY, ex rel. Attorney General Daniel Cameron,
*Intervenor-Defendant/Appellant.*

◆

On Appeal from the U.S. District Court for the Western District of Kentucky
Case No. 3:23-cv-230

BRIEF OF *AMICI CURIAE* STATES OF ALABAMA, ARKANSAS, ALASKA, FLORIDA, GEORGIA, IDAHO, INDIANA, IOWA, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, NORTH DAKOTA, OHIO, SOUTH CAROLINA, TEXAS, UTAH, SOUTH DAKOTA, AND WEST VIRGINIA IN SUPPORT OF KENTUCKY'S MOTION TO STAY INJUNCTION PENDING APPEAL

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*

OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

*Additional Counsel Listed on Signature Page*

## CORPORATE DISCLOSURE STATEMENT

As governmental parties, amici are not required to file a certificate of interested persons. Fed. R. App. P. 26.1(a).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF CONTENTS............................................................ ii

TABLE OF AUTHORITIES ................................................... iii

INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT ..............1

ARGUMENT .....................................................................3

I.     Rational-Basis Review Applies Because SB 150 Classifies
Based On Procedure, Not Sex .............................................3

II.    Even If Heightened Scrutiny Applied, The District Court Erred
By Deferring To Plaintiffs' Preferred Medical Interest Groups ..........7

CONCLUSION ..................................................................12

CERTIFICATE OF COMPLIANCE........................................14

CERTIFICATE OF SERVICE ..............................................15

# TABLE OF AUTHORITIES

## Cases

*Abigail All. For Better Access to Development Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007)...............................................................................1

*Adams v. Sch. Bd. of St. John's Cnty.*,
57 F.4th 791 (11th Cir. 2022) (en banc) ...............................................................7

*Boe v. Marshall*,
No. 2:22-cv-184-LCB (N.D. Ala.).........................................................................8

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020).........................................................................................6, 7

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022)...................................................................................1, 2, 4

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
920 F.3d 421 (6th Cir. 2019) ................................................................................7

*Gibson v. Collier*,
920 F.3d 212, 221 (5th Cir. 2019) ........................................................................9

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014)....................................................................................9

*McMain v. Peters*,
2018 WL 3732660 (D. Or. Aug. 2, 2018) ............................................................4

*Titus v. Aranas*,
2020 WL 4248678 (D. Nev. June 29, 2020)..........................................................5

## STATUTES

18 U.S.C. § 116..........................................................................................................2

## OTHER AUTHORITIES

Anna Smith Haghighi, *What To Know About Estrogen in Men*,
Medical News Today (Nov. 9, 2020), https://perma.cc/B358-S7UW ................6

Azeen Ghorayshi, *Britain Limits Use of Puberty-Blocking Drugs to
Research Only*, N.Y. Times (June 9, 2023),
https://perma.cc/Z74M-ED6R ...........................................................................11

Claire Sissions, *Typical Testosterone Levels in Males and Females*,
Medical News Today (Jan. 6, 2023), https://perma.cc/M98N-4WG4 ................6

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. Times Magazine
(June 15, 2022), https://perma.cc/ZMT2-W6DX ..................................................9

Jayne Leonard, *What Causes High Testosterone in Women?*,
Medical News Today (Jan. 12, 2023), https://perma.cc/BT38-L79X ................6

Jennifer Block, *Gender dysphoria in young people is rising—and so is
professional disagreement*, The BMJ (Feb. 23, 2023),
https://perma.cc/QKB6-5QCR...........................................................................8

Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is
Unsafe, Says Review*, The BMJ (Mar. 23, 2023),
https://perma.cc/9FQF-MJJ9 ........................................................................... 11

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious
Transgender Science*, Wall St. Journal (Apr. 17, 2022).......................................8

Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and
Adolescents with Hypogonadism*, 32 J. Pediatric & Adolscent Gynecology
460 (2019), https://perma.cc/WU36-5889............................................................6

Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV .......................3, 5

Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review:
Gender-affirming hormones for children and adolescents with gender
dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ..............................10

Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review:
Gonadotrophin releasing hormone analogues for children and
adolescents with gender dysphoria*, (Mar. 11, 2021),
https://perma.cc/93NB-BGAN ....................................................................5, 10

NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4.............................................5

Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT..................10, 11

Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, Wall St. Journal (June 28, 2023) ...........................8

Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3 ......................................10, 11

Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X ............................................................................9

WPATH, Standards of Care 8, https://perma.cc/4MK2-HVBB...............................9

**INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT**

Amici curiae are the States of Alabama, Arkansas, Alaska, Florida, Georgia, Idaho, Indiana, Iowa, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Texas, Utah, and West Virginia. From the Founding, States have exercised their authority to enact health and safety measures—regulating the medical profession, restricting access to potentially dangerous medicines, banning treatments that are unsafe or unproven. *See Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703-05 (D.C. Cir. 2007). Yet when Kentucky sought to exercise its longstanding power to prohibit experimental and harmful transitioning treatments for minors, it was quickly enjoined. Rather than accord the Commonwealth's "health and welfare law[]" a "strong presumption of validity," *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228, 2284 (2022) (citation omitted), the district court found that the law was subject to, and failed to withstand, heightened scrutiny. Op., R.61, PageID#2303.

This ruling was wrong for many reasons, but two stick out. *First*, the court assumed that heightened scrutiny applies whenever "the minor's sex at birth determines whether or not the minor can receive certain types of medical care." *Id.* (citation omitted). Under such logic, a public hospital's decision to offer testicular exams only to boys would be subject to heightened scrutiny. Same if it offers c-sections

only to women. The Constitution does not require such absurdities. "The regulation of a medical procedure that only one sex can undergo" generally "does not trigger heightened constitutional scrutiny.'" *Dobbs*, 142 S.Ct. at 2245-46 (cleaned up). No special blessing from a court is needed before enforcing a ban on female genital mutilation, for instance. *See* 18 U.S.C. §116.

Transitioning surgeries work the same way. Only females can undergo an oophorectomy (removal of the ovaries); only males an orchiectomy (removal of the testicles). The same is true for transitioning treatments that rely on sex hormones rather than removal of sex organs. Testosterone can be a transitioning treatment *only* for females. The same drug may be used in *other* procedures for males, but no amount of testosterone will cause a male to transition. The inverse is true of transitioning treatments based on estrogen: only males can receive estrogen transitioning treatments. As for puberty blockers taken for transitioning, the laws treat both sexes the same: neither male nor female minors may be prescribed puberty blockers for transitioning. Rational-basis review applies.

*Second*, even if heightened scrutiny applied, the district court erred by deferring to medical interest groups to set the constitutional standard of care. While "the position of the American Medical Association" and other interest groups may be relevant to a "legislative committee," it does not "shed light on the meaning of the Constitution." *Dobbs*, 142 S.Ct. at 2267. And there is particular reason to be

suspicious of the interest groups the court relied on. While healthcare authorities in Europe have recently curbed access to transitioning treatments for minors in response to literature reviews showing that the risks of such treatments outweigh their benefits, American organizations have run in the opposite direction: advocating unfettered access to transitioning treatments while quashing members' calls for a review of the evidence.

## ARGUMENT

### I.      Rational-Basis Review Applies Because SB 150 Classifies Based On Procedure, Not Sex.

The district court concluded that SB 150 is a sex-based classification warranting heightened scrutiny because the law "bar[s] access to treatment for some patients but not others depending on the patient's sex." Op., R.61, PageID#2305; *see id.* PageID#2303. But this reasoning breaks down the moment one considers what the "treatment" at issue is—or, more accurately, what those treatments *are*, for there are three of them.

The first is puberty blocker transitioning treatment. Puberty blockers work the same way in males and females. Sex has no bearing on their prescription or dosage, whether for treating precocious puberty or for transitioning.[1] Thus, banning their use

---

[1] *See* Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars Sinai (Jan. 16, 2023), https://perma.cc/H83F-4ZR7; Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV (last visited May 12, 2023).

in gender-transition procedures doesn't draw any line based on sex. Girls and boys are treated identically: both may receive puberty blockers to treat precocious puberty, but not to transition. Accordingly, rational-basis review applies.

