Case No. 23-5609

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

JANE DOE 1, *et al.*

*Plaintiffs-Appellees*

v.

WILLIAM C. THORNBURY, JR.,
in his official capacity, *et al.*

*Defendants-Appellees*

and

COMMONWEALTH OF KENTUCKY *ex rel.*
ATTORNEY GENERAL DANIEL CAMERON

*Intervening Defendant-Appellant*

_____

On Appeal from the U.S. District Court for the
Western District of Kentucky, No. 3:23-cv-230

_____

# COMMONWEALTH OF KENTUCKY'S RESPONSE TO
# MOTION FOR STAY PENDING APPEAL

_____

Daniel Cameron
 *Attorney General of Kentucky*
Victor B. Maddox
 *Deputy Attorney General*
Matthew F. Kuhn
 *Solicitor General*
Alexander Y. Magera
 *Assistant Solicitor General*

Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Alexander.Magera@ky.gov

*Counsel for the Commonwealth of Kentucky*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

ARGUMENT ....................................................................................................... 4

    I.    The Commonwealth will prevail on the merits. .................................. 4

        A.  The preliminary injunction is overbroad. ....................................... 4

        B.  The plaintiffs have not made a clear showing on the merits. ......... 5

    II.   The remaining factors cut against the plaintiffs. .............................. 15

CONCLUSION .................................................................................................. 18

CERTIFICATE OF COMPLIANCE .................................................................. 19

CERTIFICATE OF SERVICE ........................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach,*
   495 F.3d 695 (D.C. Cir. 2007) (en banc) ........................................................8

*Baker v. Adams Cnty./Ohio Valley Sch. Bd.,*
   310 F.3d 927 (6th Cir. 2002) ........................................................................5

*Brandt v. Rutledge,*
   No. 21-2875, 2022 WL 16957734 (8th Cir. Nov. 16, 2022) ..........................10

*Bostock v. Clayton Cnty.,*
   140 S. Ct. 1731 (2020) ............................................................................ 9, 10

*Cameron v. Beshear,*
   628 S.W.3d 61 (Ky. 2021) ...........................................................................17

*Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin,*
   498 S.W.3d 355 (Ky. 2016) ..........................................................................18

*Commonwealth v. Biden,*
   57 F.4th 545 (6th Cir. 2023) ..........................................................................4

*Connection Distrib. Co. v. Reno,*
   154 F.3d 281 (6th Cir. 1998) .........................................................................6

*D.T. v. Sumner Cnty. Schs.,*
   942 F.3d 324 (6th Cir. 2019) .........................................................................6

*Dobbs v. Jackson Women's Health Org.,*
   142 S. Ct. 2228 (2022) ............................................................................ 8, 15

*EMW Women's Surgical Ctr., P.S.C. v. Beshear,*
   920 F.3d 421 (6th Cir. 2019) .......................................................................15

*Geduldig v. Aiello,*
   417 U.S. 484 (1974) ....................................................................................10

*Gonzales v. Carhart,*
   550 U.S. 124 (2007) ........................................................................... 8, 15, 17

*J.E.B. v. Ala. ex rel. T.B.,*
   511 U.S. 127 (1994) ....................................................................................11

*Kottmyer v. Maas,*
    436 F.3d 684 (6th Cir. 2006) .........................................................................12

*L.W. ex rel. Williams v. Skrmetti,*
    --- F.4th ---, 2023 WL 4410576 (6th Cir. July 8, 2023) ...........................*passim*

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .......................................................................................7

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ...........................................................................9

*Nken v. Holder,*
    556 U.S. 418 (2009) .......................................................................................4

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ...........................................................................5

*Pelcha v. MW Bancorp, Inc.,*
    988 F.3d 318 (6th Cir. 2021) ...........................................................................9

*Performance Unlimited, Inc. v. Questar Publishers, Inc.,*
    52 F.3d 1373 (6th Cir. 1995) .........................................................................13

*Priorities USA v. Nessel,*
    978 F.3d 976 (6th Cir. 2020) .........................................................................13

