Case No. 23-5609

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

JANE DOE 1, *et al.*

*Plaintiffs-Appellees*

v.

WILLIAM C. THORNBURY, JR.,
in his official capacity, *et al.*

*Defendants-Appellees*

and

COMMONWEALTH OF KENTUCKY *ex rel.*
ATTORNEY GENERAL DANIEL CAMERON

*Intervening Defendant-Appellant*

_____

On Appeal from the U.S. District Court for the
Western District of Kentucky, No. 3:23-cv-230

_____

# THE COMMONWEALTH OF
# KENTUCKY'S MERITS BRIEF

_____

Daniel Cameron
 *Attorney General of Kentucky*
Victor B. Maddox
 *Deputy Attorney General*
Matthew F. Kuhn
 *Solicitor General*
Alexander Y. Magera
 *Assistant Solicitor General*

Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov

*Counsel for the Commonwealth of Kentucky*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ................................. vii

STATEMENT OF JURISDICTION .............................................. 1

STATEMENT OF ISSUES ................................................................... 2

INTRODUCTION ................................................................................ 3

STATEMENT OF THE CASE ............................................................. 4

SUMMARY OF THE ARGUMENT .................................................... 9

STANDARD OF REVIEW .................................................................. 12

ARGUMENT ........................................................................................ 13

    I.    The plaintiffs are not likely to succeed on the merits. ..................... 13

        A.   The parent-plaintiffs' substantive-due-process claim is bound to fail. ........ 13

        B.   The plaintiffs' equal-protection claim is unlikely to succeed. ....................... 18

            1.   SB 150 does not discriminate on the basis of sex. ................................... 19

            2.   Intermediate scrutiny is not otherwise applicable. ................................... 27

        C.   SB 150 satisfies any level of constitutional scrutiny. ...................... 30

        D.   The plaintiffs have not established standing sufficient to receive a preliminary injunction. ...................... 35

    II.   The remaining factors do not favor a preliminary injunction........................... 38

    III.  The preliminary injunction is overbroad. ......................................... 42

CONCLUSION ..................................................................................... 45

CERTIFICATE OF COMPLIANCE ................................................... 46

CERTIFICATE OF SERVICE ............................................................ 47

ADDENDUM ....................................................................................... 48

# TABLE OF AUTHORITIES

## Cases

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
    495 F.3d 695 (D.C. Cir. 2007) (en banc) ................................................................. 10, 34

*Adams v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022) (en banc) ................................................................. 20, 29

*Arizona v. Biden*,
    31 F.4th 469 (6th Cir. 2022) ................................................................................. 43

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ................................................................. 13, 35, 43

*Bostock v. Clayton Cnty.*,
    140 S. Ct. 1731 (2020) ................................................................................. *passim*

*Bowen v. Gilliard*,
    483 U.S. 587 (1987) ................................................................................. 29

*Brandt v. Rutledge*,
    47 F.4th 661 (8th Cir. 2022) ................................................................. 20, 44

*Brandt v. Rutledge*,
    No. 21-2875, 2022 WL 16957734 (8th Cir. Nov. 16, 2022) ................................ 23

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ................................................................................. 21, 22

*Cameron v. Beshear*,
    628 S.W.3d 61 (Ky. 2021) ................................................................................. 41

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    142 S. Ct. 1002 (2022) ................................................................................. 40, 41

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ................................................................................. 19, 30

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................. 38

*Collins v. Texas,*
    223 U.S. 288 (1912) ................................................................ 34

*Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin,*
    498 S.W.3d 355 (Ky. 2016) ..................................................... 41

*Commonwealth v. Biden,*
    57 F.4th 545 (6th Cir. 2023) ............................................... 12, 43

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) ................................................... *passim*

*EMW Women's Surgical Ctr., P.S.C. v. Beshear,*
    920 F.3d 421 (6th Cir. 2019) ................................................... 35

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) ........................................................... 19, 30

*Geduldig v. Aiello,*
    417 U.S. 484 (1974) ............................................. 10, 21, 22, 28

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ........................................................... 43

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ..................................................... 9, 17, 34, 39

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) ................................................................ 17

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.,*
    927 F.3d 396 (6th Cir. 2019) ............................................... 16, 17

*Kottmyer v. Maas,*
    436 F.3d 684 (6th Cir. 2006) ................................................... 32

*L.W. ex rel. Williams v. Skrmetti,*
    --- F.4th ---, 2023 WL 4410576 (6th Cir. July 8, 2023) .............. *passim*

*Leary v. Daeschner,*
    228 F.3d 729 (6th Cir. 2000) ................................................... 12

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................... 35, 36

*Maine v. Taylor*,
   477 U.S. 131 (1986) ......................................................................... 40

*Marshall v. United States*,
   414 U.S. 417 (1974) ......................................................................... 34

*Memphis A. Philip Randolph Inst. v. Hargett*,
   978 F.3d 378 (6th Cir. 2020) ........................................................ 35

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ........................................................ 23

*Nken v. Holder*,
   556 U.S. 418 (2009) ......................................................................... 40

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992) .............................................................................. 31

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ........................................................ 12

*Ondo v. City of Cleveland*,
   795 F.3d 597 (6th Cir. 2015) ............................................. 11, 29, 30

*Online Merchs. Guild v. Cameron*,
   995 F.3d 540 (6th Cir. 2021) ........................................................ 38

*Parham v. J.R.*,
   442 U.S. 584 (1979) ......................................................................... 16

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) ........................................................ 23

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
   52 F.3d 1373 (6th Cir. 1995) ........................................................ 13

*Prince v. Massachusetts*,
   321 U.S. 158 (1944) ......................................................................... 16

*Smith v. City of Salem,*
    378 F.3d 566 (6th Cir. 2004) ............................................................. 10, 25, 26

*Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.,*
    143 S. Ct. 2141 (2023) ................................................................................. 24

*Theile v. Michigan,*
    891 F.3d 240 (6th Cir. 2018) ...................................................................... 27

*Thompson v. DeWine,*
    976 F.3d 610 (6th Cir. 2020) ............................................................. 11, 40, 41

*Tuan Anh Nguyen v. INS,*
    533 U.S. 53 (2001) ................................................................................ 26, 31

*U.S. Citizens Ass'n v. Sebelius,*
    705 F.3d 588 (6th Cir. 2013) ...................................................................... 17

*United States v. Virginia,*
    518 U.S. 515 (1996) ............................................................................ *passim*

*Vacco v. Quill,*
    521 U.S. 793 (1997) .................................................................................... 27

*Warshak v. United States,*
    532 F.3d 521 (6th Cir. 2008) ................................................................. 43, 44

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ................................................................................ 32, 42

*Washington v. Reno,*
    35 F.3d 1093 (6th Cir. 1994) ...................................................................... 44

*Waskul v. Washtenaw Cnty. Cmty. Mental Health,*
    900 F.3d 250 (6th Cir. 2018) ...................................................................... 35

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ..................................................................... 12, 15, 29, 38

## Statutes

28 U.S.C. § 1292(a)(1) ........................................................................................ 1

28 U.S.C. § 1331 ......................................................................................... 1

42 U.S.C. § 2000e-2(a)(1) ........................................................................ 23

Ky. Rev. Stat. § 15.020 ............................................................................ 41

Ky. Rev. Stat. § 205.617(1)(c) ................................................................ 22

Ky. Rev. Stat. § 217.105(2) ..................................................................... 22

Ky. Rev. Stat. § 218A.274 ....................................................................... 22

Ky. Rev. Stat. § 311.372(2)(a)–(b) ................................................... *passim*

Ky. Rev. Stat. § 311.372(4) .............................................................8, 11, 36

Ky. Rev. Stat. § 311.372(5) .............................................................8, 11, 36

Ky. Rev. Stat. § 311.372(6) .............................................................8, 11, 40

Ky. Rev. Stat. § 311.715(2) ..................................................................... 22

Ky. Rev. Stat. § 311.772 .......................................................................... 22

## Other Authorities

Bruce Schreiner, *GOP lawmakers override veto of transgender bill in Kentucky*, Associated Press (Mar. 29, 2023) ...................................................... 4

Ky. AG Op. 23-03 ...................................................................................... 7

Sara Cline, *Louisiana Lawmakers Overturn Governor's Veto on Gender-Affirming Care Ban for Transgender Minors*, Associated Press (July 18, 2023) .................................... 18

*The Do No Harm Act: Hearing on H.B. 470 Before the House Judiciary Committee* (Ky. Mar. 2, 2023) ............................................................................ 5, 7

*The Do No Harm Act: Hearing on H.B. 470 Before the Senate Families & Children Committee* (Ky. Mar. 14, 2023) ................................................... 5, 7

## Constitutional Provisions

U.S. Const. amend. XIV, § 1 ................................................................... 23

## STATEMENT REGARDING ORAL ARGUMENT

The Court has already stated it will hold oral argument. The Commonwealth looks forward to addressing the Court at that time.

