No. 23-5609

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

JANE DOE, *et al.*,

*Plaintiffs-Appellees*,

v.

WILLIAM C. THORNBURY, JR., MD,

*Defendants*,

and

COMMONWEALTH OF KENTUCKY *ex rel.*
ATTORNEY GENERAL DANIEL CAMERON,

*Intervenor-Appellant.*

On Appeal from the United States District Court
for the Western District of Kentucky,
No. 3:23-cv-230, Hon. David. J. Hale

## PETITION FOR REHEARING EN BANC OF
## JULY 31, 2023 ORDER DENYING EMERGENCY
## MOTION TO LIFT STAY OF PRELIMINARY INJUNCTION

**NATIONAL CENTER FOR
LESBIAN RIGHTS**
Christopher F. Stoll
Kelly Jo Popkin
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 365-1320

**ACLU OF KENTUCKY
FOUNDATION**
Corey Shapiro
Heather Gatnarek
Crystal Fryman
Kevin Muench
325 W. Main Street, Suite 2210
Louisville, KY 40202
(502) 581-9746

**MORGAN, LEWIS & BOCKIUS LLP**
Amanda J. Ford
One Federal Street
Boston, MA 02110
(617) 431-7700

**MORGAN, LEWIS & BOCKIUS LLP**
Stephanie Schuster
Randall M. Levine
1111 Pennsylvania Avenue NW
Washington, DC 20004
(202) 739-3000

# **TABLE OF CONTENTS**

**Page**

STATEMENT REGARDING REHEARING EN BANC ......................................1

BACKGROUND ...........................................................................................3

REASONS FOR GRANTING REHEARING EN BANC.....................................4

I. THE PANEL'S CONCLUSION THAT PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR EQUAL PROTECTION CLAIMS CONFLICTS WITH DECISIONS OF THE SUPREME COURT, THIS COURT, AND OTHER CIRCUITS....................................4

    A. The Supreme Court, This Court, And Other Circuits Hold That Discrimination Against Transgender Persons, Like The Treatment Ban, Is Sex Discrimination Subject To Heightened Scrutiny. ...........................................................................4

    B. Because Cameron Failed To Present Evidence To Justify The Treatment Ban Under Heightened Scrutiny, The Record Does Not Support The Panel's Conclusion That Plaintiffs Are Unlikely To Succeed On The Merits. ...................................9

II. THE PANEL'S CONCLUSION THAT PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR DUE PROCESS CLAIMS ALSO CONFLICTS WITH PRECEDENT. ...............................10

III. THE PANEL'S ORDER PRESENTS QUESTIONS OF EXCEPTIONAL IMPORTANCE BECAUSE IT CONFLICTS WITH DECISIONS OF OTHER FEDERAL COURTS AND BECAUSE PLAINTIFFS WILL SUFFER IRREPARABLE HARM PENDING APPEAL IF SB 150 IS ALLOWED TO REMAIN IN EFFECT. ...............13

    A. The Panel's Order Conflicts With Decisions Of Other Circuits........13

    B. Plaintiffs And Other Transgender Adolescents In Kentucky Are And Will Continue Suffering Irreparable Harm. ..............................14

CONCLUSION .......................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
   495 F.3d 695 (D.C. Cir. 2007) ............................................................ 12

*Anderson v. City of Bessemer*,
   470 U.S. 564 (1985) ............................................................................ 9

*Bostock v. Clayton County*,
   140 S. Ct. 1731 (2020) ........................................................... 1, 3, 5, 6

*Boxill v. O'Grady*,
   935 F.3d 510 (6th Cir. 2019) .............................................................. 6

*Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022) ................................................... 2, 5, 7, 13

*Brandt v. Rutledge*,
   No. 21-450, 2023 WL 4073727 (E.D. Ark. June 20, 2023) ............... 11

*City of Los Angeles, Dep't of Water & Power v. Manhart*,
   435 U.S. 702 (1978) ............................................................................ 8

*Craig v. Boren*,
   429 U.S. 190 (1976) ............................................................................ 8

*Daniels v. Bd. of Educ.*,
   805 F.2d 203 (6th Cir. 1986) .............................................................. 6

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ..................................................................... 6, 7

*Doe 1 v. Thornbury*,
   No. 23-5609, — F.4th —, 2023 WL 4861984 (6th Cir. July 31, 2023) .......... 2, 4

*Doe v. Ladapo*,
   No. 23-114, 2023 WL 3833848 (N.D. Fla. June 6, 2023) ............. 7, 11, 12, 13

*Eknes-Tucker v. Marshall*,
   603 F. Supp. 3d 1131 (M.D. Ala. 2022) ........................................... 13

*GE Co. v. Gilbert*,
 429 U.S. 125 (1978)..................................................................................6

*Geduldig v. Aiello*,
 417 U.S. 484 (1974).........................................................................6, 7, 8

*Grano v. Dep't of Dev.*,
 637 F.2d 1073 (6th Cir. 1980) .................................................................6

*Grimm v. Gloucester Cnty. Sch. Bd.*,
 972 F.3d 586 (4th Cir. 2020) ..........................................................2, 5, 7, 13

*J.E.B. v. Alabama ex rel. T.B.*,
 511 U.S. 127 (1994)..................................................................................5

*K.C. v. Individual Members of Med. Licensing Bd.*,
 No. 23-595, 2023 WL 4054086 (S.D. Ind. June 16, 2023) ...........................7, 13

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
 927 F.3d 396 (6th Cir. 2019) .............................................................2, 10

*Karnoski v. Trump*,
 926 F.3d 1180 (9th Cir. 2019) .........................................................2, 5, 13

*Kitchen v. Chippewa Valley Schs.*,
 825 F.2d 1004 (6th Cir. 1987) .................................................................6

*Klein v. Cent. States S.E. & S.W. Areas Health & Welfare Plan*,
 346 F. App'x 1 (6th Cir. 2009) ..............................................................11

*L.W. by & through Williams v. Skrmetti*,
 73 F.4th 408, 2023 WL 4410576 (6th Cir. 2023)......................................*passim*

*L.W. by & through Williams v. Skrmetti*,
 No. 23-376, 2023 WL 4232308 (M.D. Tenn. June 28, 2023) ...........................11

*Lautermilch v. Findlay City Schs.*,
 314 F.3d 271 (6th Cir. 2003) .................................................................6

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
 138 S. Ct. 2361 (2018)...........................................................................12

*Nguyen v. I.N.S.*,
    533 U.S. 53 (2001).................................................................................8

*Parham v. J. R.*,
    442 U.S. 584 (1979).........................................................................2, 10

*Peruzzi v. Summa Med. Plan*,
    137 F.3d 431 (6th Cir. 1998) .............................................................11

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) .....................................................*passim*

*U.S. Student Ass'n Found. v. Land*,
    546 F.3d 373 (6th Cir. 2008) .........................................................9, 14

*United States v. Virginia*,
    518 U.S. 515 (1996)..............................................................................5

*Whitaker v. Kenosha Unified Sch. Dist. No. 1*,
    858 F.3d 1034 (7th Cir. 2017) ..................................................2, 5, 13

**Statutes**

Ky. Rev. Stat. § 311.372(2)(a)–(b) .......................................................3, 7

## <u>STATEMENT REGARDING REHEARING EN BANC</u>

Rehearing en banc of the panel's order denying Plaintiffs' emergency motion to lift the stay of the preliminary injunction against enforcement of Kentucky's ban on medically necessary, non-surgical treatment (hormone therapy and puberty blockers) for transgender minors (the "Treatment Ban") is necessary and warranted because it raises questions of exceptional importance and conflicts with prior decisions of this Court, the Supreme Court, and other circuits. Consideration by the full court is therefore necessary to secure and maintain uniformity of decisions. As shown below:

- the panel's decision presents questions of exceptional and lasting importance because the Treatment Ban forbids Plaintiffs and transgender adolescents throughout Kentucky from continuing to access necessary medical treatments for gender dysphoria, consistent with the established standard of care, as recommended by their doctors and deemed appropriate by their parents, resulting in severe physical, psychological, and *irreparable* harm;

- the panel's decision that Plaintiffs are unlikely to succeed on the merits of their Equal Protection claim because discrimination against transgender persons is not discrimination on the basis of sex conflicts with Supreme Court precedent, *see Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), a decision of this Court, *see Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004), and

decisions of other circuits, *see Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020); *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019); *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F.3d 1034 (7th Cir. 2017); and

- the panel's decision that Plaintiffs are unlikely to succeed on the merits of their Due Process Claim because parents do not have a fundamental right to determine whether or not to provide established medical treatment for gender dysphoria to their children conflicts with precedent from the Supreme Court, *see Parham v. J. R.*, 442 U.S. 584 (1979); and this Court, *see Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396 (6th Cir. 2019).

