# No. 23-5609-M

IN THE

# United States Court of Appeals

FOR THE

# Sixth Circuit

---

**Jane Doe 1,** *et al.*,

*Plaintiffs-Appellees,*

**v.**

**William C. Thornbury, Jr., MD,** *et al.*,

*Defendants,*

**and**

**Commonwealth of Kentucky ex rel.
Attorney General Daniel Cameron**,

*Intervenor-Appellant.*

---

**On Appeal from the United States District Court for the
Western District of Kentucky, No. 3:23-cv-00230, Hon. David J. Hale**

---

## APPELLEES' BRIEF

**ACLU OF KENTUCKY FOUNDATION**
Corey Shapiro
Heather Gatnarek
Crystal Fryman
Kevin Muench
325 W. Main Street, Suite 2210
Louisville, KY 40202

**NATIONAL CENTER FOR LESBIAN
RIGHTS**
Shannon Minter
Christopher F. Stoll
Kelly Jo Popkin
870 Market Street, Suite 370
San Francisco, CA 94102

**MORGAN, LEWIS & BOCKIUS LLP**
Stephanie Schuster
Randall M. Levine
1111 Pennsylvania Avenue NW
Washington, DC 20004

Amanda J. Ford
One Federal Street
Boston, MA 02110

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

GLOSSARY.......................................................................................xi

ISSUES PRESENTED........................................................................ xii

INTRODUCTION ...............................................................................1

RELEVANT STATUTE.........................................................................4

STATEMENT OF THE CASE................................................................6

    I.     THE FACTS.........................................................................6

          A.    Gender Dysphoria Is Highly Treatable With Safe And Effective Medications That Are Provided Consistent With Standards Backed By Decades Of Research. ..................6

                 1.    Gender dysphoria is a serious medical condition............6

                 2.    Established, rigorous, and careful standards of care for the treatment of gender dysphoria in minors exist and are widely accepted by the medical community. .....................................................................7

                 3.    Where indicated, medical treatments are safe and effective. ........................................................................9

                 4.    Transgender adolescents receive medical treatment only after careful evaluation and with informed consent from parents....................................................14

          B.    Kentucky Has Banned Doctors From Providing Transgender Adolescents With Safe, Effective, And Accepted Medical Care.........................................................15

          C.    The Treatment Ban Severely Harms Plaintiffs........................17

    II.    THE PRELIMINARY INJUNCTION ................................................19

SUMMARY OF ARGUMENT ............................................................21

ARGUMENT ....................................................................................24

    I.     PLAINTIFFS HAVE STANDING. ..................................................24

# **TABLE OF CONTENTS**
### (continued)

**Page**

A.     Cameron Failed to Rise His New "Standing" Argument Below And Is Barred From Raising It Now. ...........................24

B.     In Any Event, Plaintiffs Have Standing....................................25

II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .........................................................................................28

A.     The Treatment Ban Is Subject To Heightened Scrutiny..........28

      1.     The Treatment Ban requires heightened scrutiny because it prevents parents from exercising their fundamental right to obtain accepted medical care for their children. .........................................................28

      2.     The Treatment Ban requires heightened scrutiny because it discriminates based on sex. .........................35

      3.     The Treatment Ban also warrants heightened scrutiny because it discriminates based on transgender status.......................................................40

B.     The Treatment Ban Cannot Withstand Heightened Constitutional Scrutiny. .......................................................42

      1.     The district court did not clearly err in finding that the banned treatments are well-established, safe, and effective..................................................................42

      2.     Cameron's experts do not rebut the district court's findings. ......................................................42

      3.     Cameron's asserted justifications fail any level of review. ........................................................................49

III.     THE BALANCE OF EQUITIES STRONGLY SUPPORTS THE PRELIMINARY INJUNCTION..............................................51

A.     The District Court Did Not Abuse Its Discretion in Finding That Plaintiffs Will Suffer Irreparable Harm. ............51

B.     The District Court Did Not Abuse Its Discretion in Finding That the Balance of Harms and Public Interest Favor an Injunction. ................................................................54

# **TABLE OF CONTENTS**
(continued)

**Page**

IV.    THE PRELIMINARY INJUNCTION'S SCOPE IS
NECESSARY AND APPROPRIATE..................................................55

CONCLUSION...........................................................................................58

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abigail All. for Better Access to Develop. Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007) ............................................................................31

*ACLU Fund v. Livingston Cnty.*,
796 F.3d 636 (6th Cir. 2015) .........................................................................24, 55

*Arizona v. Biden*,
31 F.4th 469 (6th Cir. 2022) ...............................................................................57

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020).....................................................................................36, 39

*Bowen v. Am. Hosp. Ass'n*,
476 U.S. 610 (1986).............................................................................................28

*Brandt v. Rutledge*,
47 F.4th 661 (8th Cir. 2022) .................................................................2, 20, 36, 37

*Brandt v. Rutledge*,
551 F. Supp. 3d 882 (E.D. Ark. 2021)...........................................................*passim*

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011).............................................................................................33

*Califano v. Yamasaki*,
442 U.S. 682 (1979).............................................................................................55

*Claire v. Fla. Dep't of Mgmt. Servs.*,
No. 20-cv-20, 2021 WL 5982330 (N.D. Fla. 2021) ...........................................45

*Commonwealth v. Biden*,
57 F.4th 545 (6th Cir. 2023) ...............................................................................57

*Connection Distrib. Co. v. Holder*,
557 F.3d 321 (6th Cir. 2009) ..............................................................................56

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*D.T. v. Sumner Cty. Schs.*,
  942 F.3d 324 (6th Cir. 2019) ..................................................................24

*Dep't of Homeland Sec. v. New York*,
  — U.S. —, 140 S. Ct. 599 (2020)...........................................................58

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022)...........................................................33, 39, 40

*Doe 1 v. Thornbury*,
  No. 23-5609,—F.4th—, 2023 WL 4861984 (6th Cir. 2023) ............................21

*Doe v. Ladapo*,
  No. 23-cv-114, 2023 WL 3833848 (N.D. Fla. 2023) ................................*passim*

*Eknes-Tucker v. Marshall*,
  603 F. Supp. 3d 1131 (M.D. Ala. 2022).......................................................*passim*

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015)...........................................................25

*Geduldig v. Aiello*,
  417 U.S. 484 (1974)...........................................................39

*Gen. Elec. Co. v. Gilbert*,
  429 U.S. 125 (1978)...........................................................37

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011) .......................................................36

*Greco v. Livingston Cnty.*,
  774 F.3d 1061 (6th Cir. 2014) .......................................................25

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ...............................................36, 40, 41

*Heller v. Doe*,
  509 U.S. 312 (1993)...........................................................50

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*J.E.B. v. Alabama ex rel. T.B.*,
   511 U.S. 127 (1994)........................................................................38, 39

*Kadel v. Folwell*,
   620 F. Supp. 3d 339 (M.D.N.C. 2022) ...............................................45

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
   927 F.3d 396 (6th Cir. 2019) ...........................................1, 28, 29, 32

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ............................................................40

*L.W. by & through Williams v. Skrmetti*,
   73 F.4th 408 (6th Cir. 2023) ........................................................*passim*

*L.W. v. Skrmetti*,
   No. 23-cv-376, 2023 WL 4232308 (M.D. Tenn. 2023) .....................2, 28, 32, 43

*Loving v. Virginia*,
   388 U.S. 1 (1967)................................................................................38

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)............................................................................26

*Made in the USA Found. v. United States*,
   242 F.3d 1300 (11th Cir. 2001) .........................................................27

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ........................................................37, 38

*Nguyen v. INS*,
   533 U.S. 53 (2001)..............................................................................40

*NIFLA v. Becerra*,
   138 S. Ct. 2361 (2018)........................................................................34

*Norsworthy v. Beard*,
   87 F. Supp. 3d 1164 (N.D. Cal. 2015)...............................................43

## TABLE OF AUTHORITIES
(continued)

Page(s)

*North Carolina v. Covington,*
    581 U.S. 486 (2017)..........................................................................55

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ..............................................................56

*Ohio State Conf. of the NAACP v. Husted,*
    768 F.3d 524 (6th Cir. 2014) ..............................................................56

*Parham v. J.R.,*
    442 U.S. 584 (1979).....................................................................*passim*

*Pelcha v. MW Bancorp, Inc.,*
    988 F.3d 318 (6th Cir. 2021) ..............................................................37

*Prince v. Massachusetts,*
    321 U.S. 158 (1944)............................................................................32

*Reed v. Reed,*
    404 U.S. 71 (1971)..............................................................................39

*Reno v. Flores,*
    507 U.S. 292 (1993)............................................................................35

*Rumsfeld v. F. for Acad. & Inst. Rts., Inc.,*
    547 U.S. 47 (2006)..............................................................................27

*Sessions v. Morales Santana,*
    582 U.S. 47 (2017)..............................................................................35

*Sharpe v. Cureton,*
    319 F.3d 259 (6th Cir. 2003) ..............................................................56

*Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,*
    119 F.3d 393 (6th Cir. 1997) ..............................................................42

*Smith v. City of Salem,*
    378 F.3d 566 (6th Cir. 2004) ...........................................2, 23, 36, 37

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Steffel v. Thompson*,
    415 U.S. 452 (1974) ............................................................................56

*Stiens v. Bausch & Lomb, Inc.*
    626 S.W.3d 191 (Ky. Ct. App. 2020) ...............................................30

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    143 S. Ct. 2141 (2023) .......................................................................38

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ...........................................................27

*Troxel v. Granville*,
    530 U.S. 57 (2000) ..............................................................28, 33, 35

*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017) ............................................................................55

*U.S. Student Ass'n Found. v. Land*,
    546 F.3d 373 (6th Cir. 2008) .......................................................24, 51

*United States v. Caronia*,
    703 F.3d 149 (2d Cir. 2012) ..............................................................30

*United States v. Virginia*,
    518 U.S. 515 (1996) .....................................................................35, 40

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) .........................................................................27

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ............................................................................56

*Warshak v. United States*,
    532 F.3d 521 (6th Cir. 2008) .............................................................56

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) .................................................................33, 34, 51

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994) ..................................................................57

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ......................................................36, 41

*Williams v. Owens*,
  937 F.2d 609 (6th Cir. 1991) ......................................................55, 56

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012) ...............................................................40

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972).............................................................................33

STATUTES

Ky. Rev. Stat. §311.372 ...................................................................*passim*

RULES

Fed. R. Civ. P. 52 .................................................................................29

OTHER AUTHORITIES

Am. Academy of Pediatrics, Off-Label use of Drugs in Children (Mar.
  2014), https://doi.org/10.1542/peds.2013-4060 ..................................30

FDA Press Release, Understanding Unapproved Use of Approved Drugs
  "Off Label", https://www.fda.gov/patients/learn-about-expanded-access-
  and-other-treatment-options/understanding-unapproved-use-approved-
  drugs-label..........................................................................................30

Maggie Astor, *G.O.P. State Lawmakers Push a Growing Wave of Anti-
  Transgender Bills*, N.Y. Times (Jan. 25, 2023), https://www.nytimes.com/
  2023/01/25/us/politics/transgender-laws-republicans.html ..................42

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

WPATH, Standards of Care for the Health of Transgender and Gender
Diverse People (8th Version) (2022), https://www.wpath.org/
publications/"soc ................................................................................................ 9

Wylie C. Hembree et al., *Endocrine Treatment of Gender-
Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical
Practice Guideline*, The Journal of Clinical Endocrinology & Metabolism
Vol. 102, Issue 11 (Nov. 2017) ......................................................................... 9

# <u>GLOSSARY</u>

**Minor Plaintiffs** the minor plaintiffs appearing pseudonymously as John Minor Doe or Jane Minor Doe

**Parent Plaintiffs** the adult plaintiffs appearing pseudonymously as John Doe or Jane Doe

**Plaintiffs** Minor Plaintiffs and Parent Plaintiffs, collectively

**Treatment Ban** Ky. Rev. Stat. § 311.372(2)(a)-(b)

**WPATH** World Professional Association for Transgender Health

## <u>ISSUES PRESENTED</u>

Whether the district court correctly held that the Treatment Ban is subject to heightened scrutiny under the Due Process and Equal Protection Clauses; whether the district court's factual findings were clearly erroneous; and whether the district court abused its discretion in granting a preliminary injunction.

