**Nos. 23-5600, 23-5609 (consol.)**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

L.W., by and through her parents and next friends, Samantha Williams and Brian Williams; SAMANTHA WILLIAMS; BRIAN WILLIAMS; JOHN DOE, by and through his parents and next friends, Jane Doe and James Doe; JANE DOE; JAMES DOE; REBECCA ROE; SUSAN N. LACY, on behalf of herself and her patients; RYAN ROE, by and through his parent and next friend, Rebecca Roe,

*Plaintiffs-Appellees*,

and

UNITED STATES OF AMERICA,

*Intervenor-Appellee*,

v.

JONATHAN THOMAS SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:23-cv-00376, Eli J. Richardson, U.S. District Judge

**[Case Caption Continued On Next Page]**

JANE DOE 1; JOHN DOE 1; JOHN MINOR DOE 1, by and through his next friend, Jane Doe 1; JOHN DOE 2; JOHN MINOR DOE 2, by and through his next friend, John Doe 2; JANE DOE 3; JOHN DOE 3; JANE MINOR DOE 3, by and through her next friend, Jane Doe 3; JANE DOE 4; JOHN DOE 4; JANE MINOR DOE 4, by and through her next friend, Jane Doe 4; JANE DOE 5; JOHN DOE 5; JOHN MINOR DOE 5, by and through his next friend, Jane Doe 5; JANE DOE 6; JOHN DOE 6; JANE MINOR DOE 6, by and through her next friend, Jane Doe 6; JANE DOE 7; JOHN DOE 7; JANE MINOR DOE 7, by and through her next friend, Jane Doe 7,

*Plaintiffs-Appellees*,

v.

WILLIAM C. THORNBURY, JR., MD, in his official capacity as the President of the Kentucky Board of Medical Licensure, et al.,

*Defendants,*

and

COMMONWEALTH OF KENTUCKY *ex rel.* ATTORNEY GENERAL DANIEL CAMERON,

*Intervenor-Appellant.*

_____

On Appeal from the United States District Court
for the Western District of Kentucky at Louisville
No. 3:23-cv-00230, David J. Hale, District Judge

_____

**BRIEF OF GLBTQ LEGAL ADVOCATES & DEFENDERS, THE
NATIONAL WOMEN'S LAW CENTER, AND TWELVE ADDITIONAL
ORGANIZATIONS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

_____

Chasel Lee
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800

Jocelyn A. Sitton
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350

Adam G. Unikowsky
*Counsel of Record*
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5600, 23-5609        Case Name: L.W. v. Skrmetti;   Jane Doe 1 v. Thornbury

Name of counsel:  Jenner & Block LLP

Pursuant to 6th Cir. R. 26.1,  GLBTQ Legal Advocates & Defenders, see Attachment A
*Name of Party*
makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ August 10, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Adam G. Unikowsky
1099 New York Ave., NW Suite 900
Washington, DC 20001

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# Disclosure of Corporate Affiliations and Financial Interest

**ATTACHMENT A**

Sixth Circuit Case Numbers: 23-5600, 23-5609 (consol.)

Case Names: *L.W. v. Skrmetti*; *Jane Doe 1 v. Thornbury*

Pursuant to 6th Cir. R. 26.1(continued): *Amicus Curiae* The National Women's Law Center; Campaign for Southern Equality; Equality Federation; Family Equality (formerly Family Equality Council); Human Rights Campaign Foundation; Memphis Center for Reproductive Health; National Center for Transgender Equality; OUTMemphis; Southern Legal Counsel, Inc.; Southern Poverty Law Center; Tennessee Equality Project; The Trevor Project; and White Coats for Trans Youth:
make the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If Yes, list the identity of such corporation and the nature of the financial interest:

> No.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

STATEMENT OF INTEREST .................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................7

ARGUMENT .........................................................................................9

I.  The Health Care Bans Are Subject To Heightened Scrutiny Because They Discriminate Based On Sex ...................................................................9

   A. All Sex-Based Classifications Are Subject To Heightened Scrutiny, Regardless Of The Ostensible Purpose Of The Classification.......................9

   B. Laws That Single Out Transgender People Constitute Sex Discrimination ................................................................................12

   C. The Health Care Bans Discriminate On The Basis Of Sex And Are Therefore Subject To Heightened Scrutiny...................................................15

II. The Health Care Bans Cannot Withstand Heightened Scrutiny........................23

CONCLUSION ....................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995)..........................................................................19

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020)....................................................8, 12, 13, 19

*Brandt ex rel. Brandt v. Rutledge*,
    47 F.4th 661 (8th Cir. 2022) ..............................................................16

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)..........................................................................25

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989)............................................... 10, 16-17, 18

*Dobbs v. Jackson Women's Health Organization*,
    142 S. Ct. 2228 (2022)...............................................................21, 22

*Doe v. Ladapo*,
    No. 23cv114, 2023 WL 3833848 (N.D. Fla. June 6, 2023) ..............................21

*Eknes-Tucker v. Marshall*,
    603 F. Supp. 3d 1131 (M.D. Ala. 2022)..........................................................16

