Nos. 23-5600(L), 23-5609

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

L.W., *et al.*,

Plaintiffs-Appellees

and

UNITED STATES OF AMERICA,

Intervenor-Appellee

v.

JONATHAN THOMAS SKRMETTI, *et al.*,

Defendants-Appellants

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

———————————

BRIEF FOR THE UNITED STATES AS INTERVENOR-APPELLEE IN
NO. 23-5600 AND AMICUS CURIAE IN NO. 23-5609

———————————

HENRY C. LEVENTIS
  United States Attorney
  Middle District of Tennessee

MICHAEL A. BENNETT
  United States Attorney
  Western District of Kentucky

CARLTON S. SHIER, IV
  United States Attorney
  Eastern District of Kentucky

KRISTEN CLARKE
  Assistant Attorney General

BONNIE I. ROBIN-VERGEER
BARBARA A. SCHWABAUER
JONATHAN L. BACKER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044
  (202) 305-3034

## STATEMENT REGARDING ORAL ARGUMENT

Given the importance of the issues presented, the United States respectfully requests oral argument in this case.  This Court has scheduled oral argument for September 1, 2023.

**TABLE OF CONTENTS**

<b>PAGE</b>

STATEMENT REGARDING ORAL ARGUMENT

INTRODUCTION ................................................................................1

INTEREST OF THE UNITED STATES AS AMICUS CURIAE ...........................3

STATEMENT OF THE ISSUE.................................................................4

STATEMENT OF THE CASE.................................................................4

    1.    *Factual Background* ................................................................4

        a.    *Gender Dysphoria In Transgender Youth* ...................4

        b.    *The Widely Accepted Standard Of Care For Treating Gender Dysphoria In Transgender Children And Adolescents* ..........................................6

        c.    *Challenged Laws* ................................................10

            i.    *SB1 (Tennessee)* .........................................10

            ii.    *SB150 (Kentucky)* .......................................12

    2.    *Procedural History* ................................................14

        a.    *L.W.* v. *Skrmetti* ................................................14

        b.    *Doe* v. *Thornbury* ................................................16

SUMMARY OF THE ARGUMENT ..............................................19

**TABLE OF CONTENTS (continued):**                                    **PAGE**

ARGUMENT

    NEITHER DISTRICT COURT ABUSED ITS DISCRETION
    BY GRANTING A PRELIMINARY INJUNCTION ..................................21

    A.    *Standard Of Review* ..................................................................21

    B.    *Plaintiffs Are Likely To Succeed On The Merits Of Their
    Equal-Protection Claims* ..................................................22

        1.    *SB1 And SB150 Are Subject To Heightened Scrutiny
        Because They Discriminate On The Basis Of Sex* ...................22

            a.    *SB1 And SB150 Facially Discriminate Based
            On Sex* ..............................................................23

            b.    *SB1 And SB150 Also Discriminate Based On Sex
            By Discriminating Against Transgender Minors* ..........24

        2.    *SB1 And SB150 Also Trigger Heightened Scrutiny
        Because Transgender Persons Constitute At Least A
        Quasi-Suspect Class* ..................................................28

        3.    *The Arguments Against Application Of Heightened
        Scrutiny Lack Merit* ..................................................32

            a.    *A Law Can Discriminate Based On Sex Without
            Preferring One Sex Over Another* ................................32

            b.    Dobbs *And* Geduldig *Are Inapposite* ..............................34

            c.    *Physiological Differences Between Sexes Are
            Irrelevant To Determining The Level Of Scrutiny* ..........37

            d.    *Heightened Scrutiny Is Consistent With The
            Proper Role Of Courts Applying The Equal
            Protection Clause* ..............................................37

**TABLE OF CONTENTS (continued):**                    **PAGE**

4.    *Neither District Court Abused Its Discretion In Finding That SB1 And SB150 Are Unlikely To Survive Heightened Scrutiny* ..................................................................40

    a.    *Evidence Does Not Support Defendants' Justifications For SB1 And SB150* ................................41

        i.    *The Medical Community Supports The Use Of Puberty Blockers And Hormone Therapies To Treat Gender Dysphoria* ............................................................41

        ii.    *The* Skrmetti *Court Did Not Clearly Err In Treating Defendants' Experts With Skepticism* ....................................43

        iii.    *The District Courts Did Not Clearly Err In Rejecting Defendants' Criticisms Of The Research Supporting Gender-Affirming* Care .......................................44

        iv.    *Defendants Identify No Risks That Outweigh The Benefits Of The Banned Treatments* ...........................................49

    b.    *Neither District Court Clearly Erred In Finding That SB1 And SB150 Are Not Substantially Related To Achieving The States' Asserted Interests* ...........................................54

    c.    *SB1 And SB150 Also Fail Rational-Basis Review* .....................................................56

C.    *Transgender Adolescents, Including The Minor Plaintiffs, Will Suffer Irreparable Harm Absent Injunctive Relief* .....................58

D.    *The Balance Of Harms And The Public Interest Favor An Injunction* ........................................................59

**TABLE OF CONTENTS (continued):**                                    **PAGE**

E.      *This Court Should Remand To The District Court For
        Further Proceedings If It Is Not Satisfied With The Scope
        Of The* Skrmetti *Preliminary Injunction* ............................................60

CONCLUSION .........................................................................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**CASES:**                                                                    **PAGE**

*Adams* v. *St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc) ................. 33, 39

*Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200 (1995) ....................................33

*Arizona* v. *Biden*, 40 F.4th 375 (6th Cir. 2022) ........................................................21

*B.P.J.* v. *West Virginia State Bd. of Educ.*,
    2023 WL 111875 (S.D. W. Va. Jan. 5, 2023),
    appeal pending, No. 23-1078 (4th Cir.)..........................................................39

*Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731 (2020)........................................... *passim*

*Bowen* v. *Gilliard*, 483 U.S. 587 (1987) ........................................................... 28, 30

*Brandt* v. *Rutledge*, 47 F.4th 661 (8th Cir. 2022)............................................ *passim*

*Bray* v. *Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) .........................57

*Brown* v. *Zavaras*, 63 F.3d 967 (10th 1995)............................................................29

*C.P.* v. *Blue Cross Blue Shield of Ill.*, No. 3:20-cv-6145,
    2022 WL 17092846 (W.D. Wash. Nov. 21, 2022) ........................................43

*Califano* v. *Yamasaki*, 442 U.S. 682 (1979) ..................................................... 60-61

*City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432 (1985) ........... 28, 38-39, 56

*Communities for Equity* v. *Michigan High Sch. Athletic Ass'n*,
    459 F.3d 676 (6th Cir. 2006) ..........................................................................40

*Cooper* v. *Harris*, 137 S. Ct. 1455 (2017) ..............................................................21

*Daunt* v. *Benson*, 956 F.3d 396 (6th Cir. 2020).......................................................21

*Director, Off. of Workers' Comp. Programs* v. *Newport News*
    *Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995) .....................................62

**CASES (continued):**                                             **PAGE**

*Dobbs* v. *Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) .........................34

*Doe* v. *Ladapo*, No. 4:23cv114, 2023 WL 3833848
    (N.D. Fla. June 6, 2023),
    appeal pending, No. 23-12159 (11th Cir)........................................ 22, 35, 43

*Doster* v. *Kendall*, 54 F.4th 398 (6th Cir. 2022)......................................................60

*Edmo* v. *Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103 (D. Idaho 2018),
    aff'd in relevant part, 935 F.3d 757 (9th Cir. 2019) ......................................44

*EEOC* v. *R.G. & G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018), aff'd, *Bostock*, 140 S. Ct. 1731 (2020)..........26

*Eisenstadt* v. *Baird*, 405 U.S. 438 (1972) ...........................................................56-57

*Eknes-Tucker* v. *Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022),
    appeal filed, No. 22-11707 (11th Cir.) .................................................... 22, 43

*Frontiero* v. *Richardson*, 411 U.S. 677 (1973)........................................................31

*Geduldig* v. *Aiello*, 417 U.S. 484 (1974) ............................................................34-35

*General Tel. Co. of the Nw., Inc.* v. *EEOC*, 446 U.S. 318 (1980).........................62

*Glenn* v. *Brumby*, 663 F.3d 1312 (11th Cir. 2011)..................................................25

*Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020),
    cert. denied, 141 S. Ct. 2878 (2021) ........................................................29-31

*Heller* v. *Doe*, 509 U.S. 312 (1993).........................................................................56

*K.C.* v. *The Individual Members of the Med. Licensing Bd. Of Ind.*,
    No. 1:23cv595, 2023 WL 4054086 (S.D. Ind. June 16, 2023),
    appeal pending, No. 23-2366 (7th Cir.).........................................................22

*Kadel* v. *Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022) .......................................43

**CASES (continued):** PAGE

*Karnoski* v. *Trump*, 926 F.3d 1180 (9th Cir. 2019)...................................29

*Lexmark Intern., Inc.* v. *Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ..........................................21

*Lyng* v. *Castillo*, 477 U.S. 635 (1986) .............................. 28, 30

*M.A.B.* v. *Board of Educ. of Talbot Cnty.*,
    286 F. Supp. 3d 704 (D. Md. 2018)................................31

*Meriwether* v. *Hartop*, 992 F.3d 492 (6th Cir. 2021) ..............................27

*Miller* v. *Johnson*, 515 U.S. 900 (1994) ......................................33

*Mississippi Univ. for Women* v. *Hogan*, 458 U.S. 718 (1982) ...............................40

*Nguyen* v. *INS*, 533 U.S. 53 (2001) ..........................................37

*Obama for Am.* v. *Husted*, 697 F.3d 423 (6th Cir. 2012) ................................ 22, 58

*Ondo* v. *City of Cleveland*, 795 F.3d 597 (6th Cir. 2015) ...........................29

*Pasadena City Bd. of Educ.* v. *Spangler*, 427 U.S. 424 (1976)..............................62

*Pelcha* v. *MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir.),
    cert. denied, 142 S. Ct. 461 (2021)..........................................26-27

*Romer* v. *Evans*, 517 U.S. 620 (1996) .....................................57

*Smith* v. *City of Salem*, 378 F.3d 566 (6th Cir. 2004)........................25-26

*Spangler* v. *United States*, 415 F.2d 1242 (9th Cir. 1969) ................................61-62

*United States* v. *Virginia*, 518 U.S. 515 (1996)............................... *passim*

*Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017),
    cert. dismissed, 138 S. Ct. 1260 (2018)................................. 23, 30

**CONSTITUTION:**                                                   **PAGE**

U.S. Const., Amend. XIV, § 1 ......................................................................60

**STATUTES:**

21 U.S.C. 355(a) ........................................................................................47

21 U.S.C. 355(d) ........................................................................................47

42 U.S.C. 2000e-2(a)(1) ............................................................................27

42 U.S.C. 2000e-2(e) .................................................................................27

42 U.S.C. 2000h-2 ..........................................................................3, 14, 60-61

Ky. Rev. Stat. § 311.372 (SB150) (2023)......................................... *passim*
    § 311.372(1)(b) ...............................................................................13
    § 311.372(2).............................................................................. 23, 26
    § 311.372(2)(a) ........................................................................ 13, 36
    § 311.372(2)(b) .................................................................. 13, 24, 36
    § 311.372(3)(a) ........................................................................ 13, 55, 57
    § 311.372(3)(b) ........................................................................ 13, 55, 57
    § 311.372(4).....................................................................................13
    § 311.372(5).....................................................................................13
    § 311.372(6).............................................................................. 13, 59

Tenn. Code Ann.,
    § 68-33-101, *et seq.* (SB1) (2023) .................................................1
    § 68-33-101(h) ................................................................................56
    § 68-33-102(1) ........................................................................ 12, 55
    § 68-33-102(5)(B) ..........................................................................11
    § 68-33-102(9) ...............................................................................11
    § 68-33-103.............................................................................. *passim*
    § 68-33-103(a)(1) .................................................................. 11, 23-24
    § 68-33-103(a)(1)(A) ............................................................. 25-26
    § 68-33-103(a)(1)(B) ......................................................................25
    § 68-33-103(b)(1)(A) ............................................................. 11, 55, 57
    § 68-33-103(b)(1)(B) ......................................................................12
    § 68-33-103(b)(2) ...........................................................................12

**STATUTES (continued):**                                          **PAGE**

§ 68-33-104.................................................................................11
§ 68-33-105.................................................................................12
§ 68-33-106(b).............................................................................12

**REGULATION:**

21 C.F.R. Pt. 314.........................................................................47

**RULE:**

Fed. R. App. P. 29(a) ....................................................................4

**MISCELLANEOUS:**

2023 Anti-Trans Bills Tracker, TransLegislation.com
 (last visited July 31, 2023), https://perma.cc/X58H-823H..........................31

Am. Psych. Ass'n, Diagnostic and Statistical Manual of
 Mental Disorders (5th ed. 2013)....................................................... 5

Christopher M. Wittich et al., *Ten Common Questions
 (and Their Answers) About Off-Label Drug Use*,
 87 Mayo Clinic Proc. 982 (2012), https://perma.cc/2YHU-LLLJ .......... 47-48

Press Release, Am. Acad. Pediatrics, *AAP Reaffirms Gender-Affirming
 Care Policy, Authorizes Systematic Review of Evidence to Guide
 Update* (Aug. 4, 2023), https://perma.cc/C5TG-MEMG ..............................6

*Understanding Unapproved Use of Approved Drugs "Off Label,"*
 U.S. Food & Drug Admin. (2018), https://perma.cc/A9DG-ML23..............48

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

————————————

Nos. 23-5600(L), 23-5609

L.W., *et al.*,

Plaintiffs-Appellees

and

UNITED STATES OF AMERICA,

Intervenor-Appellee

v.