The second treatment is testosterone transitioning treatment. Unlike puberty blockers, testosterone transitioning treatments can be used *only* in females. That is, giving testosterone to a female can be a transitioning treatment because it will lead to male characteristics (i.e., lead to transitioning), while giving testosterone to a male will not lead to female characteristic (i.e., will not lead to transitioning).

The third treatment is estrogen transitioning treatment, which works the inverse as testosterone transitioning treatment. It can be given only to males to transition. Testosterone transitioning treatments and estrogen transitioning treatments are thus "medical procedure[s] that only one sex can undergo," *Dobbs*, 142 S.Ct. at 2245-46—same as abortions or testicular exams—so rational-basis review applies.

It does not matter that Kentucky allows these drugs for some uses but not others. The distinctions Kentucky drew make sense because the different uses of the drugs have different diagnoses and diagnostic criteria, different goals, and different risks. This is normal—States routinely allow drugs to be used for some treatments (morphine to treat a patient's pain) but not for others (morphine to assist a patient's suicide). *E.g.*, *McMain v. Peters*, 2018 WL 3732660, at *4 (D. Or. Aug. 2, 2018) (prisoner seeking testosterone for PTSD not similarly situated to prisoner with

Klinefelter Syndrome); *Titus v. Aranas*, 2020 WL 4248678, at *6 (D. Nev. June 29, 2020) (prisoner seeking testosterone to treat low levels not similarly situated to female prisoner taking testosterone to transition).

Consider puberty blockers again. Puberty blockers are ordinarily prescribed to treat precocious puberty, in which a child begins puberty at an unusually early age.[2] But precocious puberty is a physical abnormality that can be diagnosed through medical tests,[3] not a subjective "internal sense" that cannot be measured. Indeed, the goal of using puberty blockers to treat precocious puberty is to ensure children develop at "the normal age of puberty"[4]—the exact opposite goal as when doctors use them to treat gender dysphoria by halting normal puberty. This distinction alters the risk calculus as well: because doctors prescribe blockers to dysphoric children well beyond the normal age, using puberty blockers to treat gender dysphoria may risk diminished bone growth and social development.[5]

The same distinctions exist between uses of hormones barred by SB 150 and uses that are not. Males and females normally have very different amounts of

---

[2] Mayo Clinic, *Precocious Puberty*, *supra*.

[3] *See* NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 (last visited May 12, 2023).

[4] Mayo Clinic, *Precocious Puberty*, *supra*.

[5] *See* Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria*, (Mar. 11, 2021), https://perma.cc/93NB-BGAN, at 26-32 ("NICE Puberty Blocker Evidence Review").

naturally occurring testosterone or estrogen.[6] And these hormones serve very different purposes in the different sexes. In females, excess testosterone can *cause* infertility[7]; in males, testosterone is prescribed to *alleviate* fertility problems.[8] The inverse is true of estrogen. When prescribed at an excess level to males, estrogen can *cause* infertility and sexual dysfunction[9]; for females, estrogen is usually prescribed to *treat* problems with sexual development.[10] Raising a child's hormone levels to a normal range is not the same procedure as raising them to abnormally high levels. There is no sex-based classification.

Nor does *Bostock* say otherwise, as the district court thought. Op., R.61, PageID#2303-04 (citing *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1741 (2020)). Even if *Bostock*'s reasoning applied to the Equal Protection Clause (which it doesn't), because Kentucky's restrictions do not operate based on sex, it is *not* true that but for a child's sex he or she could be given sterilizing transitioning treatments

---

[6] *E.g.*, Claire Sissions, *Typical Testosterone Levels in Males and Females*, Medical News Today (Jan. 6, 2023), https://perma.cc/M98N-4WG4.

[7] Jayne Leonard, *What Causes High Testosterone in Women?*, Medical News Today (Jan. 12, 2023), https://perma.cc/BT38-L79X.

[8] Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. Endocrine Society 1, 2 (2021), https://perma.cc/E3ZQ-4PZV.