*Smith v. City of Salem,*
    378 F.3d 566 (6th Cir. 2004) .........................................................................10

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    143 S. Ct. 2141 (2023) .................................................................................10

*Thompson v. DeWine,*
    976 F.3d 610 (6th Cir. 2020) .................................................................17, 18

*United States v. Virginia,*
    518 U.S. 515 (1996) .....................................................................................11

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) .....................................................................................12

*Washington v. Reno,*
    35 F.3d 1093 (6th Cir. 1994) ...........................................................................5

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008)...........................................................................................1

**Statutes**

42 U.S.C. § 2000e-2(a) ...................................................................................9

Ky. Rev. Stat. § 15.020 ..................................................................................18

Ky. Rev. Stat. § 311.372(2)(a)–(b) ....................................................2, 11, 16

Ky. Rev. Stat. § 311.372(6) ..........................................................................2, 6

**Other Authorities**

Ky. AG Op. 2023-03 .......................................................................................3

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ..........................................................................9

## INTRODUCTION

The same district court that awarded the plaintiffs a preliminary injunction gave them an opportunity to explain why *L.W. ex rel. Williams v. Skrmetti*, --- F.4th ---, 2023 WL 4410576 (6th Cir. July 8, 2023), does not require a stay of that injunction as to Kentucky's Senate Bill 150. After considering the plaintiffs' attempts to distinguish *L.W.*, the district court could not discern any dispositive distinction between this case and *L.W.* and accordingly stayed its own preliminary injunction pending appeal. Order, R.79, PageID#2494–96.

Having failed to convince a district judge that initially agreed with them, the plaintiffs now come to this Court seeking emergency relief. In a clear tell about what *L.W.* means for the merits of their claims, the plaintiffs begin their motion by arguing about irreparable harm, despite the fact that the likelihood of success on the merits is the factor that drives the result at this juncture. As *L.W.* put it, "the likelihood-of-success inquiry is the first among equals." 2023 WL 4410576, at *2. And on that crucial point, the plaintiffs simply relitigate *L.W.*'s clear holdings. No doubt, *L.W.* qualified that those holdings were "initial." *Id.* at *8. But nothing in the plaintiffs' motion comes close to establishing a "clear showing" that they are entitled to a stay. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). Plus, the plaintiffs relegate to a single paragraph the issue on which the *L.W.* panel was unanimous—that the *L.W.* injunction was overbroad. 2023 WL 4410576, at *3; *id.* at *10 (White, J., concurring in part and dissenting

in part). The same is undeniably true here. And the single paragraph in which the plaintiffs discuss this issue does not even mention the most applicable precedent from this Court.

This Court has already done the hard work of wading through these issues on an expedited timeline. The plaintiffs' attempt to relitigate them on yet another expedited timeline should fail. The Court has said it intends to rule on this case by September 30—just over two months from now. The plaintiffs cannot explain why they are entitled to a stay in the short time until then.

## BACKGROUND

SB 150 overwhelmingly passed Kentucky's General Assembly over Governor Andy Beshear's veto. Like the law considered in *L.W.*, SB 150 prohibits a health-care provider from providing puberty blockers and hormones to a minor "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex." Ky. Rev. Stat. § 311.372(2)(a)–(b). SB 150, however, allows some continuing treatments for minors who were receiving the prohibited treatments before the law took effect. Under this provision, a health-care provider "may institute a period during which the minor's use of the drug or hormone is systematically reduced." Ky. Rev. Stat. § 311.372(6). This provision does not set a hard end date for when such treatments must end.

SB 150 was slated to take effect on June 29. Ky. AG Op. 2023-03. On May 3, seven children and their parents sued to challenge SB 150 and thereafter sought a preliminary injunction. Compl., R.2, PageID#11–32; Mot. PI, R.17, PageID#115–39. Attorney General Daniel Cameron promptly intervened on behalf of the Commonwealth to defend SB 150. Mot. Intervene, R.16, PageID#80–86; Order, R.38, PageID#452–54.