## STATEMENT OF JURISDICTION

The plaintiffs, who are seven children and their parents, invoked the district court's federal-question jurisdiction under 28 U.S.C. § 1331 by raising claims under the Due Process Clause and Equal Protection Clause of the federal Constitution. Compl., R.2, PageID#13–18, 29–32. The district court granted the plaintiffs' motion for a preliminary injunction on June 28, 2023. Mem. Op., R.61, PageID#2299–2313. The Commonwealth appealed the next day. Notice of Appeal, R.65, PageID#2415–16. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

The issues for the Court to decide are:

1. Whether the district court properly granted the plaintiffs' motion for a preliminary injunction.

2. Whether the district court correctly determined that the parent-plaintiffs' substantive-due-process claim is likely to succeed.

3. Whether the district court correctly determined that the plaintiffs' equal-protection claim is likely to succeed.

4. Whether on this record the plaintiffs have offered sufficient evidence of standing to receive a preliminary injunction.

5. Whether the district court properly found that the plaintiffs will suffer irreparable harm without a preliminary injunction.

6. Whether the district court properly found that the remaining preliminary-injunction factors favor entry of a preliminary injunction.

7. Assuming a preliminary injunction is warranted, whether the district court's preliminary injunction is overbroad.

## INTRODUCTION

Layla Jane has always struggled to fit in. Jane Decl., R.47-15, PageID#1527. She suffered trauma in elementary school, which led to depression, suicidality, and self-harm when puberty started. *Id.* At 11, she began identifying as a boy. *Id.* at PageID#1528. She saw various medical providers and was diagnosed with gender dysphoria. *Id.* At 12, she started puberty blockers, followed by testosterone. *Id.* And a month after she turned 13, she had a double mastectomy. *Id.*

None of these medical interventions helped Layla. *Id.* at PageID#1528–30. The puberty blockers made matters "worse," and she continued to engage in self-harm. *Id.* at PageID#1528. The testosterone did much the same, and it caused irreversible physical damage. *Id.* at PageID#1529. At 17, Layla stopped taking the testosterone. *Id.* at PageID#1530. She now describes as "life-saving" laws that prohibit giving minors puberty blockers and hormones to treat gender dysphoria. *Id.* at PageID#1530–31.

Stories like Layla's are unfortunately all too common today as more is learned about the use of puberty blockers and hormones to treat gender dysphoria in children. That is why Kentucky's General Assembly stepped in and passed Senate Bill 150, which prohibits a health-care provider from prescribing puberty blockers and hormones to children for this purpose. Ky. Rev. Stat. § 311.372(2)(a)–(b). SB 150 is a classic health-and-welfare law designed to protect Kentucky's most vulnerable citizens—its children—from experimental treatments with serious and irreversible consequences.

This lawsuit challenges SB 150 on the novel theory that the U.S. Constitution has something to say about whether Kentucky can protect its children this way. To be sure, SB 150 is controversial to some as a policy matter. But it is not controversial as a constitutional one. Our system of government depends on Kentucky's General Assembly being able to do exactly what it did here: examine the scientific and medical evidence and exercise its judgment on behalf of Kentuckians. So like other health-and-welfare laws, SB 150 is "entitled to a 'strong presumption of validity'" and "must be sustained if there is a rational basis on which the legislature could have thought [the law] would serve legitimate state interests." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (citation omitted). There can be no dispute that SB 150 clears this low bar. It is constitutional.

## STATEMENT OF THE CASE

SB 150 became the law of Kentucky after a lively, and at times raucous, debate in its legislature. *E.g.*, Bruce Schreiner, *GOP lawmakers override veto of transgender bill in Kentucky*, Associated Press (Mar. 29, 2023), https://perma.cc/EW6T-QF35. In passing SB 150, Kentucky's General Assembly carefully considered the available medical and scientific evidence and decided that Kentucky's kids are best served by prohibiting the use of puberty blockers and hormones to treat gender dysphoria. As Representative Jennifer Decker, one of the legislative sponsors of what became SB 150, summed up: "[T]here is no quality long-term study to establish that there is long-term benefit [from] gender transition services, and more importantly, there is long-term evidence that these

4

services result in permanent lifelong harm to children." *The Do No Harm Act: Hearing on H.B. 470 Before the House Judiciary Committee*, 44:40–45:00 (Ky. Mar. 2, 2023), https://ket.org/legislature/archives/2023/regular/house-judiciary-committee-198318 ("House Testimony"); *see also The Do No Harm Act: Hearing on H.B. 470 Before the Senate Families & Children Committee*, 1:10:40–12:50 (Ky. Mar. 14, 2023), https://ket.org/legislature/archives/2023/regular/senate-families-and-children-committee-198727 ("Senate Testimony").

The medical and scientific evidence bears out this statement. Although many claim that puberty blockers and hormones help children with gender dysphoria, there is a growing consensus that such treatments are experimental at best. This makes sense given that "[g]ender dysphoria is the only diagnosis . . . for which an alteration of bodily integrity is being clinically advised for the purpose of affirming identity." Nangia Decl., R.47-12, PageID#1468.

Some of the countries that first used such treatments "now endorse psychotherapy as the treatment of choice for minors, with medical interventions representing a method of last resort, if permitted at all." Cantor Decl., R.47-9, PageID#1016.[1] In Great Britain, its National Health Services published a consultation document under which it "will only commission [puberty blockers] in the context of a formal research

---

[1] *See also id.* at PageID#1014–25, 1044–48, 1082–84; Levine Decl., R.47-11, PageID#1282–83, 1293–1313, 1329–35, 1357–66; Laidlaw Decl., R.47-10, PageID#1246–48; Resp. Mot. PI Exs. 1 & 3, R.47-1, -3, PageID#517–21, 539–42.

protocol." *Id.* at PageID#1018. In Sweden, its National Board of Health and Welfare noted last year "the continued lack of reliable scientific evidence concerning the efficacy and safety" of puberty blockers and cross-sex hormones and concluded that "the evidence on treatment efficacy and safety is still insufficient and inconclusive for all reported outcomes." *Id.* at PageID#1021–22 (citation omitted); *see also* Resp. Mot. PI Ex. 2, R.47-2, PageID#525–26. And in Norway, a 2023 report by its Health Investigation Board "deemed medicalized transition to be experimental" in light of the "insufficient" evidence regarding the use of puberty blockers and hormones in children. Cantor Decl., R.47-9, PageID#1023. As *The Economist* summarized earlier this year, "the medical systems of Britain, Finland, France, Norway and Sweden" have "raised the alarm, describing treatments as 'experimental' and urging doctors to proceed with 'great medical caution.'" Resp. Pls.' Mot. PI Ex. 1, R.47-1, PageID#519.

Medical interest groups on this side of the Atlantic try to paint a different picture. But they have not "conducted a systematic review of both effectiveness and safety." Cantor Decl., R.47-9, PageID#1049; *see also id.* at PageID#1049–1054; Levine Decl., R.47-11, PageID#1303–09; Laidlaw Decl., R.47-10, PageID#1231–46. These interest groups have also acknowledged the evidentiary limitations of their positions. Cantor Decl., R.47-9, PageID#1085–87.[2] And these interest groups are by no means apolitical

---

[2] *See also* Cantor Decl., R.47-9, PageID#1039–41, 1044–54, 1111–16, 1122–23, 1125–27, 1132–36; Levine Decl., R.47-11, PageID#1303–13, 1358–61; Laidlaw Decl., R.47-10, PageID#1231–41.

about this issue. Levine Decl., R.47-11, PageID#1303–07; Laidlaw Decl., R.47-10, PageID#1207, 1231–39, 1257.

The real-world impacts of kids taking puberty blockers and hormones to treat gender dysphoria are becoming more apparent. Detransitioners like Layla have described the harms that laws like SB 150 prevent. *See* Decls., Rs.47-13, -14, -15, -16, PageID#1513–35. Testosterone treatment made Laura Becker "[e]motionally . . . spiral[] out of control and engag[e] in risky behaviors" and "intensified thoughts about suicide and not caring about living," Becker Decl., R.47-13, PageID#1515, and it made Luka Hein experience physical and mental problems, Hein Decl., R.47-14, PageID#1522–23. And parents have spoken out about what their children face. Decls., Rs.47-17, -18, -19, -20, -21, -22, PageID#1536–63.

None of this was lost on the Kentucky General Assembly. It heard from both sides of this debate—in particular, doctors, parents, and detransitioners. *E.g.*, House Testimony, *supra*, at 4:33–1:25:30; Senate Testimony, *supra*, at 2:30–1:13:00. After weighing that evidence, on March 29, 2023, the General Assembly overwhelmingly passed SB 150 over Governor Andy Beshear's veto. The law contained an effective date of June 29. Ky. AG Op. 23-03.

As written, SB 150 prohibits health-care providers from prescribing or administering puberty blockers and hormones for the "purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex." Ky. Rev. Stat. § 311.372(2)(a)–(b).

Although the law prohibits such treatments, it allows continuing treatment for those receiving such treatment when SB 150 took effect as long as the treatment is "systematically reduced" over time. *Id.* § 311.372(6). A health-care provider that provides puberty blockers or hormones in violation of SB 150 faces license or certification revocation. *Id.* § 311.372(4). The provider also risks civil liability "to recover damages for injury suffered as a result" of prescribing puberty blockers or hormones in violation of SB 150. *Id.* § 311.372(5).