The district court granted Plaintiffs' motion for a preliminary injunction, but following the panel's published order staying the preliminary injunction in a challenge to Tennessee's similar treatment ban pending appeal, *see L.W. by & through Williams v. Skrmetti*, 73 F.4th 408, 2023 WL 4410576 (6th Cir. 2023), the district court felt compelled to grant a request to stay the preliminary injunction in this case, pending Attorney General Cameron's appeal. In another split and published decision (Exhibit A), the same panel refused to stay the stay and denied Plaintiffs' emergency motion to reinstate the preliminary injunction. *Doe 1 v. Thornbury*, No. 23-5609, — F.4th — , 2023 WL 4861984, at *2 (6th Cir. July 31, 2023). As a result, Plaintiffs are and will continue suffering not merely physically

and psychologically, but also irreparably and unnecessarily. Plaintiffs appreciate that the appeal has been placed on an expedited schedule; nonetheless, absent relief, the Minor Plaintiffs will be irreparably harmed by the denial of time-sensitive, medically necessary care for a duration of at least two months. Plaintiffs thus plea for expedited relief from the en banc Court to lift the stay, restore the preliminary injunction, or at a minimum lifted to allow those who are receiving such care to continue to receive care, and thus restore the status quo while this appeal proceeds.

## **BACKGROUND**

On June 28, 2023, the district court preliminarily enjoined the Treatment Ban, codified at Ky. Rev. Stat. § 311.372(2)(a)–(b), just before its effective date. On July 14, 2023, based on *L.W.*, the district court granted Attorney General Cameron's motion for an emergency stay pending appeal. "[N]otwithstanding [its] difference of opinion as to the strength of the plaintiffs' claims under relevant Supreme Court and Sixth Circuit precedent," the district court determined it was compelled by the result in *L.W.*, which involved "a substantially similar statute" that "*Smith* and *Bostock* [are] inapplicable" and that "the L.W. plaintiffs—and, by extension, Plaintiffs here—are unlikely to succeed on appeal." Stay, R.79, PageID#2495. On July 31, 2023, the same panel that resolved *L.W.* declined to lift the district court's stay, concluding that (i) Plaintiffs were unlikely to succeed on the merits for the same reasons as in *L.W.*; and (ii) that the differences between Kentucky's and Tennessee's

laws did not "change[] [the panel's] balancing of the stay factors." *Thornbury*, 2023 WL 4861984, at *1–2. Because the panel majority here adopted its reasoning from *L.W.*, Plaintiffs cite the *L.W.* reasoning throughout where appropriate and provide a copy of the decision as Exhibit B.

### REASONS FOR GRANTING REHEARING EN BANC

## I.    THE PANEL'S CONCLUSION THAT PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR EQUAL PROTECTION CLAIMS CONFLICTS WITH DECISIONS OF THE SUPREME COURT, THIS COURT, AND OTHER CIRCUITS.

The district court determined that heightened scrutiny applies to Plaintiffs' Equal Protection Claim and that the Treatment Ban likely fails that standard. The panel's contrary determination conflicts with Supreme Court and Sixth Circuit precedent, as well as decisions from the Fourth, Seventh, Eighth, and Ninth Circuits. In light of these conflicts, the Court should grant rehearing en banc, and reinstate the preliminary injunction pending appeal, or at least allow those who have started care to continue that care pending appeal.

### A.    The Supreme Court, This Court, And Other Circuits Hold That Discrimination Against Transgender Persons, Like The Treatment Ban, Is Sex Discrimination Subject To Heightened Scrutiny.

By facially targeting transgender people, the Treatment Ban makes a sex-based classification. PI Order, R.61, PageID#2303. The Supreme Court recently held that "it is impossible to discriminate against a person for being … transgender without

4

discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. Nearly twenty years earlier, this Court similarly held that discrimination against a person who "fails to act and/or identify with his or her" sex designated at birth—that is, against a transgender person—is sex-based discrimination for purposes of the Equal Protection Clause. *Smith*, 378 F.3d at 577. The Fourth, Seventh, Eighth, and Ninth Circuits have reached the same conclusion. *Brandt*, 47 F.4th at 669; *Grimm*, 972 F.3d at 608; *Karnoski*, 926 F.3d at 1200–01; *Whitaker*, 858 F.3d at 1051–52. All sex-based classifications are subject to heightened scrutiny. *United States v. Virginia*, 518 U.S. 515, 555 (1996).

The panel majority held that these precedents do not apply if a law bans care "for minors of both sexes." *L.W.*, 2023 WL 4410576, at *11. The Supreme Court rejected that logic in *Bostock* in unequivocal terms: "an employer who intentionally fires an individual … transgender employee … violates the law *even if the employer is willing to subject all male and female … transgender employees to the same rule*." *Id*. (emphasis added). "[A]n employer cannot escape liability by demonstrating that it treats males and females comparably as groups." *Id*.; *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140–41 (1994) (holding peremptory challenges based on a juror's sex are unconstitutional, even though such challenges can be applied equally to both sexes, because the Equal Protection Clause protects *each person*—

not merely women as a group or men as a group—from disparate treatment based on sex).

The panel majority held *Bostock* inapplicable because the sex discrimination claim in that case arose under Title VII, not the Equal Protection Clause. *L.W.*, 2023 WL 4410576, at *13. However, as the Supreme Court and this Court have consistently held, what constitutes sex discrimination under Title VII constitutes sex discrimination under the Equal Protection Clause, and vice-versa. *See, e.g.*, *GE Co. v. Gilbert*, 429 U.S. 125 (1978) (relying on *Geduldig v. Aiello*, 417 U.S. 484 (1974), an equal protection case, to resolve a sex discrimination claim under Title VII); *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) ("We review § 1983 discrimination claims brought under the Equal Protection Clause using the same test applied under Title VII.").[1] The panel majority did not address these precedents.

The panel majority also incorrectly assumed that the Treatment Ban and similar laws prohibit medical care for transgender minors are comparable to the regulation of pregnancy in *Geduldig* or abortion in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). *See L.W.*, 2023 WL 4410576, at *6. But unlike the laws

---

[1] *See also, e.g.*, *Smith*, 378 F.3d at 577 (finding that the facts supporting a transgender plaintiff's Title VII claim "easily constitute[d] a claim of sex discrimination grounded in the Equal Protection Clause"); *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1011 (6th Cir. 1987); *Daniels v. Bd. of Educ.*, 805 F.2d 203, 207 (6th Cir. 1986); *Grano v. Dep't of Dev.*, 637 F.2d 1073, 1081-82 (6th Cir. 1980); *Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003).

challenged in those cases, the law here *facially* discriminates based on transgender status and, therefore, based on sex. The Treatment Ban prohibits prescribing puberty blockers and hormone therapy if—and only if—the care is provided "to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex" at birth. Ky. Rev. Stat. § 311.372(2)(a)–(b). That is precisely what defines a person as transgender.

As the law's repeated use of the word "sex" illustrates, classifications on the basis of transgender status "cannot be stated without referencing sex." *Grimm*, 972 F.3d at 608; *see* Order, R.61, PageID#2303-04 ("[T]he minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law." (citing *Brandt*, 47 F.4th at 669)); *K.C. v. Individual Members of Med. Licensing Bd.*, No. 23-595, 2023 WL 4054086, *8 (S.D. Ind. June 16, 2023) ("[W]ithout sex-based classifications, it would be impossible for [Indiana's ban] to define whether a puberty-blocking or hormone treatment involved transition from one's sex (prohibited) or was in accordance with one's sex (permitted)."); *Doe v. Ladapo*, No. 23-114, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023).

The Treatment Ban facially classifies based on sex. This is not a situation like *Geduldig* or *Dobbs*, in which a law classifies based on a physical or medical condition that is merely *correlated* only with one sex. The law expressly targets transgender minors—*i.e.*, those whose perception of their sex differs from their sex

7

at birth. As the Supreme Court held of a similarly facially sex-based policy in in *City of Los Angeles, Department of Water & Power v. Manhart*, 435 U.S. 702, 715 (1978), "[o]n its face, this [law] discriminates on the basis of sex whereas the General Electric plan [like the plan in *Geduldig*] discriminated on the basis of a special physical disability." In sum, there is a difference between a law that facially relies on sex and one that relies on a physical or medical condition associated only with one sex; while the latter may have a *disparate impact* based on sex, the former necessarily constitutes *disparate treatment* based on sex.[2]

Finally, it is for the en banc court alone to determine whether *Smith*'s holding that discrimination based on transgender status is sex discrimination for the Equal Protection Clause should be limited to constitutional claims involving employment discrimination. No precedent supports the panel majority's assumption that *Smith* is inapposite because that case involved adults and employment rather than minors and medical care. *L.W.*, 2023 WL 4410576, at *13. A law either classifies based on sex, or it does not. *See*, *e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976). If it does, it is subject to heightened scrutiny.

---

[2] Similarly, while the Supreme Court has held that physical differences between the sexes may in rare circumstances justify a sex-based classification, they do not insulate such a law from heightened scrutiny. *See Nguyen v. I.N.S.,* 533 U.S. 53, 60–61 (2001).