## **INTRODUCTION**

Every day in this country, parents make medical decisions for their children that have profound consequences for their children's lives. Absent exceptional circumstances involving clear harm, courts recognize that parents, not the government, are entrusted to make these decisions for their children subject to accepted medical standards. *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (holding that parents have a fundamental right to make medical decisions for their children); *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) (same).

Ky. Rev. Stat. §311.372's complete ban on established medical treatments for transgender adolescents ("the Treatment Ban") infringes that fundamental right. The Kentucky legislature has arbitrarily usurped Parent Plaintiffs' authority to make critical medical decisions for their children, transferring that power to officials who have no personal knowledge of these youth or their medical needs, and no personal responsibility for the consequences of their decision. Parent Plaintiffs, not the members of the Kentucky legislature, will be forced to watch their children suffer due to a ban on the only established medical treatment for a condition that, left untreated, may cause life-threatening harm. As the district court and multiple other courts have concluded, the Constitution forbids this unprecedented intrusion into parents' responsibility—and right—to protect their children from harm. *Brandt v.*

*Rutledge*, 551 F. Supp. 3d 882, 893 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022); *Eknes-Tucker v. Marshall,* 603 F. Supp. 3d 1131, 1146 (M.D. Ala. 2022); *Doe v. Ladapo,* No. 23-cv-114, 2023 WL 3833848, at *11 (N.D. Fla. 2023); *L.W. v. Skrmetti*, No. 23-cv-376, 2023 WL 4232308, at *8 (M.D. Tenn. 2023).

The Treatment Ban also fails constitutional review because it singles out a small and politically vulnerable group—transgender minors—to deny them medical care. On its face, the Treatment Ban prohibits medical treatments only for minors whose "perception of [their] sex… is inconsistent with the minor's sex" at birth, Ky. Rev. Stat. §311.372(2)—that is, for transgender minors. As this Court long ago recognized, discrimination against transgender people because of their gender nonconformity is discrimination based on sex. *Smith v. City of Salem,* 378 F.3d 566 (6th Cir. 2004). That precedent is controlling here and mandates the same result reached by every other court to consider the issue: laws that ban medical care for transgender youth facially discriminate based on sex and thus require heightened scrutiny. *See Brandt v. Rutledge*, 47 F.4th 661, 667 (8th Cir. 2022); *Ladapo*, 2023 WL 3833848, at *9; *Eknes-Tucker*, 603 F. Supp. 3d at 1146; *Skrmetti*, 2023 WL 4232308, at *8.

As the district court correctly found, the Treatment Ban cannot survive this test. Based on the extensive record before it, the district court found that the treatments banned by Ky. Rev. Stat. §311.372 are "well-established, evidence-based

treatments for gender dysphoria in minors." Order, R.61, PageID#2310. Experts and medical professionals who practice in this area agree about this evidence-based standard, which recommends an individualized assessment of transgender adolescents with gender dysphoria to determine if they would benefit from puberty blockers or (for older adolescents) hormone therapy, based on a substantial body of research and clinical practice showing their safety and efficacy in appropriate cases. The evidence supporting this standard care is comparable to that supporting many other established medical treatments. By contrast, there is no evidence-based standard that calls for a complete ban on the use of puberty blockers or hormone therapy to treat transgender minors regardless of their individual medical circumstances or symptoms, and no medical research that supports such a standard being mandated by law. No evidence supports Cameron's position that adolescents with gender dysphoria improve without medical treatment or that any effective alternative treatment exists.

Based on this record, the district court found that "the puberty-blockers and hormones barred by Ky. Rev. Stat. §311.372 are… essential to the well-being of many transgender children." *Id.*, PageID#2309. Banning them, the court found, would "eliminate treatments that have already significantly benefited six of the seven minor plaintiffs and prevent other transgender children from accessing these beneficial treatments in the future." *Id.*, PageID#2311.

To prevent those irreparable harms, the district court properly issued a preliminary injunction blocking enforcement of the Treatment Ban while this case proceeds. Before the current spate of such laws, no state has ever taken the extraordinary step of banning the only medically accepted treatment for a recognized diagnosis. This Court should affirm the district court's judgment and maintain the status quo rather than permitting transgender adolescents to suffer harms that cannot be remedied even if they ultimately prevail, and that will have severe long-term consequences for their futures and their families.

## **RELEVANT STATUTE**

**Ky. Rev. Stat. §311.372**

(1) As used in this section:

   (a) "Minor" means any person under the age of eighteen (18) years; and

   (b) "Sex" means the biological indication of male and female as evidenced by sex chromosomes, naturally occurring sex hormones, gonads, and nonambiguous internal and external genitalia present at birth.

(2) Except as provided in subsection (3) of this section, a health care provider shall not, for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex, knowingly:

   (a) Prescribe or administer any drug to delay or stop normal puberty;

   (b) Prescribe or administer testosterone, estrogen, or progesterone, in amounts greater than would normally be produced endogenously in a healthy person of the same age and sex;

* * *

(3) The prohibitions of subsection (2) this section shall not limit or restrict the provision of services to:

> (a) A minor born with a medically verifiable disorder of sex development, including external biological sex characteristics that are irresolvably ambiguous;

> (b) A minor diagnosed with a disorder of sexual development, if a health care provider has determined, through genetic or biochemical testing, that the minor does not have a sex chromosome structure, sex steroid hormone production, or sex steroid hormone action, that is normal for a biological male or biological female;

* * *

(4) If a licensing or certifying agency for health care providers finds, in accordance with each agency's disciplinary and hearing process, that a health care provider who is licensed or certified by the agency has violated subsection (2) of this section, the agency shall revoke the health care provider's licensure or certification.

* * *

(6) If a health care provider has initiated a course of treatment for a minor that includes the prescription or administration of any drug or hormone prohibited by subsection (2) of this section, and if the health care provider determines and documents in the minor's medical record that immediately terminating the minor's use of the drug or hormone would cause harm to the minor, the health care provider may institute a period during which the minor's use of the drug or hormone is systematically reduced.

## STATEMENT OF THE CASE

### I.    THE FACTS

The following facts were presented to the district court in the form of expert declarations submitted in admissible form by Daniel Shumer, M.D., Suzanne Kingery, M.D., Aron Janssen, M.D., and Dan Karasic, M.D., all of whom are experts in the treatment of gender dysphoria in minors. Schumer Decl., R.17-1, PageID#142-46; Janssen Decl., R.17-2, PageID#197-201; Kingery Decl., R.17-3, PageID#232-35; Karasic Reb. Decl., R.52-4, PageID#1856-60. The district court found their testimony credible. *See* Order, R.61, PageID#2308-09.

### A.    Gender Dysphoria Is Highly Treatable With Safe And Effective Medications That Are Provided Consistent With Standards Backed By Decades Of Research.

#### 1.    Gender dysphoria is a serious medical condition.

"Gender identity" is a person's internal, innate sense of belonging to a particular sex, and the term "transgender" refers to a person whose gender identity and birth sex do not align. Shumer Decl., R.17-1, PageID#148; Janssen Decl., R.17-2, PageID#202.

Gender dysphoria is a serious medical condition experienced by transgender people when they cannot live consistent with their gender identity. Kingery Decl., R.17-3, PageID#236; Janssen Decl., R.17-2, PageID#203; R.17-1, Shumer Decl., PageID#153. It affects less than 1% of minors. *See* Karasic Reb. Decl., R.52-4,

PageID#1879-80. The condition causes "significant psychological distress or impairment in social, occupational, or other important areas of functioning." Kingery Decl., R.17-3, PageID#236. Living consistent with one's gender identity is critical to every person's health and wellbeing. Shumer Decl., R.17-1, PageID#149; Janssen Decl., R.17-2, PageID#202. Efforts to "cure" transgender individuals— forcing gender identity to align with assigned sex—are ineffective, harmful, and widely condemned as unethical by medical and mental health professionals. Shumer Decl., R.17-1, PageID#149; Janssen Decl., R.17-2, PageID#202.

Adolescents suffering from gender dysphoria may require medical intervention. Kingery Decl., R.17-3, PageID#238-39. Without treatment, many transgender adolescents develop serious and in some instances life-threatening co-occurring health conditions, such as suicidality, self-harm, substance abuse, eating disorders, depression, and anxiety. Shumer Decl., R.155, PageID#155. By contrast, transgender adolescents who receive appropriate medical treatment can "thrive and grow into healthy adults." *Id*.; *see also* Kingery Decl., R.17-3, PageID# 251-52.

> **2.    Established, rigorous, and careful standards of care for the treatment of gender dysphoria in minors exist and are widely accepted by the medical community.**

Two professional medical organizations, the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society, develop and publish evidence-based standards for treating gender dysphoria in transgender adolescents.

Both standards have broad support and have been widely endorsed by the medical community. *See*, *e.g.*, Karasic Reb. Decl., R.52-4, PageID#1886-87; Shumer Decl., R.17-1, PageID#158-59; Janssen Decl., R.17-2, PageID#199; Kingery Decl., R.17-3, PageID#236-37. Several European countries with state-run health care systems have recently urged or required providers to adhere to practices consistent with these standards' careful, individualized assessments and conservative approach to care. Karasic Reb. Decl., R.52-4, PageID#1886 (noting that a recent U.K report commissioned by the National Health Service recommended the creation of multiple regional treatment centers and encouraged providers to follow the Endocrine Society guidelines); *see also* Shumer Reb. Decl., R.52-6, PageID#1965.

The first WPATH standards were published in 1979 and are now in their eighth version. Kingery Decl., R.17-3, PageID#236-37; Shumer Decl., R.17-1, PageID#156-57; Janssen Reb. Decl., R.52-3, PageID#1811-12. The current WPATH standards are based on evidence and professional consensus and were developed in the same way as treatment guidelines for other medical conditions. Shumer Decl., R.17-1, PageID#157; Shumer Reb. Decl., R.52-6, PageID#1939; Janssen Reb. Decl., R.52-3, PageID#1812, 1823, 1825; Goodman Decl., R.17-3, PageID#1725-26. The Endocrine Society's standards, published in 2009 and revised in 2017, are consistent with the WPATH standards and were developed using rigorous scientific methods

8

and decades of research. Shumer Decl., R.17-1, PageID#158; Shumer Reb. Decl., R.52-6, PageID#1939; Janssen Reb. Decl., R.52-3, PageID#1812.