*Geduldig v. Aiello*,
    417 U.S. 484 (1974)..........................................................................21

*Grimm v. Gloucester County School Board*,
    972 F.3d 586 (4th Cir. 2020) ..............................................................21

*J.E.B. v. Alabama ex rel. T.B.*,
    511 U.S. 127 (1994)..........................................................................19

*Jackson Women's Health Organization v. Currier*,
    349 F. Supp. 3d 536 (S.D. Miss. 2018)..........................................................21

*Miller v. Johnson*,
    515 U.S. 900 (1995)..........................................................................10

*Mississippi University for Women v. Hogan*,
    458 U.S. 718 (1982)................................................................11

*Parents Involved in Community Schools v. Seattle School District No. 1*,
    551 U.S. 701 (2007)..............................................................19

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017)..........................................................11, 12

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) ..................................8, 13, 15

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*,
    143 S. Ct. 2141 (2023)..........................................................14

*Tuan Anh Nguyen v. INS*,
    533 U.S. 53 (2001).......................................................... 10-11

*United States v. Virginia*,
    518 U.S. 515 (1996)...............................................10, 11, 18, 19

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ...............................................................9

**Statutes and Rules**

S.B. 150 § 4(2), 2023 Gen. Assemb. Reg. Sess. (Ky. 2023) ..............................8, 16

Tenn. Code Ann. § 68-33-102(5)............................................................7

Tenn. Code Ann. § 68-33-103(a)(1)(A-B).................................................7, 15

Fed. R. App. P. 29(a)(4)(E)................................................................1

**Other Authorities**

Melissa Brown*, Gov. Bill Lee Signs Ban on Gender-Affirming Care for Minors, Drag Restrictions into Law*, The Tennessean (Mar. 2, 2023) ............................................................................18

Olivia Krauth, *Kentucky Legislature Overrides Veto of Anti-Trans Bill Despite LGBTQ+ Youths' Pleas*, Louisville Courier Journal (updated Mar. 30, 2023, 7:03 a.m.) .................................................................... 17

Chris O'Brien, *Governor Lee Signs Bill Saying Teachers Don't Have to Use Student's Preferred Pronouns*, ABC News 6 (May 21, 2023) ........................................................................................................... 18

Reva B. Siegel et al., *Equal Protection in* Dobbs *and Beyond: How States Protect Life Inside and Outside of the Abortion Context,* Columbia Journal of Gender & Law 67 (2023).................................................. 22

# STATEMENT OF INTEREST[1]

*Amici* consist of GLBTQ Legal Advocates & Defenders, the National Women's Law Center, and the twelve additional organizations listed below. *Amici* are committed to ensuring that all people, including women and LGBTQ people, can live their lives free from discrimination, including with respect to access to the health care they need.

*Amicus* **GLBTQ Legal Advocates & Defenders ("GLAD")** works through litigation, public policy advocacy, and education to create a just society free from discrimination based on gender identity and expression, HIV status, and sexual orientation. GLAD has litigated widely in both state and federal courts in all areas of the law to protect and advance the rights of lesbians, gay men, bisexuals, transgender individuals, and people living with HIV and AIDS.

*Amicus* **The National Women's Law Center ("NWLC")** is a non-profit legal advocacy organization that fights for gender justice—in the courts, in public policy, and in our society—working across the issues that are central to the lives of women and girls—especially women of color, LGBTQ people, and low-income

---

[1] All parties consent to the filing of this *amicus* brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and that no person other than *amici*, their members, and their counsel contributed money that was intended to fund preparing or submitting this brief.

women and families.  Since its founding in 1972, NWLC has worked to advance educational opportunities, workplace justice, health and reproductive rights, and income security.  This work has included participating in numerous cases, including before Courts of Appeals and the U.S. Supreme Court, to ensure that rights and opportunities are not restricted based on sex.  Additionally, NWLC has a particular interest in ensuring that discrimination against LGBTQ individuals is not perpetuated in the name of women's rights.

*Amicus* **Campaign for Southern Equality ("CSE")** promotes full LGBTQ equality across the South.  Their work is rooted in commitments to equity in race, gender and class.  Through the Southern Trans Youth Emergency Project, CSE works directly with the families of transgender youth in Tennessee and Kentucky, providing information about gender-affirming care and hearing directly about the many burdens that the Health Care Bans have imposed on families—including negative impacts on the emotional, psychological, and physical health of trans youth and the economic hardships families must absorb to ensure their child's access to medical care.

*Amicus* **Equality Federation** is an advocacy accelerator rooted in social justice, building power in our network of state-based lesbian, gay, bisexual, transgender, and queer (LGBTQ+) advocacy organizations.  Equality Federation works with own network of 46 member organizations in 39 states to build their

leadership and organizational capacity, to advance policies that address the needs of LGBTQ+ people, and increase acceptance of LGBTQ+ people in the communities they call home. Equality Federation and our state partners have an ongoing interest in ensuring that transgender people can access best practices medical care and lead full, healthy lives free from discrimination.