JONATHAN THOMAS SKRMETTI, *et al.*,

Defendants-Appellants

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

————————————

BRIEF FOR THE UNITED STATES AS INTERVENOR-APPELLEE IN
NO. 23-5600 AND AMICUS CURIAE IN NO. 23-5609

————————————

## INTRODUCTION

These consolidated appeals concern Tennessee and Kentucky laws that deny

transgender minors access to medically necessary care that is available to other

minors.  Tenn. Code Ann. § 68-33-101 *et seq.* (SB1) (2023); Ky. Rev. Stat. §

311.372 (SB150) (2023).  Every other court to analyze similar laws has reached the

same conclusion:  these laws likely violate the Fourteenth Amendment's Equal
Protection Clause.

The district courts here joined that consensus by preliminarily enjoining SB1
and SB150.  Neither court abused its discretion.  These laws unjustifiably prohibit
transgender minors from accessing medically necessary and appropriate care,
while imposing no such limitation on non-transgender minors.  SB1 and SB150
discriminate based on both sex and transgender status by imposing prohibitions
using expressly sex-based terms and by targeting treatment for a condition that
only transgender minors have.  Both laws are therefore subject to heightened
scrutiny.

Neither statute can survive such scrutiny—or even rational-basis review—
because they arbitrarily deny medical treatments to transgender minors that they
permit non-transgender minors to receive.  Every major American medical
organization with a position on the issue recognizes that these treatments are safe,
effective, and medically necessary for treating gender dysphoria.  These statutes
therefore deprive the minor plaintiffs here and other transgender adolescents with
gender dysphoria of medical care—or even the option to consider such care—that
a wealth of research demonstrates is critical for their physical and mental well-
being.

To justify these laws, the States identify only speculative harms—potential, not inevitable, adverse side effects—while failing to confront the district courts' preliminary factual findings and the serious threat that denying medical treatment presently poses to the physical and mental health of transgender youth with gender dysphoria.  The courts exercised sound judgment in finding, on this record, that SB1 and SB150 are not substantially related to an important government interest.  Accordingly, this Court should reconsider the motions panel's initial view in its stay orders and affirm both district courts' preliminary injunctions.

### INTEREST OF THE UNITED STATES AS AMICUS CURIAE

The United States has a vital interest in ensuring that all minors enjoy equal protection of the laws.

The United States is intervenor-appellee in *L.W.* v. *Skrmetti*, No. 23-5600. In authorizing the United States' intervention in *Skrmetti*, the Attorney General certified that the equal-protection challenge presents a "case of general public importance" because SB1 discriminates against transgender minors in Tennessee on the basis of sex.  See 42 U.S.C. 2000h-2.  Like *Skrmetti*, *Doe* v. *Thornbury*, No. 23-5609, involves a preliminary injunction enjoining enforcement of a law that prohibits certain medical care for only transgender minors.  Because of the significant overlap in these cases, the United States has a substantial interest in

- 4 -

*Thornbury*, as demonstrated by its statement of interest filed in the district court in that case.  U.S. SOI, R.37, TPageID##427-447; see also Fed. R. App. P. 29(a).[1]

## STATEMENT OF THE ISSUE

Whether either district court abused its discretion by granting a preliminary injunction against defendants' enforcement of provisions of Tennessee's and Kentucky's laws that prohibit the use of puberty blockers and hormone therapies to treat transgender minors with gender dysphoria.[2]

## STATEMENT OF THE CASE

*1.    Factual Background*

*a.        Gender Dysphoria In Transgender Youth*

A person's gender identity "refers to a person's understanding of belonging to a particular gender" (PI Mem. (TN-Op.), R.167, SPageID#2657), and "cannot be changed voluntarily or by external forces" (Adkins Decl. (Adkins), R.29, SPageID#249).[3]  Transgender people are individuals whose gender identity does not conform to their sex assigned at birth; by contrast, a "cisgender" (or non-

---

[1] "R.__, SPageID#__" refers to the docket entry and page number of documents filed on the district court's docket in *Skrmetti*.  "R.__, TPageID#__" refers to the same on the district court's docket in *Thornbury*.

[2] The United States takes no position on any other issue in this appeal.

[3] Sections 1.a-b of the Factual Background rely primarily on the Tennessee district court record, but the record in the Kentucky case is not materially different.

transgender) child has a gender identity that corresponds with the sex the child was assigned at birth.  TN-Op., R.167, SPageID#2657.

Some transgender people experience a condition known as "gender dysphoria," a diagnostic term for clinically significant distress resulting from the incongruence between their gender identity and their sex assigned at birth.  Adkins, R.29, SPageID#250 (citing Am. Psych. Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013)).  To be diagnosed with gender dysphoria, the incongruence between sex assigned at birth and gender identity must persist for at least six months and be accompanied by clinically significant distress or impairment in occupational, social, or other important areas of functioning. Adkins, R.29, SPageID#250; Janssen Decl. (Janssen), R.31, SPageID##353-354.

When transgender youth with gender dysphoria are unable to live consistently with their gender identity due to irreversible physical changes that accompany puberty, they can experience significant harm to their overall health and well-being.  Adkins, R.29, SPageID##253-254, 266-267; Antommaria Decl. (Antommaria), R.30, SPageID#302; Janssen, R.31, SPageID##357-358, 361-363; Turban Decl. (Turban), R.32, SPageID##384-386.  For this reason, the denial of medically necessary treatment for gender dysphoria can cause minors to develop other serious mental health conditions, including anxiety, depression, and suicidality.  TN-Op., R.167, SPageID##2705-2706, 2715; Adkins, R.29,

SPageID##266-267; Antommaria, R.30, SPageID##302, 305; Janssen, R.31,
SPageID##362, 364; Turban, R.32, SPageID##382, 389-390.  The disruption of
this treatment once it has commenced and is working can "be life threatening."
Adkins, R.29, SPageID#268.

       b.    *The Widely Accepted Standard Of Care For Treating Gender*
                *Dysphoria In Transgender Children And Adolescents*

The prevailing standard of care for treating gender dysphoria is set out in
evidence-based guidelines published by well-established medical organizations,
including the World Professional Association for Transgender Health (WPATH)
and the Endocrine Society.  TN-Op., R.167, SPageID##2692-2694; see also
WPATH Standards of Care, R.113-9, SPageID##1735-1994; Endocrine Society
Guidelines, R.113-10, SPageID##1996-2030.  These guidelines provide a
framework for treating gender dysphoria based on the best available science and
clinical experience that is widely accepted for use with children and adolescents, as
endorsed by the American Academy of Pediatrics (AAP).  TN-Op., R.167,
SPageID#2692; see also Press Release, Am. Acad. Pediatrics, *AAP Reaffirms*
*Gender-Affirming Care Policy, Authorizes Systematic Review of Evidence to Guide*
*Update* (Aug. 4, 2023), https://perma.cc/C5TG-MEMG (expressing "confiden[ce]"
in AAP's original policy authorizing a "systematic review of the evidence"
supporting gender-affirming care in response to the organization's "concerns about
restrictions to access to health care").

Treatment for gender dysphoria differs for pre-pubertal children versus adolescents because gender dysphoria is more likely to persist into adulthood for the latter group.  Turban, R.32, SPageID##389-391.  Before puberty, treatment for gender dysphoria does not include any medical intervention—medications or surgery.  Adkins, R.29, SPageID#253.

At puberty's onset, individualized medical interventions become necessary for some adolescents with gender dysphoria.  Adkins, R.29, SPageID##253-256; Janssen, R.31, SPageID#356.  Potential interventions include gonadotropin-releasing hormone (GnRH) agonists—medications commonly called puberty blockers—which temporarily pause puberty.  Adkins, R.29, SPageID##253-255; Janssen, R.31, SPageID##357-358.  The purpose of this intervention is to prevent the distress of developing irreversible physical characteristics that are inconsistent with an adolescent's gender identity.  Adkins, R.29, SPageID##253-255; Janssen, R.31, SPageID##357-358.  This intervention also provides time for adolescents to better understand their gender identity and to see whether their gender dysphoria persists.  Adkins, R.29, SPageID##253-255; Janssen, R.31, SPageID##357-358.

For older adolescents with gender dysphoria, healthcare providers find it medically necessary in some instances to recommend gender-affirming hormone therapy, which initiates puberty consistent with the adolescent's gender identity.  Adkins, R.29, SPageID#255; Janssen, R.31, SPageID#358.  Hormone therapy

entails prescription of testosterone to transgender boys and estrogen (and other medications to suppress testosterone) to transgender girls.  Adkins, R.29, SPageID#255; Janssen, R.31, SPageID#358.

The WPATH and Endocrine Society guidelines recommend these medical interventions for transgender adolescents diagnosed with gender dysphoria only after a comprehensive assessment ensuring that certain clinical criteria are met. Adkins, R.29, SPageID##254-258; Janssen, R.31, SPageID##358-359.  Under the prevailing standards, providers may prescribe these treatments only if the adolescent meets the diagnostic criteria for gender dysphoria; has experienced gender dysphoria as marked and sustained over time, worsening with the onset of puberty; demonstrates the maturity to provide informed consent for the treatment; and has any other health concerns addressed, such that there are no contraindications for treatment.  WPATH Standards of Care, R.113-9, SPageID##1992-1993; Endocrine Society Guidelines, R.113-10, SPageID#2005. If an adolescent presenting with gender dysphoria does not meet these requirements, the guidelines recommend against doctors prescribing puberty blockers or gender-affirming hormone therapy.  Janssen, R.31, SPageID#359.

As the guidelines make clear, no medical interventions are appropriate without the informed assent of the patients and consent of their parents or guardians.

Like all medical interventions, puberty blockers and hormone therapies carry risks of side effects, but the evidence in these cases shows that the risks are low, usually can be mitigated, and are outweighed by the treatments' benefits, when clinically indicated.  TN-Op., R.167, SPageID##2706-2707; Adkins, R.29, SPageID#265.  Puberty blockers have been used for decades to delay puberty for non-transgender children with early onset or "precocious" puberty.  Adkins, R.29, SPageID#260.  Their effects are generally reversible.  Adkins, R.29, SPageID#254. Although patients being treated with puberty blockers (for any reason) might experience reduced bone-mineral density relative to peers who are progressing through puberty, data show that patients' bone structure and strength increase once they stop taking puberty blockers and commence puberty, whether via hormone therapy or otherwise.  Adkins Rebuttal, R.141, SPageID##2392-2393; see also TN-Op., R.167, SPageID#2700.  Puberty blockers do not cause any long-term fertility loss.  Antommaria, R.30, SPageID#303.

Medical providers regularly use hormones to treat not only transgender patients with gender dysphoria but also non-transgender patients whose hormone levels vary from normal ranges.  TN-Op., R.167, SPageID##2709-2710; Adkins, R.29, SPageID##262-263.  Cardiovascular issues can be a risk for transgender women but can be mitigated through proper monitoring and tailoring of treatment. TN-Op., R.167, SPageID##2701-2702; Adkins Rebuttal, R.141, SPageID##2395-

2396.  Hormone therapies can affect transgender patients' fertility—particularly if they begin such therapies immediately after taking puberty blockers—but that is not always the case, and patients and their parents or guardians are informed about options to preserve their fertility.  TN-Op., R.167, SPageID##2697-2698; Adkins Rebuttal, R.141, SPageID##2398-2399.  Other side effects associated with hormone therapy are rare.  Adkins Rebuttal, R.141, SPageID#2395.

Every major American medical organization, including the AAP and the American Medical Association (AMA), agrees that treatment with puberty blockers and gender-affirming hormones is appropriate and medically necessary, when clinically indicated.  TN-Op., R.167, SPageID##2707-2708; PI Mem. (KY-Op.), R.61, TPageID#2302.