[9] Anna Smith Haghighi, *What To Know About Estrogen in Men*, Medical News Today (Nov. 9, 2020), https://perma.cc/B358-S7UW.

[10] Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. Pediatric & Adolescent Gynecology 460 (2019), https://perma.cc/WU36-5889.

under the Act.[11] Because SB 150 distinguishes between different procedures, not between different sexes, *Dobbs* applies. And because SB 150's distinction is perfectly rational, SB 150 is perfectly constitutional.

## II.    Even If Heightened Scrutiny Applied, The District Court Erred By Deferring To Plaintiffs' Preferred Medical Interest Groups.

In addition to arriving at the wrong standard of review, the district court applied that standard incorrectly by blindly deferring to "major medical organization[s] in the United States" to find "that the puberty-blockers and hormones barred by SB 150 are established medical treatments." Op., R.61, PageID#2309. But the "official positions" of medical interest groups do not establish our constitutional standard, and for good reason. *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 438 (6th Cir. 2019). The medical interest groups that endorse gender-transition procedures are just that—interest groups, with a strong financial interest in promoting the procedures their members make a living by providing. And while these organizations claim to reflect the views of the medical community, there is growing evidence that this is far from true. *See* States' Amicus Br., R.64, PageID#2394-2399; FRC Amicus Br., R.63, PageID#2358-74.

---

[11] Moreover, even if the law did classify based on sex, that classification is tied to real biological differences, not stereotypes. *See Bostock*, 140 S.Ct. at 1749 (focusing on stereotypes, not biology). Such a classification is entirely permissible. *Adams v. Sch. Bd. of St. John's Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc) ("[A] policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status.").

Take the American Academy of Pediatrics (AAP), which has "decried" "as transphobic" a resolution by its members discussing "the growing international skepticism of pediatric gender transition" and calling for a literature review.[12] As AAP member Dr. Julia Mason concluded, "AAP has stifled debate" and "put its thumb on the scale … in favor of a shoddy but politically correct research agenda."[13] Similar concerns have been raised about the Endocrine Society,[14] whose guidelines for treating gender dysphoria the *British Medical Journal* recently exposed as having "serious problems" because—remarkably—the "systematic reviews" the guidelines were based on "didn't look at the effect of the interventions on gender dysphoria itself."[15]

Then there is WPATH, which describes itself as "an advocacy organization[]," *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.), ECF 208. Ample evidence shows just how true that statement is. In its latest edition of its Standards of Care, the organization decided against including a chapter on ethics, added a chapter on "Eunuchs" (for whom transitioning treatments are also purportedly medically necessary), and removed most minimum-age requirements for transitioning

---

[12] Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall St. Journal (Apr. 17, 2022).

[13] *Id.*

[14] *E.g.*, Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, Wall St. Journal (June 28, 2023).

[15] Jennifer Block, *Gender dysphoria in young people is rising—and so is professional disagreement*, The BMJ (Feb. 23, 2023), https://perma.cc/QKB6-5QCR.

hormones and surgeries.[16] According to the lead author of the chapter on children, this last change was made to "bridge th[e] considerations" regarding the need for insurance coverage with the desire to ensure that doctors would not be held liable for malpractice if they deviated from the standards.[17] WPATH has also suppressed dissent, including canceling the presentation of a prominent researcher who dared to question the safety and efficacy of transitioning young children and censuring a board member who went public with concerns that medical providers in America are transitioning minors without proper safeguards.[18] Because WPATH is an advocacy organization, not a neutral scientific body, the First and Fifth Circuits have found that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014).

The district court not only ignored that debate, but appeared to rely solely on the imprimatur of the interest groups to discount to zero the contrary findings of healthcare authorities in Europe. Op., R.61, PageID#2307 (finding that "the quoted studies from 'some European countries' questioning the efficacy of the drugs" do not "support[] banning the treatments" because that would be contrary to the "widely

---

[16] WPATH, Standards of Care 8, https://perma.cc/4MK2-HVBB.

[17] Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X.