The day before SB 150 was to take effect, the district court granted a statewide preliminary injunction blocking enforcement of the challenged provisions. Mem. Op., R.61, PageID#2299–2313. The next day, the Commonwealth appealed and filed an emergency motion to stay the preliminary injunction in district court. Notice of Appeal, R.65, PageID#2415–16; Mot. Stay, R.66, PageID#2417–32. When the district court did not promptly rule, the Commonwealth sought emergency relief in this Court. The next day, this Court issued *L.W.*

The Commonwealth immediately notified the district court of *L.W.* Notice, R.73, PageID#2458–59. The district court gave the plaintiffs a chance to explain how this case differs from *L.W.* Text Order, R.75. The plaintiffs tried to do so. Amended Response, R.77, PageID#2482–84. But they ultimately failed to convince the district court. On July 14, the district court stayed its preliminary injunction in full. In light of *L.W.*, the district court saw "no basis to deny the requested stay." Order, R.79, PageID#2495–96.

Four days later, the plaintiffs made their current motion.

# ARGUMENT

All four considerations governing whether the Court should stay the district court's order strongly favor the Commonwealth: (i) whether the plaintiffs have made a "strong showing" that they are likely to succeed on the merits; (ii) whether the plaintiffs have established irreparable harm absent a stay; (iii) whether a stay will substantially injure other parties; and (iv) the public interest. *See Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted).

## I.    The Commonwealth will prevail on the merits.

### A.    The preliminary injunction is overbroad.

The plaintiffs barely mention the part of *L.W.* on which the Court was unanimous: the overbroad scope of the injunction. *L.W.*, 2023 WL 4410576, at *3; *id.* at *10 (White, J., concurring in part and dissenting in part). There can be no dispute that the preliminary injunction the plaintiffs secured below is just like the overbroad one in *L.W.* As the district court put it, "[a] facial injunction is . . . appropriate." Mem. Op., R.61, PageID#2312.

The key case here is *Commonwealth v. Biden*, 57 F.4th 545 (6th Cir. 2023). The Commonwealth knows something about that case—this Court narrowed a preliminary injunction that Kentucky had won in district court that benefited non-parties. *Id.* at 557. Yet despite the majority and separate opinion in *L.W.* relying on *Biden*, the plaintiffs' emergency motion does not even mention it. The only case from this Court that the plaintiffs cite is *Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994). But the injunction there

4

reached non-parties because the injunction would have otherwise been "illusory in-deed" for the plaintiffs there. *Id.* at 1104. The plaintiffs do not even try to explain why a party-specific injunction here would make relief "illusory indeed" for them. More specifically, they have provided no evidence that Kentucky health-care providers will provide prohibited treatments to them only if they can provide such treatment to all Kentucky children. In short, no matter what the Court thinks of the plaintiffs' motion, there is no serious argument that they should be granted a full stay.

**B.    The plaintiffs have not made a clear showing on the merits.**

The plaintiffs essentially give away the game by starting their motion with a dis-cussion of irreparable harm. It is well-established that, when a constitutional violation is alleged, the likelihood of success on the merits "often will be the determinative fac-tor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citation omitted). Or as *L.W.* put it, that factor is "the first among equals." 2023 WL 4410576, at *2.

To justify their downplaying of the merits, the plaintiffs counter that a strong showing of irreparable harm can forgive a lackluster showing on the merits. The pub-lished authority they cite for this proposition is *Baker v. Adams County/Ohio Valley School Board*, 310 F.3d 927, 928 (6th Cir. 2002) (per curiam), which said that "[t]he strength of the likelihood of success on the merits that needs to be demonstrated is inversely pro-portional to the amount of irreparable harm that will be suffered if a stay does not issue." But *Baker* still requires "serious questions" on the merits. *Id.* And that decision predates *Winter*. The Supreme Court's language in *Winter* "seems clear—a plaintiff *must*

establish the [preliminary-injunction] factors." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 328 (6th Cir. 2019) (Nalbandian, J., concurring).