On May 3, seven children and their parents sued to challenge SB 150. Compl., R.2, PageID#11–32. They eventually sought a preliminary injunction. PI Mot., R.17, PageID#115–39. Attorney General Daniel Cameron intervened to defend SB 150 on behalf of the Commonwealth. Mot. Intervene, R.16, PageID#80–86; Order, R.38, PageID#452–54. The day before SB 150's effective date, the district court granted a statewide preliminary injunction. Mem. Op., R.61, PageID#2299–2313. In considering the plaintiffs' equal-protection claim, the district court "agree[d] with Plaintiffs both that heightened scrutiny applies and that SB 150 cannot survive it." *Id.* at PageID#2303. The district court also found a "strong likelihood" that the parent-plaintiffs will succeed on their substantive-due-process claim. *Id.* at PageID#2308–11. The district court determined that a statewide, or "facial," preliminary injunction was proper, rejecting the Commonwealth's argument that any relief should be limited to the plaintiffs. *Id.* at PageID#2312.

The next day, the Commonwealth appealed and sought an emergency stay pending appeal in district court. Notice of Appeal, R.65, PageID#2415–16; Mot. Stay, R.66, PageID#2417–31. When the district court did not promptly resolve that motion, the Commonwealth sought emergency relief in this Court. The next day, this Court issued its published decision in *L.W. ex rel. Williams v. Skrmetti*, --- F.4th ---, 2023 WL 4410576 (6th Cir. July 8, 2023). A week later, the district court stayed its preliminary injunction in full. Order, R.79, PageID#2495–96 ("In light of [*L.W.*], the Court sees no basis to deny the requested stay.").

## SUMMARY OF THE ARGUMENT

SB 150 is a paradigmatic health-and-welfare law. It is in the heartland of Kentucky's sovereign authority to enact laws regulating the practice of medicine to the betterment of its citizens. If Kentucky's legislature sees a problem, it need not sit back and wait for unanimity in the medical profession. To the contrary, legislators can—and should—roll up their sleeves and wade through complex topics on which there is "medical and scientific uncertainty." *See Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). They have "wide discretion to pass legislation in [such] areas." *Id.* It follows that health-and-welfare laws are "entitled to a 'strong presumption of validity'" and "must be sustained if there is a rational basis on which the legislature could have thought that [the law] would serve legitimate state interests." *Dobbs*, 142 S. Ct. at 2284 (citation omitted).

The plaintiffs oppose this noncontroversial proposition by offering unprecedented legal theories under the Due Process Clause and the Equal Protection Clause.

9

Neither claim is likely to succeed. The parent-plaintiffs allege that they have a substantive-due-process right to secure puberty blockers and hormones for their children. Our history and traditions are the touchstones of such an inquiry, *id.* at 2242, yet the parent-plaintiffs offer neither. With good reason. Our history and traditions are to the contrary. As a sister circuit put it, "[o]ur Nation's history and traditions have consistently demonstrated that the democratic branches are better suited to decide the proper balance between the uncertain risks and benefits of medical technology, and are entitled to deference in doing so." *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 713 (D.C. Cir. 2007) (en banc).

The plaintiffs' equal-protection claim is no more likely to succeed. SB 150 applies equally to minors of both sexes. And to the extent SB 150 prohibits providing different hormones for boys and girls, that is not an equal-protection problem. A law that simply regulates a medical treatment that only one sex can undergo does not discriminate based on sex. *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974); *Dobbs*, 142 S. Ct. at 2245–46. The plaintiffs' citation to *Bostock v. Clayton County* does not help them. 140 S. Ct. 1731 (2020). *Bostock* arose in the employment context, not the medical one. *Id.* at 1737. And it interpreted Title VII, not the Equal Protection Clause. *See id.* at 1753. Nor does *Smith v. City of Salem* apply here. 378 F.3d 566 (6th Cir. 2004). It arose in the employment context, and it concerned sex stereotyping—not children, not medicine, and not biology. *Id.* at 568–69, 576–77. Lastly, the plaintiffs' long-shot attempt to argue that

10

transgender status is a quasi-suspect class cannot succeed, especially at this juncture. *See Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015).

At this early stage, the plaintiffs also failed to provide sufficient proof of standing to secure a preliminary injunction. In particular, there is inadequate evidence of redressability. The plaintiffs simply overlook that SB 150 has two separate enforcement mechanisms—license or certification revocation and a private right of action. Ky. Rev. Stat. § 311.372(4), (5). Yet the plaintiffs offered no proof that medical providers in Kentucky will provide the children-plaintiffs with puberty blockers and hormones while risking civil liability under SB 150.

The plaintiffs' showing of irreparable harm is also lacking. It presumes that someone other than the Kentucky General Assembly gets to decide which medical treatments harm children in Kentucky. The medical interest groups on which the district court relied can lobby Kentucky's legislature, but they do not exercise the Commonwealth's sovereign authority. And Kentucky's legislature included a continuing-treatment exception without a hard end date to address concerns related to children, like some of the children-plaintiffs, who were taking puberty blockers or hormones when SB 150 took effect. Ky. Rev. Stat. § 311.372(6). By contrast, the harm to the Commonwealth is undeniable. A preliminary injunction against enforcing SB 150 causes irreparable harm to Kentucky by definition. *See Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020). And the public interest follows naturally from that conclusion. *See id.*

11

Even if the Court determines that a preliminary injunction is justified here, it should be narrowed to benefit only the plaintiffs. The key case here is *Commonwealth v. Biden*, 57 F.4th 545 (6th Cir. 2023). It directs that a district court "should not issue relief that extends further than necessary to remedy the plaintiff's injury." *Id.* at 556. The plaintiffs have not even attempted to show that they need anything more than a party-specific injunction to keep taking prohibited treatments while this case runs its course.

If most of the above conclusions sound familiar, that's because the Court already resolved these issues in *L.W.* 2023 WL 4410576, at *3–8. Although those holdings were only "initial," they are not "wrong." *See id.* at *8. The Court should reverse the preliminary injunction or, at a minimum, narrow it to benefit only the plaintiffs.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy" that involves the "exercise of a very far-reaching power." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). For this reason, a preliminary injunction can issue only upon a "clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To win a preliminary injunction, a plaintiff must establish that (i) he is likely to succeed on the merits, (ii) he is likely to suffer irreparable harm, (iii) the equities tip in his favor, and (iv) an injunction serves the public interest. *Id.* at 20. And when, as here, a party requests a preliminary injunction based on an alleged constitutional violation, the likelihood of success on the merits "often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citation omitted).

Although the Court reviews the ultimate grant of a preliminary injunction for an abuse of discretion, it reviews the district court's legal determinations, including its appraisal of the merits, "with fresh eyes." *Arizona v. Biden*, 40 F.4th 375, 381 (6th Cir. 2022). And when, as here, the district court's preliminary injunction "was made on the basis of a paper record, without an evidentiary hearing," this Court is "in as good a position as the district judge to determine the propriety of granting a preliminary injunction." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995) (citation and internal quotation marks omitted).

## ARGUMENT

This Court's *L.W.* decision correctly resolved all the issues presented here, and there in no reason to retreat from its reasoning. The plaintiffs are unlikely to succeed on the merits, and all other relevant factors weigh against entry of a preliminary injunction. At the very least, the preliminary injunction issued below should be substantially narrowed.

## I.   The plaintiffs are not likely to succeed on the merits.

### A.   The parent-plaintiffs' substantive-due-process claim is bound to fail.

The parent-plaintiffs argue that they possess a fundamental right to secure puberty blockers and hormones for their children despite what Kentucky law says. The district court did little analysis of its own in sustaining this claim, instead reasoning that "the Commonwealth effectively concedes that the parent plaintiffs have a fundamental

13

right under the Due Process Clause to choose those treatments for their children." Mem. Op., R.61, PageID#2309. The Commonwealth admitted no such thing. And there is no support, either in the constitutional text or in our history and traditions, for such a fundamental right.

Start with the basics. Whether the Constitution protects a right "begin[s] with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means." *Dobbs*, 142 S. Ct. at 2244–45 (citation omitted). But when the Constitution "makes no express reference to" an asserted right, those arguing for protection "must show that the right is somehow implicit in the constitutional text." *Id.* at 2245.

In their complaint, the parent-plaintiffs claim a fundamental right "to obtain established medical treatments to protect their children's health and well-being." Compl., R.2, PageID#30. Even putting aside that the best medical and scientific evidence does not support this assertion, the parent-plaintiffs' alleged right assumes that Kentucky's legislature can play no role in deciding whether specified medical treatments are permitted within the Commonwealth. As such, the parent-plaintiffs frame their asserted right much too generally. *See Dobbs*, 142 S. Ct. at 2258. In reality, they claim a fundamental right to procure puberty blockers and hormones for their children despite what Kentucky law says. Of course, nothing in the text of the Constitution expressly protects such a right. So they are left to prove that their alleged fundamental right "is somehow implicit in the constitutional text." *Id.* at 2245.