**B.**    **Because Cameron Failed To Present Evidence To Justify The Treatment Ban Under Heightened Scrutiny, The Record Does Not Support The Panel's Conclusion That Plaintiffs Are Unlikely To Succeed On The Merits.**

The district court correctly held that the Treatment Ban's sex-based classification is not likely to be found to be "substantially related to the achievement of" the stated objectives of "protecting vulnerable" children or preserving "the integrity and ethics of the medical profession." PI Order, R.61, PageID#2306. With regard to the protection of vulnerable children, the district court concluded that the evidence supporting the safety and efficacy of the banned medicine outweighed the evidence questioning it. *Id.* at PageID#2302. A panel of this Court "may not reverse" a district court decision simply because it "would have weighed the evidence differently." *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74 (1985); *see U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 380 (6th Cir. 2008).

The record evidence supporting the district court's findings is substantial. The doctors who describe puberty blockers and hormones as safe and effective are experts in the treatment of gender dysphoria and have extensive experience treating transgender adolescents. *E.g.*, Shumer Decl., R.17-1, PageID#166-71 (describing medicines), PageID#142-47 (describing qualifications); Janssen Decl., R.17-2, PageID# 205-07 (medicines), PageID#197-201 (qualifications); Kingery Decl. R.17-3, PageID#236-39 (medicines), PageID#232-36 (qualifications); Goodman

Decl., R.52-2, PageID#1724-25 (medicines), PageID#1718-20 (qualifications); Karasic Decl., R.52-4, PageID#1866-72 (medicines), PageID#1856-59 (qualifications). Their views are supported by established standards of care and clinical practice guidelines developed based on the same criteria and clinical practices used to establish treatments for other medical conditions. *See generally* Brief of *Amici Curiae*, R.19-2.

In sum, the district court did not abuse its discretion in finding that Cameron failed to present evidence sufficient to satisfy his burden to show that SB 150 is substantially related to any of Kentucky's stated interests. The panel's re-weighing of that evidence, and its failure to apply heightened scrutiny, conflicts with Supreme Court and Circuit precedent.

## II.   THE PANEL'S CONCLUSION THAT PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR DUE PROCESS CLAIMS ALSO CONFLICTS WITH PRECEDENT.

The Supreme Court has held that parents' fundamental rights under the Due Process Clause include "the right, coupled with the high duty … to recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602; *accord Kanuszewski*, 927 F.3d at 419. Notwithstanding that precedent, the panel majority held that "[n]o Supreme Court case extends [parental rights] to a general right to receive new medical or experimental drug treatments." *L.W.*, 2023 WL 4410576, at *4. The assumption that the banned treatments are "new" or

"experimental" is incorrect and contradicts the district court's factual findings (here and in *L.W.*). *See L.W. by & through Williams v. Skrmetti*, No. 23-376, 2023 WL 4232308, at *21 (M.D. Tenn. June 28, 2023). It also contradicts the factual findings made by every other court to hear evidence regarding this same issue, including two federal district courts following full trials on the merits. *E.g.*, *Brandt v. Rutledge*, No. 21-450, 2023 WL 4073727, at *35 (E.D. Ark. June 20, 2023) ("The State failed to provide sufficient evidence that the banned treatments are ineffective or experimental."); *Ladapo*, 2023 WL 3833848, at *5 (finding the banned medicines "have been used for decades" and have well known "safety records").

The panel's characterization of the treatments at issue as "experimental" also conflicts with settled law in this Circuit on that point, which "look[s] to the standard of care in the medical community to determine whether a given treatment was generally accepted medical therapy." *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998); *cf. Klein v. Cent. States S.E. & S.W. Areas Health & Welfare Plan*, 346 F. App'x 1, 6 (6th Cir. 2009) (upholding denial of coverage for experimental treatment based on plan exclusion for services that are "not medically necessary or are not uniformly and professionally endorsed by the general medical community as Standard Medical Care, Treatment, Services or Supplies"). Substantial evidence demonstrated that the banned treatments are part of the accepted standard of care for treatment for gender dysphoria in adolescents.

The panel majority's reliance on *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695 (D.C. Cir. 2007), is similarly inapposite. *See L.W.*, 2023 WL 4410576, at *5. Unlike in that case, Parent Plaintiffs here do not seek experimental medications—they seek medicines that the "Food and Drug Administration has approved," *Ladapo*, 2023 WL 3833848, at *5, and that the relevant standards of care authorize as an effective treatment for gender dysphoria, *see, e.g.*, Shumer Decl., R.17-1, PageID#166-71; Janssen Decl., R.17-2, PageID# 205-07; Kingery Decl. R.17-3, PageID#236-39; Goodman Decl., R.52-2, PageID#1724-25; Karasic Decl., R.52-4, PageID#1866-72.

A state's efforts to regulate health and welfare may generally be entitled to "a strong presumption of validity," *L.W.*, 2023 WL 4410576, at *8 (cleaned up), but not when such efforts violate a constitutional right, *see, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018). Parents have an established fundamental right to make medical decisions for their children. The Treatment Ban unduly burdens that right because it bans medical care that has been administered for more than twenty years, is widely accepted as the standard of care, and is supported by substantial research showing it to be safe and effective. The district court's factual findings on these issues are entitled to significant deference. The panel's conclusion that Parent Plaintiffs, in consultation with medical professionals,

have no fundamental right to obtain these established treatments for their adolescent children conflicts with precedent.

## III. THE PANEL'S ORDER PRESENTS QUESTIONS OF EXCEPTIONAL IMPORTANCE BECAUSE IT CONFLICTS WITH DECISIONS OF OTHER FEDERAL COURTS AND BECAUSE PLAINTIFFS WILL SUFFER IRREPARABLE HARM PENDING APPEAL IF SB 150 IS ALLOWED TO REMAIN IN EFFECT.

### A. The Panel's Order Conflicts With Decisions Of Other Circuits.

As the panel majority readily acknowledged, its analysis directly conflicts with the decisions of the Eighth Circuit and of multiple federal district courts, all of which have held that a ban on established medical treatments for transgender individuals constitutes sex-based discrimination. *See L.W.*, 2023 WL 4410576, at *8 (citing *Brandt*, 47 F.4th at 670; *K.C.*, 2023 WL 4054086; *Ladapo*, 2023 WL 3833848; *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022)). As the panel majority also acknowledged, its analysis similarly conflicts with decisions from other circuits arising in non-healthcare contexts, which have also held that disparate treatment of transgender individuals is sex discrimination. *See id.* (citing *Grimm*, 972 F.3d at 608); *see also, e.g.*, *Karnoski*, 926 F.3d at 1200–01; *Whitaker*, 858 F.3d at 1051–52. The panel's published orders (in this case and *L.W.*) create a conflict between this Court and many other federal courts on questions of exceptional importance, warranting en banc review.

13

**B.      Plaintiffs And Other Transgender Adolescents In Kentucky Are And Will Continue Suffering Irreparable Harm.**

The district court properly found that the Treatment Ban will cause significant, irreparable harm to Plaintiffs, Order, R.61, PageID#2311, and such findings merit significant deference. *See Land*, 546 F.3d at 380. The district court's findings were amply supported by the record, which shows that inability to access the banned treatments will cause serious and likely severe psychological and emotional harm to Minor Plaintiffs, including self-harm, suicidal ideation, depression, and anxiety. JD1 Decl., R.17-4, PageID#280-282; JD2 Decl., R.17-5, PageID#283-285; JD3 Decl., R.17-6, PageID#286-288; JD5 Decl., R.17-7, PageID#289-91.

Doctors who specialize in the treatment of transgender adolescents submitted detailed declarations that confirm the medical legitimacy of Parent Plaintiffs' fears. Shumer Decl., R.17-1, PageID#171-72 (Treatment Ban could lead "to a staggering increase in mental health problems including suicidality."); Janssen Decl., R.17-2, PageID#215 (Treatment Ban will make transgender adolescents "suffer" and cause their mental health to "deteriorate"); Kingery Decl., R.17-3, PageID#251-53 (Treatment Ban "will worsen … mental health outcomes"). Based on this evidence, the district court correctly found that the Plaintiffs would be irreparably harmed. Order, R.61, PageID#2311.

Against these severe, irreparable, and specific harms to real people, the only countervailing harm to Kentucky is a constructive form of harm from delaying the effective date of SB 150. *See L.W.*, 2023 WL 4410576, at *14. Such harm does not outweigh the concrete harms that actual children and their parents will suffer from being denied the medical care they have relied on and need. In particular, because the Treatment Ban does not otherwise permit Plaintiffs' care to continue as prescribed by their medical provider, the stay should be lifted at least to that extent. Moreover, Defendants Thornbury and Denker, the Kentucky officials responsible for enforcing the Treatment Ban, agree it would "behoove … licensees and their patients for the Court to grant the injunction and maintain the status quo pending final ruling on the merits of the suit." Response to Emergency Motion for Stay, R.69, PageID#2439.

In sum, because Plaintiffs are currently facing severe and irreparable harm by being barred from receiving recommended care, and because the officials charged with enforcing the Treatment Ban *agree* that it should be preliminarily enjoined, the panel's order presents questions of exceptional importance warranting immediate relief from the en banc Court.

## **CONCLUSION**

The Court should grant rehearing en banc on an expedited basis, and the en banc Court should lift the stay of the district court's preliminary injunction at the

earliest opportunity to prevent further irreparable harm to Plaintiffs and other transgender adolescents in Kentucky, or at a minimum lifted to allow those who are receiving such care to continue to receive care while this appeal is pending.