Both standards recommend a conservative approach to treatment. Before medical interventions may even be considered for an adolescent suffering from gender dysphoria, the current WPATH and Endocrine Society standards require an extensive, individualized assessment and medical findings that the patient's condition has been "marked and sustained over time." WPATH, Standards of Care for the Health of Transgender and Gender Diverse People (8th Version) (2022), at S60-S61, Statement 6.12b, https://www.wpath.org/publications/soc (the "WPATH Standards"); Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, The Journal of Clinical Endocrinology & Metabolism Vol. 102, Issue 11 (Nov. 2017), Table 5, p. 3878 (the "Endocrine Guidelines") (requiring "the persistence of gender dysphoria"); *see also* Kingery Decl., R.17-3, PageID#243, 248; Kingery Supp. Decl., R.52-5, PageID#1929; Shumer Decl., R.17-1, PageID#165;. Janssen Decl., R.17-1, PageID#207-09; Janssen Reb. Decl., R.52-3, PageID#1821; Karasic Reb. Decl., R.52-4, PageID#1869-70.

### 3. Where indicated, medical treatments are safe and effective.

Gender dysphoria is highly treatable. Treatment according to the standards of care reduces a transgender person's clinically significant distress by permitting them

9

to live in alignment with their gender identity. Kingery Decl., R.17-3, PageID#237. Undergoing treatment for gender dysphoria is commonly referred to as "transition" or "gender transition." *Id.*; Shumer Decl., R.17-1, PageID#160. The precise treatment for gender dysphoria in adolescents depends on a comprehensive assessment of each patient by a mental health professional and involves both social and medical components. Shumer Decl., R.17-1, PageID#155; Kingery Decl., R.17-3, PageID#239-40.

No medications are "considered for transition until after the onset of puberty." Shumer Decl., R.17-1, PageID#160; *accord* Kingery Decl., R.17-3, PageID#238. When appropriate, the medications considered are puberty-suppressing medications (aka gonadotropin-releasing hormone agonists ("GnRHa") or "puberty blockers") and hormone therapy. Significant medical research shows that these medications are safe and effective: they improve short- and long-term health and quality -of -life outcomes for transgender people, including significant reduction of suicidality and self-harm. Janssen Decl., R.17-2, PageID#207; Kingery Dec, R.17-3, PageID#248, 252; Shumer Reb. Decl., R.52-6, PageID#1936-38; Janssen Reb. Decl., R.52-3, PageID#1830-33; Karasic Reb. Decl., R.52-4, PageID#1867-69, 1891, 1895-96. The percentage of individuals who later come to regret receiving these treatments is extremely small. Kingery Decl., R.17-3, PageID#248, 250; Shumer Decl., R.17-1, PageID#155,166; Janssen Reb. Decl., R.52-3, PageID#1822, 1829-30; Shumer Reb.

Decl., R.52-6, PageID#1936-38; Karasic Reb. Decl., R.52-4, PageID#1867-68,1870.

Prescriptions for these medications for the treatment of gender dysphoria in adolescents is not experimental. They have been prescribed to transgender adolescent patients for more than twenty years. Shumer Decl., R.17-1, PageID#162-164, 171-72; Karasic Reb. Decl., R.52-4, PageID#1899-1900; Janssen Reb. Decl., R.52-3, PageID#1843-44; Kingery Decl., R.17-3, PageID#246. The evidence supporting these treatments is comparable in strength and quality to evidence supporting many other well-established treatments and procedures. Goodman Decl., R.17-3, PageID#1725-26; Janssen Reb. Decl., R.52-3, PageID#1823.

Puberty-suppressing medications are reversible, meaning that if an adolescent discontinues the treatment, puberty will resume. Shumer Decl., R.17-1, PageID#162-63; Kingery Decl., R.17-3, PageID#239. Puberty-suppressing medications have been safely used to treat precocious (or early) puberty for decades. Shumer Decl., R.17-1, PageID#163; Kingery Decl., R.17-3, PageID#246. The side effects of puberty-suppressing medications are easily managed, and any risks are greatly outweighed by the benefits of treatment. Shumer Decl., R.17-1, PageID#167,169; Kingery Decl., R.17-3, PageID#246-47. Puberty-delaying medications have no long-term effect on fertility or sexual function, and there is no evidence that they impact brain development, emotional regulation, or cognition.

Kingery Decl., R.17-3, PageID#247; Shumer Decl., R.17-1, PageID#163, 168; Shumer Reb. Decl., R.52-6, PageID#1947-48; Karasic Reb. Decl., R.52-4, PageID#1868.

For older adolescents with gender dysphoria, hormone therapy may be medically necessary. Kingery Decl., R.17-3, PageID#239; Shumer Decl., R.17-1, PageID#164. Scientific literature has established that hormone treatment is safe and effective to treat gender dysphoria in adolescents and adults. Kingery Decl., R.17-3, PageID#246, 249, 250; Shumer Decl., R.17-1, PageID#170-71. Side effects of hormone therapy are rare. Shumer Decl., R.17-1, PageID#170. The literature demonstrating that hormone therapy is effective to treat gender dysphoria is robust and well-established. Goodman Decl., R.52-2, PageID#1723-24; Shumer Decl., R.17-1, PageID#156, 171; Karasic Reb. Decl., R.52-4, PageID#1867. The literature similarly shows that hormone treatment is safe and has a low risk of side effects or adverse events, that long-term hormone treatment does not necessarily impair fertility, and that withdrawal of hormone therapy is generally successful in achieving fertility when it is desired. Shumer Decl., R.17-1, PageID#168, 170-71; Shumer Reb. Decl., R.52-6, PageID#1960.

Longitudinal studies have shown that adolescents with gender dysphoria who receive essential medical care, including puberty-suppressing medication and hormone therapy, show levels of mental health and stability consistent with those of

adolescents without gender dysphoria. Shumer Decl., R.17-1, PageID#155; *see* Kingery Decl., R.17-3, PageID# 251, 52. In contrast, transgender adolescents who do not receive appropriate medical care for gender dysphoria may experience debilitating anxiety, severe depression, self-harm, and suicidality. Janssen Decl., R.17-1, PageID#205; Janssen Reb. Decl., R.52-3, PageID#1845. Kingery Decl., R.17-3, PageID #236; Karasic Reb. Decl., R.52-4, PageID#1870-71; Shumer Decl., R.17-1, PageID#155.

No other safe and effective medical treatment for gender dysphoria exists. There is no evidence that any type of psychotherapy alone can alleviate gender dysphoria. Karasic Reb. Decl., R.52-4, at PageID#1871-75. Conversely, evidence shows that some psychotherapy—that which discourages an adolescent from being transgender—is extremely harmful. Janssen Decl., R.17-1, PageID#209; Janssen Reb. Decl., R.52-3, PageID#1826-27; Karasic Reb. Decl., R.52-4, PageID#1872-73. Even with supportive, ethical psychotherapy, withholding medically indicated medications causes serious harms. Janssen Decl., R.17-1, PageID#214; Kingery Decl., R.17-3, PageID#251; Shumer Decl., R.17-1, PageID#171-72; Karasic Reb. Decl., R.52-4, PageID#1870-71; Janssen Reb. Decl., R.52-3, PageID#1844-47.

**4.    Transgender adolescents receive medical treatment only after careful evaluation and with informed consent from parents.**

Dr. Suzanne Kingery, a pediatric endocrinologist and the Director of the Pediatric and Adolescent Gender Education program at Norton Children's Hospital in Louisville, Kentucky, submitted detailed testimony about the assessment and treatment processes for Kentucky adolescents who present with symptoms of gender dysphoria in her clinic. Kingery Decl., R.17-3, PageID#232-33. Clinics like Dr. Kingery's leverage multidisciplinary teams (pediatric endocrinologists, mental health providers, adolescent medicine physicians, and nurses) and follow the WPATH and Endocrine Society standards and process. *Id.*, PageID#234-42.

Dr. Kingery refers the patient to a mental health specialist (if the patient does not already have one) and works with that specialist to assess the patient for gender dysphoria according to the standards of care and to assess the patient for any other medical or psychosocial conditions that might affect treatment. *Id.*, PageID#243. If a diagnosis of gender dysphoria is confirmed, Dr. Kingery meets with the patient and their parent or guardian "as many times as necessary for them to fully understand the risks and benefits of treatment options in their individual circumstance and come to an informed decision." *Id.* They have detailed discussion of treatment options and outcomes, as well as the risks, benefits, and effects of any medications under consideration. *Id.*, PageID#244. If the patient, family, and healthcare team all agree

that treatment with medication is in the best interest of a patient under 18, the clinic

obtains both informed written consent from the patient's parents and verbal assent

from the adolescent patient. *Id.*

This process is conservative and ensures that medical treatments are provided

only when necessary. As Dr. Kingery averred:

> The number of adolescent patients who are prescribed hormone
> blocking medications and/or hormone therapy represent only a portion
> of all young people who are seen by the clinical team. Some adolescents
> are seen in clinic and never receive these treatments, and others are not
> ready for, or are not candidates for, these medications.

*Id.*, PageID#234. Blood tests are necessary to ensure a patient's eligibility for

puberty-suppressing medications or hormone therapy. *Id*., PageID#244. It can be a

year or more after a patient initially comes to the clinic before they physically or

psychologically meet the necessary criteria to receive these treatments. *Id.* Patients

receive extensive follow-up care including regular monitoring of their gender

dysphoria, physical and mental health, treatment efficacy, the patient's satisfaction

with the treatment, hormone levels, and any side effects. Patients also are

encouraged to continue mental health treatment throughout the process. *Id.,*

PageID#245.

> **B.    Kentucky Has Banned Doctors From Providing Transgender
> Adolescents With Safe, Effective, And Accepted Medical Care.**

Kentucky lawmakers overrode the Governor's veto to pass Senate Bill 150

and its Treatment Ban now codified at Ky. Rev. Stat. §311.372(2)(a)-(b).

The Treatment Ban targets transgender adolescents and deprives them of the only effective evidence-based treatment of gender dysphoria:

> [A] health care provider shall not, for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex, knowingly:
>
>> (a) Prescribe or administer any drug to delay or stop normal puberty; [or]
>>
>> (b) Prescribe or administer testosterone, estrogen, or progesterone, in the amounts greater than would normally be produced endogenously in a healthy person of the same age and sex.

Ky. Rev. Stat. §311.372(2).[1]

If a "health care provider has initiated a course of treatment" that involves these medications, the provider cannot continue that course of treatment and instead must terminate treatment altogether or "institute a period during which the minor's use of the drug or hormone is systematically reduced." *Id*. §311.372(6).

Healthcare providers are free to prescribe the same medications to non-transgender minors for conditions other than gender dysphoria. *See id.* §311.372(3). Specifically, the same medications may be prescribed or administered by doctors without risk of losing their licenses to treat a "[a] minor born with a medically verifiable disorder of sex development, including external biological sex

---

[1] Ky. Rev. Stat. §311.372 also bans certain surgeries for transgender minors, which Plaintiffs do not challenge in this action. Compl., R.2, PageID#23, n.5.

characteristics that are irresolvably ambiguous" or a "minor diagnosed with a disorder of sexual development." *Id.*

The agencies that license and certify healthcare providers in the Commonwealth are tasked with enforcing the Treatment Ban—they "shall revoke [a] health care provider's licensure or certification," if they find the provider violated the Treatment Ban. *Id.* §311.372(4).