*Amicus* **Family Equality** (formerly Family Equality Council) is a national organization advancing lived and legal equality for LGBTQ+ families and those who wish to form them. For over 40 years, Family Equality has worked to change attitudes, laws, and policies through advocacy and public education to ensure that all families, regardless of creation or composition, are respected, loved, and celebrated in all aspects of life. Given the profound and critical impact that transgender health care has on an individual and their family, Family Equality has an ongoing interest in ensuring that LGBTQ+ people, including youth, have access to gender-affirming health care services.

*Amicus* **Human Rights Campaign Foundation ("HRC Foundation")** is the educational arm of the Human Rights Campaign, America's largest civil rights organization working to achieve equality for LGBTQ+ people. Through its programs, the HRC Foundation seeks to make transformational change in the everyday lives of LGBTQ+ people, shedding light on inequity and deepening the

public's understanding of LGBTQ+ issues, including advancing transgender and racial justice and the importance of reproductive health care.

*Amicus* **Memphis Center for Reproductive Health ("MCRH")** provides patient-centered medical care to over 5,000 individuals across 13 states and champions sexual and reproductive rights while envisioning a world where sexual and reproductive healthcare is recognized as an essential human right. MCRH offers medication and procedural abortions, gynecological wellness care, gender-affirming hormone therapy, HIV testing and referrals, birth control, and midwife-led prenatal care and births with two locations in Memphis, Tennessee and Carbondale, Illinois.

*Amicus* **National Center for Transgender Equality ("NCTE")** works to improve the lives of the nearly two million transgender people in the United States and their families through sound public policy, public education, and groundbreaking research. NCTE has worked with countless health and human service providers as well as local, state, and federal agencies on policies to ensure equal access to vital health and human services. In 2015, NCTE conducted the U.S. Transgender Survey, the largest survey to date of transgender people, with nearly 28,000 respondents from all 50 states and U.S. territories.

*Amicus* **OUTMemphis** is the LGBTQ+ community center for the Mid-South. Since 1989, OUTMemphis has provided social services—including healthcare

4

navigation, housing assistance, case management, mental health resources, and more—to LGBTQ+ youth and adults in Memphis, serving individuals from Tennessee, Arkansas, Mississippi, and across the South.  As the largest human services organization in our region dedicated to LGBTQ+ welfare, we sees first-hand the impact of discrimination and exclusion from critical services that our youth and their caregivers experience.  OUTMemphis services approximately 90 west Tennessee minors each year with social support and navigation to health, mental health, economic support, or mentorship.

*Amicus* **Southern Legal Counsel, Inc. ("SLC")** is a Florida statewide not-for-profit public interest law firm that is committed to the ideal of equal justice for all and the attainment of basic human and civil rights.  SLC developed its Transgender Rights Initiative to fill a gap in access to justice and to protect the rights of Florida's LGBTQ+ community through federal impact litigation, policy advocacy, and individual representation.  SLC litigates in Florida's federal district courts and the Eleventh Circuit Court of Appeals to protect the rights of LGBTQ+ individuals, including the rights of transgender individuals to access evidence-based healthcare recommended by their treating providers free from government interference.

*Amicus* **Southern Poverty Law Center ("SPLC")** has provided pro bono civil rights representation to low-income persons in the Southeast since 1971, with

particular focus on seeking justice for the most vulnerable in society. SPLC is a nonprofit civil rights organization dedicated to fighting hate and bigotry and to seeking justice for the most vulnerable members of society. SPLC has participated as counsel or *amicus curiae* in a range of cases before the U.S. Supreme Court, federal appellate and district courts, and state courts in its efforts to secure equal treatment and opportunity for marginalized groups in all aspects of society.

*Amicus* **Tennessee Equality Project ("TEP")** is a statewide nonprofit, nonpartisan organization with a 20-year history of public policy advocacy, nonpartisan partnerships, public engagement, and education to advance the equal rights for all LGBTQIA+ children, youth, and adults in Tennessee at the state and local levels. TEP is actively working to stop the accelerating, yet preventable, mental and physical suffering, increasing self-harm, isolation, poverty and homelessness affecting LGBTQIA+ youth caused by public misinformation campaigns, discriminatory state policies, and political ill-will.

*Amicus* **The Trevor Project** is the nation's leading lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ") youth crisis intervention and suicide prevention organization. The Trevor Project offers the only nationwide accredited, free, and confidential phone, instant message, and text messaging crisis intervention services for LGBTQ youth. These services are used by tens of thousands of youth each month. Through analyzing and evaluating data obtained

6

from these services and national surveys,  The Trevor Project produces innovative research that brings new knowledge, with clinical implications, to issues affecting LGBTQ youth