    *c.*   *Challenged Laws*

      *i.*   *SB1 (Tennessee)*

Tennessee enacted SB1 in March 2023, and its effective date was July 1. TN-Op., R.167, SPageID#2656.  SB1 provides in relevant part:

> (a)(1) A healthcare provider shall not knowingly perform or offer to perform on a minor, or administer or offer to administer to a minor, a medical procedure if the performance is for the purpose of:
>
> (A) Enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or
>
> (B) Treating purported discomfort or distress from a discordance between the minor's sex and asserted identity.

Tenn. Code Ann. § 68-33-103(a)(1).  The statute defines "[s]ex" as a "person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics existing at the time of birth."  *Id.* § 68-33-102(9).  The medical procedures covered by SB1, as relevant here, are "[p]rescribing, administering, or dispensing any puberty blocker or hormone."  *Id.* § 68-33-102(5)(B).  In addition to regulating healthcare providers, the statute prohibits any "person" from "knowingly provid[ing]" a banned treatment to a minor.  *Id.* § 68-33-104.[4]

SB1 carves out two exemptions.  First, the law exempts any "medical procedure [provided] to a minor if  *  *  *  [t]he performance or administration of the medical procedure is to treat a minor's congenital defect, precocious puberty, disease, or physical injury."  Tenn. Code Ann. § 68-33-103(b)(1)(A).  The terms "[c]ongenital defect" and "disease" specifically exclude "gender dysphoria, gender identity disorder, gender incongruence, or any mental condition, disorder, disability, or abnormality."  *Id.* § 68-33-102(1) and 103(b)(2).   Second, SB1 provides a time-limited exemption for the "performance or administration" of a medical procedure to a minor, if the same "medical procedure on the minor began

---

[4]  SB1's ban on "surgical" medical procedures, Tenn. Code Ann. § 68-33-102(5)(B), remains in place, and is not at issue on appeal.  TN-Op., R.167, SPageID##2662-2663.

prior to the effective date of this act and concludes on or before March 31, 2024." *Id.* § 68-33-103(b)(1)(B).

Tennessee's Attorney General can bring an action to enforce SB1 against any person "that knowingly violates this [Act] * * * to enjoin future violations, to disgorge any profits," and to recover civil penalties.  Tenn. Code Ann. § 68-33-106(b).  Regulatory authorities must also pursue licensing sanctions against healthcare providers that violate the statute.  *Id.* § 68-33-107.  Finally, SB1 establishes a private right of action for minors, or parents of minors, alleging "injur[y]" arising from a violation of SB1.  *Id.* § 68-33-105.

### ii. *SB150 (Kentucky)*

Kentucky enacted SB150 over the governor's veto in March 2023.  KY-Op., R.61, TPageID#2299.  The law addresses several topics, but plaintiffs challenge only Section 4(2)(a) and (b).  Those provisions state:

> Except as provided in subsection 3 * * * , a health care provider shall not, for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex, knowingly:
>
> (a) Prescribe or administer any drug to delay or stop normal puberty;
>
> (b) Prescribe or administer testosterone, estrogen, or progesterone, in amounts greater than would normally be produced endogenously in a healthy person of the same age and sex[.]

Ky. Rev. Stat. § 311.372(2)(a)-(b).  The statute defines "[s]ex" as "the biological indication of male and female as evidenced by sex chromosomes, naturally

occurring sex hormones, gonads, and nonambiguous internal and external genitalia present at birth." *Id.* § 311.372(1)(b).

SB150 provides a blanket exemption for otherwise prohibited treatment to "[a] minor born with a medically verifiable disorder of sex development, including external biological sex characteristics that are irresolvably ambiguous." Ky. Rev. Stat. § 311.372(3)(a). In addition, the statute exempts otherwise prohibited treatment for "[a] minor diagnosed with a disorder of sexual development," under specified conditions. *Id.* § 311.372(3)(b). Finally, for minors already taking a drug or hormone prohibited by SB150, the statute allows a healthcare provider to "institute a period during which the minor's use of the drug or hormone is systematically reduced" if immediate cessation "would cause harm to the minor." *Id.* § 311.372(6).

The statute provides a private right of action "to recover damages for injury suffered as a result" of the prohibited treatments. Ky. Rev. Stat. § 311.372(5). SB150 also requires regulatory authorities to impose licensing sanctions on any healthcare provider that violates the statute. *Id.* § 311.372(4).

2.   *Procedural History*

a.   *L.W.* v. *Skrmetti*

Private plaintiffs filed suit in the Middle District of Tennessee against Tennessee government officials, including the Attorney General and Tennessee

Board of Medical Examiners.  Compl., R.1, SPageID##1-43.  Among other claims, private plaintiffs challenged SB1 under 42 U.S.C. 1983, alleging that the statute violates the Equal Protection Clause.  Compl., R.1, SPageID##35-37.  They also sought a preliminary injunction.  Pls.' PI Mot., R.21, SPageID##191-195.

The United States intervened to bring its own equal-protection claim pursuant to 42 U.S.C. 2000h-2.  See U.S. Mot. to Intervene, R.38, SPageID##460-467; Intervention Mem., R.108, SPageID##908-914.  Like private plaintiffs, the United States moved for a preliminary injunction.  U.S. PI Mot., R.40, SPageID##501-509.  That motion remains pending.

The district court granted in part private plaintiffs' motion for a preliminary injunction.  TN-Op., R.167, SPageID##2656-2724.  As relevant here, the court determined that private plaintiffs were likely to succeed on their equal-protection claim.  In particular, the court found that SB1 "plainly proscribes treatment for gender dysphoria" and thus "expressly and exclusively targets transgender people." TN-Op., R.167, SPageID#2673.  Finding that transgender people constitute a quasi-suspect class, the court held that heightened scrutiny applies to SB1.  TN-Op., R.167, SPageID##2676-2680.  The court also held that heightened scrutiny applies because SB1 discriminates on the basis of sex.  TN-Op., R.167, SPageID##2680-2683.  This is because SB1 "creates a sex-based classification on

its face," and because it discriminates based on transgender status, which is a form of sex discrimination.  TN-Op., R.167, SPageID##2682, 2684-2690.

Applying heightened scrutiny, the district court held that defendants did not demonstrate that SB150 is substantially related to an important government interest.  TN-Op., R.167, SPageID##2690-2713.  The court first found that defendants' experts Dr. Cantor and Dr. Hruz were "minimally persuasive" given that neither had "ever diagnosed or treated a minor with gender dysphoria."  TN-Op., R.167, SPageID#2690.  The court also determined that the WPATH and Endocrine Society guidelines were reliable as the standard of care for treating gender dysphoria.  TN-Op., R.167, SPageID##2692-2694, 2707-2708.  As to Tennessee's asserted interest in protecting minors, the court concluded that "the weight of the evidence" did not support defendants' contention that "either puberty blockers or cross-sex hormones pose serious risks" to transgender minors with gender dysphoria.  TN-Op., R.167, SPageID##2706-2707.  Accordingly, the court held, SB1 is not substantially related to this interest, and indeed is likely "arbitrary," because the same medications the statute bans for treatment of gender dysphoria "are not banned when provided to treat other conditions."  TN-Op., R.167, SPageID##2709-2710.

Next, the district court found that the minor plaintiffs would suffer irreparable harm without an injunction, including emotional and psychological

harms and unwanted physical changes, and concluded that the balance of equities and public interest weighed in favor of a preliminary injunction. TN-Op., R.167, SPageID##2713-2718. The court enjoined enforcement of SB1 statewide. TN-Op., R.167, SPageID##2722-2724; TN-PI Order, R.168, SPageID##2725-2727.

The district court denied defendants' motion for a stay pending appeal. Stay Order, R.172, SPageID##2747-2750. Defendants sought the same relief in this Court, which a motions panel granted. C.A. 7/8/23 Opinion (Stay-Op.).

### b.   *Doe* v. *Thornbury*

Plaintiffs filed suit in the Western District of Kentucky against the presidents of the Kentucky Board of Medical Licensure and Kentucky Board of Nursing (the medical defendants) and the Secretary of the Cabinet for Health and Family Services. Compl., R.2, TPageID##11-33. They challenged SB150 under 42 U.S.C. 1983, alleging, as relevant here, that the statute violates the Equal Protection Clause. Compl., R.2, TPageID##19-21. Plaintiffs also sought a preliminary injunction. PI Mot., R.17, TPageID##109-141. Defendants did not oppose plaintiffs' motion. Medical Defs.' PI Resp., R.41, TPageID##478-480; see also Secretary's PI Resp., R.42, TPageID##481-482. Indeed, the medical defendants stated that a preliminary injunction would "behoove" their "licensees and their patients" because it would "avoid potentially unnecessary cost, time, and

- 17 -

harmful exposure should Plaintiffs be successful."  Medical Defs.' PI Resp., R.41,

TPageID##478-479.

Kentucky's Attorney General intervened as of right to defend SB150.

Intervention Order, R.38, TPageID##452-454.

The district court granted plaintiffs' motion for a preliminary injunction.

KY-Op., R.61, TPageID#2313.  As relevant here, the court determined that

plaintiffs were likely to succeed on their equal-protection claim.  KY-Op., R.61,

TPageID#2308.  The court held that heightened scrutiny applies to SB150 because

the law discriminates on the basis of sex.  KY-Op., R.61, TPageID##2303-2305.

That is because a "minor's sex at birth determines whether or not the minor can

receive certain types of medical care under the law" and because the statute

discriminates against transgender people, which is a form of sex discrimination.

KY-Op., R.61, TPageID##2303-2304 (quoting *Brandt* v. *Rutledge*, 47 F.4th 661,

669 (8th Cir. 2022)).

Applying heightened scrutiny, the district court held that Kentucky did not

demonstrate that SB1 is substantially related to achieving an important government

interest.  KY-Op., R.61, TPageID#2306.  The court found that the State offered

"no evidence" of the "abuse, neglect, [or] mistakes" that SB150 purportedly guards

against.  KY-Op., R.61, TPageID#2306 (alteration in original) (quoting KY Opp'n,

R.47, TPageID#505).  As to the State's asserted interest in protecting children, the

- 18 -

court found it was not "a sufficiently persuasive justification given that the statute

allows the same treatments for cisgender minors" that it bans for transgender

minors.  KY-Op., R.61, TPageID#2306.  With regard to the State's asserted

interest in protecting "the integrity and ethics of the medical profession," the court

found that the State "offer[ed] no evidence that Kentucky healthcare providers

prescribe puberty-blockers or hormones primarily for financial gain as opposed to

patients' well-being"; the court emphasized that, instead, the law undermines

medical ethics by "prevent[ing] doctors from acting in accordance with the

applicable standard of care," "interfering with the patient-physician relationship,

[and] unnecessarily regulating the evidence-based practice of medicine."  KY-Op.,

R.61, TPageID##2307-2308 (citation omitted).

Next, the district court determined that the minor plaintiffs would suffer

irreparable harm without a preliminary injunction, including "severe psychological

distress," and concluded that the balance of equities and public interest weighed in

favor of an injunction.  KY-Op., R.61, TPageID##2311-2312.  The court enjoined

enforcement of SB150 statewide.  KY-Op., R.61, TPageID#2313.

The district court granted Kentucky's motion for a stay pending appeal,

given the motion panel's stay order in *Skrmetti*.  Stay Order, R.79,

TPageID##2494-2496.  A motions panel of this Court denied plaintiffs' motion to

lift the stay.  C.A. 7/31/23 Order.  Plaintiffs' petition for rehearing en banc remains
pending.

## SUMMARY OF THE ARGUMENT

Neither district court abused its discretion by preliminarily enjoining
defendants from enforcing SB1's and SB150's bans on puberty blockers and
hormone therapies for transgender minors.

Both district courts properly concluded that plaintiffs are likely to succeed
on the merits of their equal-protection claims.  As both courts recognized, SB1 and
SB150 discriminate on the basis of sex because the laws' prohibitions are stated in
expressly sex-based terms and because the statutes target transgender minors,
which necessarily involves sex discrimination.  Accordingly, as both courts held,
heightened scrutiny applies.  Heightened scrutiny also applies because transgender
persons constitute at least a quasi-suspect class.

Applying heightened scrutiny, both district courts correctly concluded that
defendants failed to show that SB1 or SB150 are "substantially related to the
achievement" of "important governmental objectives."  *United States* v. *Virginia*,
518 U.S. 515, 533 (1996) (citation omitted).  Neither court erred, much less clearly
so, in finding that the banned treatments are widely recognized by the medical
community as safe, effective, and medically necessary to treat gender dysphoria.
Nor did the *Skrmetti* court clearly err in finding that defendants failed to

substantiate their claims that SB1 is justified by purported risks associated with puberty blockers and hormone therapies—findings that apply with equal force to SB150.  Both courts also correctly found that SB1 and SB150 are not substantially related to the States' asserted interests in protecting the health and welfare of minors because the laws allow non-transgender minors to receive the same treatments that they prohibit transgender minors from receiving.  Indeed, because SB1 and SB150 arbitrarily prohibit only transgender minors from receiving the care at issue—and then categorically ban these treatments—they cannot survive even rational-basis review.