[18] Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. Times Magazine (June 15, 2022), https://perma.cc/ZMT2-W6DX.

accepted standard of care"). But the findings of these healthcare authorities, based as they are on systematic evidence reviews, are far more trustworthy than the *ipse dixit* of self-interested medical organizations.

After completing two separate, comprehensive literature reviews—one on puberty blockers and one on cross-sex hormones—the UK's National Institute for Health and Care Excellence concluded that there are no "reliable comparative studies" on the "effectiveness and safety of [puberty blockers],"[19] and that the safety of cross-sex hormones was similarly unknown.[20] Sweden's National Board of Health and Welfare came to a similar conclusion, finding that "the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits."[21] The Council for Choices in Healthcare in Finland lamented that, "[a]s far as minors are concerned," "there are no medical treatment[s] [for gender dysphoria] that can be considered evidence-based."[22] And

---

[19] NICE Puberty Blocker Evidence Review, *supra*, at 12.

[20] Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG, at 14

[21] Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3.

[22] *See* Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT.

the Norwegian Healthcare Investigation Board (Ukom) found "insufficient evidence for the use of puberty blockers and cross sex hormone treatments in young people."[23]

As a result, these healthcare authorities have suggested curbing the availability of transitioning treatments to minors. On June 9, 2023, Britain's National Health Services issued an interim service specification that mandates the prioritization of psychological—not hormonal or surgical—care for the treatment of gender dysphoria in youth and allows consideration of puberty blockers *only* as part of a formal research protocol.[24] Sweden's National Board likewise restricted the use of transitioning treatments to strictly controlled research settings or "exceptional cases."[25] Finland's Council concluded that "no decisions should be made that can permanently alter a still-maturing minor's mental and physical development."[26] And Norway's Ukom defines transitioning treatments as "utprøvende behandling, or 'treatments under trial,'"—that is, experimental.[27]

Kentucky's similar weighing of the risks and benefits of transitioning treatments for minors, and its decision to ban those decisions while awaiting the results

---

[23] Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, The BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.

[24] *See* Azeen Ghorayshi, *Britain Limits Use of Puberty-Blocking Drugs to Research Only*, N.Y. Times (June 9, 2023), https://perma.cc/Z74M-ED6R.

[25] Socialstyrelsen, *supra*, at 3-4.

[26] Palveluvalikoima, *supra*.

[27] Block, *Norway's Guidance*, *supra*.

of the experiments starting to be conducted in Europe, easily survives heightened

scrutiny. The district court erred by concluding otherwise.

## CONCLUSION

The Court should stay the injunction.

Dated: July 7, 2023

Steve Marshall
  *Attorney General*
s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Respectfully submitted,

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*

OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Amici Curiae*

12

## ADDITIONAL COUNSEL

TREG TAYLOR
Attorney General
State of Alaska

AUSTIN KNUDSEN
Attorney General
State of Montana

ASHLEY MOODY
Attorney General
State of Florida

MICHAEL T. HILGERS
Attorney General
State of Nebraska

CHRIS CARR
Attorney General
State of Georgia

DREW H. WRIGLEY
Attorney General
State of North Dakota

RAÚL R. LABRADOR
Attorney General
State of Idaho

DAVE YOST
Attorney General
State of Ohio

THEODORE E. ROKITA
Attorney General
State of Indiana

ALAN WILSON
Attorney General
State of South Carolina

BRENNA BIRD
Attorney General
State of Iowa

MARTY JACKLEY
Attorney General
State of South Dakota

JEFF LANDRY
Attorney General
State of Louisiana

JOHN SCOTT
Provisional Attorney General
State of Texas

LYNN FITCH
Attorney General
State of Mississippi

SEAN REYES
Attorney General
State of Utah

ANDREW BAILEY
Attorney General
State of Missouri

PATRICK MORRISEY
Attorney General
State of West Virginia

## CERTIFICATE OF COMPLIANCE

1. I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2,577 words.

2. In addition, pursuant to Fed. R. App. P. 32(g)(1), this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated:  July 7, 2023

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on July 7, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to any CM/ECF participants.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amici Curiae*