In any event, in constitutional cases like this one, the likelihood of success on the merits is often the determinative factor because the other preliminary-injunction factors usually flow from it. So it is here. The plaintiffs' theory of irreparable harm is based on the fact that they will have to decrease and eventually stop prohibited treatments as a result of SB 150. But Kentucky's General Assembly made the judgment that the continuing-treatment provision in Ky. Rev. Stat. § 311.372(6) suffices to protect the plaintiffs from any resulting harm. This shows that the plaintiffs' theory of irreparable harm inevitably depends on whether SB 150 is constitutional—their theory presumes that the Constitution prohibits enforcing SB 150. The Court's *L.W.* opinion recognized this very point: "In this instance, elected representatives made the precise cost-benefit decisions and did not trigger any reasons for skeptical review in doing so." *L.W.*, 2023 WL 4410576, at *8; *see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (making the same point in the First Amendment context). For this reason, the plaintiffs must make a "'clear showing' that they will succeed on the merits." *L.W.*, 2023 WL 4410576, at *8 (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). And as *L.W.* explains, the plaintiffs cannot do so.

**Substantive due process.** The plaintiffs' substantive-due-process arguments simply repackage those that the Court rejected in *L.W.* Nothing the plaintiffs say undermines *L.W.*'s bottom line that "[a]ll told, the plaintiffs' efforts to expand our substantive due process precedents to this new area are unlikely to succeed.*" Id.* at *6.

The plaintiffs first quibble with *L.W.*'s statement that "no Supreme Court case extends [substantive-due-process protection] to a general right to receive new medical or experimental drug treatments." *Id.* at *8. Instead of identifying such a Supreme Court case (or a Sixth Circuit one), the plaintiffs argue that the treatments prohibited by SB 150 are not new and experimental. The plaintiffs, however, cannot dispute that the FDA "is not prepared to put its credibility and careful testing protocols behind the use" of puberty blockers and hormones to treat gender dysphoria in minors. *Id.* at *5. The plaintiffs counter that in general the off-label use of prescription drugs is widespread. But as *L.W.* recognized, "the Constitution does not require [a State] to view these treatments the same way as the majority of experts or to allow drugs for all uses simply because the FDA has approved them for some." *Id.* In sum, the plaintiffs' argument does not lay a glove on *L.W.*'s reasoning.

The plaintiffs also object to *L.W.*'s reliance on the D.C. Circuit's decision in *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695 (D.C. Cir. 2007) (en banc). It's clear why the plaintiffs want to run from this decision. It conducted a careful review of our country's history and traditions, which is required in substantive-due-process cases, and held that "[o]ur Nation's history and traditions have

7

consistently demonstrated that the democratic branches are better suited to decide the proper balance between the uncertain risks and benefits of medical technology, and are entitled to deference in doing so." *Id.* at 713. The plaintiffs point out that in *Eschenbach* the FDA had not approved the drugs in question. But their motion offers nothing from our history and traditions to show why that difference matters. Without a historical hook, their substantive-due-process claim is bound to fail. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022) ("[T]he Court has long asked whether the right is deeply rooted in our history and tradition and whether it is essential to our Nation's scheme of ordered liberty." (cleaned up)). In any event, our history and traditions are against the plaintiffs. As *L.W.* pointed out, the States get to decide health-and-welfare matters even when "medical and scientific uncertainty exists." *L.W.*, 2023 WL 4410576, at *5 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007), and collecting cases).

**Equal protection.** The plaintiffs all but admit that *L.W.* is squarely against them on their equal-protection claim. So they offer that *L.W.* "did not adequately consider the full weight of controlling authority supporting [the plaintiffs'] equal protection claims." But the first two cases that the plaintiffs cite are ones that *L.W.* expressly considered. As *L.W.* explained, "*Bostock v. Clayton* does not change the analysis," and "*Smith v. City of Salem* does not move the needle either." 2023 WL 4410576, at *7. Consider each case (again).