14

The provision that they say implicitly protects them is the Due Process Clause. The Commonwealth very much disagrees. But what is not subject to disagreement is that the plaintiffs' argument requires "extend[ing]" the Due Process Clause "to new territory." *L.W.*, 2023 WL 4410576, at *3. Of course, nothing prohibits the parent-plaintiffs from pressing these first-of-their-kind arguments. But this is not an appeal from a final judgment. It is an appeal from a preliminary injunction—a context in which the parent-plaintiffs must make a "clear showing" that they will likely win the case. *Winter*, 555 U.S. at 22. More to the point, the novelty of the parent-plaintiffs' ask "suggest[s] that the key premise of a preliminary injunction—likelihood of success on the merits—is missing." *L.W.*, 2023 WL 4410576, at *3.

In all events, the parent-plaintiffs' argument that the Due Process Clause provides them substantive protection is not a winner. To establish an implicit substantive right, the parent-plaintiffs must show that "the right is 'deeply rooted in [our] history and tradition' and . . . essential to our Nation's 'scheme of ordered liberty.'" *Dobbs*, 142 S. Ct. at 2246 (citations omitted). This requires "a careful analysis of the history of the right at issue" to show that "the Framers and ratifiers of the Fourteenth Amendment counted the right . . . among those fundamental rights necessary to our system of ordered liberty." *See id.* at 2246–47 (citation and quotation marks omitted).

The district court did not hold the parent-plaintiffs to this near-insurmountable showing. Its three pages of analysis do not show a deeply rooted right to obtain puberty blockers and hormones that is essential to our scheme of ordered liberty. That is reason

enough to reverse on this claim. Instead of discussing history and traditions, the district court's reasoning turned on its conclusion that the Commonwealth "effectively concede[d]" this issue. Mem. Op., R.61, PageID#2309. But that confuses matters and gives the parent-plaintiffs a pass on the showing necessary to recognize a new substantive right in the Due Process Clause. What the Commonwealth acknowledged in light of this Court's precedent is that "[p]arents possess a fundamental right to make decisions concerning the medical care of their children." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418 (6th Cir. 2019). But that general right does not seal the deal for the parent-plaintiffs. That's because in the next breath *Kanuszewski* emphasized that "limitations on parents' control over their children are particularly salient in the context of medical treatment." *Id.* at 419 (collecting cases).

The key here is that Kentucky's legislature has an essential role to play in protecting children from harm. On this point, there can be no dispute. *Parham v. J.R.*, 442 U.S. 584, 603 (1979) ("[W]e have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized."); *Prince v. Massachusetts*, 321 U.S. 158, 167 (1944) ("[T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare . . . ."). So while parents do indeed have a fundamental right with respect to their children, *Kanuszewski*, 927 F.3d at 418, that general right does not oust the Commonwealth from the field.

16

In fact, the Commonwealth's authority to regulate what medical treatments are permitted within its borders is substantial. As this Court has summarized, "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment . . . if the government has reasonably prohibited that type of treatment." *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 599 (6th Cir. 2013) (citation omitted). Indeed, the Commonwealth gets to regulate medical treatments even—indeed, especially—in the face of "medical and scientific uncertainty." *See Gonzales*, 550 U.S. at 163 (collecting cases). More to the point, if there are "opposing theories" about the best way to protect its citizens, the Commonwealth is not "compelled to commit a matter involving the public health and safety" to judicial second-guessing. *See Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905). As the D.C. Circuit persuasively explained, "[o]ur Nation's history and traditions have consistently demonstrated that the democratic branches are better suited to decide the proper balance between the uncertain risks and benefits of medical technology, and are entitled to deference in doing so." *Eschenbach*, 495 F.3d at 713.

No one disputes that there is an ongoing debate about how best to treat children with gender dysphoria. The medical community is naturally part of this debate. So are the States. And of course, parents and their children are central to this debate as well. The involvement of all is a good thing. After all, "sound government usually benefits from more rather than less debate, more rather than less input, more rather than less consideration of fair-minded policy approaches." *L.W.*, 2023 WL 4410576, at *3. The

Constitution, however, is not the parent-plaintiffs' trump card in this debate. Neither the district court nor the parent-plaintiffs can point to a deeply rooted right that is essential to ordered liberty. As a matter of substantive due process, that ends the inquiry.

But by ending the constitutional inquiry, the Court will give needed space for the debates in statehouses to continue. And "the States are indeed engaged on these issues, as the recent proliferation of legislative activity across the country shows." *L.W.*, 2023 WL 4410576, at *3. During even the short time since *L.W.* issued, another state legislature passed legislation on this subject. Sara Cline, *Louisiana Lawmakers Overturn Governor's Veto on Gender-Affirming Care Ban for Transgender Minors*, Associated Press (July 18, 2023), https://perma.cc/4MFA-5F3M. The Commonwealth urges the Court not to stall this ongoing process. To do so would "usurp authority that the Constitution entrusts to the people's elected representatives" and "confuse what [the Due Process Clause] protects with [the Court's] own ardent views about the liberty that Americans should enjoy." *See Dobbs*, 142 S. Ct. at 2247.

## B.    The plaintiffs' equal-protection claim is unlikely to succeed.

On their equal-protection claim, the plaintiffs' only hope is that intermediate scrutiny applies. But as this Court has already correctly reasoned, rational-basis review applies, and it is easily satisfied here. *L.W.*, 2023 WL 4410576, at *6–8. But even if heightened scrutiny applies, SB 150 survives it.[3]

---

[3] This analysis also applies if the Court agrees with the parent-plaintiffs on their substantive-due-process claim.

### 1.    SB 150 does not discriminate on the basis of sex.

**a.** Almost three decades ago, the Supreme Court considered an equal-protection challenge to a prohibition on women attending an "incomparable military college." *United States v. Virginia*, 518 U.S. 515, 519 (1996). With Justice Ginsburg writing, the Court emphasized that "official action denying rights or opportunities based on sex" is subject to intermediate scrutiny. *Id.* at 531, 533. Such heightened review is necessary, the Court explained, when "official action . . . closes a door or denies opportunity to women (or to men)." *Id.* at 532.

This explanation of why intermediate scrutiny applies to laws that discriminate based on sex is longstanding. Heightened scrutiny reflects the fact that laws "distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the relative capabilities of men and women." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985). In one of its foundational decisions about sex discrimination, the Supreme Court explained the justification for heightened scrutiny this way: "[S]ince sex . . . is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility.'" *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) (citation omitted).

This historical backdrop shows just how far the plaintiffs want the Court to stretch the concept of sex discrimination. They invite the Court to contort—really, re-make—equal-protection doctrine so that sex is no longer the "immutable characteristic" described in *Frontiero*. But "biological sex . . . is the driving force behind the Supreme Court's sex-discrimination jurisprudence." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.6 (11th Cir. 2022) (en banc). The plaintiffs' theory of equal protection could not be more unlike the classic sex discrimination in cases like *Virginia*.

Most notably, SB 150 applies equally to both sexes. It prohibits health-care providers from prescribing puberty blockers and hormones for a specified purpose no matter the child's sex. Ky. Rev. Stat. § 311.372(2)(a)–(b). Put differently, no minor, regardless of sex, can obtain the prohibited treatments. SB 150's prohibition simply does not "prefer one sex to the detriment of the other." *L.W.*, 2023 WL 4410576, at *6. To put this point in *Virginia*'s terms, SB 150 does not "close[] a door or den[y] opportunity to women (or to men)." 518 U.S. at 532. It follow that only rational-basis review applies.

**b.** The district court concluded otherwise. It reasoned that SB 150 classifies based on sex because it prevents girls from doing something that boys can, and vice versa. As the district court put it, "the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law." Mem. Op., R.61, PageID#2303 (quoting *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022)). This assertion is based on the fact that only boys can take estrogen to try to change their natal sex

20

appearance, and only girls can take testosterone to try to change their natal sex appearance. *See* Laidlaw Decl., R.47-10, PageID#1220–28.

But that biological reality does not establish that SB 150 discriminates based on sex. Under binding precedent, it shows why rational-basis review applies. As the Supreme Court held in *Dobbs*, "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig*, 417 U.S. at 496 n.20).

*Geduldig* is the key case here. There, the Court held that, even though only women can become pregnant, a state insurance policy that excluded coverage related to pregnancy does not classify on the basis of sex. 417 U.S. at 495–97; *accord Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993) (describing *Geduldig* as "reject[ing] the claim that a state disability insurance system that denied coverage to certain disabilities resulting from pregnancy discriminated on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment"). Just as "only women can become pregnant," *Geduldig*, 417 U.S. at 496 n.20, only boys can take estrogen to try to change their natal sex appearance and only girls can take testosterone to try to change their natal sex appearance. For this simple reason, and as in *Geduldig*, this case is a "far cry" from those involving sex discrimination. *See id.* To regulate a medical treatment that only one sex can undergo is not sex discrimination. *Geduldig* so holds—as affirmed in *Dobbs*.