Dated: August 3, 2023          Respectfully Submitted,

*/s/ Stephanie Schuster*
Stephanie Schuster
Randall M. Levine
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave., NW
Washington, DC 20004-2541
(202) 739-3000
stephanie.schuster@morganlewis.com
randall.levine@morganlewis.com

Amanda J. Ford
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110-1726
(617) 431-7700
amanda.ford@morganlewis.com

Corey Shapiro
Heather Gatnarek
Crystal Fryman
Kevin Muench
**ACLU OF KENTUCKY FOUNDATION**
325 W. Main St. Suite 2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
heather@aclu-ky.org
crystal@aclu-ky.org
kevin@aclu-ky.org

Christopher F. Stoll
Kelly Jo Popkin
Amy Whelan
**NATIONAL CENTER FOR LESBIAN RIGHTS**
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 365-1320
cstoll@nclrights.org
kpopkin@nclrights.org
awhelan@nclrights.org

*Counsel for Plaintiffs-Appellees*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

The foregoing petition was computer-generated in 14-point Times New Roman proportional font and contains 3,540 words, and thus complies with the requirements of Federal Rule of Appellate Procedure 35(b)(2)(A).

*/s/ Stephanie Schuster*

Exhibit A

2023 WL 4861984
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Jane DOE 1, et al., Plaintiffs-Appellees,

v.

William C. THORNBURY, Jr., M.D., in his
official capacity as the President of the Kentucky
Board of Medical Licensure, et al., Defendants,
Commonwealth of Kentucky ex rel.
Daniel Cameron, Attorney General of the
Commonwealth of Kentucky, Intervenor-Appellant.

No. 23-5609
|
Decided and Filed: July 31, 2023

**Synopsis**
**Background:** Transgender minors and their parents filed
suit against Commonwealth of Kentucky and various state
officials, asserting that Kentucky's law banning gender-
transition care to minors violated equal protection and due
process. United States District Court for the Western District
of Kentucky, David J. Hale, J., initially granted plaintiffs'
request for preliminary injunction against enforcement of law,
but then stayed injunction. Plaintiffs filed emergency motion
to lift stay.

**Holdings:** The Court of Appeals held that:

holding in *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408,
that plaintiffs in that case were not entitled to injunctive
relief against enforcement of Tennessee ban against gender-
transition care for minors controlled emergency motion to lift
stay of preliminary injunction, and

certain Kentucky officials disagreement with law had no
bearing on court's consideration of likelihood of success on
merits of plaintiffs' claims, as required to obtain injunctive
relief.

Motion denied.

White, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** Motion to Lift Stay; Motion for
Preliminary Injunction.

On Emergency Motion to Lift Stay of Preliminary Injunction.
United States District Court for the Western District
of Kentucky at Louisville. No. 3:23-cv-00230—David J. Hale,
District Judge.

**Attorneys and Law Firms**

ON EMERGENCY MOTION: Corey Shapiro, Heather
Gatnarek, Crystal Fryman, ACLU OF KENTUCKY
FOUNDATION, Louisville, Kentucky, Stephanie Schuster,
MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C.,
for Appellees. ON RESPONSE: Victor B. Maddox,
Matthew F. Kuhn, Alexander Y. Magera, OFFICE OF
THE KENTUCKY ATTORNEY GENERAL, Frankfort,
Kentucky, for Appellant.

Before: SUTTON, Chief Judge; WHITE and THAPAR,
Circuit Judges.

The court issued an order. WHITE, J. (pp. ——— – ———),
delivered a separate dissenting opinion.

## ORDER

PER CURIAM.

 **\*1** The district court preliminarily enjoined Kentucky's ban
on sex-transition care for minors but later stayed its injunction
in light of *L.W. ex rel. Williams v. Skrmetti*, ——— F.4th ———,
No. 23-5600, 2023 WL 4410576 (6th Cir. July 8, 2023).
Plaintiffs ask us to lift the district court's stay.

Our decision is governed by four factors: likelihood of
success on the merits, irreparable harm, the balance of harms,
and the public interest. *Roberts v. Neace*, 958 F.3d 409, 413
(6th Cir. 2020). We recently balanced these factors in a case
involving Tennessee's ban on sex-transition care for minors
and held that they favored allowing Tennessee to enforce its
law. *Skrmetti*, ——— F.4th at ———, 2023 WL 4410576, at \*8.

That holding controls here. Kentucky bans the same conduct
as in *Skrmetti*. Ky. Rev. Stat. § 311.372(2); Tenn. Code Ann. §
68-33-103(a). Plaintiffs bring the same Equal Protection and
Due Process claims that, in *Skrmetti*, we held were unlikely
to succeed. ——— F.4th at ——— – ———, 2023 WL 4410576, at
\*3–8. Their likelihood of success—often "the determinative

2023 WL 4861984

factor"—is the same here. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Indeed, plaintiffs identify only two differences between this case and *Skrmetti*. But neither changes our balancing of the stay factors.

First, plaintiffs note that Tennessee's law allows minors currently receiving treatment to continue care until March 31, 2024. *See* Tenn. Code Ann. § 68-33-103(b)(1)(B). Kentucky's law likewise gives minors currently on treatment time to wean off, but it requires that weaning begin immediately. Ky. Rev. Stat. § 311.372(6). Plaintiffs argue that this changes the balance of harms because they suffer immediately the harm that Tennessee's law allowed minors to postpone for months.

Looking only at the text of the laws, plaintiffs have a point. But the facts presented to us in *Skrmetti* were no different from the facts here. There, the district court found that the plaintiffs' doctors would begin weaning immediately. *L.W. ex rel. Williams v. Skrmetti*, ––– F.Supp.3d ––––, ––––, No. 3:23-cv-376, 2023 WL 4232308, at *33 (M.D. Tenn. June 28, 2023) ("[T]he record demonstrates undisputedly that the continuing care exception will cause doctors to titrate down their minor patients' medications ... beginning on July 1, 2023."). We did not disturb that finding. So, just as in *Skrmetti*, Kentucky's weaning period "lessens the harm" to minors "who wish to continue receiving treatment." *See Skrmetti*, ––– F.4th at ––––, 2023 WL 4410576, at *8.

Next, plaintiffs argue that because some Kentucky officials disagree with the ban, Kentucky's interest in enforcing the ban is weaker than Tennessee's. But the fact that some officials disagree with the ban does not change the analysis. As a sovereign state, Kentucky has an interest in creating and enforcing its own laws. *See Cameron v. EMW Women's Surgical Ctr., P.S.C.*, ––– U.S. ––––, 142 S. Ct. 1002, 1011, 212 L.Ed.2d 114 (2022); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). The people of Kentucky enacted the ban through their legislature. That body—not the officials who disagree with the ban—sets the Commonwealth's policies. *See Cameron v. Beshear*, 628 S.W.3d 61, 75 (Ky. 2021).

**\*2** In short, plaintiffs' requested stay presents the same issues decided in *Skrmetti*. We decline to lift the district court's stay.

## DISSENT

HELENE N. WHITE, Circuit Judge, dissenting.

For the reasons stated in my separate opinion in *L.W. ex rel. Williams v. Skrmetti*, I would lift the district court's stay of its preliminary injunction. *See* ––– F.4th ––––, No. 23-5600, 2023 WL 4410576, at *9 (6th Cir. July 8, 2023) (White, J., concurring in part and dissenting in part). Further, because I do not agree that Kentucky patients who were receiving the now-banned treatments at the time the law was enacted are in the same position as the Tennessee patients in *Skrmetti*, I would, at a minimum, lift the stay as to patients who were receiving treatment.

Like the plaintiffs challenging Tennessee's law, Plaintiffs here have shown that they are likely to succeed on the merits because Kentucky's law discriminates on the basis of sex. *See id.* Thus, the district court here properly issued a preliminary injunction, as did the district court in *Skrmetti*. *Id.* In this case, however, there is greater reason to let the preliminary injunction stand because, unlike the Tennessee statute in *Skrmetti*, Kentucky's law does not provide a continuing-care exception. As this court has explained, "[t]he probability of success [on the merits] that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer." *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). Even following the majority's reasoning in *Skrmetti*, a preliminary injunction is appropriate here for patients who were undergoing the now-banned treatments, due to the greater risk of irreparable harm.

Unlike Tennessee's law, Kentucky's law provides no grace period during which patients receiving care may continue treatment. *Cf.* Tenn. Code Ann. § 68-33-103(b)(1)(B) (permitting care to continue without alteration through March 31, 2024). Instead, healthcare providers must immediately cease treatment or "institute a period during which the minor's use of the drug or hormone is systematically reduced." Ky. Rev. Stat. § 311.372(6). If choosing the latter course, the provider must "document[ ] in the minor's medical record that immediately terminating the minor's use of the drug or hormone would cause harm to the minor." *Id.* Violations of the statute result in license revocation. *Id.* § 311.372(4).