**C.    The Treatment Ban Severely Harms Plaintiffs.**

The Minor Plaintiffs are three transgender boys and four transgender girls who live in Kentucky. Compl., R.2, PageID#25-29. Before the Treatment Ban went into effect, six of them were receiving the prohibited treatments under the supervision of their treating healthcare providers and with the informed consent of their parents. *Id.,* PageID#13-15. The remaining Minor Plaintiff has not received medication treatment yet but anticipates that she will need to when puberty begins. *Id.*, PageID#16. Each Plaintiff is directly harmed by the Treatment Ban, which categorically prohibits their providers from providing or administering medications to treat their gender dysphoria. Four Parent Plaintiffs submitted declarations describing the benefits their children received when undergoing the now-banned treatment and the harms that result from the Treatment Ban.

- John Minor Doe 1 ("JM1") is a twelve-year-old transgender boy. JD1 Decl., R.17-4, PageID#281. In 2022, JM1 was diagnosed with gender dysphoria and,

after multidisciplinary assessment, began taking puberty blockers. *Id*. JM1's emotional and mental health has improved greatly, with a dramatic reduction of suicidality. *Id.* JM1's parents fear that the Treatment Ban will deprive their son of "lifesaving and life changing" treatment. *Id.*, PageID#281-82.

- John Minor Doe 2 ("JM2") is a fifteen-year-old transgender boy. JD2 Decl., R.17-5, PageID#283. After a multidisciplinary assessment, JM2 began receiving hormone therapy to treat his gender dysphoria, which has significantly improved his mental health. *Id.*, PageID#284. Without these now-banned treatments, JM2's father believes his son will revert to his previous distressed mental state. *Id.*

- Jane Minor Doe 3 ("JM3") is an eleven-year-old transgender girl. JD3 Decl., R.17-6, PageID#286. Her psychologist diagnosed her with gender dysphoria in spring 2022 and referred her to a pediatric endocrinologist who prescribed puberty blockers. *Id.*, PageID#287. Puberty blockers have improved JM3's gender dysphoria and overall mental health, which her parents believe will once again deteriorate if she is forced to discontinue them. *Id.*

- John Minor Doe 5 ("JM5") is a sixteen-year-old transgender boy. JD5 Decl., R.17-7, PageID#289. Receiving prescribed hormone therapy has dramatically improved his mental health. *Id.*, PageID#290. JM5's parents fear that the Treatment Ban will cause his symptoms of distress to return. *Id.*

18

## II.   THE PRELIMINARY INJUNCTION

The Treatment Ban was set to take effect on June 29, 2023. Plaintiffs sued the public officials tasked to enforce the Treatment Ban on May 3, 2023, Compl. R.2, and moved for a preliminary injunction, Mot. for Prelim. Injunction, R.17. The defendant officials whom the Legislature has tasked with enforcing the Treatment Ban had "no objection to" a preliminary injunction and instead agreed "it would behoove [licensed physicians and nurses] and their patients for the Court to grant the injunction and maintain the status quo pending final ruling on the merits of the suit." Resp. to Mot., R.41. Kentucky Attorney General Cameron intervened. Mot. for Intervention, R.38.

The district court issued a preliminary injunction on June 28, 2023. Order, R.61. The court concluded that Plaintiffs are likely to prevail on the merits of their claims, and that the remaining preliminary injunction factors all weighed in their favor. *Id*. The district court also concluded that a statewide injunction was necessary to afford the Plaintiffs complete relief. *Id*., PageID#2312. The court expressly found "that the treatments barred by [Ky. Rev. Stat. §311.372] are medically appropriate and necessary for some transgender children under the evidence-based standard of care accepted by all major medical organizations in the United States," and that "[t]hese drugs have a long history of safe use in minors for various conditions." *Id.*, PageID#2302.

The court held that the Treatment Ban is subject to heightened scrutiny under the Equal Protection Clause because it deploys sex-based discrimination—"the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law." *Id.*, PageID#2303 (quoting *Brandt*, 47 F.4th at 669). The court further concluded that strict scrutiny governs Parent Plaintiffs' claims under the Due Process Clause because Parent Plaintiffs have a fundamental right to choose "available, legally permissible treatments for gender dysphoria" for their children, including puberty blockers and hormone therapy. *Id.*, PageID#2309.

Applying heightened scrutiny, the district court found that Attorney General Cameron failed to show that the Treatment Ban was substantially related to any of its asserted objectives, which included "protecting children, 'protecting vulnerable groups… from abuse, neglect, and mistakes'; and 'protecting the integrity and ethics of the medical profession.'" *Id.*, PageID#2306. According to the court, Cameron's "quoted studies from 'some European countries' questioning the efficacy of the drugs… [and] anecdotes from a handful of 'detransitioners'" did not support "banning the treatments entirely." *Id.*, PageID#2307. To the contrary, the Treatment Ban "would prevent doctors from acting in accordance with the applicable standard of care." *Id.*

Concerning the equitable factors, the district court found that Plaintiffs would suffer irreparable harm if the Treatment Ban took effect both because it violates their

constitutional rights and because it "eliminate[s] treatments that have already significantly benefited six of the seven minor plaintiffs and prevents other transgender children from accessing these beneficial treatments in the future." *Id.*, PageID#2311. The court concluded that the irreparable harm to Plaintiffs and other transgender adolescents outweighed any harm to the law's proponents in having to wait for this case to resolve. The court entered a facial injunction preventing enforcement of the Treatment Ban against any licensed health provider. *Id.*, PageID# 2315-17.

On July 14, 2023, the district court stayed the injunction pending appeal, finding it was compelled to do so by *L.W. by & through Williams v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023), where a divided motions panel of this Court stayed an injunction against Tennessee's similar law. On July 31, 2023, in another split decision, the same panel denied Plaintiffs' emergency motion to reinstate the preliminary injunction. *Doe 1 v. Thornbury*, No. 23-5609,—F.4th—, 2023 WL 4861984, at *2 (6th Cir. 2023). Plaintiffs petitioned for en banc review of the July 31 order, and that petition is pending.

## SUMMARY OF ARGUMENT

None of the issues Cameron raises warrant reversal of the district court's thoughtfully reasoned preliminary injunction order.

First, the Court should reject Cameron's argument that the preliminary injunction should have been denied because Plaintiffs did not rebut an entirely speculative theory concerning standing that he did not raise before the district court and asserts for the first time on appeal. Even if that argument were properly before the Court, Plaintiffs have more than adequately demonstrated that they are harmed by the Treatment Ban's categorical prohibition on medical treatments they previously were able to receive.

Second, the district court correctly concluded that Plaintiffs have shown they are likely to succeed on the merits. The Treatment Ban violates the Parent Plaintiffs' long-recognized fundamental right to make decisions about their children's medical treatment, subject to established medical standards. Plaintiffs do not seek recognition of a new "right to receive new medical or experimental drug treatments." *L.W.*, 73 F.4th at 417. Because the Treatment Ban's infringes the Parent Plaintiffs' fundamental rights, it may be upheld only if it is narrowly tailored to achieve a compelling governmental interest.

Heightened scrutiny is also required because the Treatment Ban facially classifies based on sex. The Treatment Ban prohibits medical treatments only for minors whose "perception of [their] sex… is inconsistent with the minor's sex" at birth, Ky. Rev. Stat. §311.372(2)—that is, for transgender minors. Under this Court's longstanding precedent, discrimination against a transgender person because

22

of their gender nonconformity is discrimination based on sex. *Smith*, 378 F.3d at 572.

The Treatment Ban cannot withstand any level of constitutional scrutiny, much less the required heightened scrutiny. Substantial evidence demonstrated that the banned treatments are "well-established, evidence-based treatments for gender dysphoria in minors," and that "[t]hese drugs have a long history of safe use in minors for various conditions," Order, R.61, PageID#2302, 2310. The district court's findings were not clearly erroneous. Cameron offered no credible evidence to support his claims that adolescents with gender dysphoria will improve without medical treatment or that effective alternative treatments exist.

Third, the district court did not abuse its discretion in concluding that the balance of equities and the public interest favor a preliminary injunction. Being deprived of treatment for their gender dysphoria will cause the Minor Plaintiffs to suffer potentially severe psychological, emotional, and physical harm, including anxiety, depression, self-harm, and suicidality. This harm far outweighs any harm to Cameron from being unable to enforce the Treatment Ban while this case proceeds.

Fourth, the district court did not err in issuing a statewide injunction in this facial constitutional challenge; such an injunction is necessary to afford Plaintiffs complete relief.

## **ARGUMENT**

This Court "review[s] *de novo* the legal conclusions made by the district court, and [it] review[s] its factual findings for clear error." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 380 (6th Cir. 2008). The "ultimate decision regarding injunctive relief is reviewed under the highly deferential abuse-of-discretion standard." *Id.* The district court properly determined that all preliminary injunction factors weigh heavily in Plaintiffs' favor. *See D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019); *ACLU Fund v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015).

## I.    PLAINTIFFS HAVE STANDING.

### A.    Cameron Failed to Rise His New "Standing" Argument Below And Is Barred From Raising It Now.

Cameron erroneously claims that Plaintiffs have failed to establish standing because they have not shown "that their medical providers will likely provide puberty blockers and hormones despite the risk of civil liability created by Ky. Rev. Stat. §311.372." Cameron Br. at 43; *see also id.* at 44 (arguing that Plaintiffs therefore "have not proved that a favorable ruling will likely redress their alleged injuries"). As amply demonstrated by the record, Plaintiffs have shown that the Treatment Ban has blocked their ability to obtain medically necessary care and that enjoining it will provide the relief they seek. Plaintiffs had no obligation to respond to evidence or arguments that Cameron did not present below and which he is barred from raising now for the first time on appeal.

24

As Cameron correctly acknowledges, standing, at the preliminary injunction stage, is a *merits* question: it goes to the plaintiff's likelihood of success on her claims, not the court's subject-matter jurisdiction. Cameron Br. at 43; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912-13 (D.C. Cir. 2015). While questions about subject-matter jurisdiction may be raised for the first time on appeal, merits questions relating to the propriety of granting a preliminary injunction may not. Cameron's new, nonjurisdictional standing "argument trips over the forfeiture rule, which tells us to correct errors raised and addressed below, not to entertain new claims raised for the first time on appeal." *Greco v. Livingston Cnty.*, 774 F.3d 1061, 1064 (6th Cir. 2014) (Sutton, C.J.). Cameron's argument is forfeit and must be rejected.

### B.    In Any Event, Plaintiffs Have Standing.

Cameron insists that Plaintiffs lack standing because they sought a preliminary injunction against enforcement of the Treatment Ban only, rather than an injunction barring every patient from suing Plaintiffs' doctors for violating the Treatment Ban. Cameron Br. at 36. According to Cameron this creates a "redressability problem." *Id.* This argument fails for several reasons.

For starters, Ky. Rev. Stat. §311.372 does not create a private right of action. The provision Cameron references simply provides *special limitations periods* for "[a]ny civil action to recover damages for injury suffered as a result of violation of"

the Treatment Ban, Ky. Rev. Stat. §311.372(5)—rights of action that already exist at common law (*e.g.*, medical malpractice). In addition, as the plain language of the statute makes clear, Section 5 applies only if Section 2(a)-(b) of Ky. Rev. Stat. §311.372 is ultimately found constitutional; it cannot stand if Section 2 is struck down.

Cameron also assumes Plaintiffs' doctors, freed from the fear of losing their licenses because of the Treatment Ban, will nevertheless refuse to treat Plaintiffs because of the completely speculative possibility that Plaintiffs may someday sue them for malpractice. Such illogical speculation does not undermine Plaintiffs' standing. Plaintiffs seek a judgment declaring the Treatment Ban unconstitutional. Compl., R.2, at PageID#32. Common sense dictates that providers will not fear malpractice suits based on their compliance with the established standard of care rather than an unconstitutional law.