*Amicus* **White Coats for Trans Youth** is an organization of Tennessee health care professionals who believe in comprehensive compassionate care for the mental and physical health of all children, without boundaries.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In March 2023, Tennessee and Kentucky enacted statutes (the "Health Care Bans" or the "Bans") forbidding healthcare providers from providing medical treatment to transgender minors if—and only if—the purpose of that treatment is to allow those minors to live their lives consistent with their gender identity. Tennessee's statute prohibits healthcare providers from performing or offering to perform any medical procedure for the purpose of "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity."  Tenn. Code Ann. § 68-33-103(a)(1)(A-B).  Tennessee's prohibitions on health care for minors are broad, encompassing puberty blockers, hormones, and surgery. *Id.* § 68-33-102(5).  Kentucky's statute, likewise, states that a healthcare provider "shall not, for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or

perception is inconsistent with the minor's sex, knowingly" prescribe puberty blockers or hormones.  S.B. 150 § 4(2), 2023 Gen. Assemb. Reg. Sess. (Ky. 2023). In enacting the Health Care Bans, Tennessee and Kentucky have placed many transgender adolescents at grave risk of harm while also violating their constitutional rights.

The district courts in both Tennessee and Kentucky correctly held that Plaintiffs are entitled to preliminary injunctive relief against the Health Care Bans. The Health Care Bans facially discriminate on the basis of sex.  Every time the laws are applied, the minor's sex is outcome-determinative.  The laws target transgender people, and as both the Supreme Court and this Court have held, laws and policies that target transgender people inherently discriminate on the basis of sex.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753-54 (2020); *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004).  Therefore, the laws should be subject to heightened scrutiny, rather than rational basis review.

In granting a stay, the motions panel considering the preliminary injunction on the Tennessee health care ban held that rational basis review was warranted because the Health Care Bans regulate medical procedures.  That reasoning was incorrect.  Regardless of what the Health Care Bans regulate, they discriminate on the basis of sex.  To be sure, the States have a legitimate interest in protecting minors from unsafe medical procedures—interests that may be considered when evaluating

whether the law *withstands* heightened scrutiny.  But that interest does not transform a sex-based law that targets transgender people into a generally applicable law warranting rational basis review.

The Health Care Bans cannot withstand heightened scrutiny.  The Bans categorically bar medical care for transgender minors, even when the minors, their parents, and their doctors all agree that the care is warranted.  These extreme restrictions reflect hostility to gender nonconformity, not a legitimate effort to protect children's health or safety.  The Court should lift the stays of the preliminary injunctions and restore Tennessee's and Kentucky's youths' access to medically appropriate health care.

## ARGUMENT

### I.    The Health Care Bans Are Subject To Heightened Scrutiny Because They Discriminate Based On Sex.

Laws singling out transgender people, including the Health Care Bans, discriminate on the basis of sex.  Like all other laws that discriminate on the basis of sex, they are subject to heightened scrutiny.

### A.    All Sex-Based Classifications Are Subject To Heightened Scrutiny, Regardless Of The Ostensible Purpose Of The Classification.

The Equal Protection Clause bars a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of

9

a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (internal quotation marks and citations omitted).

To implement that constitutional guarantee, the Supreme Court requires "all gender-based classifications" to be subjected to "heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (citations omitted). "Parties who seek to defend gender-based government action must demonstrate an exceedingly persuasive justification for that action." *Id.* at 531 (citation omitted). Heightened scrutiny serves to "smoke out" illegitimate motives by ensuring that the state can prove—not just assert—that the classification has a sufficiently persuasive justification. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989). "[B]enign justifications" for such classifications "will not be accepted automatically"; a court will closely scrutinize whether the classification in fact advances the "alleged objective." *Virginia*, 518 U.S. at 535-36 (internal quotation marks and citations omitted).

Heightened scrutiny applies even to those classifications ostensibly based on physical differences between men and women. For example, laws distinguishing between mothers and fathers are subject to heightened scrutiny. The typical rationale for such laws—mothers give birth to children, fathers do not—are relevant to whether the laws *pass* heightened scrutiny, not whether they are subject to heightened scrutiny in the first instance. *Compare Tuan Anh Nguyen v. INS*, 533

U.S. 53, 60-61 (2001) (applying heightened scrutiny to statute distinguishing between mothers and fathers, but upholding statute based on physical differences in means of proving parentage), *with Sessions v. Morales-Santana*, 582 U.S. 47, 57-58 (2017) (applying heightened scrutiny and invalidating statute distinguishing between mothers and fathers that relied on outdated gender stereotypes about each's relationship to nonmarital children).

Constitutional limitations on gender classifications apply with full force to laws that single out people who do not conform to sex stereotypes. Many of the Supreme Court's foundational sex-discrimination cases involve such litigants. Women stereotypically do not attend military school, yet "generalizations about 'the way women are,'" or "estimates of what is appropriate for *most women*," do not justify treating women who do seek to attend military school differently from men. *Virginia*, 518 U.S. at 550. Likewise, even in a world where "nearly 98[%] of all employed registered nurses were female," men and women applying to nursing school must be treated equally, and a legislature may not "perpetuate the stereotyped view of nursing as an exclusively woman's job." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 729 (1982). As the Supreme Court recently reaffirmed, "[o]verbroad generalizations" concerning gender roles "have a constraining impact, descriptive though they may be of the way many people still order their lives." *Morales-Santana*, 582 U.S. at 63. "Even if stereotypes frozen into legislation have

'statistical support,'" the Supreme Court's decisions "reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Id.* at 63 n.13 (citations omitted).