Finally, neither district court abused its discretion in concluding that transgender adolescents, including the minor plaintiffs, will suffer severe physical and psychological harms in the absence of a preliminary injunction.  The courts also properly weighed the imminent threat of concrete harm to the minor plaintiffs against the speculative harms cited by the States, correctly concluding that both the balance of the harms and the public interest weigh in favor of injunctive relief.

**ARGUMENT**

**NEITHER DISTRICT COURT ABUSED ITS DISCRETION BY GRANTING A PRELIMINARY INJUNCTION**

In considering a preliminary injunction, a district court must weigh:  (1) the movant's likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether an injunction would cause others substantial harm; and (4) whether an injunction would serve the public interest.  *Daunt* v. *Benson*, 956 F.3d 396, 406 (6th Cir. 2020).  Neither district court abused its discretion by granting a preliminary injunction prohibiting defendants' enforcement of SB1 and SB150 during the litigation's pendency.

A.    *Standard Of Review*

This Court reviews a "district court's ultimate decision whether to grant a preliminary injunction for an abuse of discretion."  *Arizona* v. *Biden*, 40 F.4th 375, 381 (6th Cir. 2022).  A court "abuses its discretion [when] it relies upon clearly erroneous findings of fact, employs an incorrect legal standard or improperly applies the correct law to the facts."  *Lexmark Intern., Inc.* v. *Static Control Components, Inc.*, 387 F.3d 522, 532 (6th Cir. 2004).  In applying the clear-error standard, this Court must affirm if a district court's factual finding "is plausible in light of the full record—even if another is equally or more so."  *Cooper* v. *Harris*, 137 S. Ct. 1455, 1465 (2017) (citation and internal quotation marks omitted).  A

- 22 -

district court's legal conclusions are reviewed de novo. *Obama for Am.* v. *Husted*, 697 F.3d 423, 428 (6th Cir. 2012).

B.    *Plaintiffs Are Likely To Succeed On The Merits Of Their Equal-Protection Claims*

Neither district court abused its discretion in finding that private plaintiffs were likely to succeed on the merits of their equal-protection claims challenging SB1 and SB150. Every other court to consider a similar gender-affirming-care ban has reached the same conclusion. See *Brandt* v. *Rutledge*, 47 F.4th 661, 670-671 (8th Cir. 2022); *Eknes-Tucker* v. *Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022), appeal filed, No. 22-11707 (11th Cir. argued Nov. 18, 2022); *Doe* v. *Ladapo*, No. 4:23cv114, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023), appeal pending, No. 23-12159 (11th Cir. filed June 27, 2023); *K.C.* v. *The Individual Members of the Med. Licensing Bd. Of Ind.*, No. 1:23cv595, 2023 WL 4054086, at *8-9 (S.D. Ind. June 16, 2023), appeal pending, No. 23-2366 (7th Cir. filed July 12, 2023). This Court should do the same.

1.    *SB1 And SB150 Are Subject To Heightened Scrutiny Because They Discriminate On The Basis Of Sex*

SB1 and SB150 are subject to heightened scrutiny because both laws discriminate on the basis of sex and because they target transgender minors by denying them access to medically necessary procedures that remain available to

non-transgender minors.  Laws that discriminate based on sex are subject to

intermediate scrutiny.  *United States* v. *Virginia*, 518 U.S. 515, 555 (1996).

### a.    *SB1 And SB150 Facially Discriminate Based On Sex*

The *Skrmetti* court properly found that SB1 "creates a sex-based

classification on its face" and is subject to heightened scrutiny.  TN-Op., R.167,

SPageID#2682.  SB150 is no different.  See KY-Op., R.61, TPageID##2303-2305.

Because both laws "cannot be stated without referencing sex," they are "inherently

based upon a sex-classification."  *Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd.

of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017), cert. dismissed, 138 S. Ct. 1260

(2018).

SB1 bans healthcare providers from administering puberty blockers or

hormone therapy if they would "[e]nabl[e]" the minor to identify with a gender

"identity inconsistent with the *minor's sex*" or treat the "distress from a

discordance between the *minor's sex*" and gender identity.  Tenn. Code Ann. § 68-

33-103(a)(1) (emphases added).  Similarly, SB150 prohibits these treatments if

undertaken "to alter the appearance of, or to validate the minor's perception of, the

*minor's sex*, if that appearance or perception is inconsistent with the *minor's sex*."

Ky. Rev. Stat. § 311.372(2) (emphases added).  Because the legislature cannot

"writ[e] out instructions" to identify the banned medical procedures "without using

the words man, woman, or sex (or some synonym)," these laws facially

discriminate on the basis of sex. *Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731, 1746 (2020).

Under both SB1 and SB150, if a minor was assigned female at birth, that minor cannot receive testosterone to live as a male. By contrast, a minor assigned male at birth can receive testosterone for the same purpose (*i.e.*, to live as a male) because the treatment is consistent with the sex the minor was assigned at birth. TN-Op., R.167, SPageID#2682; see Tenn. Code Ann. § 68-33-103(a)(1); Ky. Rev. Stat. § 311.372(2)(b). "Because a minor's sex at birth determines whether or not the minor can receive certain types of medical care," these laws "discriminate[] on the basis of sex." *Brandt*, 47 F.4th at 669 (8th Cir. 2022). Accordingly, intermediate scrutiny applies.

### b. SB1 And SB150 Also Discriminate Based On Sex By Discriminating Against Transgender Minors

In addition to facially discriminating based on sex, SB1 and SB150 subject "individuals to disparate treatment on the basis of sex because" they discriminate "based on transgender status." TN-Op., R.167, SPageID#2684. Because these laws "plainly proscribe[] treatment for gender dysphoria" and "only transgender individuals suffer from gender dysphoria," they "expressly and exclusively target[]

transgender people." TN-Op., R.167, SPageID#2673.[5]  The very purpose of the

prohibited gender-affirming care is to treat a transgender minor's "distress from

[the] discordance between the minor's sex" assigned at birth and gender identity.

Tenn. Code Ann. § 68-33-103(a)(1)(B).  Thus, for example, a transgender minor

seeking puberty blockers to delay puberty cannot obtain that medication under SB1

and SB150, but a non-transgender minor seeking puberty blockers for the same

purpose can.

SB1 and SB150 target transgender minors based on their gender

nonconformity, which this Court has held is a form of sex discrimination.

See *Smith* v. *City of Salem*, 378 F.3d 566, 575, 577 (6th Cir. 2004) (holding such

discrimination violates the Equal Protection Clause); see also *Glenn* v. *Brumby*,

663 F.3d 1312, 1316 (11th Cir. 2011) (same).  Discrimination against transgender

people who, by definition, are gender nonconforming because they "fail[] to act

and/or *identify*" with their sex assigned at birth, "is no different from"

discrimination based on sex stereotyping.  *Smith*, 378 F.3d at 575, 577 (emphasis

added).  Both SB1 and SB150 discriminate against transgender minors because—

in the statutes' terms—they "*identify* with" a sex, or their "*perception* of" their sex,

is "inconsistent" with their sex assigned at birth.  Tenn. Code Ann. § 68-33-

---

[5]  The motions panel did not dispute that SB1 discriminates based on
transgender status in its stay order.  See Stay-Op. 12.

103(a)(1)(A) (emphasis added); Ky. Rev. Stat. § 311.372(2) (emphasis added). As a result, these laws constitute "impermissible [sex] discrimination" based on gender nonconformity. *Smith*, 378 F.3d at 575.

Finally, as the Supreme Court has recognized, "it is impossible to discriminate against a person for being * * * transgender without discriminating against the individual based on sex." *Bostock*, 140 S. Ct. at 1741. In a case consolidated with *Bostock*, this Court likewise concluded that "[d]iscrimination on the basis of transgender and transitioning status is necessarily discrimination on the basis of sex." *EEOC* v. *R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018), aff'd, *Bostock*, 140 S. Ct. 1731 (2020). By discriminating against transgender minors, SB1 and SB150 "unavoidably discriminate[] against persons with one sex identified at birth" but who identify with a different sex "today." *Bostock*, 140 S. Ct. at 1746. Neither law can be enforced against transgender minors without knowing their sex assigned at birth and comparing it with the sex they identify with "today." TN-Op., R.167, SPageID#2682.

To be sure, the Supreme Court in *Bostock* explicitly stated that whether its rule applied beyond Title VII remains an open question. 140 S. Ct. at 1753. In its stay order, the motions panel cited two earlier Sixth Circuit cases to support its initial view that *Bostock*'s reasoning applies only to Title VII. Stay-Op. 13 (citing *Pelcha* v. *MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir.), cert. denied, 142 S. Ct.

- 27 -

461 (2021), and *Meriwether* v. *Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021)).

But neither case suggests that *Bostock*'s analysis as to what it means "to

discriminate against any individual * * * because of such individual's * * *

sex," 140 S. Ct. at 1738 (quoting 42 U.S.C. 2000e-2(a)(1)), is inapposite here.  In

*Pelcha*, the appellant claimed *Bostock* changed the causation standard under the

ADEA, a proposition which this Court correctly rejected as inconsistent with

binding Supreme Court authority.  988 F.3d at 324.  And *Meriwether*, a First

Amendment case that assessed a university's interest in restricting a professor's

speech, simply noted that Title VII principles do not "automatically apply" to Title

IX, without analyzing in which contexts *Bostock*'s reasoning is persuasive.  992

F.3d at 510 n.4.[6]

Although *Bostock* involved an employment-discrimination claim, nothing

about its logic is limited to such claims.  See Stay-Op. 16-17 (White, J.,

concurring) (noting *Bostock*'s "principle is directly on point here and highly

persuasive").  *Bostock*'s reasoning rests on principles of "but-for" causation—not

on any text of Title VII specific to employment.  See 140 S. Ct. at 1739.  As the

---

[6]  Nor is *Bostock* distinguishable on the ground that sex is never relevant in
the workplace.  KY-Br. 24.  Title VII expressly allows sex-specific criteria if they
stem from a *bona fide* occupational qualification.  42 U.S.C. 2000e-2(e).  But such
considerations go to whether discrimination can be *justified*—not whether the
classification must be scrutinized.  See Section B.3.c, *infra*.

- 28 -

Court explained, "if changing the employee's sex would have yielded a different"
outcome for that individual employee, then the employer discriminated on the
basis of sex.  *Id.* at 1741.  Applying that logic here:  if a transgender adolescent
assigned female at birth seeks testosterone to affirm his identity as a boy, then SB1
and SB150 forbid it.  But change the minor's sex to male, and the laws permit his
access to testosterone.  Thus, because these statutes discriminate against
transgender minors, they discriminate on the basis of sex.

2.    *SB1 And SB150 Also Trigger Heightened Scrutiny Because
       Transgender Persons Constitute At Least A Quasi-Suspect Class*

As the *Skrmetti* district court correctly held, SB1 also is subject to
heightened scrutiny because transgender persons constitute at least a quasi-suspect
class.  TN-Op., R.167, SPageID##2676-2680.  The Supreme Court has analyzed
four factors to determine whether a group constitutes a "suspect" or "quasi-
suspect" class:  (1) whether the class historically has been subjected to
discrimination, see *Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986); (2) whether the
class has a defining characteristic that "frequently bears no relation to [the] ability
to perform or contribute to society," *City of Cleburne* v. *Cleburne Living Ctr.*, 473
U.S. 432, 440-441 (1985) (citation omitted); (3) whether the class has "obvious,
immutable, or distinguishing characteristics that define them as a discrete group,"
*Lyng*, 477 U.S. at 638; and (4) whether the class lacks political power, see *Bowen*

v. *Gilliard*, 483 U.S. 587, 602 (1987).  If these factors are satisfied, then the classification warrants heightened scrutiny.

This test sets a high bar to ensure that a class of people truly requires "extraordinary protection from the majoritarian political process." *Ondo* v. *City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015) (citation omitted).[7]  For precisely this reason, the Supreme Court has not recently considered whether to recognize another quasi-suspect class.  But numerous courts have found that transgender people are the rare class of people that meet this high bar and concluded that they "constitute at least a quasi-suspect class." *Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020) (collecting district court cases reaching same conclusion), cert. denied, 141 S. Ct. 2878 (2021); see also *Karnoski* v. *Trump*, 926 F.3d 1180, 1200-1201 (9th Cir. 2019) (finding that a district "reasonably applied the factors" in finding transgender persons to be a quasi-suspect class); *Brandt*, 47 F.4th at 670 n.4 (8th Cir. 2022) (finding no "clear error in the district court's factual findings underlying" the legal conclusion that transgender persons are a quasi-suspect class but not relying on this legal theory to affirm).[8]

---

[7]  The *Skrmetti* court did not "overrul[e]" *Ondo* to hold transgender persons are a quasi-suspect class.  TN-Br. 38.  *Ondo* did not apply the four-factor test or hold that transgender persons are not a quasi-suspect class.