*Bostock* is twice removed from this one. *Bostock* interpreted a federal statute, not the Equal Protection Clause. And *Bostock* arose in the employment context, not the

medical context. *Bostock* itself addressed the concern that "our decision will sweep beyond Title VII." 140 S. Ct. 1731, 1753 (2020). It emphasized that "[t]he only question before" the Court was the interpretation of Title VII. *Id.* Any other issues are "questions for future cases." *Id. Bostock*'s emphasis on this point cannot be missed. This Court has already gotten the not-so subtle hint. *Bostock*, this Court has held, "was clear on the narrow reach of its decision and how it was limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). More to the point, "the rule in *Bostock* extends no further than Title VII." *Id.*; *see also Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (reasoning that Title VII analysis does not apply to Title IX).

Aside from *Bostock*'s assurances, there are good reasons not to extend its statutory analysis to the Equal Protection Clause. The most obvious is that Title VII's text differs from that of the Equal Protection Clause. *Compare* 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex . . . ."), *with* U.S. Const. amend. XIV, § 1 ("No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."). In addition, "[t]he Fourteenth Amendment . . . predates Title VII by nearly a century, so there is reason to be skeptical that its protections reach so far." *Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing en banc). And if *Bostock* was clear about one thing, it was that Title VII's particular text drove the result. 140 S. Ct. at 1749. In fact, *Bostock*'s author recently made this point in an analogous context. Faced with an argument that

9

a differently worded statute (Title VI) means the same thing as the Equal Protection

Clause, Justice Gorsuch dismissed the contention as "implausible on its face." *Students

for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2220 (2023)

(Gorsuch, J., concurring).

*Bostock*'s reasoning also cannot apply in the medical context. In employment mat-

ters, Title VII means that "an individual's homosexuality or transgender status is not

relevant to employment decisions." *Bostock*, 140 S. Ct. at 1741. But that reasoning can-

not hold in the medical context, where males and females are not always similarly situ-

ated. If the Court were to extend *Bostock*'s statutory reasoning to the equal-protection

context, it would all but nullify the holdings from *Geduldig v. Aiello*, 417 U.S. 484, 496

n.20 (1974), and *Dobbs*, 142 S. Ct. at 2245–46, that regulating a procedure or treatment

that only one sex can undergo is generally not sex discrimination. That reality fully an-

swers the plaintiffs' cited precedent about the Equal Protection Clause being equivalent

to Title VII. Such simply cannot be true in the medical context in light of *Geduldig* and

*Dobbs*.

Now consider *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004). The plaintiffs

say that *Smith* broadly held that discrimination against a transgender person "is sex-

based discrimination for purposes of the Equal Protection Clause." But *L.W.* addressed

this argument fully. *Smith* "did not hold that every claim of transgender discrimination

requires heightened scrutiny, least of all in the fraught context of whether a State may

limit irreversible medical treatments to minors facing gender dysphoria." *L.W.*, 2023

WL 4410576, at *7. The plaintiffs' *Smith* argument also suffers from the same problem as their *Bostock* one: both run headlong into *Geduldig* and *Dobbs*. *Id.* at *7 (recognizing this point).

To their credit, the plaintiffs do cite at least one case not addressed in *L.W.* They rely on *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), for the notion that "a law [that] applies to members of both sexes does not necessarily mean that it does not discriminate based on sex." But *L.W.* did not end its analysis upon concluding that the challenged law applies equally to minors of both sexes. Even still, the plaintiffs emphasize the passage from *J.E.B.* that "individual jurors themselves have a right to nondiscriminatory jury selection procedures." *Id.* at 140–41. Of course, no one disputes that the Equal Protection Clause prohibits discrimination against women and men. As Justice Ginsburg explained for the Court in *United States v. Virginia*, intermediate scrutiny applies when "official action . . . closes a door or denies opportunity to women (or men)." 518 U.S. 515, 532 (1996). The operative point here is that SB 150 applies equally to minors of both sexes. It prohibits health-care providers from prescribing puberty blockers and hormones for a specified purpose no matter the child's sex. Ky. Rev. Stat. § 311.772(2)(a)–(b). Nothing in *J.E.B.*—a case about explicit sex discrimination in jury selection, *J.E.B.*, 511 U.S. at 137–38—suggests that in so doing SB 150 discriminates based on sex.