21

*Geduldig* and *Dobbs* make good sense. They explain why the Equal Protection Clause does not override the States' broad authority to pass "health and safety measures" that relate to medical issues or treatments that affect only one sex. *See Dobbs*, 142 S. Ct. at 2245–46. After all, the States, Kentucky included, regularly pass such laws. *See, e.g.*, Ky. Rev. Stat. § 311.772 (abortion); Ky. Rev. Stat. § 311.715(2) (in-vitro fertilization); Ky. Rev. Stat. § 218A.274 (pregnancy); Ky. Rev. Stat. § 205.617(1)(c) (cervical cancer); Ky. Rev. Stat. § 217.105(2) (prostate gland disorders). If the Court concludes that SB 150 is subject to heightened scrutiny merely because it prohibits a treatment that is biologically unique to each sex, it would contradict the reasoning of *Geduldig* and *Dobbs* while opening the door to equal-protection challenges to all manner of state laws.

If a state regulates a medical treatment that only one sex can undergo, precedent dictates that a challenger faces a higher hurdle. As *Geduldig* explained, the plaintiff must show that the classification is "mere pretext[] designed to effect an invidious discrimination against the members of one sex or the other." 417 U.S. at 496 n.20; *see also Bray*, 506 U.S. at 271–72. No such invidious discrimination has been suggested here. Indeed, nothing of the sort is mentioned in the district court's decision. Mem. Op., R.61, PageID#2303–08.

**c.** The district court also justified its equal-protection holding by relying on *Bostock v. Clayton County*. Mem. Op., R.61, PageID#2304. But analogizing to *Bostock* is unpersuasive. *L.W.*, 2023 WL 4410576, at *7.

22

To begin with, *Bostock* is at least twice removed from this case. *Bostock* interpreted a federal statute, not the Equal Protection Clause. And *Bostock* arose in the workplace, not the medical context. *Bostock* itself addressed the concern that "our decision will sweep beyond Title VII." 140 S. Ct. at 1753. It emphasized that "[t]he only question before" the Court was the interpretation of Title VII in a particular context. *Id.* Any other issues are "questions for future cases." *Id. Bostock*'s emphasis on this point cannot be missed. This Court has already gotten the not-so subtle hint. *Bostock*, the Court has held, "was clear on the narrow reach of its decision and how it was limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). More to the point, "the rule in *Bostock* extends no further than Title VII." *Id.*; *see also Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("It does not follow that principles announced in the Title VII context automatically apply in the Title IX context.").

Aside from *Bostock*'s assurances about its narrow scope, there are good reasons not to extend its statutory analysis to the Equal Protection Clause. The most obvious is that Title VII's text differs from that of the Equal Protection Clause. *Compare* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex . . . ."), *with* U.S. Const. amend. XIV, § 1 ("No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."). In addition, "[t]he Fourteenth Amendment . . . predates Title VII by nearly a century, so there is reason to be skeptical that its protections reach so far." *Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16,

23

2022) (Stras, J., dissenting from denial of rehearing en banc). And if *Bostock* was clear about one thing, it was that Title VII's particular text drove the result. 140 S. Ct. at 1741–43. In fact, *Bostock*'s author recently rejected the notion that the Equal Protection Clause maps onto a differently worded anti-discrimination provision (Title VI). "That such differently worded provisions should mean the same thing is implausible on its face." *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2219–20 (2023) (Gorsuch, J., concurring).

*Bostock*'s reasoning also cannot apply in the medical context. In employment matters, Title VII means that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Bostock*, 140 S. Ct. at 1741. But that reasoning cannot hold in the medical context, where males and females are not similarly situated. As discussed above, an individual's sex in fact matters to many medical decisions and treatments. If the Court were to extend *Bostock*'s statutory reasoning to the equal-protection context, it would all but nullify the recognition from *Geduldig* and *Dobbs* that merely regulating a procedure or treatment that only one sex can undergo is not sex discrimination.

The plaintiffs have suggested that precedent dictates that Title VII and the Equal Protection Clause mean the same thing in the context of alleged sex discrimination. Emergency Mtn. to Lift Stay, at 11 & n.2 (July 18, 2023) (collecting cases). But the precedent they marshal predates *Bostock*. And their argument saps much of the import of Title VII, which *Bostock* labeled a "[m]ajor initiative[]" that is "equally simple and

24

momentous." 140 S. Ct. at 1737, 1741. As the plaintiffs see it, Title VII was apparently not needed to remedy sex discrimination in the workplace, given that the Equal Protection Clause provided identical protections all along. Even putting that aside, Title VII cannot mean the same thing as the Equal Protection Clause in the medical context in light of *Geduldig* and *Dobbs*.

**d.** The district court also leaned into this Court's decision in *Smith v. City of Salem*. Mem. Op., R.61, PageID#2304–05. But this Court has already explained why *Smith* "does not move the needle either." *L.W.*, 2023 WL 4410576, at \*7.

In *Smith*, the plaintiff "began expressing a more feminine appearance on a full-time basis—including at work." 378 F.3d at 568 (cleaned up). "Soon thereafter, [the plaintiff]'s co-workers began questioning him about his appearance and commenting that his appearance and mannerisms were not 'masculine enough.'" *Id.* After this, the plaintiff "informed [his supervisor] of the likelihood that his treatment would eventually include complete physical transformation from male to female." *Id.* The supervisor then told a higher-up. *Id.* After being terminated, the plaintiff sued and "claim[ed] that the discrimination he experienced was based on his failure to conform to sex stereotypes by expressing less masculine, and more feminine mannerisms and appearance." *Id.* at 572. In other words, the plaintiff alleged that he was fired for "his appearance and mannerisms . . . not being masculine enough." *Id.*

*Smith*'s constitutional reasoning spans only a few sentences. Its only real analysis says (with a citation to non-binding precedent) that "[t]he facts [the plaintiff] has alleged

to support his claims of gender discrimination pursuant to Title VII easily constitute a claim of sex discrimination grounded in the Equal Protection Clause of the Constitution, pursuant to § 1983." *Id.* at 577. That brief statement, made in a context far removed from this case, has no purchase here.

Merely describing the sex-stereotype theory of liability in *Smith* shows why it does not apply here. SB 150 does not turn on a stereotype about how masculine or feminine an individual should dress or act, which is what drove the employer's action in *Smith*. *See Tuan Anh Nguyen v. INS*, 533 U.S. 53, 68 (2001) (defining a stereotype as a "frame of mind resulting from irrational or uncritical analysis"). To put things in *Smith*'s terms, SB 150 is unconcerned with whether a boy or girl dresses or behaves a certain way. SB 150 implicates biological differences between boys and girls and related medical treatment. And biology is "not a stereotype," *see id.*, given that "[p]hysical differences between men and women . . . are enduring," *Virginia*, 518 U.S. at 533. As the Supreme Court has made clear, "[t]o fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen*, 533 U.S. at 73.

The district court disagreed by focusing on the language in SB 150 prohibiting treatments "for the purpose of attempting to alter the appearance of, or to validate the minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex." Ky. Rev. Stat. § 311.372(2). As the district court saw things, under

26

*Smith*, this provision demonstrates that SB 150 has "the effect of enforcing gender conformity." Mem. Op., R.61, PageID#2304. But again, SB 150 relates to biological differences between boys and girls. It cares not whether a child dresses or behaves as someone else thinks he or she should.

Importantly, the district court's line of thinking extends *Smith* far beyond its ambit. *Smith* concerned the workplace; SB 150 concerns medical treatment. *Smith* involved adults; SB 150 involves children. *L.W.* captured this point perfectly: *Smith* "did not hold that every claim of transgender discrimination requires heightened scrutiny, least of all in the fraught context of whether a State may limit irreversible medical treatments to minors facing gender dysphoria." *L.W.*, 2023 WL 4410576, at *7. To do so, *L.W.* emphasized, would create unresolvable tension with *Dobbs* and *Geduldig*. *Id.*

### 2. Intermediate scrutiny is not otherwise applicable.

Although the district court did not reach this issue, Mem. Op., R.61, PageID#2303 n.5, the plaintiffs argued below that SB 150 discriminates based on transgender status, which they assert is a quasi-suspect classification afforded intermediate scrutiny. There are two problems with this submission. First, SB 150 does not discriminate based on transgender status. And second, even if it did, transgender status is not a quasi-suspect class to which intermediate scrutiny applies.

**a.** SB 150 does not discriminate based on transgender status. Instead, the challenged provisions at best create classifications based on age and medical treatment, both

27

of which generally receive only rational-basis review. *See Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018); *Vacco v. Quill*, 521 U.S. 793, 799–801 (1997).

Under SB 150, only minors are prohibited from receiving hormones and puberty blockers. Ky. Rev. Stat. § 311.372(1)(a), (2). And the prohibition applies for the purpose of attempting to alter the minor's natal sex appearance. Ky. Rev. Stat. § 311.372(2). Puberty blockers and hormones can be used for other reasons—for example, to treat central precocious puberty and testicular cancer. Laidlaw Decl., R.47-10, PageID#1209–13. So SB 150 classifies based on age and the use of the drugs, not based on whether transgender persons are using them.