In *Skrmetti*, in determining that a preliminary injunction was inappropriate, the majority found the risk of irreparable harm

diminished precisely because of Tennessee's grace period. *Id.* at ——, 2023 WL 4410576 at *8. Today, the majority sidesteps that analysis, reasoning that "the facts presented to us in *Skrmetti* were no different from the facts here" because, in that case, "the district court found that the plaintiffs' doctors would begin weaning immediately." Maj. Op. at ——. But the *Skrmetti* majority specifically noted that the Tennessee law "permits the challengers *to continue their existing treatments* until March 31, 2024" and "*[t]hat* feature ... lessens the harm to those minors who wish to continue receiving treatment." —— F.4th at ——, 2023 WL 4410576, at *8 (emphasis added). It seems obvious that there is a tremendous difference between a statute like Tennessee's that allows flexibility regarding treatment decisions and time to explore alternatives and one like Kentucky's that forces doctors to either discontinue treatment immediately or risk losing their license if a stranger to the doctor-patient relationship second-guesses the doctor's determination or documentation that interrupting treatment would harm the minor.

**\*3** For these reasons, I dissent from the majority's denial of the Plaintiffs' motion. I would lift the district court's stay of its preliminary injunction based on Plaintiffs' likelihood of success on the merits. And, to prevent the harm previously recognized by the *Skrmetti* majority, I would lift the stay at least with regard to those who were undergoing the now-banned treatments when the law took effect.

**All Citations**

--- F.4th ----, 2023 WL 4861984

---

# Exhibit B

73 F.4th 408
United States Court of Appeals, Sixth Circuit.

L. W., BY AND THROUGH her parents and next
friends, Samantha WILLIAMS and Brian Williams;
Samantha Williams; Brian Williams; John Doe, by
and through his parents and next friends, Jane Doe
and James Doe; Jane Doe; James Doe; Rebecca
Roe; Susan N. Lacy, on behalf of herself and her
patients; Ryan Roe, by and through his parent and
next friend, Rebecca Roe, Plaintiffs-Appellees,
v.
Jonathan Thomas SKRMETTI, in his official
capacity as the Tennessee Attorney General
and Reporter, et al., Defendants-Appellants,
United States of America, Intervenor-Appellee.

No. 23-5600
|
Decided and Filed: July 8, 2023

**Synopsis**
**Background:** Transgender minors, their parents, and doctor
sued several state officials in their official capacities under
§ 1983, alleging that Tennessee law prohibiting healthcare
providers from performing gender-affirming surgeries and
administering hormones or puberty blockers to transgender
minors violated the United States Constitution's guarantees
of due process and equal protection. United States District Court
for the Middle District of Tennessee, Eli J. Richardson, J.,
2023 WL 4232308, issued statewide preliminary injunction
against law's enforcement. After unsuccessfully seeking a
stay in the district court, Tennessee appealed. In the interim,
Tennessee moved for an emergency stay.

**Holdings:** The Court of Appeals, Sutton, Chief Judge, held
that:

injunction was overbroad and exceeded norms of judicial
power;

plaintiffs sought to extend constitutional guarantees to new
territory that was subject of debate, which supported an
emergency stay;

plaintiffs were not likely to succeed on merits of their due
process claim;

plaintiffs were not likely to show that law lacked a rational
basis;

plaintiffs were not likely to succeed on merits of their equal
protection claim;

irreparable harm to Tennessee favored granting emergency
stay; and

public interest factor heavily favored granting emergency
stay.

Preliminary injunction stayed.

White, Circuit Judge, filed opinion concurring in part and
dissenting in part.

**Procedural Posture(s):** On Appeal; Motion for Preliminary
Injunction; Motion for Stay.

**\*412** On Emergency Motion for Stay of Preliminary
Injunction Pending Appeal United States District Court for
the Middle District of Tennessee at Nashville. No. 3:23-
cv-00376—Eli J. Richardson, District Judge.

**Attorneys and Law Firms**

ON EMERGENCY MOTION FOR STAY OF
PRELIMINARY INJUNCTION PENDING APPEAL and
REPLY: Clark L. Hildabrand, Steven J. Griffin, Brooke A.
Huppenthal, OFFICE OF THE TENNESSEE ATTORNEY
GENERAL & REPORTER, Nashville, Tennessee, Adam K.
Mortara, LAWFAIR LLC, Nashville, Tennessee, Cameron
T. Norris, Tiffany H. Bates, CONSOVOY MCCARTHY
PLLC, Arlington, Virginia, for Appellants. ON RESPONSE:
Joshua A. Block, Chase Strangio, AMERICAN CIVIL
LIBERTIES UNION FOUNDATION, New York, New
York, Stella Yarbrough, Lucas Cameron-Vaughn, ACLU
FOUNDATION OF TENNESSEE, Nashville, Tennessee,
Sruti J. Swaminathan, LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC., New York, New
York, Tara Borelli, LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC., Decatur, Georgia, Christopher
J. Gessner, AKIN GUMP STRAUSS HAUER & FELD
LLP, Washington, D.C., for Appellees. ON AMICUS
BRIEF: Jonathan F. Mitchell, MITCHELL LAW PLLC,

Austin, Texas, Edmund G. LaCour, Jr., A. Barrett Bowdre, OFFICE OF THE ALABAMA ATTORNEY GENERAL, Montgomery, Alabama, for Amici Curiae.

Before: SUTTON, Chief Judge; WHITE and THAPAR, Circuit Judges.

SUTTON, C.J., delivered the opinion of the court in which THAPAR, J., joined. WHITE, J. (pp. —— – ——), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

SUTTON, Chief Judge.

Tennessee enacted a law that prohibits healthcare providers from performing gender-affirming surgeries and administering hormones or puberty blockers to transgender minors. After determining that the law likely violated the Equal Protection and Due Process Clauses, the district court facially enjoined the law's enforcement as to hormones and puberty blockers and applied the injunction to all people in the State. Tennessee appealed and moved for an emergency stay of the district court's order. Because Tennessee is likely to succeed on its appeal of the preliminary injunction, we grant the stay.

### I.

In March 2023, Tennessee enacted the Prohibition on Medical Procedures Performed on Minors Related to Sexual Identity. Tenn. Code Ann. § 68-33-101. It was scheduled to go into effect on July 1, 2023. Seeking to "protect[ ] minors from physical and emotional harm," id. § 68-33-101(m), the legislature identified several concerns about recent treatments being offered by the medical profession for children with gender dysphoria. It was concerned that some treatments for gender dysphoria "can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness, or suffering adverse and sometimes fatal psychological consequences." Id. § 68-33-101(b). It was concerned that the long-term costs of these treatments remain unknown and outweigh any near-term benefits because they are "experimental in nature and not supported by high-quality, long-term medical studies." Id. And it noted that other helpful, less risky, and non-irreversible treatments remain available. Id. § 68-33-101(c).

These findings convinced the legislature to ban certain medical treatments for minors with gender dysphoria. A healthcare provider may not "administer or offer to administer" "a medical procedure" to a minor "for the purpose of" either "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Id. § 68-33-103(a)(1). Prohibited medical procedures include "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs" and "[p]rescribing, administering, or dispensing any puberty blocker or hormone." Id. § 68-33-102(5).

The Act contains two relevant exceptions. It permits the use of these medical procedures to treat congenital defects, precocious puberty, disease, or physical injury. Id. § 68-33-103(b)(1)(A). And it has a "continuing care" exception until March 31, 2024, which permits healthcare providers to continue administering a long-term treatment, say hormone therapy, that began before the Act's effective date. Id. § 68-33-103(b)(1)(B).

The Act authorizes the Tennessee Attorney General to enforce these prohibitions. Id. § 68-33-106(b). It permits the relevant state regulatory authorities to impose "professional discipline" on healthcare providers that violate the Act. R.1 ¶ 56; Tenn. Code Ann. § 68-33-107. And it creates a private right of action, enabling an injured minor or nonconsenting parent to sue a healthcare provider for violating the law. Tenn. Code Ann. § 68-33-105(a)(1)–(2).

Three transgender minors, their parents, and a doctor sued several state officials, claiming the Act violated the United States Constitution's guarantees of due process and equal protection. The plaintiffs challenged the Act's prohibitions on hormone therapy and its surgery prohibitions, but they did not challenge its private right of action. They moved for a preliminary injunction to prevent those features of the Act from going into effect on July 1, 2023.

On June 28, the district court granted the motion in part. It concluded that the challengers lacked standing to contest the ban on surgeries but could challenge the ban on hormones and puberty blockers. As to due process, the court found that the Act infringes the parents' "fundamental right to direct the medical care of their children." R.167 at 14. As to equal protection, the court reasoned (1) that the Act improperly

discriminates on the basis of sex and (2) that transgender persons constitute a quasi-suspect class and that the State could not satisfy the necessary justifications that come with this designation. The district court concluded that the Act was facially unconstitutional (with the exception of the surgery and private enforcement provisions), and it issued a statewide injunction against its enforcement. Tennessee appealed. It unsuccessfully sought a stay in the district court and moves for a stay here.