Cameron's argument proves too much. If adopted, a plaintiff would always lack standing to challenge the constitutionality of a privately enforceable law unless it sought an injunction against all non-parties who might conceivably avail themselves of the right of action. That absurd proposition defies precedent. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) ("The redressability element of the Article III standing requirement and the '*complete* relief' referred to by Rule 19 are not identical.") (emphasis in original). Indeed, it is settled that "the ability to

effectuate a partial remedy satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (cleaned up); *see also Made in the USA Found. v. United States*, 242 F.3d 1300, 1310 (11th Cir. 2001); *Swan v. Clinton*, 100 F.3d 973, 980-81 (D.C. Cir. 1996). [2]

Cameron also insists that standing is lacking because, in his view, "only *some* of the plaintiffs have submitted proof of an alleged injury in fact." Cameron Br. 45 (emphasis added) (citing proof). That argument is irrelevant to whether the Court has jurisdiction, for "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 53 n.2 (2006).

---

[2] Even if such an argument could prevail, Plaintiffs will be able to provide evidence that providers in Kentucky provided care to transgender adolescent patients from June 28, 2023, through July 14, 2023, when Section 2 was enjoined by the district court, and would again provide care if Section 2 were again blocked, demonstrating the argument lacks any actual merit. While such evidence necessarily could not have been in the record given the injunction was not in place nor had Cameron raised the argument, if the Court believes the absence of such evidence necessitates dismissal based on lack of standing, the Court should remand the issue to the district court so Plaintiffs can proffer such evidence.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    The Treatment Ban Is Subject To Heightened Scrutiny.

#### 1.    The Treatment Ban requires heightened scrutiny because it prevents parents from exercising their fundamental right to obtain accepted medical care for their children.

Contrary to *L.W.*'s preliminary conclusions, the Supreme Court has not "confined… to narrow fields, such as education or child custody" parents' fundamental right to "the care, custody, and control of their children." *L.W.*, 73 F.4th at 417 (citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). In *Parham*, the Supreme Court squarely held that parents have a fundamental right to make decisions about a child's medical treatment subject to established medical standards. Because parents have a duty "to recognize symptoms of illness and to seek and follow medical advice," *Parham*, 442 U.S. at 602, parents "retain *plenary authority to seek [medical] care for their children*, subject to a physician's independent examination and medical judgment," *id*. at 604 (emphasis added). This is not an untrammeled right to subject children to any treatment a parent desires: it is a right to seek and follow medically accepted advice.[3] *See id.* at 602. As this Court held in *Kanuszewski*,

---

[3] *See Eknes-Tucker*, 603 F. Supp. 3d at 1146 (holding parents' "fundamental right to direct the medical care of their children… includes the more specific right to treat their children… subject to medically accepted standards"); *Brandt*, 2023 WL 4073727, at *36 (recognizing "[parents'] fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary"); *Bowen*

28

"parents' substantive due process right to make decisions concerning the care, custody, and control of their children includes the right to direct their children's medical care." 927 F.3d at 419.

Plaintiffs are not trying to break new substantive due process ground. Plaintiffs assert the precise right the Supreme Court recognized in *Parham*. They do not assert a "right to receive new medical or experimental drug treatments." *L.W.*, 73 F.4th at 417. The banned treatments are well established, not new or experimental, as the district court found based on the significant evidence before it. Order, R.61, PageID#2309-10. Those findings are binding on this Court unless clearly erroneous, Fed. R. Civ. P. 52(a)(6), and they are not clearly erroneous. The medications involved have been prescribed by doctors for decades—puberty blockers for over thirty years, hormones for even longer. Kingery Decl., R.17-3, PageID#246; Karasic Reb. Decl., R.52-4, PageID#1867; Shumer Decl., R.17-1, PageID#167-68; *see also Ecknes-Tucker*, 603 F. Supp. 3d at 1145. Diagnosing gender dysphoria in adolescents is also not new or experimental; it has been recognized since the 1980s. WPATH Standards, at S43. The banned treatments— administering these medications to treat gender dysphoria—are not new or

---

*v. Am. Hosp. Ass'n*, 476 U.S. 610, 627 n.13 (1986) ("[A]s long as parents choose from professionally accepted treatment options, the choice is rarely reviewed in court and even less frequently supervened.").

experimental, either. Doctors have recommended and prescribed these treatments to adolescents with gender dysphoria for more than twenty years; the treatments are proven safe and effective by a robust body of medical research and literature; and they are provided pursuant to conservative, evidence-based standards that are widely accepted by experts, practitioners, and medical organizations. Kingery Decl., R.17-3, PageID#236-37, 246; Schumer Decl., R.17-1, PageID#156-57; 162-63; Janssen Reb. Decl., R.52-3, PageID#1811-12.

There is no correlation—as a matter of fact, law, or logic—between FDA-approval of a medication for a specific purpose and experimental use: "From the FDA perspective, once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient." FDA Press Release, Understanding Unapproved Use of Approved Drugs "Off Label", https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label. In fact, off-label use is common and integral to contemporary medical practice, particularly in pediatric medicine. Am. Academy of Pediatrics, Off-Label use of Drugs in Children (Mar. 2014), https://doi.org/10.1542/peds.2013-4060. "Doctors are permitted and even encouraged to prescribe drugs for both [FDA]-approved and unapproved uses for the benefit of their patients." *Stiens v. Bausch & Lomb, Inc.* 626 S.W.3d 191, 203 (Ky. Ct. App. 2020) (citing *United States*

*v. Caronia*, 703 F.3d 149, 153 (2d Cir. 2012)). The FDA does not regulate the practice of medicine, nor does it initiate testing of a particular treatment on its own. That a particular treatment has not been FDA-approved does not mean it has been FDA-rejected or is experimental: it conveys nothing about either the FDA's views or whether the treatment is medically accepted with a proven track record. *See Ladapo*, 2023 WL 3833848, at *15 ("That the FDA has not approved these drugs for treatment of gender dysphoria says precisely nothing about whether the drugs are safe and effective when used for that purpose.").

Thus, *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695 (D.C. Cir. 2007), which involved access to experimental medications, is irrelevant. Parent Plaintiffs here seek no such novel authority, but rather merely the ability to follow established medical advice. They seek treatments for their children that, for decades, have been recognized as safe and effective by medical specialists and the nation's leading medical and mental health organizations.[4] Here, as in *Parham*, Plaintiffs assert a right to seek and follow *accepted* medical advice for their children, not a right to new or experimental

---

[4] As the district court correctly held: "This case is therefore distinguishable from those cited by the Commonwealth in which plaintiffs claimed a right to access treatment for themselves that was not already available or accepted." Order. R.61, PageID#2310.

medications or to treatments that are widely repudiated or deemed dangerous by the medical community.

When a law burdens a fundamental right, the government must do more than simply invoke an interest in protecting children. *See L.W.*, 73 F.4th at 418 (noting that "state governments have an abiding interest in "'preserving the welfare of children" and "broad power "'to limit parental freedom'"") (citing *Kanuszewski*, 927 F.3d at 417 and *Prince v. Massachusetts*, 321 U.S. 158, 167 (1944)). The defendants in *Prince* and *Parham*, like the defendants here, invoked the protection of children to justify the policies challenged by parents in those cases. Nevertheless, the courts applied heightened scrutiny in those cases, carefully examining the state's asserted interests and the specific circumstances in each case.[5] *Parham*, 442 U.S. at 602; *Prince*, 321 U.S. at 167.

A similar analysis applies to the state's generic invocation of "medical and scientific uncertainty." *L.W.*, 73 F.4th at 417. As the Supreme Court held in *Gonzalez v. Carhart*, "where constitutional rights are at stake," "the Court retains an independent constitutional duty to review [legislative] factual findings," not merely to rubberstamp them. 550 U.S. 124, 165 (2007).

---

[5] *L.W.* also distinguishes *Kanuszewski* on the ground that "the Michigan program compelled medical care, while the Tennessee Act law prohibits certain medical care." 73 F.4th at 418. But the parent in *Parham* was seeking to obtain treatment for a child, not to refuse it. *Parham*, 442 U.S. at 602

Finally, *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) does not cast doubt on the continuing vitality of the fundamental right of parents to direct their children's medical care as described in *Parham*. The Supreme Court could not have been clearer: "nothing in this [*Dobbs* majority] opinion should be understood to cast doubt on precedents that do not concern abortion."[6] In addition, the right asserted by the Parent Plaintiff is "deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Constitutional law presumes that parents are best situated to act in a child's best interests and imposes on parents a "high duty" to protect their children from harm, including by meeting the child's medical needs. *Parham*, 442 U.S. at 602 ("Surely,

---

[6] Notably, while Justice Thomas has expressed skepticism that the Due Process Clause protects fundamental rights, he has repeatedly stated that the privileges or immunities clause of the federal Constitution strongly protects parental rights. *See Troxel*, 530 U.S. at 80 (Thomas, J., concurring); *cf. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 822 (2011) (Thomas, J., dissenting) ("The historical evidence shows that the founding generation believed parents had absolute authority over their minor children and expected parents to use that authority to direct the proper development of their children.").

33

this includes a 'high duty' to recognize symptoms of illness and to seek and follow medical advice.").

This right is also "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721. As the Supreme Court noted in *Parham*, "our constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare their children for additional obligations." 442 U.S. at 602. It is no accident that the Supreme Court emphasized this point in a case about a parent's right to direct a child's medical care. As this case illustrates, decisions regarding a child's medical treatment may and often do implicate issues of profound personal, social, and political importance. Constitutional due process guarantees serve as a bulwark against government misuse of power, including through medical regulations that "increase state power and suppress minorities." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2374 (2018). That danger is present here, where Ky. Rev. Stat. §311.372 severely undermines the ability of Parent Plaintiffs to raise their transgender adolescents consistent with their own values and beliefs. "[T]he statist notion that governmental power should supersede parental authority" in determining how to raise their children "is repugnant to American tradition." *Parham*, 442 U.S. at 603.

Because the Treatment Ban burdens this fundamental right, it may be upheld only if it is narrowly tailored to further a compelling governmental interest. *Reno v. Flores,* 507 U.S. 292, 301-02 (1993); *Troxel*, 530 U.S. at 80 (Thomas, J., concurring).

> ### 2.   The Treatment Ban requires heightened scrutiny because it discriminates based on sex.

Because the Treatment Ban discriminates based on sex, it may be upheld only if Kentucky can show that its proffered justifications are "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 531 (1996). This requires Kentucky to show that the Treatment Ban serves important governmental objectives and that the means employed are substantially related to the achievement of those objectives. *Sessions v. Morales Santana*, 582 U.S. 47, 58 (2017). Kentucky has not done so, and the District Court's preliminary injunction should be affirmed.

The Treatment Ban targets an identifiable group—*transgender* minors—and prohibits them from being prescribed medicines because they are transgender. The Treatment Ban prohibits the listed medications only when used to "alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's [birth] sex." Ky. Rev. Stat. §311.372(2). Having an "appearance or perception" of one's sex that is "inconsistent with [one's birth] sex" is precisely what defines a person as transgender, and the prohibited medications are precisely what allow a transgender person to live as a

35

transgender person—that is, to live consistent with their gender identity rather than be forced to live in their birth sex.