### B. Laws That Single Out Transgender People Constitute Sex Discrimination.

When laws target transgender people, they discriminate on the basis of sex. Therefore, these laws must be subject to heightened scrutiny.

*Bostock v. Clayton County* explains why policies discriminating against transgender people constitute sex discrimination. 140 S. Ct. 1731 (2020). "[T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 1741. And if the policy discriminates against both transgender men and transgender women, it "doubles rather than eliminates" the discrimination. *Id.* at 1742.

In the Court's stay order, the Court distinguished *Bostock* by concluding *Bostock*'s reasoning "applies only to Title VII." *L.W. v. Skrmetti*, 73 F.4th 408, 420

(6th Cir. 2023), ECF No. 44-2.[2]  That is not a principled distinction.  Title VII and the Equal Protection Clause both bar sex discrimination.  Why would a law that *is* sex discrimination under Title VII transform into a law that *is not* sex discrimination under the Constitution?  This Court has established that "the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section § 1983."  *Smith*, 378 F.3d at 577 (citations omitted).  Nothing in *Bostock* undermines that conclusion.

Moreover, as noted above, the Supreme Court has repeatedly underscored that laws premised on sex stereotyping constitute illicit sex discrimination under the Equal Protection Clause.  *Bostock*, meanwhile, explained that it is arbitrary to distinguish discrimination based on sex stereotyping from discrimination against transgender people:  If an employer who "fires men who do not behave in a sufficiently masculine way" engages in sex discrimination, why should courts "roll out a new and more rigorous standard" when "that same employer discriminates against … persons identified at birth as women who later identify as men"?  140 S. Ct. at 1749.  That arbitrariness does not go away when considering discrimination under the Equal Protection Clause as opposed to discrimination under Title VII.

---

[2] This Court subsequently held that the preliminary injunction in the Kentucky case should also be stayed, citing its prior stay order in the *Skrmetti* Tennessee case. *Doe 1 v. Thornbury*, No. 23-5609, 2023 WL 4861984, at *1-2 (6th Cir. July 31, 2023), ECF No. 41-2 (per curiam).  Throughout this brief, references to the "stay order" refer to the stay order in the Tennessee case.

In its stay order, the Court cited Justice Gorsuch's concurrence in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 143 S. Ct. 2141 (2023), for the proposition that "Title VI differs from the Equal Protection Clause." *L.W.*, 73 F.4th at 420. This citation reflects a profound misunderstanding of both the majority opinion in *Students for Fair Admissions* and Justice Gorsuch's concurrence. First, the majority opinion, which Justice Gorsuch joined, invalidated both Harvard's and the University of North Carolina's admissions policies on the ground that Title VI's and the Equal Protection Clause's prohibitions on racial discrimination are coextensive. 143 S. Ct. at 2156 n.2. That approach parallels the Plaintiffs' approach here, under which sex discrimination for Title VII purposes is also sex discrimination for constitutional purposes. Second, Justice Gorsuch *endorsed* vigorous enforcement of the Equal Protection Clause's nondiscrimination principle and argued that Title VI should *also* be vigorously enforced. *Id.* at 2221 (Gorsuch, J., concurring) ("Today, the Court corrects course in its reading of the Equal Protection Clause. With that, courts should now also correct course in their treatment of Title VI."). Nothing in Justice Gorsuch's concurring opinion suggests that the Equal Protection Clause's protections should *exclude* a form of discrimination that constitutes sex discrimination under Title VII.

This Court's decision in *Smith v. City of Salem* similarly confirms that discrimination against transgender people constitutes sex discrimination under the

Equal Protection Clause.  The *Smith* Court explained: "Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity."  378 F.3d at 575.  The Court made clear its holding applied to the plaintiff's Equal Protection claim.  *Id.* at 576-77.

In its stay order, the Court asserted that *Smith* "did not hold that every claim of transgender discrimination requires heightened scrutiny."  *L.M.*, 73 F.4th at 420-21.  But *Smith* establishes the principle that laws or policies singling out transgender people are a type of sex discrimination.  That principle does not go away merely because the law at issue involves medical care rather than employment.

## C.  The Health Care Bans Discriminate On The Basis Of Sex And Are Therefore Subject To Heightened Scrutiny.

On their face, the Health Care Bans discriminate on the basis of sex.  Under Tennessee's ban, a healthcare provider may not "knowingly perform or offer to perform" a medical procedure on a minor "for the purpose of" either "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity," Tenn. Code Ann. § 68-33-103(a)(1)(A-B)—in other words, for the person to be transgender.  Likewise, under Kentucky's ban, a healthcare provider is barred from knowingly prescribing puberty blockers or

hormones "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex."  S.B. 150 § 4(2), 2023 Gen. Assemb. Reg. Sess. (Ky. 2023).