[8]  The Tenth Circuit in *Brown* v. *Zavaras*, 63 F.3d 967, 971 (1995), held that a transgender plaintiff was "not a member of a protected class," but that decision

First, "[t]here is no doubt" that transgender persons, as a class, "historically have been subjected to discrimination on the basis of their gender identity, including high rates of violence and discrimination in education, employment, housing, and healthcare access." *Grimm*, 972 F.3d at 611 (citation omitted); see also *Whitaker*, 858 F.3d at 1051 ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity.").

Second, whether a person is transgender bears no relation to their ability to contribute to society. As the Fourth Circuit has found, "[s]eventeen of our foremost medical, mental health, and public health organizations agree that being transgender 'implies no impairment in judgment, stability, reliability, or general social or vocational capabilities.'" *Grimm*, 972 F.3d at 612 (citation omitted).

Third, there is no reasonable dispute that transgender persons share "obvious, immutable, *or* distinguishing characteristics that define them as a discrete group." *Bowen*, 483 U.S. at 602 (emphasis added) (quoting *Lyng*, 477 U.S. at 638). Transgender persons are distinguishable as a group because their gender identities do not align with their sex assigned at birth. Courts have also held that transgender status is immutable because it "is not a choice" but is "as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612-613; see also,

---

"reluctantly followed a since-overruled Ninth Circuit opinion." *Grimm*, 972 F.3d at 611.

- 31 -

*e.g.*, *M.A.B.* v. *Board of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 720-721

(D. Md. 2018) (collecting district court cases).  The testimony of plaintiffs' experts

confirms this as well.  See Janssen, R.31, SPageID#352; Adkins, R.29,

SPageID#249.

Finally, transgender persons have not "yet been able to meaningfully

vindicate their rights through the political process."  *Grimm*, 972 F.3d at 613.

"Even considering the low percentage of the population that is transgender," they

are "underrepresented in every branch of government."  *Ibid.* (citing relevant data).

Furthermore, the proliferation of laws and governmental policies, like SB1 and

SB150, targeting transgender persons for discrimination, particularly transgender

youth, is further evidence that transgender people lack the power necessary to

protect themselves in the political process.  See *2023 Anti-Trans Bills Tracker*,

TransLegislation.com (last visited July 31, 2023), https://perma.cc/X58H-823H

(listing 80 anti-transgender laws enacted in 2023).

That the position of *some* transgender persons in society "has improved

markedly in recent decades," *Frontiero* v. *Richardson*, 411 U.S. 677, 685-686

(1973), does not undermine finding that transgender persons as a class lack

political power.  See TN-Br. 39-40; KY-Br. 30.  The same was true about women

when the Supreme Court began treating sex as a quasi-suspect classification.  See

*Frontiero*, 411 U.S. at 658-686.  Nor is the fact that the United States has taken

action in *Skrmetti* and elsewhere proof that transgender persons now have

"political muscle" (TN-Br. 40); instead, it underscores how dire their situation has

become.

In sum, all four factors clearly confirm that transgender persons constitute at

least a quasi-suspect class.  Consequently, heightened scrutiny applies for the

additional reason that SB1 and SB150 discriminate against that class.[9]

3.    *The Arguments Against Application Of Heightened Scrutiny Lack Merit*

a.    *A Law Can Discriminate Based On Sex Without Preferring One Sex Over Another*

Defendants contend that SB1 and SB150 do not discriminate based on sex

because they apply equally to boys and girls.  TN-Br. 31-32; KY-Br. 10, 20.  In

their view, the laws do not discriminate because they do not prefer one sex over

another sex.  TN-Br. 31; KY-Br. 20; see also Stay-Op. 11.  They are wrong.  The

Supreme Court squarely rejected this same argument in *Bostock*.  140 S. Ct. 1741-

1742.  A law like SB1 or SB150 that discriminates against *both* transgender girls

---

[9]  The motions panel suggested that the lack of Supreme Court or Sixth
Circuit precedent recognizing transgender status as a quasi-suspect class is "nearly
dispositive" because plaintiffs seeking a preliminary injunction must establish "a
'clear' right to relief."  Stay-Op. 12 (citation omitted).  But the preliminary-
injunction standard demands only a likelihood of success on the merits—not that
the case be controlled by existing precedent.

and boys "*doubles* rather than eliminates" liability for sex discrimination.  *Id.* at 1742 (emphasis added).

As is true for Title VII, which "works to protect individuals of both sexes from discrimination" even if an employer "treat[s] men and women as groups more or less equally," *Bostock* 140 S. Ct. at 1741, the right to equal protection is a "personal right" that considers the treatment of *individuals* as individuals and not only as part of a (favored or disfavored) group.  See *Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200, 227, 230 (1995) (the Fourteenth Amendment "protect[s] persons, not groups"); *Miller* v. *Johnson*, 515 U.S. 900, 911 (1994) (similar).  On the States' reasoning, a law requiring racial segregation in schools would not discriminate on the basis of race because it applies equally to members of *all* races—no one can attend racially integrated schools.  We already know what to make of that logic.

Here, as the *Skrmetti* court found, "when two individuals want the same procedure," whether they can access that procedure "will depend on their respective sexes."  TN-Op., R.167, SPageID#2683.  As the Eighth Circuit (and many other courts) have recognized, such laws discriminate based on sex.  *Brandt*, 47 F.4th at 669; see also *Adams* v. *St. Johns Cnty.*, 57 F.4th 791, 801, 803 (11th Cir. 2022) (en banc) (recognizing that sex-based bathroom policy was subject to heightened scrutiny).

>    *b.*    Dobbs *And* Geduldig *Are Inapposite*

Defendants cite *Dobbs* v. *Jackson Women's Health Org.*, 142 S. Ct. 2228

(2022), and *Geduldig* v. *Aiello*, 417 U.S. 484 (1974), to argue that SB1 and SB150

do not discriminate on the basis of sex.  TN-Br. 32, 41-42; KY-Br. 21, 28-29.  The

motions panel tentatively agreed.  Stay-Op. 13.  In *Dobbs*, the Supreme Court

declined to apply heightened scrutiny to a State's regulation of abortion.  142 S. Ct.

at 2245-2246.  The law on its face did not discriminate based on sex, see *id.* at

2243, and the Court held that while abortion is a "medical procedure that only one

sex can undergo," that fact alone was insufficient to "trigger heightened

constitutional scrutiny," *id.* at 2245-2246.  Likewise, in *Geduldig*, the Court

declined to apply heightened scrutiny to a state law that excluded from disability-

insurance coverage "certain disabilities resulting from pregnancy."  417 U.S. at

486.  The law on its face did not discriminate based on sex, see *id.* at 489, and the

Court held that "[w]hile it is true that only women can become pregnant," that fact

alone did not trigger heightened scrutiny, *id.* at 486 n.20.

Defendants' reliance on *Dobbs* and *Geduldig* is misplaced.  Unlike the

facially neutral laws at issue in those cases, SB1 and SB150 facially discriminate

based on sex.  Indeed, the States cannot even describe the banned procedures

without using the words "man, woman, sex (or some synonym)."  *Bostock*, 140 S.

Ct. at 1746.  When, as here, a law on its face discriminates based on sex,

- 35 -

heightened scrutiny is warranted, and nothing in *Dobbs* or *Geduldig*—neither of which involved a facially discriminatory law—suggests otherwise.

*Geduldig* also is of no help to the States in avoiding the conclusion that SB1 and SB150 independently warrant heightened scrutiny because they discriminate based on transgender status. The States point to language in *Geduldig* describing a "lack of identity" between pregnancy and sex because "members of both sexes" were in the nonpregnant group. 417 U.S. at 496 n.20. They claim a similar lack of identity here because not all transgender minors seek the banned treatments. TN-Br. 41-42; KY-Br. 28-29. But in *Geduldig*, as in *Dobbs*, "men and women were treated the same: *nobody* had [disability-insurance] coverage for pregnancy," *Ladapo*, 2023 WL 3833848, at *10 (emphasis added), or the ability to obtain prohibited abortions.

Here, in contrast, transgender patients are barred from receiving treatments that are available to non-transgender patients. As the *Skrmetti* court explained, such a facially discriminatory law triggers heightened scrutiny even if it does not affect all members of the protected class. For example, "a law that said that 'no Black individuals can attend graduate school'" is obviously discriminatory even though "there are Black individuals who do *not* want to attend graduate school." TN-Op., R.167, SPageID#2674. So too here: Under the challenged laws, "the only group of individuals that are denied treatment are transgender persons," which

means that "it is not relevant that some transgender persons" may choose not to seek those treatments.  TN-Op., R.167, SPageID#2674.

Finally, unlike laws regulating abortion or pregnancy, SB1 and SB150 regulate medical procedures that *all* individuals can undergo.  Healthcare providers cannot perform an abortion on a cisgender man, but they *can* "[p]rescrib[e], administer[], or dispens[e]  *  *  *  puberty blockers or hormone[s]" to any person regardless of their sex assigned at birth (or their gender identity).  *E.g.*, Tenn. Code Ann. § 68-33-102(5)(B).  But SB1 and SB150 bar healthcare providers from prescribing testosterone to minors whose sex assigned at birth is female, while allowing them to prescribe the exact same testosterone to minors whose sex assigned at birth is male—and the same in reverse for estrogen.  See *id.* § 68-33-103(a)-(b); Ky. Rev. Stat. § 311.372(2)(a)-(b).

Tennessee protests that the procedures are not the same because the "benefit-risk calculation" of giving these medications to treat gender dysphoria is "not the same."  TN-Br. 36-37.  But that insistence, as the Eighth Circuit explained, "conflates the classifications drawn by the law with the state's justification for it." *Brandt*, 47 F.4th at 670.  (That justification, in any event, is not supported by the record.  See Section B.4.a.iv, *infra*.)

> c.    *Physiological Differences Between Sexes Are Irrelevant To Determining The Level Of Scrutiny*

That physiological differences exist between sexes does not mean that the rational-basis standard applies to sex-based classifications in the healthcare context.  See TN-Br. 34; KY-Br. 26-27.  Indeed, the Court developed intermediate (and not strict) scrutiny precisely because "[p]hysical differences between men and women * * * are enduring." *Virginia*, 518 U.S. at 533.  Accordingly, equal-protection analysis already accounts for physiological differences between sexes at the second step of the inquiry, which considers whether the States' justification for the law is "exceedingly persuasive." *Ibid.*[10]  Thus, the States' reliance on *Nguyen* v. *INS*, 533 U.S. 53, 60, 64 (2001), is misplaced.  There the Court applied heightened scrutiny to a sex-based classification and then held the law was *justified* because of the physiological differences between men and women.  Because SB1 and SB150 draw sex-based distinctions, heightened scrutiny likewise applies here.

> d.    *Heightened Scrutiny Is Consistent With The Proper Role Of Courts Applying The Equal Protection Clause*

The motions panel suggested that SB1 and SB150 do not violate "the original fixed meaning" of the Equal Protection Clause and questioned "whether

---

[10]  Nor is a State at risk of violating the Equal Protection Clause by regulating urologists, gynecologists, or other doctors in sex-specific specialties.  See TN-Br. 8, 37.  A hypothetical (if odd) prohibition against doctors performing in vitro fertilization on people who lack uteruses, while allowing the same for

the people of this country ever agreed to remove debates" about gender-affirming care from "the democratic process." Stay-Op. 6. But much the same argument could have been made against applying heightened scrutiny to laws that "withhold from women opportunities accorded men." *Virginia*, 518 U.S. at 531. Such laws were commonplace when the Fourteenth Amendment was ratified and for more than a century thereafter. *Ibid.* Yet it is now uncontroversial that the Equal Protection Clause demands "an exceedingly persuasive justification" for any "gender-based government action." *Ibid.* (citation omitted). The lesson is that the "original fixed meaning" of the Equal Protection Clause (Stay-Op. 6) is defined not by the particular applications foreseen by its framers, but instead by the principle of equal treatment embodied in its text. Cf. *Bostock*, 140 S. Ct. at 1750-1751 (rejecting a similar appeal to Title VII's "expected applications").

Nor is heightened scrutiny inconsistent with respect for the "democratic process." Stay-Op. 6. In most contexts, the Constitution presumes "that even improvident decisions will eventually be rectified by the democratic process." *Cleburne Living Ctr.*, 473 U.S. at 440. But the Equal Protection Clause's premise is that courts must take a different approach to lines based on race, gender, and

---

people who have uteruses, would not deny equal protection—at the very least because there would be an exceedingly persuasive justification for withholding such care. A person without a uterus does not have the anatomy required for such a procedure.

other suspect classifications.  As our Nation's history makes all too clear, such distinctions are both pernicious and "unlikely to be soon rectified by legislative means."  *Ibid.*  Accordingly, when States draw distinctions based on suspect classifications, the Constitution gives courts not just the power but the duty to carefully scrutinize their proffered justifications.