The plaintiffs also dispute *L.W.*'s application of *Geduldig* and *Dobbs*. This case is different, say the plaintiffs, because the law here allegedly "*facially* discriminates based

11

on transgender status, and therefore, on sex." But *L.W.* addressed this very point in several ways. Most importantly, *L.W.* explained that "[i]f a law restricting a medical procedure that applies only to women does not trigger heightened scrutiny, as in *Dobbs*, a law equally applicable to all minors, no matter their sex at birth, does not require such scrutiny either." *L.W.*, 2023 WL 4410576, at *6.

Even if the Court concludes (contrary to *L.W.*) that intermediate scrutiny applies, SB 150 survives it. No one can dispute that Kentucky has a "compelling governmental interest in the protection of children," *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006), an interest "in protecting vulnerable groups . . . from abuse, neglect, and mistakes," *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997), and an interest "in protecting the integrity and ethics of the medical profession," *id.* So the only question is whether the challenged provisions sufficiently serve those interests. They do.

Those advocating for what they call "gender-affirming care" argue that without it children will have higher rates of anxiety, depression, and suicidality. Pls.' Mot. PI, R.17, PageID#119. That is wrong.[1] At the very least, it is vigorously disputed. As this issue is studied more, a consensus is emerging that such care is experimental. Resp. Pls.' Mot. PI Ex. 1, R.47-1, PageID#518; Resp. Pls.' Mot. PI Ex. 2, R.47-2, PageID#526;

---

[1] At the stay stage, the Court undertakes de novo review. *Priorities USA v. Nessel*, 978 F.3d 976, 982 (6th Cir. 2020). Similarly, because the district court did not hold an evidentiary hearing, this Court is "in as good a position as the district judge." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995) (citation omitted).

Resp. Pls.' Mot. PI Ex. 3, R.47-3, PageID#539; Resp. Pls.' Mot. PI Ex. 4, R.47-4, PageID#545; Cantor Decl., R.47-9, PageID#1016–25, 1040–48, 1082–87; Laidlaw Decl., R.47-10, PageID#1246–48; *see also* Resp. Pls.' Mot. PI, R.47, PageID#491, 507–08. Even the primary interest groups that advocate for such treatment—WPATH and the Endocrine Society—have recognized the evidentiary limitations supporting its efficacy. Cantor Decl., R.47-9, PageID#1049–54, 1074, 1084–87, 1111–16; Levine Decl., R.47-11, PageID#1304–13; Resp. Pls.' Mot. PI Ex. 6, R.47-6, PageID#700. So have many others. Cantor Decl., R.47-9, PageID#1013–54, 1076–97, 1111–37; Levine Decl., R.47-11, PageID#1283–84, 1297–1313, 1328–40, 1352–53, 1360–66; Laidlaw Decl., R.47-10, PageID#1208, 1220, 1231–42, 1256–57; Nangia Decl., R.47-12, PageID#1429–30, 1467–70; Resp. Pls.' Mot. PI, R.47, PageID#510.

In fact, record evidence shows that such treatments have the opposite effect— they lead to *higher* rates of mental illness and suicide. Levine Decl., R.47-11, PageID#1283–84, 1297–1313, 1331–52, 1361–63; Laidlaw Decl., R.47-10, PageID#1221, 1225, 1241–42; Cantor Decl., R.47-9, PageID#1020, 1070–80, 1088–97, 1104–10; Resp. Pls.' Mot. PI, R.47, PageID#492. Not only that, such treatment leads to physical and mental-health problems, many of which are irreversible, and many of which would have never befallen the child but for such treatment. Cantor Decl., R.47-9, PageID#1098–1110; Laidlaw Decl., R.47-10, PageID#1204, 1211–28, 1243–44, 1247, 1256–57; Levine Decl., R.47-11, PageID#1283–84, 1290, 1324–25, 1327–28, 1331, 1341–52; *see also* Resp. Pls.' Mot. PI Ex 7, R.47-7, PageID#926–65.