This illustrates that there is an imperfect fit between transgender status and the use of puberty blockers and hormones. This line of thinking tracks with *Geduldig*. There, the statutory exclusion "divide[d] potential recipients into two groups—pregnant women and nonpregnant persons." *Geduldig*, 417 U.S. at 496 n.20. As *Geduldig* emphasized, "[w]hile the first group is exclusively female, the second includes members of both sexes." *Id*. This led to a "lack of identity between the excluded disability and gender as such." *Id*.

Although transgender minors cannot be prescribed drugs to attempt to alter their natal sex appearance, not all transgender minors seek such treatments. Levine Decl., R.47-11, PageID#1300–01. And not all minors who seek such treatments may characterize themselves as transgender. *See* Resp. Pls.' Mot. PI, R.47, PageID#502 n.2. So transgender status is not coterminous with those who desire to receive the prohibited

treatments—in *Geduldig*'s terms, there is a "lack of identity." 417 U.S. at 496 n.20. That being the case, SB 150 does not discriminate based on transgender status.

**b.** Even if SB 150 discriminates based on transgender status, heightened scrutiny is still not warranted.

On this point, the early stage of this litigation resolves the issue. That's because the plaintiffs cannot dispute that "neither the Supreme Court nor this court has recognized transgender status as a quasi-suspect class." *L.W.*, 2023 WL 4410576, at *6. And the Supreme Court "has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so." *Ondo*, 795 F.3d at 609. This decades-long reticence undercuts any suggestion that the plaintiffs can establish a "clear" right to relief. *See Winter*, 555 U.S. at 22. Indeed, given how "rarely" the Supreme Court recognizes a new quasi-suspect class, the Eleventh Circuit recently expressed "grave 'doubt' that transgender persons constitute a quasi-suspect class." *Adams*, 57 F.4th at 803 n.5.

Perhaps recognizing that they lack a clear right to relief, the plaintiffs urged the district court to discern a new quasi-suspect class by applying a multi-factor test. But those factors do not help the plaintiffs, much less clearly so. For example, one of the factors is whether a group "exhibit[s] obvious, immutable, or distinguishing characteristics." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). As this Court has emphasized, the Supreme Court "has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or

biological gender." *Ondo*, 795 F.3d at 609. But the plaintiffs invite the Court to do exactly that. Sex is "an immutable characteristic determined solely by the accident of birth." *Frontiero*, 411 U.S. at 686 (plurality op.). By contrast, individuals identify as transgender when their internal perception of their sex changes from that immutable characteristic. *See, e.g.*, Cantor Decl., R.47-9, PageID#1055–57; Levine Decl., R.47-11, PageID#1284–89; Nangia Decl., R.47-12, PageID#1413–26; Laidlaw Decl., R.47-10, PageID#1199–1202. And that internal perception can of course change. *See, e.g.*, Levine Decl., R.47-11, PageID#1286, 1320–28; Laidlaw Decl., R.47-10, PageID#1200. Layla's story from above demonstrates as much. Jane Decl., R.47-15, PageID#1526–31.

On this record, it also is hard to conclude that transgender persons "require[] 'extraordinary protection from the majoritarian political process.'" *Ondo*, 795 F.3d at 609 (citation omitted). Below, the United States filed a brief in support of the plaintiffs, Statement of Interest, R.37, PageID#427–46, as did more than a dozen interest groups, Interest Group Amicus Br., R.19-2, PageID#319–38. And although the plaintiffs believe *Bostock* helps them, it works against them on this point. As *Bostock* held, Title VII, passed in 1964, takes the "simple but momentous" step of providing that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Bostock*, 140 S. Ct. at 1737, 1741.

**C.    SB 150 satisfies any level of constitutional scrutiny.**

The Equal Protection Clause "is essentially a direction that all persons *similarly situated* should be treated alike." *City of Cleburne*, 473 U.S. at 439 (emphasis added). It

"simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

This animating principle explains why only intermediate scrutiny, not strict scrutiny, applies in the sex-discrimination context. *See Virginia*, 518 U.S. at 531–34. As *Virginia* emphasized, "[p]hysical differences between men and women . . . are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'" *Id.* at 533 (second and third alterations in original) (citation omitted). And these "'[i]nherent differences' between men and women, we have come to appreciate, remain cause for celebration." *Id.* It is when these inherent differences are "used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women" that a law cannot survive intermediate scrutiny. *See id.* at 534 (internal citation omitted). In other words, classifications cannot "rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* at 533.

A law that concerns the medical impact of hormones and puberty blockers does not cross this line. As the Supreme Court put it in an another context, such a law is not "marked by misconception and prejudice, nor does it show disrespect for either class." *See Nguyen*, 533 U.S. at 73. "To fail to acknowledge even our most biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it." *Id.*

Kentucky's interests with respect to SB 150 are of the highest order. They bear no relation to "overbroad generalizations about the different talents, capacities, or preferences of males and females." *See Virginia*, 518 U.S. at 533. The Commonwealth has a "compelling governmental interest in the protection of children." *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006). Kentucky is equally concerned with "protecting vulnerable groups . . . from abuse, neglect, and mistakes," *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997), and with "protecting the integrity and ethics of the medical profession," *id.* So the only question is whether SB 150 sufficiently serves those interests. It does.

As this Court has outlined, "the medical and regulatory authorities are not of one mind about using hormone therapy to treat gender dysphoria." *L.W.*, 2023 WL 4410576, at *4. Those advocating for what they call "gender-affirming care" argue that without it children will have higher rates of anxiety, depression, and suicidality. That is wrong. At the very least, the best available medical evidence does not support such a conclusion.

As this issue is studied more, a consensus is emerging that such treatment is experimental at best. Resp. Pls.' Mot. PI Ex. 1, R.47-1, PageID#518–19; Resp. Pls.' Mot. PI Ex. 2, R.47-2, PageID#526; Resp. Pls.' Mot. PI Ex. 3, R.47-3, PageID#539; Resp. Pls.' Mot. PI Ex. 4, R.47-4, PageID#545; Cantor Decl., R.47-9, PageID#1016–25, 1040–48, 1082–87; Levine Decl., R.47-11, PageID#1328–51; Laidlaw Decl., R.47-

10, PageID#1246–48. Even the primary interest groups that advocate for such treatment—WPATH and the Endocrine Society—have recognized the evidentiary limitations supporting it. Cantor Decl., R.47-9, PageID#1049–54, 1074, 1084–87, 1111–16; Levine Decl., R.47-11, PageID#1300–13; Resp. Pls.' Mot. PI Ex. 6, R.47-6, PageID#700. So have many others. Cantor Decl., R.47-9, PageID#1013–54, 1073–75, 1082–97, 1111–37; Levine Decl., R.47-11, PageID#1282–84, 1297–1313, 1328–40, 1352–53, 1360–66; Laidlaw Decl., R.47-10, PageID#1208, 1220, 1231–42, 1256–57; Nangia Decl., R.47-12, PageID#1429–30, 1467–70.

In fact, record evidence shows that such treatments have the opposite effect argued by the interest groups. Levine Decl., R.47-11, PageID#1283–84, 1328–52, 1361–63; Laidlaw Decl., R.47-10, PageID#1221, 1225, 1241–42; Cantor Decl., R.47-9, PageID#1020, 1070–80, 1088–97, 1098–10. Such treatments lead to physical and mental-health problems that are irreversible and that would have never befallen the child but for such treatment. Cantor Decl., R.47-9, PageID#1098–1110; Laidlaw Decl., R.47-10, PageID#1204, 1211–31, 1243–44, 1247, 1256–57; Levine Decl., R.47-11, PageID#1283–84, 1290, 1324–52.

All of this shows (at the very least) that there is not an agreed-upon standard of care for treating children with gender dysphoria. Levine Decl., R.47-11, PageID#1282, 1300–13. And importantly, alternative treatments exist if one recognizes that gender dysphoria desists in most children, unless the treatments prohibited by SB 150 are instituted. Then the odds flip. Cantor Decl., R.47-9, PageID#1059–69; Levine Decl.,

R.47-11, PageID#1282–83, 1297–1300, 1317, 1320–28, 1331, 1361–63; Laidlaw Decl., R.47-10, PageID#1207–09, 1243–44, 1256. Psychotherapy is an effective alternative form of treatment, so much so that other countries prioritize it. Levine Decl., R.47-11, PageID#1293–1300, 1306, 1308–09, 1357–64; Nangia Decl., R.47-12, PageID#1410, 1426–37, 1471–85, 1491–96; Cantor Decl., R.47-9, PageID#1016, 1032, 1035, 1061–62, 1076–80, 1088–97; Laidlaw Decl., R.47-10, PageID#1247.

True, several medical interest groups disagree.[4] And the district court adopted their views. Mem. Op., R.61, PageID#2307. But the Constitution does not compel Kentucky's legislature to outsource protecting health and welfare to those interest groups. The Constitution of course leaves such health-and-welfare decisions to "the democratic branches," which are "better suited to decide the proper balance between the uncertain risks and benefits" of medical treatment. *See Eschenbach*, 495 F.3d at 713. More specifically, Kentucky's General Assembly has "wide discretion" to pass health-and-welfare legislation "in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163; *see also Marshall v. United States*, 414 U.S. 417, 427 (1974); *Collins v. Texas*, 223 U.S. 288, 297–98 (1912). Although "the position of the American Medical Association" and other interest groups may be relevant to a "legislative committee," their views do not "shed light on the meaning of the Constitution." *See Dobbs*, 142 S.