## II.

A request for a stay pending appeal prompts four questions: "Is the applicant likely to succeed on the merits? Will the applicant be irreparably injured absent a stay? Will a stay injure the other parties? Does the public interest favor a stay?" *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020). As is often the case in a constitutional setting, the likelihood-of-success inquiry is the first among equals. *Id.* at 416. In this instance, it is largely dispositive. While we assess "the district court's ultimate decision whether to grant a preliminary injunction for abuse of discretion," we assess "its legal determination, including the likelihood of success on the merits, with fresh eyes." *Arizona v. Biden*, 40 F.4th 375, 381 (2022) (quotation omitted).

There are two merits-related problems with the district court's order. One relates to its scope. The other relates to its assessment of plaintiffs' chances in challenging the Act on due process and equal protection grounds.

## A.

*Scope.* The district court rested its preliminary injunction on a facial invalidation of the Act, as opposed to an as-applied invalidation of the Act, and it assumed authority to issue a statewide injunction. We doubt each premise.

The challengers claim that Tennessee's law facially violates the Constitution. But litigants raising "a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.' " *United States v. Hansen*, ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2023 WL 4138994, at *5 (U.S. June 23, 2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). That's a "strict standard" that we have no authority to "dilute[ ]." *Dobbs*

*v. Jackson Women's Health Org.*, ––– U.S. ––––, 142 S. Ct. 2228, 2275, 213 L.Ed.2d 545 (2022). The district court questioned whether the test applied and declined to engage with Tennessee's arguments that it could lawfully apply the Act in some settings. But it is not for lower-court judges to depart from *Salerno*, meaning that plaintiffs must show no set of valid applications of a law before we may declare it invalid in all of its applications. *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (noting that the Supreme Court alone exercises "the prerogative of overruling" its decisions). Consistent with the point, we have many cases adhering to the *Salerno* test. *See, e.g.*, *Oklahoma v. United States*, 62 F.4th 221, 231 (6th Cir. 2023); *United States v. Fields*, 53 F.4th 1027, 1038 (6th Cir. 2022); *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 826 (6th Cir. 2012); *Warshak v. United States*, 532 F.3d 521, 529 (6th Cir. 2008) (en banc); *Aronson v. City of Akron*, 116 F.3d 804, 809 (6th Cir. 1997).

Turn to the nature of the injunction. District courts "should not issue relief that extends further than necessary to remedy the plaintiff's injury." *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). The court's injunction prohibits Tennessee from enforcing the law against the nine challengers in this case *and* against the other seven million residents of the Volunteer State. But absent a properly certified class action, why would nine residents represent seven million? Does the nature of the federal judicial power or for that matter Article III permit such sweeping relief? A "rising chorus" suggests not. *Doster v. Kendall*, 54 F.4th 398, 439 (6th Cir. 2022); *see, e.g.*, *Trump v. Hawaii*, ––– U.S. ––––, 138 S. Ct. 2392, 2424–29, 201 L.Ed.2d 775 (2018) (Thomas, J., concurring); *Dep't of Homeland Sec. v. New York*, ––– U.S. ––––, 140 S. Ct. 599, 599–601, 206 L.Ed.2d 115 (2020) (Gorsuch, J., concurring); *see also* Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 457–82 (2017).

Article III confines the "judicial power" to "Cases" and "Controversies." U.S. Const. art. III, § 2. Federal courts may not issue advisory opinions or address statutes "in the abstract." *California v. Texas*, ––– U.S. ––––, 141 S. Ct. 2104, 2115, 210 L.Ed.2d 230 (2021) (quotation omitted). They instead must operate in a party-specific and injury-focused manner. *Id.*; *Gill v. Whitford*, ––– U.S. ––––, 138 S. Ct. 1916, 1934, 201 L.Ed.2d 313 (2018). A court order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power.

Even if courts may in some instances wield such power, the district court likely abused its discretion by deploying it here. *See, e.g., Biden,* 57 F.4th at 557; *see also United States v. Texas,* —— U.S. ——, —— S.Ct. ——, ——, ——, —— L.Ed.2d——, 2023 WL 4139000, at *17 (U.S. June 23, 2023) (Gorsuch, J., concurring) (considering the systemic harms of overbroad injunctions as part of the abuse-of-discretion review). In particular, it did not offer any meaningful reason for granting such relief, creating considerable doubt about the survival of this overriding feature of the decision on appeal.

## B.

The challengers also are unlikely to prevail on their due process and equal protection claims. Start with several considerations that apply to both claims. *First,* the challengers do not argue that the original fixed meaning of either the due process or equal protection guarantee covers these claims. That prompts the question whether the people of this country ever agreed to remove debates of this sort—about the use of new drug treatments on minors—from the conventional place for dealing with new norms, new drugs, and new technologies: the democratic process. Life-tenured federal judges should be wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy by construing a largely unamendable federal constitution to occupy the field.

*Second,* while the challengers do invoke constitutional precedents of the Supreme Court and our Court in bringing this lawsuit, not one of them resolves these claims. In each instance, they seek to extend the constitutional guarantees to new territory. There is nothing wrong with that, to be sure. But it does suggest that the key premise of a preliminary injunction—likelihood of success on the merits —is missing. The burden of establishing an imperative for constitutionalizing new areas of American life is not—and should not be—a light one, particularly when "the States are currently engaged in serious, thoughtful" debates about the issue. *Washington v. Glucksberg,* 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).

*Third,* the States are indeed engaged on these issues, as the recent proliferation of legislative activity across the country shows. *Compare* Ga. Code Ann. § 31-7-35 (banning gender-affirming treatments for minors) *and* Idaho Code § 18-1506C (similar), *with* Cal. Penal Code § 819 (prohibiting cooperation with other states as to gender-affirming care

provided to out-of-state minors in California), Colo. Rev. Stat. § 12-30-121(1)(d) (designating gender-affirming care as "legally protected health-care activity"), *and* Minn. Stat. § 260.925 (refusing to enforce out-of-state laws that would limit a parent's custody rights for consenting to gender-affirming care). *See also* Ala. Code § 16-1-52 (restricting sports participation by transgender students); Wyo. Stat. Ann. § 21-25-102 (similar); Mont. Code Ann. § 40-6-7X1(1)(f) (requiring parental consent for changes in a child's pronouns). Leaving the preliminary injunction in place starts to grind these all-over-the-map gears to a halt. *Glucksberg,* 521 U.S. at 720, 117 S.Ct. 2258. Given the high stakes of these nascent policy deliberations—the long-term health of children facing gender dysphoria—sound government usually benefits from more rather than less debate, more rather than less input, more rather than less consideration of fair-minded policy approaches. To permit legislatures on one side of the debate to have their say while silencing legislatures on the other side of the debate under the U.S. Constitution does not further these goals.

That many members of the medical community support the plaintiffs is surely relevant. But it is not dispositive for the same reason we would not defer to a consensus among economists about the proper incentives for interpreting the impairment-of-contracts or takings clauses of the U.S. Constitution. At all events, the medical and regulatory authorities are not of one mind about using hormone therapy to treat gender dysphoria. Else, the FDA would by now have approved the use of these drugs for these purposes. That has not happened, however, giving us considerable pause about constitutionalizing an answer they have not given or, best we can tell, even finally studied.

*Due process.* The challengers argue that the Act violates their due process right to control the medical care of their children. "No State," the Fourteenth Amendment says, shall "deprive any person of life, liberty, or property, without due process of law." The provision over time has come to secure more than just procedural rights. It also includes substantive protections "against government interference with certain fundamental rights and liberty interests." *Glucksberg,* 521 U.S. at 720, 117 S.Ct. 2258. Courts identify such rights by looking for norms that are "fundamental" or are "deeply rooted in this Nation's history and tradition." *Id.* at 720–21, 117 S.Ct. 2258 (quotation omitted); *Timbs v. Indiana,* —— U.S. ——, 139 S. Ct. 682, 689, 203 L.Ed.2d 11 (2019) (same). Experience has shown that substantive due process is "a treacherous field." *Moore v. City of E. Cleveland,* 431 U.S. 494, 502, 97

S.Ct. 1932, 52 L.Ed.2d 531 (1977). Increasingly appreciative of that danger, the federal courts have become ever more "reluctant to expand the concept of substantive due process" to new areas. *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

Parents, it is true, have a substantive due process right "to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). But the Supreme Court cases recognizing this right confine it to narrow fields, such as education, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), and visitation rights, *Troxel*, 530 U.S. at 57, 120 S.Ct. 2054. No Supreme Court case extends it to a general right to receive new medical or experimental drug treatments. In view of the high stakes of constitutionalizing areas of public policy, any such right must be defined with care. *Glucksberg*, 521 U.S. at 721, 117 S.Ct. 2258 (requiring "a 'careful description' of the asserted fundamental liberty interest" (quotation omitted)). The challengers have not shown that a right to new medical treatments is "deeply rooted in our history and traditions" and thus beyond the democratic process to regulate. *Id.* at 727, 117 S.Ct. 2258.