The Treatment Ban must be tested under heightened scrutiny because discrimination against a person for being transgender is sex-based discrimination: "It is *impossible* to discriminate against a person for being… transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020) (emphasis added). Classifications based on transgender status "cannot be stated without referencing sex." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020). As this Court held nearly twenty years ago, discrimination against a person who "fails to act and/or identify with his or her gender… is no different" than other forms of gender discrimination, *Smith*, 378 F.3d at 575, and "easily constitute[s] a claim of sex discrimination grounded in the Equal Protection Clause," *id.* at 577; *accord Brandt,* 47 F.4th at 670; *Grimm*, 972 F.3d at 608-09; *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017);[7] *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011).

The Treatment Ban illustrates the point. It prohibits medications prescribed or administered "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's *sex*, if that appearance or perception is

---

[7] *Abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

inconsistent with the minor's *sex*" assigned at birth. Ky. Rev. Stat. §311.372(1)(a)-(b) (emphases added). A law that "prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity… constitutes a sex-based classification for purposes of the Fourteenth Amendment." *Eknes-Tucker,* 603 F. Supp. 3d at 1147; *accord Brandt*, 47 F.4th at 670. Heightened scrutiny applies for this reason alone.

Cameron argues that *Bostock*'s logic is limited to Title VII but fails to offer any reason why the definition or understanding of "discrimination" under the Equal Protection Clause would be different than the understanding of "discrimination" in Title VII. None exists, and the Supreme Court and this Court have long recognized that the definition of "sex" discrimination under the Constitution and the Civil Rights Act are the same. *See, e.g., Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1978); *Smith*, 378 F.3d at 577 (cleaned up) (plaintiff alleging a violation of the Equal Protection Clause "must prove the same elements as are required to establish a disparate treatment claim under Title VII.").

The cases Cameron relies on are not to the contrary. *Pelcha v. MW Bancorp, Inc.*, addressed differing evidentiary burdens under Title VII and a federal law prohibiting age discrimination; it had nothing to do with what constitutes sex discrimination under Title VII and the Equal Protection Clause. 988 F.3d 318, 324 (6th Cir. 2021). In *Meriwether v. Hartop*, a footnote mentions only that Title VII and

37

Title IX differ "in important respects," citing Title IX's express allowances for consideration of sex in allocating athletic scholarships and living facilities. *Meriwether* did not find a substantive distinction between sex discrimination under Title VII and the Equal Protection Clause. 992 F.3d 492, 510 n.4 (6th Cir. 2021). And in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA*"), Justice Gorsuch agreed with the majority that the definition of race discrimination under Title VI and equal protection are the same; his concurrence merely notes that while race discrimination may be justified by a sufficiently compelling rationale under equal protection, there is no such option under Title VI. 143 S. Ct. 2141, 2220 (2023) (Gorsuch, J., concurring).

That the Treatment Ban applies to both transgender boys and girls does not immunize it from scrutiny under the Equal Protection Clause, which like Title VII, protects individuals, not groups. *See Loving v. Virginia*, 388 U.S. 1, 9 (1967) ("the fact of equal application does not immunize" government action from Equal Protection review). In *J.E.B. v. Alabama ex rel. T.B.*, the Supreme Court held that peremptory challenges based on a juror's sex are unconstitutional, even though such challenges can be applied equally to both sexes. The Court held that the Equal Protection Clause protects *each person*—not merely women as a group or men as a group—from disparate treatment based on sex: "individual jurors themselves have a right to nondiscriminatory jury selection procedures." 511 U.S. 127, 140-41 (1994).

Heightened scrutiny applied because each person faced discrimination based on their sex, even if there was an equal effect on men and women. *Id*. at 141-42.[8] As the Supreme Court explained in *Bostock*: It is not "a defense for an employer to say it discriminates against both men and women because of sex…. Instead of avoiding Title VII exposure, this employer doubles it." 140 S. Ct. at 1741. That logic applies fully here—each individual transgender minor is entitled to receive recommended medical care without prohibitions because of their sex.

*Geduldig* and *Dobbs* accordingly are inapposite. Cameron Br. at 21 (citing *Geduldig v. Aiello*, 417 U.S. 484 (1974) and *Dobbs*, 142 S. Ct. 2228). *Geduldig* did not consider a facial classification based on sex, but rather what it viewed as a facially neutral pregnancy exclusion based on "an objectively identifiable physical condition." 417 U.S. at 497 n.20. The Treatment Ban, however, unquestionably involves classifications based on sex as such—the whole point of the law is to deny recommended medical care only to minors whose birth sex differs from their innate perception of their sex. *Geduldig* thus does not speak to the kind of explicit sex

---

[8] *Reed v. Reed*, 404 U.S. 71 (1971) is not to the contrary. In *Reed*, the law at issue happened to prefer members of one sex over the other, which the Supreme Court noted. However, the Court nowhere held that a sex-based classification *must* confer such a group-based advantage to warrant heightened scrutiny under the Equal Protection Clause, and the Supreme Court's subsequent decisions reject that limitation.

classification found in the Treatment Ban, and for the same reason, neither does *Dobbs*.

Nor is there an exception for such explicit sex classifications because they are purportedly based on innate physiological or biological characteristics. As the Supreme Court has made clear, "all gender-based classifications" are subject to heightened scrutiny. *Virginia*, 518 U.S. at 555; *see also Nguyen v. INS*, 533 U.S. 53, 70, 73 (2001) (applying heightened scrutiny to different standard of establishing citizenship through fathers and mothers, which was based on biological differences related to procreation).

> ### 3.    The Treatment Ban also warrants heightened scrutiny because it discriminates based on transgender status.

This Court should follow the Fourth and Ninth Circuits and hold that government discrimination based on transgender status also separately triggers heightened scrutiny. *Grimm*, 972 F.3d at 611-13; *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019). Transgender people satisfy all the indicia of a suspect class: (1) they have historically been subject to discrimination; (2) they have a defining characteristic that bears no relation to their ability to contribute to society; (3) they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) they are a minority group lacking political power. *See, e.g., Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 570 U.S. 744, 770 (2013).

40

In particular:

(1) "Transgender people frequently experience harassment in places such as schools (78%), medical settings (28%), and retail stores (37%), and they also experience physical assault in places such as schools (35%) and places of public accommodation (8%)," and they "are more likely to be the victim of violent crimes" than people who are not transgender. *Grimm*, 972 F.3d at 612.

(2) "[T]here is obviously no relationship between transgender status and the ability to contribute to society." *Bd. of Educ. of the Highland Loc. Sch. Dist.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016). Medical experts "agree that being transgender implies no impairment on judgment, stability, reliability, or general social or vocational abilities." *Grimm*, 972 F.3d at 612.

(3) "Gender identity is real," and transgender people are defined by the obvious, immutable, and distinguishing characteristic of having a gender identity that does not match their sex at birth. *Ladapo*, 2023 WL 3833848, *2.

(4) There is ample evidence that transgender people, who represent "a tiny minority of the population," lack sufficient political power to protect themselves from majoritarian discrimination. *Bd. of Educ.*, 208 F. Supp. 3d at 874. Today, many states, including Kentucky, have enacted laws that single out transgender people for adverse treatment in a wide variety of areas, including healthcare, schools, restrooms, employment, and government

identity documents. *See* Maggie Astor, *G.O.P. State Lawmakers Push a Growing Wave of Anti-Transgender Bills*, N.Y. Times (Jan. 25, 2023).[9] In 2023 alone, state legislatures proposed more than 150 bills targeting transgender people for negative treatment. *Id.*

**B.    The Treatment Ban Cannot Withstand Heightened Constitutional Scrutiny.**

**1.    The district court did not clearly err in finding that the banned treatments are well-established, safe, and effective.**

The record shows, and the district court specifically found, that "the treatments barred by Ky. Rev. Stat. §311.372 are medically appropriate and necessary for some transgender children." Order, R.61, PageID#2302. The district court also found that "[t]hese drugs have a long history of safe use in minors for various conditions," and that "[i]t is undisputed that puberty-blockers and hormones are not given to prepubertal children with gender dysphoria." *Id.* As set forth above, those findings are amply supported by the record, not "clearly erroneous," and thus warrant deference. *See Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997).

**2.    Cameron's experts do not rebut the district court's findings.**

None of the experts proffered by Cameron have expertise in diagnosing or treating gender dysphoria in adolescents, and none of their attempts to discredit these

---

[9] https://www.nytimes.com/2023/01/25/us/politics/transgender-laws-republicans.html

treatments have scientific support. Numerous other courts have rejected or given little credence to the testimony of Defendants' witnesses for these reasons.[10] *See, e.g., Eckness-Tucker*, 603 F.Supp.3d at 1142-43 (giving Cantor's testimony "very little weight" due to his lack of relevant expertise); *Skrmetti*, 2023 WL 4232308, at *20. ("[T]he testimony of Dr. Cantor… is minimally persuasive given that [he has never] diagnosed or treated a minor with gender dysphoria.); *see also id.* at *25 (noting that Dr. Levine's contains "inconsistencies and illogical inferences"); *id.* at n.40 (noting "that the testimony of both Dr. Laidlaw and Dr. Levine, on topics virtually identical to those on which they testify on behalf of Defendants in this case, has been treated by courts with a dose of skepticism") (collecting cases); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015) (giving Dr. Levine's opinions "very little weight" given that his report "contains illogical inferences").

There is no scientific evidence that the banned "treatments lead to physical and mental-health problems that are irreversible and that would have never befallen the child but for such treatment." Cameron Br. at 33. Not a single credible scientific study supports that conclusion. Cameron cites James Cantor, a psychologist known

---

[10] One of Cameron's proffered experts, Stephen Levine, has testified in prior cases that he "does not support banning gender-affirming medical care for adolescents with gender dysphoria." *Brandt*, 2023 WL 4073727, at *27; *see also Ladapo*, 2023 WL 3833848, at *5 ("Even the defendants' expert Dr. Levine testified that treatment [of transgender adolescents] with GnRH agonists and cross-sex hormones is sometimes appropriate.").

for his controversial views on pedophilia and who has no experience in diagnosing or treating gender dysphoria. Janssen Reb. Decl., R.52-3, PageID#1824-25; Karasic Reb. Decl., R.52-4, at PageID#1893-94. Despite his lack of any relevant medical background, Cantor purports to summarize the supposed medical "harms" caused by the banned treatments; in fact, however, he simply lists possible side effects without any recognition of their benefits or of how likely or unlikely they are to occur. Cantor Decl., R.47-9, PageID#1098-1110. Not surprisingly, given Cantor's lack of relevant medical qualifications, this list is riddled with misstatements. Shumer Reb. Decl., R.52-6, PageID#1945, 1947-48. But even if Cantor were qualified to opine about medical risks and described them accurately, this approach would no more show that the treatments "harm" transgender adolescents than would a list of the possible side effects of any pediatric medication considered without regard to its benefit in treating the condition for which it is prescribed. All treatments have risks. That alone is not a basis for banning treatments that are generally safe and effective—particularly where no other effective treatment exists. Simply looking at alleged "harms" with no consideration of clinical benefits makes no medical sense and does not provide even a rational basis, much less an important or compelling one, for banning the only known effective treatment for a serious medical condition.