For these two statutes, sex is baked into the statutory text.  Not only does the word "sex" appear throughout both statutes, but every single time the laws will be enforced and applied, a court must ascertain the minor's sex assigned at birth. Suppose a minor receives estrogen.  If the minor was assigned male at birth, the law applies.  If the minor was assigned female at birth, the law does not apply.  In each case, the minor's sex is outcome-determinative.  The laws on their face classify based on sex.  Their application rests directly on discerning the sex of the minor. Therefore, the laws discriminate based on sex.  A law that "prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity . . . . constitutes a sex-based classification for purposes of the Fourteenth Amendment."  *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022); *accord Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022).

Moreover, with both these laws, the rationale for applying heightened scrutiny applies with full force.  Heightened scrutiny exists to "smoke out" improper legislative rationales, such as hostility to gender nonconformity.  *J.A. Croson Co.*,

16

488 U.S. at 493. Although the States contend that they are merely trying to protect minors from dangerous medical treatments, there are strong reasons to be concerned that these justifications are a pretext for a desire to discourage gender nonconformity. With both statutes, the district courts reviewed the medical evidence and rejected each State's asserted rationale that the medical procedures at issue were harmful to minors. *L.W. v. Skrmetti*, No. 23-cv-00376, 2023 WL 4232308, at *29 (M.D. Tenn. June 28, 2023), ECF No. 167 ("Tennessee PI Order"); *Doe 1 v. Thornbury*, No. 23-cv-00230, 2023 WL 4230481, at *4-5 (W.D. Ky. June 28, 2023); ECF No. 61 ("Kentucky PI Order"); *see infra* at Section II. Moreover, Kentucky's ban on medical care is part of an omnibus statute targeting transgender youths in numerous respects, such as guaranteeing teachers the ability to use pronouns inconsistent with the minors' gender identity and banning discussion of issues related to transgender people in schools.[3]

Meanwhile, the same day that Tennessee enacted its Health Care Ban, it simultaneously enacted a different law that effectively banned children from viewing

---

[3] *See* Olivia Krauth, *Kentucky Legislature Overrides Veto of Anti-Trans Bill Despite LGBTQ+ Youths' Pleas*, Louisville Courier Journal (updated Mar. 30, 2023, 7:03 a.m.), https://www.courier-journal.com/story/news/politics/2023/03/29/sb-150-kentucky-senate-overrides-beshear-veto-of-anti-trans-bill/70051987007/.

drag performances.[4]    And, shortly thereafter, Tennessee passed another law guaranteeing teachers the ability to use pronouns inconsistent with the minors' gender identity.[5]  Those laws have nothing to do with medical care—and everything to do with stigmatizing gender nonconformity.  These facts show that a court cannot merely assume that these statutes are garden-variety regulations of medical safety, warranting application of rational basis review.   To the contrary, they show that the Legislature chose to enact facially discriminatory statutes because of the Legislature's discomfort toward gender nonconformity, rather than concern about children's health or safety.

It therefore makes perfect sense to conduct the heightened scrutiny analysis, which "smoke[s] out" illicit motives by requiring a "searching analysis" into the justifications for the challenged law.  *Virginia*, 518 U.S. at 536 (citation omitted); *J.A. Croson Co.*, 488 U.S. at 493.  That analysis allows the Court to determine whether both States' asserted motive—protection of children from dangerous medical treatments—*in fact* justifies the Health Care Bans.  *See Virginia*, 518 U.S.

---

[4] *See* Melissa Brown*, Gov. Bill Lee Signs Ban on Gender-Affirming Care for Minors, Drag Restrictions into Law*, The Tennessean (Mar. 2, 2023), https://www.tennessean.com/story/news/politics/2023/03/02/tennessee-governor-bill-lee-signs-anti-trans-bill-drag-restrictions-into-law/69937336007/.

[5] *See* Chris O'Brien, *Governor Lee Signs Bill Saying Teachers Don't Have to Use Student's Preferred Pronouns*, ABC News 6 (May 21, 2023), https://www.wate.com/news/tennessee/governor-lee-signs-bill-saying-teachers-dont-have-to-use-students-preferred-pronouns/.

at 535-36 ("[A] tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded.").

The stay order's arguments for applying rational basis review instead of heightened scrutiny are irreconcilable with Supreme Court precedent. First, the order reasoned: "The ban thus applies to all minors, regardless of their biological birth with male or female sex organs. That prohibition does not prefer one sex to the detriment of the other." *L.W.*, 73 F.4th at 419.

*Bostock* repudiated that reasoning. It rejected an interpretation of Title VII that "would require [the Court] to consider the employer's treatment of groups rather than individuals, to see how a policy affects one sex as a whole versus the other as a whole," instead explaining that "our focus should be on individuals, not groups." 140 S. Ct. at 1740. The same analysis applies to the Equal Protection Clause. It is hornbook law that the Equal Protection Clause embodies the exact same "basic principle" as Title VII: it "protect[s] *persons*, not *groups*." *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Thus, a law that treats groups equally in the aggregate—but *individually* classifies people based on a suspect characteristic—is subject to heightened scrutiny. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 743 (2007); *accord J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring in judgment) (explaining that the Equal Protection Clause bars gender discrimination in jury

19

selection because "[t]he neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals, not groups"). If a transgender boy is classified based on sex, that discrimination does not disappear because a transgender girl is also classified based on sex.