For much the same reason, the motions panel erred in suggesting that applying heightened scrutiny to classifications based on transgender status would improperly enmesh the judiciary in policy questions.  Stay-Op. 12.  And the panel's concerns about "sports" and "bathrooms" (Stay-Op. 12), were particularly misplaced, because there is no dispute that intermediate scrutiny applies in those contexts.  The government is unquestionably drawing sex-based lines when it establishes sex-specific bathrooms or sports teams.  Accordingly, even courts that have rejected equal-protection challenges to laws preventing transgender individuals from using the bathrooms or participating on sports teams consistent with their gender identity have recognized that such policies are "subject to intermediate scrutiny" because they "classif[y] on the basis of biological sex." *Adams*, 57 F.4th at 803; see, *e.g.*, *B.P.J.* v *West Virginia State Bd. of Educ.*, 2023 WL 111875, at *6 (S.D. W. Va. Jan. 5, 2023), appeal pending, No. 23-1078 (4th Cir. filed Jan. 24, 2023).

4.     *Neither District Court Abused Its Discretion In Finding That SB1 And SB150 Are Unlikely To Survive Heightened Scrutiny*

To satisfy heightened scrutiny, defendants bear the "demanding" burden of showing that "the [challenged] classification serves important governmental objectives" and that it is "substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533.  This justification must be "exceedingly persuasive." *Mississippi Univ. for Women* v. *Hogan*, 458 U.S. 718, 724 (1982) (citation omitted).  Accordingly, the justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation" and "must not rely on overbroad generalizations." *Virginia*, 518 U.S. at 533; accord *Communities for Equity* v. *Michigan High School Athletic Ass'n*, 459 F.3d 676, 692 (6th Cir. 2006).

SB1 and SB150 cannot survive heightened scrutiny for two reasons.  First, the evidence does not support defendants' assertion that the laws are necessary to protect the health and welfare of minors.  Second, the statutes are not substantially related to these asserted interests because defendants' criticisms against gender-affirming care could be leveled against countless other pediatric treatments, and because the statutes allow non-transgender minors to access the very same care that they deny to transgender minors.  Indeed, SB1 and SB150 are so overinclusive, underinclusive, and arbitrary in pursuing defendants' asserted interests that they cannot survive even rational-basis review.

- 41 -

### a. Evidence Does Not Support Defendants' Justifications For SB1 And SB150

Defendants contend that SB1 and SB150 are necessary to protect the health and welfare of minors because, in their view, evidence is lacking that the efficacy of puberty blocker and hormone therapies in treating gender dysphoria outweighs the risks associated with such interventions. TN-Br. 43; KY-Br. 32. Neither district court clearly erred in finding that the evidence does not support defendants' view.[11]

### i. The Medical Community Supports The Use Of Puberty Blockers And Hormone Therapies To Treat Gender Dysphoria

A strong consensus within the medical community supports the use of puberty blockers and hormone therapies to treat gender dysphoria. As the *Skrmetti* court recognized, WPATH and the Endocrine Society have each "published widely accepted guidelines for treating gender dysphoria" that "are based on scientific research and clinical experience." TN-Op., R.167, SPageID#2692. Those guidelines endorse the use of puberty blockers and hormone therapies to treat gender dysphoria only after the onset of puberty and subject to rigorous conditions.

---

[11] Kentucky also states that SB150 is necessary to "protect[] the integrity and ethics of the medical profession" (KY-Br. 32 (citation omitted)), but it says nothing further about that asserted interest. In any event, the *Thornbury* court did not clearly err in finding that SB150 undermines that interest by "prevent[ing] doctors from acting in accordance with the applicable standard of care." KY-Op., R.61, TPageID#2307.

Janssen, R.31, SPageID##357-359; Kingery Decl. (Kingery), R.17-3,

TPageID##240-242; see also pp. 8-9, *supra*.

And as both district courts found, "every major medical organization to take

a position on the issue," including the AAP and the AMA, "agrees that puberty

blockers and cross-sex hormone therapy are appropriate and medically necessary

treatments for adolescents when clinically indicated."  TN-Op., R.167,

SPageID##2707-2708; accord KY-Op., R.61, TPageID#2309.

That medical-community consensus is based upon numerous observational

studies showing that puberty blockers and hormone therapies reduce distress and

suicidal ideation among patients with gender dysphoria.  Adkins, R.29,

SPageID#261; Janssen, R.31, SPageID##360-362; Turban, R.32, SPageID##384-

386, 388-389; Shumer Decl. (Shumer), R.17-1, TPageID##152, 155, 168-171,

Janssen Decl., R.17-2, TPageID##205-207; Kingery, R.17-3, TPageID##248, 250;

see also *Brandt*, 47 F.4th at 670 (finding "substantial evidence" that gender

affirming care is supported by the recognized standard of care and rigorous

medical study).  Moreover, these are not novel treatments.  Puberty blockers have

been used to treat precocious puberty for more than 30 years and gender dysphoria

for almost 20 years.  Adkins Rebuttal, R.141, SPageID#2390; Kingery,

TPageID#246.

ii.   The *Skrmetti Court Did Not Clearly Err In Treating
       Defendants' Experts With Skepticism*

Defendants' attempts to challenge the consensus within the medical

community are unpersuasive in part because they did not put forward credible

experts.  The *Skrmetti* court found Dr. Cantor and Dr. Hruz "minimally persuasive"

because "neither of them state that they have ever diagnosed or treated a minor

with gender dysphoria."  TN-Op., R.167, SPageID#2690.  For the same reason,

other courts have accorded little weight to these same experts' opinions concerning

treatment of gender dysphoria.  See *Ladapo*, 2023 WL 3833848, at *2 n.8; *Kadel*

v. *Folwell*, 620 F. Supp. 3d 339, 364 (M.D.N.C. 2022); *Eknes-Tucker*, 603 F.

Supp. 3d at 1142-1143.[12]

And although the *Skrmetti* court did not discount the opinions of Dr. Laidlaw

or Dr. Levine, it noted that other courts have treated their testimony with a "dose of

skepticism."  TN-Op., R.167, SPageID#2691 n.40; see also *C.P.* v. *Blue Cross*

*Blue Shield of Ill.*, No. 3:20-cv-6145, 2022 WL 17092846, at *4 (W.D. Wash. Nov.

21, 2022) (finding whether to allow Dr. Laidlaw to testify regarding gender-

affirming care "a close question" given his minimal experience treating either

---

[12]   Similarly, Dr. Nangia assumes based on a review of case files that she has
treated patients who have gender dysphoria, but she does not claim to have actually
treated anyone for that condition.  Nangia Decl., R.113-8, SPageID#1652; Janssen
Rebuttal, R.143, SPageID#2422.

minors or patients with gender dysphoria); *Edmo* v. *Idaho Dep't of Corr.*, 358 F.

Supp. 3d 1103, 1125-1126 (D. Idaho 2018) (noting that "Dr. Levine is considered

an outlier in the field of gender dysphoria"), aff'd in relevant part, 935 F.3d 757

(9th Cir. 2019).  An expert can of course provide an admissible opinion that runs

contrary to the mainstream in their field.  But an expert opinion that departs from

the views of every major medical organization must be persuasive indeed.

Defendants' experts fall well short of the mark.[13]

> ### iii.    The District Courts Did Not Clearly Err In Rejecting Defendants' Criticisms Of The Research Supporting Gender-Affirming Care

Even taking defendants' evidence at face value, neither district court clearly

erred in finding that the record does not substantiate their stated concerns about

gender-affirming care.

**Quality of Evidence.**  Defendants generally critique the WPATH and

Endocrine Society guidelines because they are based on uncontrolled observational

studies, which defendants assert yield evidence that is considered lower quality

than the kind derived from randomized, placebo-controlled trials.  TN-Br. 14; see

also KY-Br. 4-5.  But as the *Skrmetti* court found, the WPATH and Endocrine

Society guidelines "are not unique in that respect," and their foundation in

---

[13]  Dr. Cantor, Dr. Laidlaw, Dr. Levine, and Dr. Nangia all submitted expert declarations in *Thornbury* as well.

observational data is "not itself a reason to find [them] unreliable."  TN-Op.,
R.167, SPageID#2693.  As plaintiffs' experts explained, "[r]ecommendations for
pediatric care made by professional associations in guidelines are seldom based on
well-designed and conducted randomized controlled trials."  Antommaria, R.30,
SPageID#293; accord Goodman Rebuttal, R.52-2, TPageID#1725; see also *Brandt*,
47 F.4th at 671 (noting that "hormone treatments have been evaluated in the same
manner as other medical interventions" and that several studies have shown their
"statistically significant positive effects" on adolescents with gender dysphoria).

Indeed, as the *Skrmetti* court found, the vast majority of the American Heart
Association's guidelines for Pediatric Basic and Advanced Life Support are not
supported by randomized trials.  TN-Op., R.167, SPageID#2693.  Over half of all
pediatric practice guidelines are based on observational studies or other
alternatives to randomized trials.  Goodman Rebuttal, R.52-2, TPageID#1725.  In
fact, the Food and Drug Administration (FDA) approved the use of certain puberty
blockers to treat precocious puberty based on observational studies, not
randomized trials.  Antommaria Rebuttal, R.142, SPageID##2405-2406.

There are several reasons for the lack of evidence from randomized trials
supporting gender-affirming care.  Conducting randomized trials on minors with
gender dysphoria would be "unethical" because that would require withholding
treatment from some participants when observational studies already establish that

"pharmacological treatment is superior" to the alternative.  Antommaria, R.30, SPageID##298-299; accord Goodman Rebuttal, R.52-2, TPageID##1724-1725. For the same reason, any randomized trial concerning such interventions likely would struggle to enroll "a sufficient number of participants."  Antommaria, R.30, SPageID#299.  Even if such studies were ethical and sufficiently enrolled, "it would be impossible to blind the investigators or the participants to whether the participants were receiving the active treatment or a placebo" due to the "physical changes  *  *  *  or lack thereof" associated with puberty blockers and hormone therapies.  Antommaria, R. 30, SPageID#299.

**"Off-Label" Drug Use.**  Tennessee also attempts to justify SB1 by noting that the use of puberty blockers or hormones to treat gender dysphoria is "off-label," meaning that the FDA has not approved those medications for that particular use.  TN-Br. 26-28.  In its stay order, the motions panel provisionally found that argument persuasive, stating that banning the "off-label" use of a drug is "well within a State's police power."  Stay-Op. 9.  But that is not necessarily true where, as here, the ban triggers heightened scrutiny under the Equal Protection Clause.  And although States undoubtedly have an interest in protecting minors' health and welfare, the mere "off-label" status of the banned treatments does not support the States' assertion that they are unsafe.

The motions panel mistakenly inferred that the *absence* of FDA approval of puberty blockers and hormone therapies to treat gender dysphoria means that "medical and regulatory authorities are not of one mind" about these treatments. Stay-Op. 7, 9. This absence implies no such conflict. FDA does not *sua sponte* engage in a review of all drugs for all potential uses. Instead, a sponsor must submit a new drug application expressly asking the FDA to approve a particular use. See 21 U.S.C. 355(a) and (d); 21 C.F.R. Pt. 314. A particular use may lack FDA approval for reasons entirely unrelated to a medication's safety and efficacy. For example, even where there is ample evidence supporting a drug's effectiveness for a new use and no apparent safety concerns, a sponsor may elect not to file an application with the FDA to market the drug for that use because doing so is not economically viable. Christopher M. Wittich et al., *Ten Common Questions (and Their Answers) About Off-Label Drug Use*, 87 Mayo Clinic Proc. 982, 985 (2012), https://perma.cc/2YHU-LLLJ.

The *Skrmetti* court specifically addressed this point: "off-label use of medications does not itself indicate that there are greater risks associated with those uses than when used for the purpose that is approved by the FDA—or that the FDA has even considered such risks." TN-Op., R.167, SPageID#2711. The FDA itself explains that "once the [agency] approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is

medically appropriate for their patient." *Understanding Unapproved Use of Approved Drugs "Off Label,"* U.S. Food & Drug Admin. (2018), https://perma.cc/A9DG-ML23. As the *Skrmetti* court found, "off-label" use of drugs "is common in medicine generally and particularly in pediatrics." TN-Op., R.167, SPageID##2710-2711 (quoting Turban, R.32, SPageID#383); accord Karasic Rebuttal, R.52–4, TPageID#1899. For example, guidelines recommend that diabetic patients take aspirin to prevent cardiovascular disease, even though the FDA has not approved that use of the medication. Wittich et al., 87 Mayo Clinic Proc. at 983.