13

All of this shows (at the very least) that there is not an agreed-upon standard of care for treating children with gender dysphoria. Levine Decl., R.47-11, PageID#1282, 1300–13. *L.W.* recognized as much: "[T]he medical and regulatory authorities are not of one mind about using hormone therapy to treat gender dysphoria." 2023 WL 4410576, at *4. And importantly, alternative treatments exist if one recognizes that gender dysphoria desists in most children, unless the treatments prohibited by SB 150 are instituted—then the odds flip. Cantor Decl., R.47-9, PageID#1059–63, 1065–68; Levine Decl., R.47-11, PageID#1282–83, 1297–1300, 1317, 1320–28, 1331, 1361–63; Laidlaw Decl., R.47-10, PageID#1207–09, 1243–44, 1256. Psychotherapy is an effective alternative form of treatment, so much so that other countries are prioritizing it. Levine Decl., R.47-11, PageID#1293–1300, 1306, 1308–09, 1358–64; Nangia Decl., R.47-12, PageID#1410, 1426–37, 1471–85, 1491–96; Cantor Decl., R.47-9, PageID#1016, 1032, 1035, 1061–62, 1076–80, 1088–97; Laidlaw Decl., R.47-10, PageID#1247; Resp. Pls.' Mot. PI, R.47, PageID#507–08, 511–12.

True, several interest groups disagree.[2] Interest Group Amicus Br., R.19-2, PageID#319–38. But Kentucky's legislature, not interests groups, makes such health-and-welfare decisions on behalf of Kentuckians. Kentucky's General Assembly has

---

[2] The record below gives ample reason to question the views of these interest groups. Levine Decl., R.47-11, PageID#1304–13, 1358–60; Cantor Decl., R.47-9, PageID#1013–14, 1084–87; Laidlaw Decl., R.47-10, PageID#1207, 1231–41; *see also* Resp. Pls.' Mot. PI, R.47, PageID#491, 511; Family Research Council Amicus Br., R.49-2, PageID#1591–1615; States Amicus Br., R.51-1, PageID#1638–43.

"wide discretion" to pass health-and-welfare legislation, especially "in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163. Although "the position of the American Medical Association" and other interest groups may be relevant to a "legislative committee," their views do not "shed light on the meaning of the Constitution." *See Dobbs*, 142 S. Ct. at 2267 (citation omitted). Kentucky need not "surrender its authority to regulate" to protect its citizens simply because of what some "private party claims is the norm for the practice of medicine." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 439 (6th Cir. 2019). If the plaintiffs' favored interest groups want their views enshrined in Kentucky law, "they should address their arguments to [Kentucky's] elected representatives." *See id.*

## II.    The remaining factors cut against the plaintiffs.

As noted above, the plaintiffs' lead argument is that they are suffering irreparable harm. And as they point out, Kentucky's law is slightly different from Tennessee's in one respect. The continuing-treatment exception in SB 150 allows a health-care provider to "institute a period during which the minor's use of the drug or hormone is systematically reduced" if the minor was previously receiving prohibited treatments. Ky. Rev. Stat. § 311.372(6). Tennessee's equivalent law, by contrast, "permits the challengers to continue their existing treatments until March 31, 2024." *L.W.*, 2023 WL 4410576, at *8. Although these provisions operate somewhat differently, both allow some continuing treatment for minors who were previously receiving the prohibited drugs. In fact, unlike Tennessee's law, SB 150 does not specify a hard end date. So

similar to Tennessee's law, SB 150's continuing-treatment exception "lessens the harm to those minors who wish to continue receiving treatment." *Id.* This is especially so because the Court has promised to try to resolve this appeal in just over 60 days from now.