---

[4] The record below gives ample reason to question whether those interest groups' views are driven by something other than science and medicine. *E.g.*, Levine Decl., R.47-11, PageID#1304–13, 1358–60; Cantor Decl., R.47-9, PageID#1013–14, 1084–87; Laidlaw Decl., R.47-10, PageID#1207, 1231–41.

Ct. at 2267 (citation omitted). Kentucky need not "surrender its authority to regulate" to protect its citizens simply because of what some "private party claims is the norm for the practice of medicine." *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 439 (6th Cir. 2019). If the plaintiffs' favored interest groups want their views enshrined in law, "they should address their arguments to [Kentucky's] elected representatives." *See id.*

### D.  The plaintiffs have not established standing sufficient to receive a preliminary injunction.

To win a preliminary injunction, a plaintiff must provide proof of standing. *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018). At this stage, a court "normally" evaluates standing "under the heightened standard for evaluating a motion for summary judgment." *Id.* (citation omitted). It follows that a plaintiff generally cannot rest on "mere allegations" in a complaint but "must set forth by affidavit or other evidence specific facts" showing standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up) (citation omitted). If a plaintiff seeking a preliminary injunction fails to sufficiently prove standing, the remedy is not dismissal for lack of jurisdiction. *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020). Instead, considering standing at this stage is simply another way of examining the plaintiff's likelihood of success on the merits. *See Arizona*, 40 F.4th at 383–87, 390–93 (concluding that the plaintiffs were unlikely to establish standing but also addressing the merits).

At this early juncture, the plaintiffs' standing proof is deficient in two respects. First, on this record, the plaintiffs have not proved that a favorable ruling will likely redress their alleged injuries. *See Lujan*, 504 U.S. at 561 ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" (citation omitted)). The plaintiffs' redressability theory proceeds on the assumption that an injunction prohibiting the original defendants from revoking the licenses or certifications of health-care providers under Ky. Rev. Stat. § 311.372(4) for violating SB 150 will allow the children-plaintiffs to receive puberty blockers and hormones. *See* Compl., R.2, PageID#25–29. But that theory overlooks that license and certification revocation is not the only way that SB 150 can be enforced. The statute also authorizes a private right of action against health-care providers—what SB 150 describes as a "civil action to recover damages for injury suffered as a result of a violation of" of SB 150. Ky. Rev. Stat. § 311.372(5). And the law provides a generous statute of limitations for those injured by a medical provider's violation of SB 150. *Id.* § 311.372(5)(a)–(b).

That SB 150 can be enforced in two distinct ways creates a redressability problem on this record. In particular, the plaintiffs have offered no proof that their medical providers will likely provide puberty blockers and hormones despite the risk of civil liability created by SB 150. None of the children-plaintiffs' medical providers submitted a declaration below. (The plaintiffs did provide declarations from a Kentucky doctor, but she does not state that she treats any of the children-plaintiffs or that she will provide prohibited treatments at the risk of civil liability. Kingery Decl., R.17-3, PageID#232–

54; Kingery Supp. Decl., R.52-5, PageID#1928–33.) And the parent-plaintiffs' declarations simply do not discuss this crucial issue. Jane Doe 1 Decl., R.17-4, PageID#280–82; John Doe 2, R.17-5, PageID#283–85; John Doe 3 Decl., R.17-6, PageID#286–88; Jane Doe 5 Decl., R.17-7, PageID#289–91. The only possibly relevant statement is in John Doe 3's declaration, which says that "JM Doe 3's endocrinologist has informed us that she will no longer be able to treat JM Doe 3 once the Treatment Ban goes into effect on June 29 and will instead have to refer us out-of-state."[5] Jane Doe 3 Decl., R.17-6, PageID#288. But if anything, that statement cuts against John Doe 3, Jane Doe 3, and JM Doe 3 on redressability, given that both the license-revocation provision and the private right of action prohibit treatment. In short, at this early stage, the record contains no evidence that an injunction against the original defendants will likely redress the plaintiffs' alleged injuries.

Second, only some of the plaintiffs have submitted proof of an alleged injury in fact. The only such proof consists of the four parent-plaintiff declarations. Those declarations state that each parent-plaintiff's respective child is currently receiving treatment that SB 150 prohibits. Jane Doe 1 Decl., R.17-4, PageID#281; John Doe 2, R.17-5, PageID#284; John Doe 3 Decl., R.17-6, PageID#287–88; Jane Doe 5 Decl., R.17-7, PageID#290. The plaintiffs offered no proof of standing with respect to the other three

---

[5] The declaration does not define "Treatment Ban."

children-plaintiffs and their parents; they merely offered the allegations in their unverified complaint. Compl., R.2, PageID#13–16, 25–29. And the complaint acknowledges that JM Doe 7 is not receiving any treatment affected by SB 150. *Id.* at PageID#16 ("JM Doe 7 . . . anticipates needing to receive medically necessary care that will be prohibited by the Ban when it goes into effect."), PageID#29 (alleging that JM Doe 7 "may" need treatment prohibited by SB 150). As a result, the only plaintiffs who offered proof of an injury in fact are JM Doe 1, 2, 3, and 5 and their parents. And because JM Doe 7 merely "anticipates" wanting prohibited treatment with an added "may" qualifier, JM Doe 7, John Doe 7, and Jane Doe 7 also have an imminence problem in establishing standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

## II.    The remaining factors do not favor a preliminary injunction.

**1.** A showing of irreparable harm is essential to securing a preliminary injunction. *Winter*, 555 U.S. at 22. Yet the plaintiffs came up short in this respect.

The district court identified two types of irreparable harm. First, it "presumed" irreparable harm because of its constitutional holdings. Mem. Op., R.61, PageID#2311 (citation omitted). But that presumption does not hold in light of the merits discussion above. *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 560 (6th Cir. 2021).

Second, the district court found irreparable harm because, in its view, prohibiting puberty blockers and hormones for the children-plaintiffs "would cause serious consequences, including severe psychological distress and the need to move out of state."

38

Mem. Op., R.61, PageID#2311. That assertion suffers from factual problems and uncertainties. Laidlaw Decl., R.47-10, PageID#1248–56. And make no mistake, the Commonwealth could not take more seriously its obligation to protect children with gender dysphoria. Indeed, in passing SB 150, Kentucky's legislature decided that what in fact protects these children is prohibiting the use of puberty blockers and hormones. As *L.W.* summed up, "[b]oth sides have the same fear, just in the opposite direction—one saying the procedures create health risks that cannot be undone, the other saying the absence of such procedures creates risks that cannot be undone." 2023 WL 4410576, at *8. The irreparable-harm question thus reduces to a question of "who decides"—the interest groups whose views the district court credited or Kentucky's legislature.

Our Constitution supplies the answer. In areas of "medical and scientific uncertainty," the Kentucky General Assembly has "wide discretion" to pass health-and-welfare laws. *See Gonzales*, 550 U.S. at 163 (collecting cases). "Medical uncertainty does not foreclose the exercise of legislative power . . . ." *Id.* at 164. The Constitution empowers legislatures to protect health and welfare even "if some part of the medical community were disinclined to follow the proscription." *Id.* at 166. And "[c]onsiderations of marginal safety, including the balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends." *Id.* In light of the extensive evidence catalogued above, it cannot be said that Kentucky's legislature acted unreasonably by determining that prohibiting puberty blockers and hormones for a certain purpose protects Kentucky's children.

One final point about irreparable harm. SB 150 does not require the plaintiffs who were taking puberty blockers or hormones when the law took effect to immediately stop taking them. To the contrary, SB 150 allows continuing treatments without specifying an end date as long as the prohibited treatments are "systematically reduced" over time. Ky. Rev. Stat. § 311.372(6). This provision allows the affected plaintiffs to consult with a physician about how to decrease dosage and when to end taking the prohibited drugs. If the physician "determines and documents in the minor's medical record that immediately terminating the minor's use of the drug or hormone would cause harm to the minor," SB 150 explicitly allows the minor and the physician to institute a plan to "systematically reduce[]" the prohibited drugs. *See id.* By not giving a firm end date for when treatments must end, SB 150 gives physicians discretion to wind down the prohibited treatments.

**2.** When, as here, the government is the opposing party, the remaining preliminary-injunction factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The harm to Kentucky, especially its children, from not enforcing SB 150 is irreparable. As this Court has recognized, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Thompson*, 976 F.3d at 619 (cleaned up) (citation omitted). Kentucky's sovereign prerogative to enforce its law is not some abstract interest, but one that "sounds in deeper, constitutional considerations." *See Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1010 (2022); *see also Maine v. Taylor*, 477 U.S. 131, 137 (1986).