Constitutionalizing new parental rights in the context of new medical treatments is no mean task. On the one side of the ledger, parents generally can be expected to know what is best for their children. On the other side of the ledger, state governments have an abiding interest in "preserving the welfare of children," *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019); *Dobbs*, 142 S. Ct. at 2284, and "in protecting the integrity and ethics of the medical profession," *Glucksberg*, 521 U.S. at 731, 117 S.Ct. 2258. These interests give States broad power, even broad power to "limit[ ] parental freedom," *Prince v. Massachusetts*, 321 U.S. 158, 167, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *see Parham v. J. R.*, 442 U.S. 584, 606, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), particularly in an area of new medical treatment. We doubt, for example, that there are many drug-regulatory agencies in the world that, without satisfactory long-term testing, would delegate to parents and a doctor exclusive authority to decide whether to permit a potentially irreversible new drug treatment.

More generally, state legislatures play a critical role in regulating health and welfare, and their efforts are usually "entitled to a 'strong presumption of validity.' " *Dobbs*, 142 S. Ct. at 2284 (quotation omitted); *Planned Parenthood*

*Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006). As a result, federal courts must be vigilant not to "substitute" their views for those of legislatures, *Dobbs*, 142 S. Ct. at 2284, a caution that is particularly apt when construing unenumerated guarantees, *see Collins*, 503 U.S. at 125, 112 S.Ct. 1061.

Judicial deference is especially appropriate where "medical and scientific uncertainty" exists. *Gonzales v. Carhart*, 550 U.S. 124, 163, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007); *see also Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974); *Collins v. Texas*, 223 U.S. 288, 297–98, 32 S.Ct. 286, 56 L.Ed. 439 (1912). In this respect, consider the work of the Food and Drug Administration. Under a highly reticulated process that requires considerable long-range testing, the FDA determines when new drugs are safe for public use, including use by minors, and when new drugs are safe for certain purposes but not others. In making these decisions and in occasionally frustrating those who would like to have access to new drugs sooner, the Constitution rarely has a say over the FDA's work. There is no constitutional right to use a new drug that the FDA has determined is unsafe or ineffective. *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703 (D.C. Cir. 2007). And that is true even if the FDA bars access to an experimental drug that a doctor believes might save a terminally ill patient's life. Invoking our nation's long history of regulating drugs and medical treatments, the D.C. Circuit correctly held that the Constitution does not take over this field. *Id.* at 711; *see also id.* at 710 & n.18 (collecting similar cases).

Today's case has many parallels to that one. Gender-affirming procedures often employ FDA-approved drugs for non-approved, "off label" uses. Tennessee decided that such off-label use in this area presents unacceptable dangers. Tenn. Code Ann. § 68-33-101(b), (e), (g). Many medical professionals and many medical organizations may disagree. But the Constitution does not require Tennessee to view these treatments the same way as the majority of experts or to allow drugs for all uses simply because the FDA has approved them for some. *Cf. Taft*, 444 F.3d at 505 (explaining off-label use is legal "[a]bsent state regulation"); *Gonzales v. Raich*, 545 U.S. 1, 27–28, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (explaining that Congress may prohibit marijuana use even when doctors approve its use for medical purposes). It is well within a State's police power to ban off-label uses of certain drugs. At the same time, it is difficult to maintain that the medical community is of one mind about the use of hormone therapy

for gender dysphoria when the FDA is not prepared to put its credibility and careful testing protocols behind the use.

*Kanuszewski v. Michigan Department of Health and Human Services* does not alter this conclusion. 927 F.3d 396. A Michigan health program collected blood samples from newborns and stored the samples for future use. *Id.* at 403–04. This compulsory storage program, we held, violated nonconsenting parents' rights "to make decisions concerning the medical care of their children." *Id.* at 418. This case differs from that one in at least two material ways. Unlike the Michigan program, the Tennessee Act rests on the legislative judgment that it will protect "the health of the child." *Id.* at 421; *see* Tenn. Code Ann. § 68-33-101(a), (b); *Parham*, 442 U.S. at 603, 99 S.Ct. 2493 (noting that States retain authority, notwithstanding parental rights, to protect children's health). And the Michigan program *compelled* medical care, while the Tennessee Act law *prohibits* certain medical care. Although individuals sometimes have a constitutional right to refuse treatment, the Supreme Court has not handled affirmative requests for treatment in the same way. *See Glucksberg*, 521 U.S. at 725–26, 117 S.Ct. 2258. Most circuits have drawn the same line, "reject[ing] arguments that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government." *Eschenbach*, 495 F.3d at 710 & n.18 (collecting cases).

*Glucksberg* illuminates the point. 521 U.S. 702, 117 S.Ct. 2258. Harold Glucksberg claimed that Washington State's ban on physician-assisted suicide violated his patients' due process rights. *Id.* at 708, 117 S.Ct. 2258. The Court held that the Constitution did not bestow an affirmative right to physician assistance in committing suicide. *Id.* at 725–26, 117 S.Ct. 2258. The State could prohibit individuals from receiving care they wanted and their physicians wished to provide, all despite the "personal and profound" liberty interests at stake. *Id.* at 725, 117 S.Ct. 2258. As in that case, so in this one, indeed more so in this one. There's little reason to think that a parent's right to make decisions for a child sweeps more broadly than an adult's right to make decisions for herself. *Cf. Whalen v. Roe*, 429 U.S. 589, 604, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *Prince*, 321 U.S. at 166, 64 S.Ct. 438. All told, the plaintiffs' efforts to expand our substantive due process precedents in this new area are unlikely to succeed.

*Equal protection.* "No state," the Fourteenth Amendment says, "shall ... deny to any person within its jurisdiction the equal protection of the laws." Statutory classifications are ordinarily valid if they are rationally related to and further a legitimate state interest. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 55, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). More exacting scrutiny applies when a law implicates protected classes. *See Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

It's highly unlikely, as an initial matter, that the plaintiffs could show that the Act lacks a rational basis. The State plainly has authority, in truth a responsibility, to look after the health and safety of its children. In this area of unfolding medical and policy debate, a State has more rather than fewer options. Tennessee could rationally take the side of caution before permitting irreversible medical treatments of its children.

The challengers pin their main claims for likelihood of success on the assumption that heightened scrutiny applies. They first argue that the Tennessee Act discriminates on the basis of sex and thus requires the State to satisfy intermediate scrutiny. We are skeptical.

The Act bans gender-affirming care for minors of both sexes. The ban thus applies to all minors, regardless of their biological birth with male or female sex organs. That prohibition does not prefer one sex to the detriment of the other. *See Reed*, 404 U.S. at 76, 92 S.Ct. 251. The Act mentions the word "sex," true. But how could it not? That is the point of the existing hormone treatments—to help a minor transition from one gender to another. That also explains why it bans procedures that administer cross-sex hormones but not those that administer naturally occurring hormones. Tenn. Code Ann. § 68-33-103(b)(1)(A). A cisgender girl cannot transition through use of estrogen; only testosterone will do that. A cisgender boy cannot transition through use of testosterone; only estrogen will do that. The reality that the drugs' effects correspond to sex in these understandable ways and that Tennessee regulates them does not require skeptical scrutiny. *Dobbs*, 142 S. Ct. at 2245–46; *see Geduldig v. Aiello*, 417 U.S. 484, 496 n.20, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974); *see also Reed*, 404 U.S. at 76, 92 S.Ct. 251. "The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against the members of one sex or the other.' " *Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig*, 417 U.S. at 496 n.20, 94 S.Ct. 2485). No such pretext has been shown here. If a law restricting a medical procedure that applies only to women does not trigger heightened scrutiny,

as in *Dobbs*, a law equally applicable to all minors, no matter their sex at birth, does not require such scrutiny either.

The plaintiffs separately claim that the Act amounts to transgender-based discrimination, violating the rights of a quasi-suspect class. But neither the Supreme Court nor this court has recognized transgender status as a quasi-suspect class. Until that changes, rational basis review applies to transgender-based classifications. In the context of a preliminary injunction and the need to establish a likelihood of success on the merits, that should be nearly dispositive given the requirement of showing a "clear" right to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (emphasis omitted); *see Winter v. NRDC*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Whole Woman's Health v. Jackson*, ––– U.S. ––––, 141 S. Ct. 2494, 2495, 210 L.Ed.2d 1014 (2021).

The bar for recognizing a new quasi-suspect class, moreover, is a high one. The Supreme Court has recognized just two such classes, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (gender and illegitimacy), and none in recent years. The Court "has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015); *Cleburne*, 473 U.S. at 442, 105 S.Ct. 3249 (holding that mental disability is not a quasi-suspect class); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam) (holding that age is not a quasi-suspect class); *see Obergefell v. Hodges*, 576 U.S. 644, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015) (declining to address whether gay individuals qualify as a suspect class).

That hesitancy makes sense here. Gender identity and gender dysphoria pose vexing line-drawing dilemmas for legislatures. Plenty of challenges spring to mind. Surgical changes versus hormone treatment. Drugs versus counseling. One drug versus another. One age cutoff for minors versus another. Still more complex, what about sports, access to bathrooms, definitions of disability? And will we constitutionalize the FDA approval rules in the process? Even when accompanied by judicial tiers of scrutiny, the U.S. Constitution does not offer a principled way to judge each of these lines—and still others to boot. All that would happen is that we would remove these trying policy choices from fifty state legislatures to one Supreme Court. Instead of the vigorous, sometimes frustrating, "arena of public debate and legislative action" across the country and instead of other

options provided by fifty governors and fifty state courts, we would look to one judiciary to sort it all out. *Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258. That is not how a constitutional democracy is supposed to work—or at least works best —when confronting evolving social norms and innovative medical options.