Cameron also cites Stephen Levine, who has no background in adolescent psychiatry or firsthand knowledge of how medical treatment for gender dysphoria is

provided to transgender adolescents, and whose testimony has been excluded in several cases. Janssen Reb. Decl., R.52-3, PageID#1808; *Claire v. Fla. Dep't of Mgmt. Servs.*, No. 20-cv-20, 2021 WL 5982330, at *2 (N.D. Fla. 2021) (granting in part plaintiff's motion to exclude Levine's testimony); *Kadel v. Folwell*, 620 F. Supp. 3d 339, 373 (M.D.N.C. 2022) (same). Nothing in Levine's declaration provides scientific support for the contention that the treatments banned by Ky. Rev. Stat. §311.372 are harmful. Levine opposes permitting *prepubertal* transgender children to socially transition, but the treatments banned by Ky. Rev. Stat. §311.372 are prescribed exclusively for pubertal adolescents; the statute does not address social transition in any way. Janssen Reb. Decl., R.52-3, PageID#1813-14. Levine claims that certain studies show that puberty blockers and hormone therapy are ineffective or even cause harm, but the studies themselves conclude otherwise. Shumer Reb. Decl., R.52-6, PageID#1945: Karasic Reb. Decl., R.52-4, PageID#1890. Levine stresses the absence of randomized controlled trials showing the benefits of the banned treatments, but he fails to acknowledge that only a small percentage of medical treatments are supported by randomized controlled trials, or that performing such trials on transgender adolescents would be unethical. Shumer Reb. Decl., R.52-6, PageID#1940.

Finally, Cameron cites Michael Laidlaw who, like Cantor, simply ignores that the treatments banned by Ky. Rev. Stat. §311.372 are for the purpose of treating

gender dysphoria and thus similarly analyzes them in a vacuum, without regard to their benefits in treating gender dysphoria. *See*, *e.g*., Laidlaw Decl., R.47-10, PageID#1220 *et seq*. As a result, Laidlaw does not address whether these treatments are effective in reducing or eliminating gender dysphoria, but simply presupposes that the physical changes caused by the treatments, which are intended and desired by the patients to treat their gender dysphoria, are harmful. As Plaintiffs' expert Shumer explains, this is not evidence of harm, but merely a statement of Laidlaw's opposition to medical care for transgender adolescents. Shumer Reb. Decl., R.52-6, PageID#1955-59.

There is no scientific evidence that left untreated, most transgender adolescents will "desist" and spontaneously cease being transgender, as Cameron claims. As Cantor, one of Cameron's expert witnesses, acknowledges, the research on desistance involves prepubertal children, not adolescents. *See* Cantor, PageID#1059-1065. Similarly, Levine acknowledges that apart from anecdotes, no study shows that youth whose gender dysphoria persists into adolescence are likely to desist. Levine Decl., R.47-11, PageID#1296. Cameron's other experts offer personal anecdotes and speculation, but no credible research supports their claims. See Janssen Reb. Decl., R.52-3, PageID#1815-16, 1828-30; Shumer Reb. Decl., R.52-6, PageID#1953-53; Karasic Reb. Decl., R.52-4, PageID#1894-95. In contrast,

it is well-established that children whose gender dysphoria persists into adolescence are highly likely to be transgender. Shumer Decl., R.17-1, PageID#160-61.

Cameron also fails to provide even a scintilla of scientific evidence to support his claim that there are effective alternative treatments for gender dysphoria in adolescents. Cameron's experts agree that gender dysphoria is a real condition that causes serious distress, as has every court to consider this issue. Cantor Decl., R.47-9, PageID#1057; Nangia Decl., R.47-12, PageID#1413-1414; Laidlaw Decl., R.47-10, PageID#1206; Levine Decl., R.47-11, PageID#1289. Nothing in their declarations rebuts the need for treatment or provides even a single study to support the efficacy of any alternative treatment for youth whose gender dysphoria persists into adolescence. Cameron's experts criticize the research supporting the banned treatments for its "low-quality" evidence, but their advocacy of so-called "alternative treatments" are based on *no* research, and the approaches they advocate are known to cause severe harm.

According to Cameron's expert witness, Laidlaw, in addition to the standard care the minor Plaintiffs are now receiving, there purportedly are two other "approaches to treating gender dysphoria in minors":

> One is psychosocial treatment that helps the young person align their internal sense of gender with their physical sex. Another would be to "watch and wait" and allow time and maturity to help the young person align sex and gender through natural desistance, while providing psychological support and therapy as needed and addressing comorbidities.

Laidlaw Decl., R.47-10, PageID#1207-08; *see also* Cantor Decl., R.47-9, PageID#1112, 1088; Levine Decl., R.47-11, PageID#1293-1300.

Neither of these proposed "alternatives" has any scientific support. Karasic Reb. Decl., R .52-4, PageID#1897. There is no scientific evidence that therapeutic efforts to force or persuade transgender adolescents to "align their internal sense of gender with their physical sex" have any efficacy, Karasic Reb. Decl., R.52-4, PageID#1888-89, as even Cameron's own expert concedes, *see* Levine Decl., R.47-11, PageID#1296 ("To my knowledge, there is no systematic evidence beyond anecdotal reports that psychotherapy can enable a return to male identification for genetically male boys, adolescents, and men, or return to female identification for genetically female girls, adolescents, and women."). In contrast, substantial evidence shows that such efforts put youth at risk of serious harms, including a dramatically increased risk of suicidality. Janssen Reb. Decl., R.52-3, PageID#1809-10; *see also* Nangia Decl., R.47-12, PageID#1436 (acknowledging that conversion therapy is traumatic).

Similarly, there is no dispute that "watchful waiting," as this term is used by experts in the field, applies exclusively to prepubertal children. Janssen Reb. Decl., PageID#1813-14; Karasic Reb. Decl., R.52-4, PageID#1873-74. There are no record facts that show that simply "waiting" or providing counseling alone can effectively treat gender dysphoria in adolescents or will result in "natural desistance." Karasic

Reb. Decl., R.52-4, PageID#1897. In contrast, there is substantial evidence that withholding medically needed care for adolescents with severe gender dysphoria causes serious harms. Janssen Decl., R.17-1, PageID#214; Kingery Decl., R.17-3, PageID#251; Shumer Decl., R.17-1, PageID#171-72; Karasic Reb. Decl., R.52-4, PageID#1870-71; Janssen Reb. Decl., R.52-3, PageID#1844-47.

### 3.    Cameron's asserted justifications fail any level of review.

Every federal district court to rule on a law like Ky. Rev. Stat. §311.372 has concluded—after considering testimony from experts, parents, and medical providers—that the evidence necessary to support such a sweeping categorical ban on standard medical treatments for transgender adolescents simply does not exist. The states in these cases have had every opportunity to support their claims, but they have been unable to show any rational basis—much less one that would survive heightened review—for such a drastic and unprecedented prohibition. In the two cases that have resulted in final judgments after a full trial, both courts found that "[t]here is no rational basis for a state to categorically ban these treatments." *Ladapo,* 2023 WL 3833848, at *11. The same is true in this case. None of Cameron's asserted justifications have merit; they fail even rational basis review and certainly cannot survive the heightened scrutiny required here.

Cameron contends that the ban protects children, but, as the district court found, banning the only medically accepted treatment for gender dysphoria serves

only to cause harm. *See* Order, R.61, PageID#2311-12. As such, the Treatment Ban
serves no rational purpose, much less a compelling or important one. In addition, as
the district court noted, any assertion that the purpose of Ky. Rev. Stat. §311.372 is
to protect children "in general" fails "given that the statute allows the same
treatments for cisgender minors." Order, R.61, PageID#2306 (citing §311.372(3)(a)-
(b) and *Brandt*, 551 F. Supp. at 893).

Cameron also contends that the ban protects "vulnerable groups ... from abuse,
neglect, and mistakes," Resp. Opp. Mot. Prelim. Inj., R.47, PageID#505, but as the
district court correctly found, "there is no evidence of any 'abuse, neglect, [or]
mistakes' protected against by Ky. Rev. Stat. §311.372." Order, R.61, PageID#2306.
That finding is amply supported by the record, which shows only that the minor
Plaintiffs have benefitted from these treatments and is devoid of any evidence that
medical providers who treat transgender adolescents in Kentucky are failing to
exercise proper care. Even under rational basis review, a law "must find some
footing in the realities of the subject addressed by the legislation." *Heller v. Doe*,
509 U.S. 312, 320 (1993). As the district court correctly found, no such footing is
evident here, much less the level of evidence required to satisfy heightened review.

Finally, the record is equally devoid of any evidence that the ban promotes
"the integrity and ethics of the medical profession." Cameron's Br. at 32. As the
district court found, Cameron offered "no evidence that Kentucky healthcare

providers prescribe puberty-blockers or hormones primarily for financial gain as

opposed to patients' well-being…" Order, R.61, PageID#2307. Cameron also likens

Ky. Rev. Stat. §311.372 to the ban on assisted suicide considered in *Glucksberg*, 521

U.S. at 731, but in that case, "the American Medical Association, like many other

medical and physicians' groups, ha[d] concluded that '[p]hysician-assisted suicide is

fundamentally incompatible with the physician's role as healer.'" In stark contrast,

here, every major medical recognizes puberty-suppressing medications and hormone

therapy as medically necessary and effective care to alleviate the distress associated

with gender dysphoria. Rather than protecting the integrity and ethics of the medical

profession, Ky. Rev. Stat. §311.372 would "prevent doctors from acting in

accordance with the applicable standard of care." Order, R.61, PageID#2307; *see*

*also Brandt*, 551 F. Supp. 3d at 891.

## III.    THE BALANCE OF EQUITIES STRONGLY SUPPORTS THE PRELIMINARY INJUNCTION.

### A.    The District Court Did Not Abuse Its Discretion in Finding That Plaintiffs Will Suffer Irreparable Harm.

The district court found, based on substantial evidence, that Plaintiffs will

suffer imminent, irreparable harm if the Treatment Ban is not enjoined. Order, R.61,

PageID#2311. Those findings were amply supported by the record and are owed

significant deference by this Court. *U.S. Student Ass'n Found. v. Land*, 546 F.3d

373, 380 (6th Cir. 2008) (holding that this Court reviews factual findings only for

"clear error"). Through their own testimony and the testimony of medical professionals who specialize in the treatment of transgender adolescents, Plaintiffs demonstrated that being deprived of treatment for their gender dysphoria will cause the Minor Plaintiffs to suffer potentially severe psychological, emotional, and physical harm, including anxiety, depression, self-harm, and suicidality. The district court did not abuse its discretion in concluding, based on this record, that Plaintiffs are irreparably harmed because the Treatment Ban "eliminate[s] treatments that have already significantly benefited" them. Order, R.61, PageID#2311.

The Parent Plaintiffs testified to the substantial improvements in physical and mental health that their children have experienced because of the now-banned treatments. For example, Plaintiff JM Doe 1, a 12-year-old transgender boy, experienced suicidal thoughts shortly after beginning puberty, resulting in his hospitalization. See JD1 Decl., R.17-4, PageID#281. As a result of taking puberty blockers and, later, hormone therapy, JM Doe 1 saw "immediate improvement in his emotional and mental health" and his suicidality was "dramatically reduced." *Id.* The other Minor Plaintiffs who had been receiving treatment prior to the Ban had likewise seen significant health improvements from treatment. JD2 Decl., R.17-5, PageID#283-285; JD3 Decl., R.17-6, PageID#286-288; JD5 Decl., R.17-7, PageID#289-91. Absent an injunction, the Treatment Ban will force the Minor Plaintiffs to proceed through endogenous puberty, an irreversible step that will

severely harm their mental and physical health. *See* JD1 Decl., R.17-4, PageID#281; JD2 Decl., R.17-5, PageID#283; JD3 Decl., R.17-6, PageID#187; JD5 Decl., R.17-7, PageID#290.