Next, the stay order reasoned: "The Act mentions the word 'sex,' true. But how could it not? That is the point of the existing hormone treatments—to help a minor transition from one gender to another. That also explains why it bans procedures that administer cross-sex hormones but not those that administer naturally occurring hormones . . . . The reality that the drugs' effects correspond to sex in these understandable ways and that Tennessee regulates them does not require skeptical scrutiny." *L.W.*, 73 F.4th at 419. The same reasoning was extended to Kentucky's Health Care Ban. *Doe 1*, 2023 WL 4861984, at *1.

The stay order was correct that any law regulating medical care for transgender minors will necessarily refer to a person's sex. But it drew the wrong inference. Precisely *because* such laws necessarily refer to a person's sex, heightened scrutiny is warranted. The Health Care Bans are not generally applicable laws that happen to regulate transgender people. They apply to transgender people only, and hence inherently classify based on sex every time they are applied. The fact that a law "needs" to refer to sex to regulate transgender health care is not a basis to ratchet the level of scrutiny down—it is the very reason the standard of

20

scrutiny must be ratcheted up. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (if a prohibition "cannot be stated without referencing sex," "heightened scrutiny should apply") (citation omitted); *Doe v. Ladapo*, No. 23cv114, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023) ("If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex.").

The stay order's reliance on *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), and *Geduldig v. Aiello*, 417 U.S. 484 (1974), was also misplaced. Those cases involved laws that restricted abortion (*Dobbs*) and barred coverage for certain pregnancy-related disabilities (*Geduldig*). The stay order cited those cases for the proposition that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against the members of one sex or the other.'" *L.W.*, 73 F.4th at 419 (quoting *Dobbs*, 142 S. Ct. at 2245-46, in turn (quoting *Geduldig*, 417 U.S. at 496 n.20)). *Amici* respectfully disagree with this proposition: the statement in *Dobbs* was dictum[6] and

---

[6] Justice Alito discussed an *amicus* brief arguing that abortion rights are grounded in the Equal Protection Clause, *see Dobbs*, 142 S. Ct. at 2244-45, because there was no equal protection claim active in the case. Rather, the plaintiffs amended their complaint years prior to drop their equal protection challenge to Mississippi's statute. *See Jackson Women's Health Org. v. Currier*, 349 F. Supp. 3d 536, 538 (S.D. Miss. 2018).

there are strong arguments that *Geduldig*—which predates the Supreme Court's decision to apply heightened scrutiny to sex-based classifications—is inconsistent with subsequent case law, including *United States v. Virginia*.[7]

But even if *Dobbs* and *Geduldig* accurately characterize the law, both cases would be irrelevant to this case. In *Dobbs* and in *Geduldig*, the Court determined the particular laws at issue did not facially discriminate. Rather, the Court analyzed the challenges as disparate impact claims, applying rational basis review absent a showing that the States' justifications were "mere pretext[s] designed to effect an invidious discrimination against members of one sex or the other." *Dobbs*, 142 S. Ct. at 2246 (citation omitted). Here, the Plaintiffs present facial challenges. And there is no need to consider pretext because the words of the challenged laws manifest the invidiousness by identifying the targeted characteristic——sex—and describing the targeted group—a minor whose identity is different from their sex, in other words, a transgender minor. The laws here are squarely *facially* discriminatory.

Finally, the stay order expressed concern that gender transition care involves medical treatments that could be dangerous for children. *L.W.*, 73 F.4th at 420-22.

---

[7] *See* Reva B. Siegel et al., *Equal Protection in* Dobbs *and Beyond: How States Protect Life Inside and Outside of the Abortion Context,* Colum. J. Gender & L. 67, 68-69 (2023), https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=3954&context=faculty_scholarship.

There is no doubt that protecting children from dangerous medical treatments is a proper role of government. But this analysis comes into play at Step 2 of the analysis—whether heightened scrutiny is satisfied—not Step 1—whether heightened scrutiny applies. No doubt, "[g]ender identity and gender dysphoria pose vexing line-drawing dilemmas for legislatures," *id*. at 420, but that is a reason to analyze the States' actions and assess whether their line-drawing is justified, not to rubber-stamp the States' actions that facially single out transgender people.

## II.    The Health Care Bans Cannot Withstand Heightened Scrutiny.

Neither the panel that issued the stay orders, nor any other court, has ever held that a complete ban on health care for transgender minors can withstand heightened scrutiny.

Tennessee and Kentucky have banned *all* medical treatment for transgender minors seeking to live according to their gender identity. Even if the minor, the minor's parents, and the minor's doctor[s] are unanimous that the medical treatment would be safe and beneficial, Tennessee and Kentucky have declared such care to be flatly illegal across the board.