**International Developments.** Defendants also highlight developments in the United Kingdom, Sweden, Finland, and Norway regarding gender-affirming care for minors, including calls for additional research and limits on access to this care. TN-Br. 15; KY-Br. 5-6. But, as the *Skrmetti* court found, "none of these countries have gone so far as to ban hormone therapy entirely," as SB1 and SB150 do. TN-Op., R.167, SPageID#2704 n.53; see also Antommaria, R.30, SPageID#309; Karasic Rebuttal, R.52-4, TPageID#1886. To the contrary, one of the reports Dr. Cantor relies on calls for *increasing* the number of clinics in the United Kingdom providing gender-affirming care in accordance with the Endocrine Society's clinical practice guidelines. Karasic Rebuttal, R.52-4, TPageID#1886; see also *Brandt*, 47 F.4th at 671 (noting that a Finnish medical

body has made recommendations concerning treatment of gender dysphoria that "closely mirror the standards of care laid out by [WPATH] and the Endocrine Society").

Regardless, as the *Skrmetti* court found, "mere existence of particular European practices" that differ from the consensus approach to treating gender dysphoria in the United States does not call into question the safety or efficacy of puberty blockers and hormone therapies. TN-Op., R.167, SPageID#2704. That is particularly true when defendants have made no "attempt to persuade the Court that the bases (clinical or otherwise) of certain European practices are highly persuasive." TN-Op., R.167, SPageID#2704.

iv.    *Defendants Identify No Risks That Outweigh The Benefits Of The Banned Treatments*

Defendants' briefs devote little space to discussing specific medical risks they associate with the treatments banned by SB1 and SB150. In fact, Tennessee candidly frames the *intended effect* of gender-affirming care as the medical risk that SB1 seeks to avoid. TN-Br. 36-37. That is a normative, not an empirical, judgment. No amount of medical research concerning the safety and efficacy of gender-affirming care could disprove Tennessee's subjective and unsubstantiated view that treating gender dysphoria with puberty blockers or hormone therapies produces a "diseased state" in patients. TN-Br. 35-36.

To the limited extent that defendants identify any specific risks associated with puberty blockers or hormone therapies, they do not justify SB1 or SB150. As the *Skrmetti* court recognized, gender-affirming care, like "virtually all medical procedures * * * carries with it the risk of negative side effects."  TN-Op., R.167, SPageID#2703.  But defendants' evidence highlights no risk that would justify a categorical ban of such care.

**Fertility.**  Tennessee focuses most on the risk of infertility (or what it characterizes as "sterilization") associated with gender-affirming care.  TN-Br. 11-12, 29-30, 54.  But, as the *Skrmetti* court found, the "record overwhelmingly demonstrates that many individuals receiving puberty blockers or cross-sex hormones will remain fertile for procreation purposes, and that the risk of negative impacts on fertility can be mitigated."  TN-Op., R.167, SPageID#2697.  Those findings are amply supported.  See Antommaria, R.30, SPageID##303-304 ("Transgender men and women are also capable of producing eggs and sperm respectively both during and after the discontinuation of gender-affirming hormone treatment."); Adkins Rebuttal, R.141, SPageID#2398 ("Pregnancy among trans men after undergoing testosterone therapy is very common."); Janssen, R.31, SPageID#362 (stating that a patient who shifts from treatment with puberty blockers to hormone therapy might first "preserve their sperm or eggs for future assisted reproduction by stopping puberty suppression briefly before initiating

gender affirming hormones"). Accordingly, there is zero basis for Tennessee's offensive characterization of "castration" as "the surgical analog" of hormone therapies. TN-Br. 30.

**Cardiovascular Disease.** Tennessee also (briefly) mentions certain cardiovascular risks associated with hormone therapies. TN-Br. 12-13. But as the district court found, any such risk for transgender women is usually present "only * * * when a patient is denied care and self-administers the treatment without appropriate clinical supervision." TN-Op., R.167, SPageID#2701 (quoting Adkins Rebuttal, R.141, SPageID##2395-2396). Thus, SB1 and SB150 make risk of cardiovascular disease *more*, not less, acute by increasing the likelihood of adolescents "resort[ing] to other methods of accessing care that include buying medication from unauthorized suppliers and using medication that they get from friends." Lacy Decl., R.28, SPageID#243.

**Other Risks.** The *Skrmetti* court also made detailed findings regarding each of the other purported risks associated with gender-affirming care that Tennessee mentions only fleetingly. TN-Br. 11-13. As the district court found, defendants' own expert admitted that the evidence concerning the effect of puberty blockers on bone density "remains limited and conflicting," while plaintiffs put forward evidence showing that there are no adverse effects on bone mineralization for patients taking puberty blockers for the time interval that patients with gender

dysphoria actually take them.  TN-Op., R.167, SPageID#2700 (quoting Levine

Decl. (Levine), R.113-5, SPageID#1456).

Similarly, the district court found that defendants' own expert admitted that

there have been "no substantial studies to identify" any impact on brain

development by gender-affirming care, and plaintiffs' experts state that there is no

evidence of any such effect.  TN-Op., R.167, SPageID#2697 (quoting Cantor

Decl., R.113-3, SPageID#1186).  The court also found that Dr. Levine "cites

[neither] studies nor research in support of" his contention that gender-affirming

care results in sexual dysfunction, while the WPATH and Endocrine Society

guidelines state the opposite.  TN-Op., R.167, SPageID##2699-2700.  Finally, the

court found that the "weight of the evidence" does not support the conclusion that

hormone therapies increase the risk of cancer.  TN-Op., R.167, SPageID#2703.

**"Desistance."**  Defendants also attempt to argue that any risk associated

with gender-affirming care—however rare or speculative—cannot be tolerated

because, in their view, many minors with gender dysphoria will not persist (*i.e.*,

will "desist[]") in experiencing that condition in adulthood.  TN-Br. 12, 54; KY-

Br. 33.  That position obscures the difference between minors with gender

dysphoria in early childhood versus adolescence.  Defendants' experts highlight

studies showing that "[v]ery few gender dysphoric *children* still want to transition

by the time they reach adulthood."  Hruz Decl., R.113-4, SPageID##1305-1306

(emphasis added); accord Levine, R.47-11, TPageID#1320.  But research shows that "[o]nce a transgender youth begins puberty, it is rare for them to later identify as cisgender."  Turban, R.32, SPageID#390; accord Karasic Rebuttal, R.52-4, TPageID#1875.

This distinction between early childhood and adolescence is significant because, as the *Thornbury* court found, "[i]t is undisputed that puberty-blockers and hormones are not given to prepubertal children with gender dysphoria." KY-Op., R.61, TPageID#2302; accord Janssen, R.31, SPageID#357; Shumer, R.17-1, TPageID#160.  In other words, the patients who are eligible to receive the treatments at issue are the ones who research shows are highly likely to persist in their gender incongruence or gender dysphoria.

**Benefits.**  To the extent that defendants identify any risks unique to treating gender dysphoria with puberty blockers or hormone therapies that cannot be effectively mitigated—and they do not—they ignore the countervailing evidence of the treatments' substantial benefits.  As both district courts found, "treatment for gender dysphoria lowers rates of depression, suicide, and additional mental health issues faced by transgender individuals."  TN-Op., R.167, SPageID#2706; accord KY-Op., R.61, TPageID#2311 (finding that SB150 "would eliminate treatments that have already significantly benefited six of the seven minor plaintiffs and prevent other transgender children from accessing these beneficial treatments in

the future"). Those findings are bolstered by the numerous observational studies demonstrating the efficacy of the banned treatments in reducing distress and suicidal ideation among patients with gender dysphoria. See p. 42, *supra*. Even defendants do not seriously dispute that puberty blockers and hormone therapies are medically necessary for *some* transgender minors. Indeed, one of defendants' own experts sometimes treats his patients' gender dysphoria using the banned interventions. Levine, R.113-5, SPageID#1397. Yet SB1 and SB150 bar these treatments of gender dysphoria in *all* instances—highlighting the laws' overinclusive reach.

> b.  *Neither District Court Clearly Erred In Finding That SB1 And SB150 Are Not Substantially Related To Achieving The States' Asserted Interests*

Even if defendants had put forward important government objectives underlying SB1 and SB150, neither district court erred in finding that the statutes are not substantially related to furthering those objectives. As the courts found, "the medical procedures banned by [the statutes] because they are purportedly unsafe to treat gender dysphoria in minors * * * are not banned when provided to treat other conditions." TN-Op., R.167, SPageID#2709; accord KY-Op., R.61, TPageID#2306. Indeed, SB1 and SB150 contain exclusions that expressly permit

the banned procedures for conditions other than gender dysphoria.  Tenn. Code
Ann. § 68-33-103(b)(1)(A); Ky. Rev. Stat. § 311.372(3)(a)-(b).

Plaintiffs' experts explain that puberty blockers are routinely used to treat
precocious puberty and delay puberty for patients undergoing chemotherapy or to
preserve fertility for patients with hormone-sensitive cancers.  Adkins, R.29,
SPageID#260; Kingery, R.17-3, TPageID#246.  And hormone therapies are used,
sometimes on a lifelong basis, to treat a range of conditions other than gender
dysphoria, including certain intersex conditions.[14]  Adkins, R.29, SPageID##262-
263; Adkins Rebuttal, R.141, SPageID##2397-2398; Kingery, R.17-3,
TPageID#249.  According to plaintiffs' experts, "the risks related to hormone
therapy and puberty suppression generally do not vary based on the condition they
are being prescribed to treat."  Adkins, R.29, SPageID#263.

Nor are the statutes substantially related to the States' purported concerns
regarding the lack of randomized trials evaluating the use of puberty blockers and
hormone therapies to treat gender dysphoria and the absence of FDA approval for
those uses.  As explained above, see pp. 44-48, *supra*, many widely accepted
treatments—particularly in pediatrics—also are based on evidence from
observational studies and involve "off-label" drug uses.  Similarly, Tennessee's

---

[14]  Intersex conditions include those subject to exemptions in SB1 and
SB150.  See Tenn. Code Ann. § 68-33-102(1); Ky. Rev. Stat. § 311.372(3)(a)-(b).

unsubstantiated belief that minors are incapable of making informed medical decisions with their parents or guardians (see Tenn. Code Ann. § 68-33-101(h)) would apply with equal force to nearly any pediatric treatment, not gender-affirming care alone.

The absence of a reasonable "fit" between Tennessee's stated concerns and SB1's ban rightly led the *Skrmetti* court to find that "SB1 objectively is severely underinclusive." TN-Op., R.167, SPageID#2713; see also KY-Op., R.61, TPageID##2306-2308 (finding that SB150 is not "substantially related" to achieving Kentucky's stated objectives).

> c.    *SB1 And SB150 Also Fail Rational-Basis Review*

In fact, SB1 and SB150 are so poorly tailored to the States' purported interests that they cannot survive even rational basis review. Under that standard, there must be a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller* v. *Doe*, 509 U.S. 312, 320 (1993). The relationship between the classification and the asserted goal cannot be "so attenuated as to render the distinction arbitrary or irrational." *Cleburne Living Ctr.*, 473 U.S. at 446. For example, in *Eisenstadt* v. *Baird*, 405 U.S. 438 (1972), the Supreme Court found a Sate's attempt to justify on safety grounds a law barring only unmarried people from obtaining contraceptives was "illogical to the point of irrationality" because "the same physician who can prescribe for married

patients * * * ha[s] sufficient skill to protect the health of patients who lack a marriage certificate." *Id.* at 451 (citation omitted).

As the *Skrmetti* court found, SB1 is "arbitrary" in denying transgender minors the same care that it permits non-transgender minors to receive (TN-Op., R.167, SPageID#2710), and SB150 is no different. Indeed, both laws expressly permit intersex minors to receive this care, regardless of whether it carries the same risks for these minors. Tenn. Code Ann. § 68-33-103(b)(1)(A); Ky. Rev. Stat. § 311.372(3)(a)-(b). SB1 and SB150 also are not rationally related to any legitimate state interest because they "impos[e] a broad and undifferentiated disability on a single named group" in a manner that is "discontinuous with the reasons offered for" them. *Romer* v. *Evans*, 517 U.S. 620, 632 (1996). Although SB1 and SB150 do not expressly name transgender minors, they do so by unmistakable proxy. See pp. 24-25, *supra*; cf. *Bray* v. *Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). And for the reasons previously mentioned, see Section B.4.b, *supra*, the statutes' restrictions that apply only to transgender minors are utterly "discontinuous" with defendants' asserted justifications for them. *Romer*, 517 U.S. at 632.

- 58 -

*C.*     *Transgender Adolescents, Including The Minor Plaintiffs, Will Suffer*
         *Irreparable Harm Absent Injunctive Relief*

Both district courts found that, without injunctive relief, SB1 and SB150

would cause irreparable harm to transgender adolescents, including the minor

plaintiffs, in Tennessee and Kentucky.  TN-Op., R.167, SPageID#2717; KY-Op.,

R.61, TPageID#2311; see also *Brandt*, 47 F.4th at 671-672.  The courts did not

abuse their discretion.