The plaintiffs believe that the difference in the continuing-treatment exceptions establishes that they will suffer irreparable harm. But the plaintiffs' specific proof on this point is thin. The only plaintiff declaration submitted below that arguably discusses this point simply says without explanation that the child's "endocrinologist has informed us that she will no longer be able to treat JM Doe 3 once the Treatment Ban goes into effect on June 29." John Doe 3 Decl., R.17-6, PageID#288. And in any event, the plaintiffs' assertions of harm are very much disputed. *See, e.g.*, Laidlaw Decl., R.47-10, PageID#1248–56. That disagreement points to "an irreversible problem of its own, one that lies at the crux of this case." *L.W.*, 2023 WL 4410576, at *8. As *L.W.* explained, "[b]oth sides have the same fear, just in opposite directions—one saying the procedures create health risks that cannot be undone, the other saying the absence of such procedures creates risks that cannot be undone." *Id.* The way to resolve this issue, especially at the stay stage, is to recognize that disputes about who is right on the science and medicine are best left to the legislature. And Kentucky's General Assembly waded through the "medical and scientific uncertainty" surrounding this issue and made a reasonable decision for the Commonwealth. *See Gonzales*, 550 U.S. at 163. In fact, "[c]onsiderations of marginal safety, including the balance of risks, are within the legislative

16

competence when the regulation is rational and in pursuit of legitimate ends." *See id.* at 166. Kentucky's legislature reasonably decided to include SB 150's continuing-treatment exception to address the very harms about which the plaintiffs now complain.

As to the harm to the Commonwealth, precedent is clear. "*Any time* a state is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (cleaned up) (emphasis added). The plaintiffs fight this holding by pointing out that two state officials in Kentucky seem amenable to SB 150 not taking effect. But so what? Those two officials are not the Kentucky General Assembly. Kentucky's high court recently explained why that matters: "As we have noted time and again, so many times that we need not provide citation, the General Assembly establishes the public policy of the Commonwealth." *Cameron v. Beshear*, 628 S.W.3d 61, 75 (Ky. 2021). Plus, the two officials who seemingly support the plaintiffs cannot speak for the Commonwealth in court. That is the job of Attorney General Daniel Cameron, who intervened below on behalf of the Commonwealth and continues to defend SB 150 (including through this filing). *See Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin*, 498 S.W.3d 355, 363 (Ky. 2016); *see also* Ky. Rev. Stat. § 15.020.

The public interest follows from what has already been said. It favors "giv[ing] effect to the will of the people 'by enforcing the laws they and their representatives enact.'" *Thompson*, 976 F.3d at 619 (citation omitted). All the more so given the need—found by Kentucky's legislature in passing SB 150—to protect Kentucky's children

17

from experimental procedures with long-term, irreversible consequences. *See L.W.*, 2023 WL 4410576, at *8 ("As for the public interest, Tennessee's interests in applying the law to its residents and in being permitted to protect its children from health risks weighs heavily in favor of the State at this juncture.").

## CONCLUSION

The Court should deny the plaintiffs' motion for a stay pending appeal.

Respectfully submitted by,

<u>*s/ Alexander Y. Magera*</u>

| | |
|---|---|
| Daniel Cameron | Office of the Kentucky Attorney General |
| *Attorney General of Kentucky* | 700 Capital Avenue, Suite 118 |
| Victor B. Maddox | Frankfort, Kentucky 40601 |
| *Deputy Attorney General* | (502) 696-5300 |
| Matthew F. Kuhn | Alexander.Magera@ky.gov |
| *Solicitor General* | |
| Alexander Y. Magera | *Counsel for the Commonwealth of Kentucky* |
| *Assistant Solicitor General* | |

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limitation in Fed. R. App. P. 27(d)(2)(A) because it contains 4,626 words. This response also complies with the type-face requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(6) because it has been prepared in 14-point Garamond font using Microsoft Word.

*s/ Alexander Y. Magera*

## CERTIFICATE OF SERVICE

I certify that before noon on July 21, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/  Alexander Y. Magera*