The plaintiffs have contested this point by pointing out that the initial defendants had no interest in opposing a preliminary injunction below. KBML/KBN Resp. Pls. Mot. PI, R.41, PageID#478–79; Friedlander Resp. Pls. Mot. PI, R.42, PageID#481–82. That is unfortunate but irrelevant. Those officials do not decide Kentucky's public policy. Its legislature does that. Kentucky's high court could not be more emphatic about that point: "As we have noted time and again, so many times that we need not provide citation, the General Assembly establishes the public policy of the Commonwealth." *Cameron v. Beshear*, 628 S.W.3d 61, 75 (Ky. 2021). Plus, the state officials who are sitting on their hands in this case do not speak for the Commonwealth in court. That is the job of Attorney General Daniel Cameron, who intervened below on behalf of the Commonwealth. *See Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin*, 498 S.W.3d 355, 363 (Ky. 2016); *see also* Ky. Rev. Stat. § 15.020. And part of respecting Kentucky's sovereignty is "tak[ing] into account the authority of a State to structure its executive branch in a way that empowers multiple officials to defend its sovereign interests in federal court." *Cameron*, 142 S. Ct. at 1011.

The public interest mostly follows from what has already been said. It favors "giv[ing] effect to the will of the people 'by enforcing the laws they and their representatives enact.'" *Thompson*, 976 F.3d at 619 (citation omitted). All the more so given the need to protect Kentucky's children from what its legislature determined are experimental treatments with long-term, irreversible consequences.

More generally, the public interest favors letting the ongoing debate about how best to treat children with gender dysphoria continue. As these consolidated appeals show, "the States are currently engaged in serious, thoughtful" discussions about the issue. *See Glucksberg*, 521 U.S. at 719. And so far, the States have taken rather different positions on this issue. That disagreement is a reason for more, not less, debate. A preliminary injunction throws sand in these constitutional gears at the very moment the States are focused on how to protect children. It serves the public interest for this deliberative process to continue.

## III.    The preliminary injunction is overbroad.

Even if the Court decides that the district court's preliminary injunction survives, it should be substantially narrowed so that it benefits only the plaintiffs. The Court already explained why this is so. *L.W.*, 2023 WL 4410576, at *3; *id.* at *10 (White, J., concurring in part and dissenting in part). And what the Court said in *L.W.* applies fully here.

The district court granted what it termed a "facial injunction." Mem. Op., R.61, PageID#2312. Under it, the defendants cannot enforce the enjoined provisions anywhere in the Bluegrass State. *Id.* at PageID#2313 ("Defendants and Intervening Defendant and their agents, employees, servants, attorneys, successors, and any other person in active concert with them are **ENJOINED**, pending final judgment, from enforcing, threatening to enforce, or otherwise requiring compliance with SB 150 § 4(2)(a) and (b)."). More to the point, under the preliminary injunction, the defendants cannot

42

enforce SB 150 against any health-care provider through license or certification revocation even if the provider gives cross-sex hormones or puberty blockers to non-party children and even if those children have not previously taken such drugs.

At a minimum, the district court overstepped in this respect. The only parties who sought a preliminary injunction were the plaintiffs. PI Mot., R.17, PageID#109. And when they filed suit, not all the children-plaintiffs were even receiving treatment prohibited by SB 150. Compl., R.2., PageID#16, 29. Importantly, the plaintiffs did not bring a class-action suit. Compl., R.2, PageID#13–17. So they have not tried to use the procedural mechanism that could potentially allow them to litigate on behalf of other children and parents in Kentucky.

It is black-letter law that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). This means that a preliminary injunction must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Biden*, 57 F.4th at 557 (citation omitted). A district court "abuse[s] its discretion" when it "extend[s] the preliminary injunction's protection to non-part[ies]" when "an injunction limited to the parties" would suffice. *Id.*; *accord Warshak v. United States*, 532 F.3d 521, 531 (6th Cir. 2008). The reason for this rule goes to Article III itself. "[A]ffording relief beyond the parties . . . raises substantial questions about federal courts' constitutional and equitable powers." *Biden*, 57 F.4th at 557 (citing *Arizona v. Biden*, 31 F.4th 469, 483 (6th Cir. 2022) (Sutton, C.J., concurring)).

If a preliminary injunction is warranted, the plaintiffs have not shown the need for anything more than party-specific relief. More specifically, the plaintiffs provided no evidence that their health-care providers will provide prohibited treatment to them only if they can provide it to every child who presents to them allegedly needing such treatment. This simple fact distinguishes the plaintiffs' favored case about the proper scope of an injunction. *Washington v. Reno*, 35 F.3d 1093, 1104 (6th Cir. 1994) (finding that party-specific injunction would be "illusory indeed" for the plaintiffs).

The district court devoted a single paragraph to discussing the scope of the injunction. Mem. Op., R.61, PageID#2312. It did not mention *Biden* or *Warshak*—this Court's most applicable precedents—despite the Commonwealth citing them. Resp. PI Mot., R.47, PageID#514–15. The district court instead went out of circuit and cited the Eighth Circuit's *Brandt* decision. *Id.* True, *Brandt* (also in a single paragraph) affirmed a statewide injunction against Arkansas's equivalent law to SB 150. 47 F.4th at 672. But *Brandt* faulted the government for "fail[ing] to offer a more narrowly tailored injunction that would remedy Plaintiffs' injuries." *Id.* That flips the burden. The plaintiffs must show the need for something more than a party-specific injunction. *See Warshak*, 532 F.3d at 531 ("[The plaintiff] did not seek class-action relief, and he has made no showing—below or here—why the injunction needed to run in favor of other individuals in order to protect him."). In any event, Kentucky has offered a narrower injunction: if an injunction is proper, it should be limited to the plaintiffs. In all events, *Brandt*'s cursory

reasoning cannot be squared with this Court's more measured approach in *Biden* and *Warshak*.

## CONCLUSION

The Court should reverse the preliminary injunction. At the least, the Court should narrow the injunction to the plaintiffs.

Respectfully submitted by,

*s/ Matthew F. Kuhn*
Daniel Cameron                                    Office of the Kentucky Attorney General
 *Attorney General of Kentucky*           700 Capital Avenue, Suite 118
Victor B. Maddox                                Frankfort, Kentucky 40601
 *Deputy Attorney General*                   (502) 696-5300
Matthew F. Kuhn                               Matt.Kuhn@ky.gov
 *Solicitor General*
Alexander Y. Magera                          *Counsel for the Commonwealth of Kentucky*
 *Assistant Solicitor General*

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(g) and 6th Cir. R. 32, I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 11,180 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Garamond font using Microsoft Word.

*s/ Matthew F. Kuhn*

**CERTIFICATE OF SERVICE**

I certify that on July 24, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Matthew F. Kuhn*

# ADDENDUM

The Commonwealth designates the following district-court documents as relevant to this appeal:

1. The plaintiffs' complaint. R.2, PageID#11–33.

2. The plaintiffs' motion for a preliminary injunction and attached exhibits. R.17, 17-1, 17-2, 17-3, 17-4, 17-5, 17-6, 17-7, PageID#109–291.

3. The Commonwealth's response to the plaintiffs' motion for a preliminary injunction and the Commonwealth's attached exhibits. R.47, 47-1, 47-2, 47-3, 47-4, 47-5, 47-6, 47-7, 47-8, 47-9, 47-10, 47-11, 47-12, 47-13, 47-14, 47-15, 47-16, 47-17, 47-18, 47-19, 47-20, 47-21, 47-22, 47-23, PageID#490–1575.

4. The plaintiffs' reply regarding their motion for preliminary injunction and their attached exhibits. R.52, 51-1, 52-2, 52-3, 52-4, 52-5, 52-6, PageID#1660–973.

5. The Commonwealth's motion to strike or for leave to file rebuttal declarations. R.54, PageID#1977–79.

6. The plaintiffs' response to the Commonwealth's motion to strike or for leave to file rebuttal declarations. R.58, PageID#1985–92.

7. The Commonwealth's reply regarding its motion to strike or for leave to file rebuttal declarations and its attached exhibits. R.60, 60-1, 60-2, 60-3, PageID#2000–298.

8. The amicus briefs filed in the district court. R.19-2, PageID#307–40; R.37, PageID#427–47; R.49-2, PageID#1584–616; R.51-1, PageID#1625–58.

48

9. The district court's memorandum opinion and order granting the plaintiffs' motion for a preliminary injunction. R.61, PageID#2299–313.

10. The Commonwealth's notice of appeal. R.65, PageID#2415–16.

11. The Commonwealth's district-court motion to stay the preliminary injunction pending appeal. R.66, PageID#2417–32.

12. The plaintiffs' response to the Commonwealth's district-court motion to stay the preliminary injunction pending appeal. R.71, PageID#2443–50.

13. The Commonwealth's notice of supplemental authority informing the district court of this Court's decision in *L.W. v. Skrmetti*, No. 23-5600 (6th Cir. July 8, 2023). R.73, PageID#2458–59.

14. The plaintiffs' amended response to the Commonwealth's notice of supplemental authority. R.77, PageID#2482–87.

15. The district court's order granting the Commonwealth's motion to stay the preliminary injunction pending appeal. R.79, PageID#2494–96.