*Bostock v. Clayton County* does not change the analysis. –––– U.S. ––––, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020). Title VII's prohibition on employment discrimination "because of ... sex" encompasses discrimination against persons who are gay or transgender, the Court concluded. *Id.* at 1743; 42 U.S.C. § 2000e-2(a)(1). But that reasoning applies only to Title VII, as *Bostock* itself and our subsequent cases make clear. *Bostock*, 140 S. Ct. at 1753; *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (refusing to apply *Bostock* to the Age Discrimination in Employment Act); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (reasoning that Title VII analysis does not apply to Title IX); *see also Students for Fair Admissions v. Harvard Coll.*, ––– U.S. ––––, ––– S.Ct. ––––, ––––, ––– L.Ed.2d ––––, 2023 WL 4239254, at *59–60 (U.S. June 29, 2023) (Gorsuch, J., concurring) (explaining that Title VI differs from the Equal Protection Clause).

*Smith v. City of Salem* does not move the needle either. 378 F.3d 566 (6th Cir. 2004). It was an employment case, it involved an adult, and it concerned "sex stereotyping," not whether someone's body is male or female. *Id.* at 574– 75. In that setting, it held that a transgender employee fired for dressing as a woman established a cognizable equal protection claim. *See id.* at 573, 577 (resting the holding on "[t]he facts Smith has alleged"). It did not hold that every claim of transgender discrimination requires heightened scrutiny, least of all in the fraught context of whether a State may limit irreversible medical treatments to minors facing gender dysphoria. And *Dobbs* prevents us from extending *Smith* that far, as it held that medical treatments that affect only one sex receive rational-basis review. *Dobbs*, 142 S. Ct. at 2245–46; *see Geduldig*, 417 U.S. at 496 n.20, 94 S.Ct. 2485.

We recognize that other courts and judges have taken different approaches to these issues. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (differential treatment of transgender person triggers intermediate scrutiny); *id.* at 627–28 (Niemeyer, J., dissenting); *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022) (ban on gender-transition procedures

constituted sex-based discrimination); *Brandt ex rel. Brandt v. Rutledge*, 2022 WL 16957734, at *1 & n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissental); *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801, 803 n.5 (11th Cir. 2022) (sex-based bathroom policy did not violate equal protection); *id.* at 823 (Wilson, J., dissenting).

We recognize, too, that several district courts have addressed similar laws in other States and assessed those laws in much the same way as the district court did in this case. *See Brandt v. Rutledge*, —— F.Supp.3d ——, 2023 WL 4073727 (E.D. Ark. June 20, 2023); *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, --- F.Supp.3d ——, 2023 WL 4054086 (S.D. Ind. June 16, 2023); *Doe v. Ladapo*, —— F.Supp.3d ——, 2023 WL 3833848 (N.D. Fla. June 6, 2023); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022). And our thoughtful colleague has reached a similar conclusion. We appreciate their perspectives, and they give us pause. But they do not eliminate our doubts about the substantial strength of the challengers' claims for the reasons just given.

All told, the challengers lack a "clear showing" that they will succeed on the merits, *Mazurek*, 520 U.S. at 972, 117 S.Ct. 1865 (emphasis omitted), and that is particularly so in view of the burdensome nature of a facial attack and the fraught task of justifying statewide relief.

## III.

The other stay factors largely favor the State as well. If the injunction remains in place during the appeal, Tennessee will suffer irreparable harm from its inability to enforce the will of its legislature, to further the public-health considerations undergirding the law, and to avoid irreversible health risks to its children. As for harm to others, the Act's continuing care exception permits the challengers to continue their existing treatments until March 31, 2024. That feature of the law lessens the harm to those minors who wish to continue receiving treatment. But we appreciate that it does not answer the concerns of those who might wish to continue treatment after that date or to those minors who might seek treatment for the first time in the future. That creates an irreversible problem of its own, one that lies at the crux of the case. Both sides have the same fear, just in opposite directions —one saying the procedures create health risks that cannot be undone, the other saying the absence of such procedures creates risks that cannot be undone. What makes it bearable to choose between the two sides is the realization that not

every choice is for judges to make. In this instance, elected representatives made these precise cost-benefit decisions and did not trigger any reasons for skeptical review in doing so. As for the public interest, Tennessee's interests in applying the law to its residents and in being permitted to protect its children from health risks weigh heavily in favor of the State at this juncture.

\*\*\*

These initial views, we must acknowledge, are just that: initial. We may be wrong. It may be that the one week we have had to resolve this motion does not suffice to see our own mistakes. In an effort to mitigate any potential harm from that possibility, we will expedite the appeal of the preliminary injunction, with the goal of resolving it no later than September 30, 2023. In the interim, the district court's preliminary injunction is stayed.

## CONCURRING IN PART AND DISSENTING IN PART

WHITE, Circuit Judge, concurring in part and dissenting in part.

Because I believe that Tennessee's law is likely unconstitutional based on Plaintiffs' theory of sex discrimination, I would not stay the district court's injunction, although I would narrow its scope. I do not find it necessary to address Plaintiffs' alternative theories of constitutional injury at this time.

Tennessee's law likely discriminates against Plaintiffs on the basis of sex in violation of the Equal Protection Clause, thus triggering intermediate scrutiny. Although the state argues that the act "appl[ies] equally to males and females," Appellant's Br. 8-9, the law discriminates based on sex because "medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex," *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022). To illustrate, under the law, a person identified male at birth could receive testosterone therapy to conform to a male identity, but a person identified female at birth could not. [1] *See* Tenn. Code Ann. § 68-33-103(a)(1). Indeed, until today, every federal court addressing similar laws reached the same conclusion as *Brandt*. [2]

In the Title VII context, the Supreme Court has made clear that sex discrimination occurs when an "employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Bostock v. Clayton County*, ––– U.S. ––––, 140 S. Ct. 1731, 1741, 207 L.Ed.2d 218 (2020). That principle is directly on point here and highly persuasive. *Cf. Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004) (finding transgender plaintiff raised Title VII claim based on sex-stereotyping and concluding that the facts supporting the Title VII claim "easily constitute[d] a claim of sex discrimination grounded in the Equal Protection Clause"); *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) ("We review § 1983 discrimination claims brought under the Equal Protection Clause using the same test applied under Title VII.").

"Like racial classifications, sex-based discrimination is presumptively invalid." *Vitolo v. Guzman*, 999 F.3d 353, 364 (6th Cir. 2021). "Government policies that discriminate based on sex cannot stand unless the government provides an 'exceedingly persuasive justification,' " *id.* (quoting *United States v. Virginia*, 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996)), which requires showing that the "classification serves 'important governmental objectives,' and ... is 'substantially and directly related' to the government's objectives," *id.* (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982)). Applying this standard, I fail to see how the state can justify denying access to hormone therapies for treatment of minor Plaintiffs' gender dysphoria while permitting access to others, especially in light of the district court's robust factual findings on the benefits of these treatments for transgender youth.

However, I agree that the district court abused its discretion in granting a statewide preliminary injunction. As the majority observes, "District courts 'should not issue relief that extends further than necessary to remedy the plaintiff's injury.' " Maj. Op. at 415 (quoting *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)). I would uphold the stay as it applies to Plaintiffs and also Vanderbilt University Medical Center.

Lastly, I reiterate the majority's caveat that today's decision is preliminary only.

I CONCUR in part and DISSENT in part.

**All Citations**

73 F.4th 408

---

## Footnotes

1    Defendants raise in their reply brief the argument that "[b]oth sexes use the same puberty blockers, so prohibiting them for gender dysphoria does not even consider sex." Reply Br. 3. But this does not solve the problem. Under Tennessee's law, someone identified male at birth could take puberty blockers consistent with a treatment plan that contemplates development consistent with a male identity, but someone identified female at birth could not. *See* Tenn. Code Ann. § 68-33-103(a)(1).

2    *See Brandt*, 47 F.4th at 669; *Doe 1 v. Thornbury*, No. 3:23-CV-230-DJH, ––– F.Supp.3d ––––, ––––, 2023 WL 4230481, at *3 (W.D. Ky. June 28, 2023); *Brandt v. Rutledge*, No. 4:21CV00450 JM, ––– F.Supp.3d ––––, ––––, 2023 WL 4073727, at *31 (E.D. Ark. June 20, 2023); *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, No. 123CV00595JPHKMB, ––– F.Supp.3d ––––, ––––, 2023 WL 4054086, at *7 (S.D. Ind. June 16, 2023); *Doe v. Ladapo*, No. 4:23CV114-RH-MAF, ––– F.Supp.3d ––––, ––––, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023); *see also Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1146 (M.D. Ala. 2022).

---

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.