Doctors who specialize in the treatment of transgender adolescents submitted detailed declarations confirming that cutting transgender adolescents off from medical treatments that have benefited them poses severe and irreparable threats to their physical and mental health. Shumer Decl., R.17-1, PageID#171-72 (Ky. Rev. Stat. §311.372 could lead "to a staggering increase in mental health problems including suicidality."); Janssen Decl., R.17-2, PageID#215 (SB150 will make transgender adolescents "suffer" and cause their mental health to "deteriorate"); Kingery Decl., R.17-3, PageID#251-53 (Ky. Rev. Stat. §311.372 "will worsen… mental health outcomes").

Ky. Rev. Stat. §311.372 's provision permitting a "health care provider [to] institute a period during which the minor's use of the [drugs] is systematically reduced" does not mitigate these serious and irreparable harms. *See* Ky. Rev. Stat. §311.372(6). Just as the harm caused by a prohibition of diabetes treatment would not be mitigated by allowing physicians to taper a diabetic child off insulin, the irreparable harm from a prohibition of medical treatment for transgender adolescents is not mitigated by allowing physicians to taper them off their medicines. A transgender minor who has been receiving and benefitting from these medications

and who is then required to stop taking them (either immediately or over time) "will suffer and their mental health will deteriorate." Janssen Decl., R.17-3, PageID#215. As even one of Cameron's own experts has acknowledged, the impact of cutting off medical care for transgender adolescents currently receiving it would be "shocking" and "devastating"—so much so that "he would expect doctors to 'find a way' to help those patients, even providing treatment in violation of the law." *Brandt,* 2023 WL 4073727 at *24 (quoting testimony from Stephen Levine).

## B.    The District Court Did Not Abuse Its Discretion in Finding That the Balance of Harms and Public Interest Favor an Injunction.

Against these severe, irreparable, and specific harms to real people, the only countervailing harm to Kentucky is a constructive form of harm from delaying the effective date of Ky. Rev. Stat. §311.372; *see also L.W.*, 73 F.4th 408 at 413. Such harm does not outweigh the concrete, irreparable physical and psychological harms that actual children and their parents will suffer from being denied the medical care they have relied on and need.

For similar reasons, upholding the preliminary injunction is in the public interest. In the absence of a preliminary injunction, the lives of Plaintiffs and many other transgender youth and their families will be—indeed, already have been—upended while courts continue to evaluate the lawfulness of the Treatment Ban. In contrast, the State will suffer no harm from a delay in implementing a prohibition on medications that, prior to enactment of the Treatment Ban, had been lawfully, safely,

and beneficially prescribed to transgender adolescents in Kentucky for many years. In addition, "[w]hen a constitutional violation is likely… the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *ACLU Fund*, 796 F.3d at 649 (cleaned up).

## IV.    THE PRELIMINARY INJUNCTION'S SCOPE IS NECESSARY AND APPROPRIATE.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (per curiam). As the Supreme Court has explained, "the scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). "An injunction… protect[ing] nonparties [is not overbroad] if such breadth is necessary to give the prevailing parties the relief to which they are entitled," *Williams v. Owens*, 937 F.2d 609 (6th Cir. 1991), or to make the injunction "workable," *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam). This Court should affirm the district court's statewide injunction because an injunction limited to the Plaintiffs would fail to provide Plaintiffs with the relief to which they are entitled and would be impracticable.

A statewide injunction is necessary because Plaintiffs in this action make a facial challenge to the Treatment Ban's constitutionality. A facial challenge to a

law's constitutionality is an effort "to invalidate the law in each of its applications," to completely prohibit a law's enforcement. *Sharpe v. Cureton*, 319 F.3d 259, 271 (6th Cir. 2003) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc)). In contrast to an as-applied challenge, which argues that a law is unconstitutional as enforced against the plaintiffs before the court, a facial challenge "is not an attempt to invalidate the law in a discrete setting but an effort 'to leave nothing standing[.]'" *Connection Distrib.*, 557 F.3d at 335 (en banc) (quoting *Warshak v. United States,* 532 F.3d 521, 528 (6th Cir. 2008) (en banc)). Because the Plaintiffs argue that all applications of the Treatment Ban violate parents' fundamental rights and adolescents' rights to equal protection, statewide preliminary relief is necessary to give the Plaintiffs "the relief to which they are [likely to be] entitled." *Owens*, 937 F.2d 609. An injunction limited only to the named Plaintiffs would fail to adequately redress their claim that the Treatment Ban is "invalid *in toto*—and therefore incapable of any valid application.'" *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495, n.5 (1982) (quoting *Steffel v. Thompson*, 415 U.S. 452, 474 (1974))); *see also Ohio State Conf. of the NAACP v. Husted,* 768 F.3d 524, 531, 545-49 (6th Cir. 2014), *vacated*, 2014 WL 10384647 (6th Cir. Oct. 1, 2014) (enjoining statute's enforcement against voters regardless of their affiliation with plaintiff groups); *Obama for Am. v. Husted,* 697 F.3d 423, 428-36 (6th Cir. 2012) (same).

A statewide injunction is also necessary because it would be impractical for this Court to fashion a narrower remedy that remains capable of protecting the named Plaintiffs. *Washington v. Reno*, 35 F.3d 1093, 1104 (6th Cir. 1994) (applying an injunction to all inmates because it would be factually impossible to limit an injunction to the named plaintiffs). As the district court recognized, "it would be virtually impossible to fashion" a more narrowly tailored injunction given that the Ban constrains medical providers who treat Minor Plaintiffs *and others*. Order, R.61, PageID#2312 (citing Reply In Further Support of Preliminary Injunction, R.52, PageID#1678-79). The Minor Plaintiffs cannot obtain care in Kentucky if providers are unable to treat them and pharmacists are unable to fill their prescriptions. *See, e.g.*, JD3 Decl., R.17-6, PageID#288 (attesting that Jane Minor Doe 3's "endocrinologist has informed us she will no longer be able to treat Jane Minor Doe 3 once the Treatment Ban goes into effect"). Statewide relief is therefore necessary.

This Court's decision in *Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) does not compel a different result. Unlike here, the Plaintiffs in *Biden* sought an injunction enjoining a federal statute in numerous different states. *Id.* The injunction here does not raise the forum-shopping or federalism concerns that have recently caused courts to caution against "nationwide" injunctions. *See Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring) ("Nationwide injunctions sometimes give States victories they do not want… They incentivize

forum shopping"); *Dep't of Homeland Sec. v. New York*, — U.S. —, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring) ("Because plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide.").

In the alternative, if this Court determines that the claims of the Minor Plaintiffs and Parent Plaintiffs do not support a statewide injunction, the Court should affirm the injunction as it applies to Plaintiffs.

## <u>CONCLUSION</u>

The preliminary injunction should be affirmed.

Respectfully submitted,

Dated: August 10, 2023

*s/ Stephanie Schuster*

Corey Shapiro
Heather Gatnarek
Crystal Fryman
Kevin Muench
**ACLU OF KENTUCKY FOUNDATION**
325 W. Main Street, Suite 2210
Louisville, KY 40202
502.581.9746
corey@aclu-ky.org
heather@aclu-ky.org
crystal@aclu-ky.org
kevin@aclu-ky.org

Stephanie Schuster
Randall M. Levine
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 20004
202.739.3000
stephanie.schuster@morganlewis.com
randall.levine@morganlewis.com

Amanda J. Ford
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110
617.431.7700
amanda.ford@morganlewis.com

Shannon Minter
Christopher F. Stoll
Kelly Jo Popkin
Amy Whelan
**NATIONAL CENTER FOR**
**LESBIAN RIGHTS**
870 Market Street, Suite 370
San Francisco, CA 94102
415.365.1320
cstoll@nclrights.org
kpopkin@nclrights.org
awhelan@nclrights.org

*Attorneys for Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation in Rule 32(a)(7)(B) because it is drafted using Times New Roman size 14 font and contains 12,983 words.

*<u>s/ Stephanie Schuster</u>*
Stephanie Schuster

**ADDENDUM**

| Docket Entry No. | Page ID # | Description |
|---|---|---|
| 2 | 11-33 | Complaint |
| 17, 17-1 through 17-7 | 109-291 | Plaintiffs' Motion for Preliminary Injunction and Corresponding Exhibits |
| 19-2 | 307-339 | Amicus Brief by Amicus Parties American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, Academic Pediatric Association, American Academy of Family Physicians, American Academy of Nursing, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association, American Pediatric Society, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, Inc., Endocrine Society, Kentucky Chapter of the American Academy of Pediatrics, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Endocrinology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, World Professional Association for Transgender Health |
| 37 | 427-447 | Statement of Interest of the United States |
| 41 | 478-480 | Defendants William Thornbury and Audria Denker's Response to Motion for Preliminary Injunction |
| 42 | 481-482 | Defendant Eric Friedlander's Response to Motion for Preliminary Injunction |

| Docket Entry No. | Page ID # | Description |
|---|---|---|
| 47, 47-1 through 47-23 | 490-1564 | Intervenor-Defendant Cameron's Response to Motion for Preliminary Injunction |
| 52, 52-1 through 52-6 | 1660-1934 | Plaintiffs' Reply in Further Support of Motion for Preliminary Injunction and Corresponding Exhibits |
| 60, 60-1 through 60-3 | 2000-2298 | Intervenor-Defendant Cameron's Rebuttal Declarations |
| 61 | 2299-2313 | Memorandum Opinion and Order Granting Plaintiffs' Motion for Preliminary Injunction |
| 62 | 2314-2347 | Amicus Brief by Academic Pediatric Association, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Physicans for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association, American Pediatric Society, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, Inc., Endocrine Society, Kentucky Chapter of the American Academy of Pediatrics, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Endocrinology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, World Professional Association for Transgender Health. |
| 63 | 2348-2380 | Amicus Brief by Family Research Council |

| Docket Entry No. | Page ID # | Description |
|---|---|---|
| 64 | 2381-2414 | Amicus Brief by State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of South Carolina, State of South Dakota, State of Utah, State of West Virginia. |
| 66 | 2417-2432 | Intervenor-Defendant Cameron's Emergency Motion to Stay |
| 69 | 2439-2440 | Defendants William Thornbury and Audria Denker's Response to Cameron's Emergency Motion to Stay |
| 70 | 2441-2442 | Defendant Eric Friedlander's Response to Cameron's Emergency Motion to Stay |
| 71, 71-1 | 2443-2750 | Plaintiffs' Response to Intervenor-Defendant Cameron's Emergency Motion to Stay and Corresponding Exhibits |
| 73, 73-1 | 2458-2477 | Intervenor-Defendant Cameron's Notice of Supplemental Authority and Corresponding Exhibits |
| 74 | 2478-2481 | Plaintiffs' Response to Intervenor-Defendant Cameron's Notice of Supplemental Authority |
| 77 | 2482-2487 | Plaintiffs' Amended Response to Intervenor-Defendant Cameron's Notice of Supplemental Authority |
| 78 | 2488-2493 | Intervenor-Defendant Cameron's Reply in Further Support of Notice of Supplemental Authority |

| Docket Entry No. | Page ID # | Description |
|---|---|---|
| 79 | 2494-2496 | Order Granting Intervenor-Defendant Cameron's Emergency Motion to Stay |