There is no "exceedingly persuasive justification" for these laws. *L.W.*, 73 F.4th at 423. The panel observed that gender dysphoria poses "vexing line-drawing dilemmas": "Surgical changes versus hormone treatment. Drugs versus counseling. One drug versus another. One age cutoff for minors versus another." *Id.* at 420. Yet

the existence of line-drawing problems does not justify Tennessee's or Kentucky's blunderbuss approach.

As explained in the district courts' detailed findings, as well as the submissions of other *amici*, the States' asserted interests in safety do not justify the discriminatory Health Care Bans. In the Tennessee court's view, the "weight of the evidence at this stage in the proceedings does not support Defendants' allegations that either puberty blockers or cross-sex hormones pose serious risks to the minors receiving these treatments for gender dysphoria." Tennessee PI Order at 51-52. "[T]he record suggests that either 1) the risks identified by Defendants are not more prevalent in transgender individuals receiving the procedures banned by [Tennessee's Health Care Ban] than in individuals not receiving these procedures; 2) to the extent that individuals receiving these procedures experience the negative side effects raised by Defendants, that the prevalence of these effects is low, or 3) the risk of negative side effects resulting from the use of such medical procedures banned by [Tennessee's Health Care Ban] can be mitigated." *Id.* at 52. Likewise, the Kentucky court concluded that "the puberty-blockers and hormones barred by [Kentucky's Health Care Ban] are established medical treatments essential to the well-being of many transgender children: every major medical organization in the United States agrees that these treatments are safe, effective, and appropriate when used in accordance with clinical guidelines." Kentucky PI Order at 11. Those

24

findings are not clearly erroneous, and they necessarily establish that the States cannot justify a targeted ban on health care treatment for transgender minors.

The stay order expressed concern that "[g]ender-affirming procedures often employ FDA-approved drugs for non-approved, 'off label' uses." *L.W.*, 73 F.4th at 418. If Tennessee or Kentucky had chosen to ban *all* off-label uses of FDA-approved drugs, an equal protection challenge to such a ban would likely be subject to rational-basis review, even if it had the incidental effect of restricting medical care for transgender people. Instead, however, both Tennessee and Kentucky allow physicians discretion to prescribe drugs for off-label uses *except* when they prescribe drugs to transgender minors. That aspect of these laws should raise concern that the States' asserted justification is pretextual. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("[A] law cannot be regarded as protecting an interest . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (citations omitted). And that aspect of these States' laws is what triggers the application of heightened scrutiny.

As the Tennessee district court explained in its thorough analysis of the medical evidence, concerns about the lack of FDA approval are not a basis to ban medical care for transgender youth. "[W]hile understanding why Defendants would seek to score metaphorical points from the fact that the FDA has yet to approve certain hormone therapies for gender dysphoria, the Court declines to draw from that

25

fact a negative inference regarding the risks of gender-affirming treatment." Tennessee PI Order at 56. "[T]hat the FDA has not approved these drugs for treatment of gender dysphoria says precisely nothing about whether the drugs are safe and effective when used for that purpose. Off-label use of drugs is commonplace and widely accepted across the medical profession." *Id.* (citation and footnote omitted). "Perhaps a specific instance of off-label prescribing would be problematic based on the particular circumstances involved," but "Defendants point to nothing indicating any circumstances that indicate any such troubling circumstances associated with the off-label nature of the prescribing of drugs for treatment of gender dysphoria." *Id.* at 56 n.54.

For the reasons stated by the district courts, Plaintiffs, and *amici*, the Health Care Bans cannot survive under heightened scrutiny. Laws like the Health Care Bans, which discriminate on the basis of sex without adequate justification, are unconstitutional.

## CONCLUSION

For the foregoing reasons and those articulated by Plaintiffs-Appellees, *amici* respectfully request that this Court lift the stays of the district court's preliminary injunctions of Tennessee's and Kentucky's bans on the provision of gender transition medical care for transgender youth.

August 10, 2023                                  Respectfully submitted,

                                                 By: */s/ Adam G. Unikowsky*

Chasel Lee                                       Adam G. Unikowsky
JENNER & BLOCK LLP                                   *Counsel of Record*
455 Market Street, Suite 2100                    JENNER & BLOCK LLP
San Francisco, CA 94105                          1099 New York Avenue, NW
(628) 267-6800                                   Suite 900
clee@jenner.com                                  Washington, DC 20001
                                                 (202) 639-6000
                                                 aunikowsky@jenner.com
Jocelyn A. Sitton
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
jsitton@jenner.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because this brief contains 5,944 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b)(1).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14 point Times New Roman font for the main text and footnotes.

Dated:  August 10, 2023

/s/Adam G. Unikowsky
Adam G. Unikowsky

**CERTIFICATE OF SERVICE**

I, Adam G. Unikowsky, an attorney, hereby certify that on August 10, 2023, I caused the foregoing **Brief Of GLBTQ Legal Advocates & Defenders, The National Women's Law Center, And Twelve Additional Organizations As *Amici Curiae* In Support Of Plaintiffs-Appellees And Affirmance** to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/Adam G. Unikowsky
  Adam G. Unikowsky