Where, as here, "constitutional rights are threatened or impaired, irreparable

injury is presumed."  *Husted*, 697 F.3d at 436.  Additionally, continued

enforcement of SB1 and SB150 will cause transgender minors, including the minor

plaintiffs, to "suffer actual and imminent injury in the form of emotional and

psychological harm as well as unwanted physical changes" by denying them access

to puberty blockers and hormone therapies.  TN-Op., R.167, SPageID#2714;

accord KY-Op., R.61, TPageID#2311 ("If allowed to take effect, SB 150 would

eliminate treatments that have already significantly benefited six of the seven

minor plaintiffs and prevent other transgender children from accessing these

beneficial treatments in the future.").  Indeed, the record is replete with examples

of how transgender minors with gender dysphoria will suffer severe medical harm

- 59 -

if they must forgo gender-affirming care.  Adkins, R.29, SPageID##266-268;

Kingery, R.17-3, TPageID##251-253.  As plaintiff L.W. explains:

> Without this medication, my body will go through changes that I do
> not want and that do not feel good or right for a girl like me.  [SB1]
> would mean that I could not stop those changes, and I am terrified
> because I know some of them would be permanent.

L.W. Decl., R.22, SPageID#201.

The narrow and qualified carveouts in SB1 and SB150 for continuing

care do not alter the analysis.  See Tenn. Code Ann. § 68-33-103(b)(1)(B);

Ky. Rev. Stat. § 311.372(6).  As the *Skrmetti* court found, SB1's continuing-

care exception "comes with constraints" by limiting patients to receiving the

same types of treatment they are currently receiving and by effectively

requiring doctors to "titrate down their minor patients' medications" because

of the exception's March 2024 cutoff.  TN-Op., R.167, SPageID##2715-

2716; see also Lacy Reply Decl., R.140, SPageID#2383.  The same

constraints inhere in SB150's continuing-care exception, which expressly

requires titration of care.  Ky. Rev. Stat. § 311.372(6).

D.    *The Balance Of Harms And The Public Interest Favor An Injunction*

Neither district court abused its discretion in concluding that the balance of

the harms and the public interest weigh in favor of injunctive relief.  TN-Op.,

R.167, SPageID#2718; KY-Op., R.61, TPageID##2311-2312.  Although

defendants offer anecdotal evidence that some people experience regret after

- 60 -

receiving puberty blockers or hormone therapies to treat gender dysphoria (see, *e.g.*, Kershner Decl., R.113-12, SPageID#2041), plaintiffs' experts provide empirical evidence that that outcome is exceptionally rare (Antommaria, R.30, SPageID#307; Karasic Rebuttal, R.52-4, TPageID#1870).  And, in any event, the speculative risks of regret or negative side effects are outweighed by the concrete, ongoing, and sometimes life-threatening, harms that transgender adolescents, including the minor plaintiffs, will suffer *now* if SB1 and SB150 remain in effect. See Section C, *supra*.

The balance of the equities tips especially decisively in plaintiffs' favor in *Skrmetti*, where the United States represents the nation's interest in ensuring that Tennessee does not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., Amend. XIV, § 1; see also 42 U.S.C. 2000h-2.

E.   *This Court Should Remand To The District Court For Further Proceedings If It Is Not Satisfied With The Scope Of The* Skrmetti *Preliminary Injunction*

A district court "enjoys wide latitude when crafting the scope" of a preliminary injunction "to fit the equities of the case."  *Doster* v. *Kendall*, 54 F.4th 398, 441 (6th Cir. 2022).  Such relief must extend no further "than necessary to provide [a plaintiff] complete relief."  *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979).

Although Tennessee challenges the preliminary injunction issued by the *Skrmetti* court to remedy private plaintiffs' ongoing harms, the United States, as

plaintiff-intervenor, also moved for a preliminary injunction in that case. See U.S. PI Mot., R.40, SPageID##501-509. That motion remains pending in the district court. A statewide injunction against defendants' enforcement of SB1 is necessary to provide "complete relief" to the United States. See *Califano*, 442 U.S. at 702. If this Court holds that private plaintiffs lack standing or that the injunction is overly broad, the Court should remand to the district court to address the United States' motion and enter appropriate statewide relief.

The United States intervened in *Skrmetti* under Section 902 of the Civil Rights Act of 1964, 42 U.S.C. 2000h-2. Section 902 provides the Attorney General with a cause of action under the Equal Protection Clause that the Attorney General can institute as an intervenor. *Ibid.* To exercise this authority, the Attorney General must certify that the case is of "general public importance." *Ibid.* The statute makes clear that the United States is entitled to its own relief as plaintiff-intervenor (and separate from that of private plaintiffs). *Spangler* v. *United States*, 415 F.2d 1242, 1244 (9th Cir. 1969) (concluding that the text of Section 902 "certainly does not limit the United States  *  *  *  to the relief asked by the plaintiff").[15]

---

[15]  Tennessee thus manifestly errs in suggesting (TN-Br. 52 n.5) that the United States lacks standing or a cause of action to seek a statewide injunction. Once the United States intervenes under Section 902, it becomes a "party plaintiff" that can maintain an equal-protection claim, even if the court dismisses the original

Only a statewide injunction against the enforcement of SB1 would provide complete relief to the United States. The United States seeks not only to remedy the violation of private plaintiffs' equal-protection rights, but also to vindicate the national interest in ensuring the Constitution's guarantee of equal protection of the laws for all transgender minors in Tennessee. See *General Tel. Co. of the Nw., Inc.* v. *EEOC*, 446 U.S. 318, 326 (1980) (noting that when the United States uses its statutory civil rights authority "for the benefit of specific individuals, it acts also to vindicate the public interest"). For this reason, relief that is less than statewide in scope is insufficient to protect the United States' dual interests in *Skrmetti*.

---

plaintiffs' claims for mootness. *Pasadena City Bd. of Educ.* v. *Spangler*, 427 U.S. 424, 430-431 (1976); see also Intervention Op., R.108, SPageID##910-912 (citing *Spangler*, 415 F.2d at 1245). And the Supreme Court's precedents "establish" that Congress may "confer[] standing upon" the United States to enforce federal law "without infringing Article III of the Constitution." *Director, Off. of Workers' Comp. Programs* v. *Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 132-133 (1995).

# CONCLUSION

This Court should affirm the district courts' determinations that preliminary

injunctions enjoining defendants' enforcement of SB1 and SB150 are appropriate.

Respectfully submitted,

HENRY C. LEVENTIS
  United States Attorney
  Middle District of Tennessee

ELLEN BOWDEN MCINTYRE
RASCOE DEAN
  Assistant United States Attorney
  719 Church Street, Suite 3300
  Nashville, TN  37203
  (615) 736-5151


MICHAEL A. BENNETT
  United States Attorney
  Western District of Kentucky

JESSICA R. C. MALLOY
  Assistant United States Attorney
  717 West Broadway
  Louisville, KY  40202
  (502) 779-2765


CARLTON S. SHIER, IV
  United States Attorney
  Eastern District of Kentucky

CARRIE B. POND
  Assistant United States Attorney
  260 West Vine Street, Suite 300
  Lexington, KY  40507
  (859) 233-2661

KRISTEN CLARKE
  Assistant Attorney General

s/ Barbara A. Schwabauer
BONNIE I. ROBIN-VERGEER
BARBARA A. SCHWABAUER
JONATHAN L. BACKER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-3034

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing BRIEF FOR THE UNITED STATES AS INTERVENOR-APPELLEE IN NO. 23-5600 AND AMICUS CURIAE IN NO. 23-5609:

(1)  complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

(2)  complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared using Microsoft Word for Microsoft 365 in a proportionally spaced typeface (Times New Roman) in 14-point font.

s/ Barbara A. Schwabauer
Barbara Schwabauer
 Attorney

Date:  August 11, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2023, I electronically filed the foregoing

BRIEF FOR THE UNITED STATES AS INTERVENOR-APPELLEE IN

NO. 23-5600 AND AMICUS CURIAE IN NO. 23-5609 with the Clerk of the

Court for the United States Court of Appeals for the Sixth Circuit by using the

appellate CM/ECF system.  All participants in this case are registered CM/ECF

users, and service will be accomplished by the appellate CM/ECF system.

s/ Barbara A. Schwabauer
Barbara Schwabauer
 Attorney

**ADDENDUM**

## ADDENDUM DESIGNATING DISTRICT COURT DOCUMENTS

Appellee-Intervenor United States designates the following documents from

the electronic record in *L.W.* v. *Skrmetti*, No. 3:23-cv-376 (M.D. Tenn.):

| Record Entry Number | Description | PageID# Range |
|---|---|---|
| 1 | Complaint | 1-43 |
| 21 | Plaintiffs' Motion for a Preliminary Injunction | 191-195 |
| 22 | Declaration of L.W. | 196-201 |
| 28 | Declaration of Susan N. Lacy, M.D., FACOG | 239-245 |
| 29 | Expert Declaration of Deanna Adkins, MD | 246-284 |
| 30 | Expert Declaration of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C | 285-346 |
| 31 | Expert Declaration of Aron Janssen, M.D. | 347-378 |
| 32 | Expert Declaration of Jack Turban, M.D. | 379-410 |
| 38 | United States' Motion to Intervene | 460-467 |
| 40 | Plaintiff-Intervenor United States' Motion for a Preliminary Injunction | 501-506 |
| 108 | Memorandum Opinion and Order (United States' Motion to Intervene) | 908-914 |
| 113-3 | Expert Declaration of James Cantor, PhD | 1090-1279 |
| 113-4 | Expert Declaration of Paul W. Hruz, M.D., Ph.D | 1281-1390 |
| 113-5 | Expert Declaration of Stephen B. Levine, M.D. | 1392-1514 |

| 113-8 | Expert Declaration of Geeta Nangia, M.D. | 1627-1733 |
|---|---|---|
| 113-9 | Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, Int'l J. of Transgender Health (2022) (WPATH Standards of Care) | 1735-1994 |
| 113-10 | Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*,. J. Clinical Endocrinology & Metabolism (2017) (Endocrine Society Guidelines) | 1996-2030 |
| 113-12 | Declaration of Helena Kershner | 2039-2042 |
| 140 | Reply Declaration of Susan N. Lacy, MD, FACOG | 2383-2386 |
| 141 | Expert Rebuttal Declaration of Deanna Adkins, MD | 2387-2402 |
| 142 | Expert Rebuttal Declaration of Armand H. Matheny Antommaria, MD PhD, FAAP, HEC-C | 2403-2419 |
| 147 | Order (Motion to Proceed Pseudonymously) | 2532-2533 |
| 143 | Expert Rebuttal Declaration of Aron Janssen, M.D. | 2420-2429 |
| 167 | Memorandum Opinion (Motion for Preliminary Injunction) | 2656-2724 |

| 168 | Order on Motion for a Preliminary Injunction | 2725-2727 |
| 172 | Order (Motion for Stay) | 2747-2750 |

Amicus Curiae United States designates the following documents from the

electronic record in *Doe* v. *Thornbury*, No. 3:23-cv-230 (W.D. Ky.):

| Record Entry Number | Description | PageID# Range |
| --- | --- | --- |
| 1 | Plaintiffs' Motion for Leave to Proceed Pseudonymously and Incorporated Memorandum of Law | 1-8 |
| 2 | Complaint | 11-33 |
| 17 | Plaintiffs' Motion for Preliminary Injunctive Relief | 109-141 |
| 17-1 | Expert Declaration of Daniel Shumer, M.D. | 142-196 |
| 17-2 | Declaration of Aron Janssen, M.D. | 197-231 |
| 17-3 | Expert Declaration of Suzanne Kingery, M.D. | 232-279 |
| 37 | Statement of Interest of the United States | 427-447 |
| 38 | Order (Motion to Intervene) | 452-454 |
| 41 | Response to Plaintiffs' Motion for Preliminary Injunctive Relief by Defendants William C. Thornbury, Jr. M.D. and Audria Denker, R.N., in their Official Capacities | 478-480 |

| 42 | Response to Plaintiffs' Motion for Preliminary Injunctive Relief by Defendant Eric Friedlander in his Official Capacity as Secretary of the Cabinet for Health and Family Services | 481-482 |
|---|---|---|
| 47-11 | Expert Declaration of Stephen B. Levine, M.D. | 1276-1405 |
| 52-2 | Expert Rebuttal Declaration of Kenneth W. Goodman, Ph.D. | 1717-1804 |
| 52-4 | Expert Rebuttal Declaration of Dan H. Karasic, M.D. | 1856-1927 |
| 61 | Memorandum Opinion and Order (Motion for a Preliminary Injunction) | 2299-2313 |
| 79 | Order (Motion for Stay) | 2494-2496 |