Case No. 23-5609

# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

JANE DOE 1, *et al.*

*Plaintiffs-Appellees*

v.

WILLIAM C. THORNBURY, JR.,
in his official capacity, *et al.*

*Defendants-Appellees*

v.

COMMONWEALTH OF KENTUCKY *ex rel.*
ATTORNEY GENERAL DANIEL CAMERON

*Intervening Defendant-Appellant*

---

On Appeal from the U.S. District Court for the
Western District of Kentucky, No. 3:23-cv-230

---

# THE COMMONWEALTH OF KENTUCKY'S REPLY BRIEF

---

Daniel Cameron
 *Attorney General of Kentucky*
Victor B. Maddox
 *Deputy Attorney General*
Matthew F. Kuhn
 *Solicitor General*
Alexander Y. Magera
 *Assistant Solicitor General*

Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov

*Counsel for the Commonwealth of Kentucky*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

ARGUMENT ...................................................................................... 1

  I.   The plaintiffs are unlikely to succeed on the merits............................. 2

     A.  The parent-plaintiffs' substantive-due-process claim fails.............. 2

     B.  The plaintiffs' equal-protection claim is unlikely to succeed.......... 5

        1.  Rational-basis review applies. ..................................................... 5

        2.  No matter the level of scrutiny, SB 150 survives review. ....... 12

     C.  The plaintiffs have not established standing sufficient to receive a preliminary injunction. ....................................................... 19

  II.  The other preliminary-injunction factors favor the Commonwealth. ............ 20

  III.  At the very least, the preliminary injunction should be narrowed. .................. 22

CONCLUSION ................................................................................... 24

CERTIFICATE OF COMPLIANCE ..................................................... 26

CERTIFICATE OF SERVICE ............................................................. 27

# TABLE OF AUTHORITIES

## Cases

*Adams v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) (en banc) ...................................................... 11

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) .......................................................................... 23

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) ........................................................................................ 14

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020) .................................................................................. 6, 7

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
  142 S. Ct. 1002 (2022) .................................................................................... 22

*Commonwealth v. Biden*,
  57 F.4th 545 (6th Cir. 2023) .......................................................................... 23

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) .............................................................................. *passim*

*Doe 1 v. Thornbury*,
  --- F.4th ---, 2023 WL 4861984 (6th Cir. July 31, 2023).............................. 22

*Doe By & Through Doe v. Pub. Health Tr. of Dade Cnty.*,
  696 F.2d 901 (11th Cir. 1983) .......................................................................... 5

*Doe ex rel. Doe v. Governor of N.J.*,
  783 F.3d 150 (3d Cir. 2015) ........................................................................ 3, 5

*Doe v. Ladapo*,
  --- F. Supp. 3d ---, 2023 WL 3833848 (N.D. Fla. June 6, 2023) .................. 14

*Fair Elections Ohio v. Husted*,
  770 F.3d 456 (6th Cir. 2014)............................................................................ 20

*Geduldig v. Aiello*,
  417 U.S. 484 (1974)................................................................................... 5, 7, 8

*Gen. Elec. Co. v. Gilbert*,
  429 U.S. 125 (1976)..................................................................................... 6, 7

*Gonzales v. Carhart*,
    550 U.S. 124 (2007)................................................................4, 13, 14

*Indmar Prods. Co. v. Comm'r*,
    444 F.3d 771 (6th Cir. 2006).......................................................... 14

*J.E.B. v. Ala. ex rel. T.B.*,
    511 U.S. 127 (1994)...................................................................9, 10

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905)............................................................................ 4

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
    927 F.3d 396 (6th Cir. 2019)............................................................ 4

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022) .......................................................... 21

*L.W. ex rel. Williams v. Skrmetti*,
    73 F.4th 408 (6th Cir. 2023) .......................................................9, 21

*Loving v. Virginia*,
    388 U.S. 1 (1967)........................................................................9, 10

*Ondo v. City of Cleveland*,
    795 F.3d 597 (6th Cir. 2015)........................................................11, 12

*Online Merchs. Guild v. Cameron*,
    995 F.3d 540 (6th Cir. 2021)........................................................... 21

*Parham v. J.R.*,
    442 U.S. 584 (1979)......................................................................3, 4

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
    52 F.3d 1373 (6th Cir. 1995)........................................................... 12

*Pickup v. Brown*,
    42 F. Supp. 3d 1347 (E.D. Cal. 2012).............................................. 3

*Prince v. Massachusetts*,
    321 U.S. 158 (1944)......................................................................... 4

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983)........................................................................... 7

*Thompson v. DeWine*,
    976 F.3d 610 (6th Cir. 2020)........................................................... 22

*U.S. Citizens Ass'n v. Sebelius,*
705 F.3d 588 (6th Cir. 2013) ............................................................................ 5

*United States v. Virginia,*
518 U.S. 515 (1996) ........................................................................................ 10

*Washington v. Glucksberg,*
521 U.S. 702 (1997) .......................................................................................... 1

*Washington v. Reno,*
35 F.3d 1093 (6th Cir. 1994) ........................................................................... 25

## Statutes

Ky. Rev. Stat. § 311.372 ......................................................................... 8, 9, 20, 21

Ky. Rev. Stat. § 311.772 ....................................................................................... 8

Miss. Code Ann. § 41-41-191 ............................................................................. 8

## Other Authorities

Azeen Ghorayshi, *Medical Group Back Youth Gender Treatments but Calls for Research
Review*, N.Y. Times (Aug. 3, 2023) ............................................................... 23

Bernard Lane, *Doubt in Denmark*, Gender Clinic News (Aug. 13, 2023) ..................... 18

Rick Rojas & Anna Bets, *North Carolina Bans Transgender Care for Minors as Republicans
Override Veto*, N.Y. Times (Aug. 16, 2023) ................................................... 22

# ARGUMENT

Nearly every State in our union has weighed in on this consolidated case. Counting Kentucky and Tennessee, 42 States have taken a position here about whether giving puberty blockers and hormones to children with gender dysphoria helps or harms them. Twenty-one States agree with Kentucky and Tennessee that these treatments harm children. *See* Ala.Br. Nineteen States take the contrary view. *See* Cal.Br. This Court's own docket thus shows that "the States are currently engaged in serious, thoughtful examinations" about how best to protect children within their borders. *See Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).

The plaintiffs invite the Court to read one side of this policy debate into the Constitution. The question before the Court, however, is not which group of States is right as a medical and scientific matter. The question here is *who decides* what best protects children. Is it medical interest groups, as the plaintiffs say? Or is each State allowed to make this call for itself, as Kentucky argues? So framed, this question answers itself. The States play an indispensable, frontline role in regulating the practice of medicine within their borders. That the States sometimes disagree about the safety and efficacy of a given treatment is a feature of federalism. Senate Bill 150 is thus within the heartland of Kentucky's sovereign authority to protect children by regulating medical treatments that are unique to each sex.

I.    **The plaintiffs are unlikely to succeed on the merits.**

A.    **The parent-plaintiffs' substantive-due-process claim fails.**

The parent-plaintiffs claim a fundamental right "to make decisions about a child's medical treatment subject to established medical standards." Br.28. And by "established medical standards," the parent-plaintiffs mean the views of their favored medical interest groups to the exclusion of the States. The parent-plaintiffs therefore frame their alleged fundamental right at too "high [a] level of generality." *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2258 (2022). What the parent-plaintiffs really seek is a fundamental right to secure treatments for their children despite contrary state law. In their view, if enough medical interest groups say that a treatment is safe and effective, the Constitution outsources the regulation of medicine from the States to the interest groups.

For our Constitution to protect such a right, the parent-plaintiffs must show that it is "'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *See id.* at 2242 (citation omitted). Given this history-focused inquiry, one would expect the parent-plaintiffs' brief to be teeming with facts about our country's history and traditions. After all, the Supreme Court's most recent discussion of substantive due process reads in part like a history textbook. *See id.* at 2248–56. Yet the parent-plaintiffs' brief altogether avoids this "essential" "[h]istorical inquiry." *See id.* at 2247. It points to no history and no tradition of granting medical interest groups a veto over state law. That absence tells the Court all it needs to know.

Rather than discuss history and tradition, the parent-plaintiffs stake their claim on *Parham v. J.R.*, 442 U.S. 584 (1979). According to the parent-plaintiffs, they "assert the precise right the Supreme Court recognized in *Parham.*" Br.29. Not so. *Parham* did not involve parents seeking to ignore state law concerning medical treatment for their children. Rather, *Parham* concerned minors seeking to invalidate a state law that *allowed* the treatment their parents sought. 442 U.S. at 587, 590–91, 597. So the situation in *Parham* could not be more different. "In *Parham*, unlike here, parents and the state were on *the same side*; the Court was not deciding a contest between parents' and states' interests, but confirmed parents' right to make mental health decisions on behalf of their minor children but against the children." *Pickup v. Brown*, 42 F. Supp. 3d 1347, 1374 (E.D. Cal. 2012) (emphasis added), *aff'd* 740 F.3d 1208, 1235–36 (9th Cir. 2014).

As a result, when *Parham* made statements like parents have a "'high duty' to recognize symptoms of illness and to seek and follow medical advice," 442 U.S. at 602, it did so in the context of parents seeking medical treatment permitted by state law. *Parham* thus has no purchase here, where parents seek treatments prohibited by state law. More to the point, although *Parham* supports "parents hav[ing] decision-making authority with regard to the provision of medical care for their children," it "does not support the extension of this right to a right of parents to demand that the State make available a particular form of treatment." *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150,

3

156 (3d Cir. 2015) (*Doe N.J.*). Indeed, *Parham* itself recognized that "a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." 442 U.S. at 603.

*Parham* stood on sure ground in so holding. The States have "a wide range of power for limiting parental freedom and authority in things affecting the child's welfare." *Prince v. Massachusetts*, 321 U.S. 158, 167 (1944). Or as this Court has put it, "limitations on parents' control over their children are particularly salient in the context of medical treatment." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019). More generally, it is a "settled principle[ that] the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety." *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). That principle is no less "settled" when there is medical and scientific disagreement about whether a medical treatment is safe and effective. In fact, the States have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty."[1] *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). The

---

[1] The parent-plaintiffs dispute this aspect of *Gonzales* by noting that the decision declined to place "dispositive weight" on legislative factfinding "in the circumstances [t]here." 550 U.S. at 165. But such factfinding was still reviewed under a "deferential standard." *Id.* And in any event, "[c]onsiderations of marginal safety, including the balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends." *Id.* at 166.

4

parent-plaintiffs identify no authority to suggest that *Parham* upsets this established understanding of the States' sovereign prerogative to regulate the practice of medicine.

The parent-plaintiffs also cannot explain the incongruency between reading *Parham* to provide them a fundamental right and the fact that "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider." *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 599 (6th Cir. 2013) (citation omitted). That being so, "it would be odd if parents had a substantive due process right to choose specific treatments for their children—treatments that reasonably have been deemed harmful by the state—but not for themselves." *Doe N.J.*, 783 F.3d at 156 (citation omitted). As a result, a parent's "rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself." *Doe By & Through Doe v. Pub. Health Tr. of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983). Because there is no fundamental right to obtain a medical treatment reasonably prohibited by the State, it follows that parents have no fundamental right to obtain such treatment for their children.

### B.    The plaintiffs' equal-protection claim is unlikely to succeed.

#### 1.    Rational-basis review applies.

The overarching question raised by the plaintiffs' equal-protection claim is whether a law discriminates on the basis of sex by regulating a medical treatment or condition that is unique to each sex. The Supreme Court answered that question in the

5

negative almost fifty years ago in *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974). And it reaffirmed that holding just last year. *Dobbs*, 142 S. Ct. at 2245–46. The plaintiffs simply cannot avoid these holdings.

**a.** They first retreat to *Bostock v. Clayton County* for its Title VII reasoning that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 140 S. Ct. 1731, 1741 (2020). But the plaintiffs base their claim not on Title VII, but on the very differently worded Equal Protection Clause. And *Bostock* could not have been clearer that the particular text of Title VII drove its result. *See id.* (basing its holding on "the ordinary public meaning of [Title VII's] language at the time of its adoption").

The plaintiffs suggest that case law holds that the meaning of sex discrimination under Title VII and the Equal Protection Clause is the "same." Br.37. Their lead case for this proposition is *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976). But *Gilbert* does not help them. True, *Gilbert* says equal-protection case law is a "useful starting point" for interpreting Title VII. *Id.* at 133. But the plaintiffs seek something very different here: to use Title VII as a straitjacket in interpreting the Equal Protection Clause. And they seek to use a Title VII case (*Bostock*) that was uniquely driven by Title VII's text— text that the Equal Protection Clause lacks. As a result, *Gilbert* does not stand for the proposition that Title VII and the Equal Protection Clause are the "same." In fact, *Bostock*'s text-driven reasoning cannot help but unlink Title VII from the Equal Protection Clause.

*Gilbert* cuts against the plaintiffs for a more fundamental reason. There, the Court interpreted Title VII to incorporate the constitutional reasoning from *Geduldig*. It held under Title VII that "an exclusion of pregnancy from a disability-benefits plan providing general coverage is not a gender-based discrimination at all." *Id.* at 136. Of course, Congress later "overcame" *Gilbert* by amending Title VII. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 88–89 (1983). But what matters here is that the Supreme Court interpreted Title VII's unamended text to say that an employment policy affecting a medical condition only one sex can experience is not sex discrimination. And unlike with Title VII, Congress cannot simply amend the Equal Protection Clause to get around *Geduldig*'s reasoning.

The plaintiffs also cannot explain how *Bostock*'s reasoning could apply in the medical context. *Bostock* was clear about its scope: "An individual's homosexuality or transgender status is not relevant *to employment decisions*." *Bostock*, 140 S. Ct. at 1741 (emphasis added). But unlike the employment context, an individual's sex often affects medical treatment. That's why (for example) laws regulating abortion, which is a procedure that only women can undergo, "do[] not trigger heightened constitutional scrutiny unless the regulation is a mere pretext designed to effect an invidious discrimination against members of one sex or the other." *Dobbs*, 142 S. Ct. at 2245–46 (cleaned up) (quoting *Geduldig*, 417 U.S. at 496 n.20).

**b.** This brings us to the plaintiffs' attempt to distinguish *Geduldig* and *Dobbs* (to which they devote only a paragraph). The plaintiffs argue that "*Geduldig* did not consider

7

a facial classification based on sex, but rather what it viewed as a facially neutral pregnancy exclusion based on 'an objectively identifiable physical condition.'" Br.39 (citation omitted); *see also* U.S.Br.34–35. This argument fails for several reasons.

To begin with, SB 150 operates the same way the law did in *Geduldig*. Facially, the *Geduldig* law prohibited both men and women from obtaining disability insurance coverage related to pregnancy. 417 U.S. at 489 (quoting the law); *see also id.* at 496–97. Of course, only women can become pregnant, but the law did not facially distinguish between the sexes, a point on which the plaintiffs and the federal government agree. Br.39; U.S.Br.34–35. By like token, as a facial matter, SB 150 prohibits both boys and girls from being prescribed puberty blockers, testosterone, or estrogen for a specified purpose. Ky. Rev. Stat. § 311.372(2)(a)–(b). So just like in *Geduldig*, any differentiation between the sexes is not apparent based on SB 150's face. The differentiation arises only upon learning that as a matter of biology only boys can take estrogen to try to change their sex while only girls can take testosterone to try to change their sex.

The plaintiffs counter by noting that, unlike the law in *Geduldig*, SB 150 uses the word "sex." But *Dobbs* applied *Geduldig*'s reasoning to a statute that used the word "woman." Miss. Code Ann. § 41-41-191(3)(e), (f), (j); *see Dobbs*, 142 S. Ct. at 2243 n.14. Mississippi's law regulating abortion is no outlier. *E.g.*, Ky. Rev. Stat. § 311.772(3)(a) (prohibiting an elective abortion on a "pregnant woman"). The way *Dobbs* applied *Geduldig* could not be more sensible. It is unsurprising that SB 150 uses the word "sex" given that the law regulates medical procedures that only one sex can undergo. *See L.W.*

*ex rel. Williams v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023) ("The Act mentions the word 'sex,' true. But how could it not?"). The plaintiffs' argument that *Geduldig* and *Dobbs* only apply if the law does not mention sex thus makes no sense. The whole point of *Geduldig* and *Dobbs* is to allow the States to regulate medical procedures that only one sex can undergo. *Dobbs* could not have been clearer about this point: "The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a mere pretext designed to effect an invidious discrimination against members of one sex or the other." 142 S. Ct. at 2245–46 (citation omitted) (cleaned up).

**c.** The plaintiffs next acknowledge that SB 150 "applies to both transgender boys and girls." Br.38. But they view that equal treatment as proof positive of sex discrimination. To be clear, if SB 150 prohibited prescribing hormones to treat gender dysphoria for only boys or for only girls, the plaintiffs no doubt would view that as sex discrimination as well. (Their equal-protection argument with respect to such a statute would be far better.) But of course SB 150 does not target only one sex. It prohibits a medical treatment for each sex that is unique to that sex: excess testosterone for girls and excess estrogen for boys. Ky. Rev. Stat. § 311.372(2)(a)–(b). And that equal treatment demonstrates that it does not discriminate based on sex. Put more simply, SB 150 "does not prefer one sex to the detriment of the other." *L.W.*, 73 F.4th at 419.

The plaintiffs respond by invoking *Loving v. Virginia*, 388 U.S. 1 (1967), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). Those cases, they argue, show that the Equal

Protection Clause "protects individuals, not groups." Br.38. Kentucky of course has no quarrel with the notion that the Equal Protection Clause protects both women and men from sex discrimination. *United States v. Virginia*, 518 U.S. 515, 532–33 (1996). But that principle does not get the plaintiffs anywhere, given that SB 150 treats boys and girls the same.

The plaintiffs respond that a law's discrimination against one sex is not forgiven if the law also discriminates against the other sex. But this line of thinking presumes (wrongly) that SB 150 in fact discriminates based on sex. For example, in *Loving*, Virginia argued that its law was constitutional because it "punish[ed] equally" both white and black individuals who wish to marry. 388 U.S. at 8. The Supreme Court correctly rejected this argument given the "invidious" discrimination at issue.[2] *Id.* at 8–9. It reasoned that "the fact of equal application does not immunize the statute from the very heavy burden which the Fourteenth Amendment has traditionally required of state statutes *drawn according to race*." *Id.* at 9 (emphasis added). This principle does not apply here. Unlike in *Loving*, SB 150 does not invidiously discriminate in any respect, and the law's equal application to both sexes demonstrates as much.

---

[2] Invidious discrimination also drove the result in *J.E.B.* 511 U.S. at 140 ("The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.").

**d.** The plaintiffs also briefly argue that transgender status is a quasi-suspect class. Br.40–42. But this argument falters out of the gate because SB 150 does not discriminate based on transgender status. For one thing, not all transgender children suffer from gender dysphoria. Levine Decl., R.47-11, PageID#1300-01. Indeed, the plaintiffs' brief defines individuals with gender dysphoria as a subset of those who are transgender. Br.6. Even putting that aside, SB 150 distinguishes based on the use of puberty blockers and hormones, not based on transgender status. The law prohibits prescribing puberty blockers and hormones to treat gender dysphoria for all kids transgender or not, while allowing for the drugs to treat other medical conditions for all kids transgender or not. *See* Laidlaw Decl., R.47-10, PageID#1209–28.

Even if the Court finds that SB 150 differentiates based on transgender status, that does not get the plaintiffs to heightened scrutiny. To accomplish that feat, the plaintiffs must convince the Court (in a preliminary-injunction posture) to do something the Supreme Court has not done "in over four decades, and instead has repeatedly declined to do." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015). The plaintiffs advert to out-of-circuit precedent to support their monumental ask, but they omit to mention that the Eleventh Circuit just expressed "grave 'doubt'" on this very issue. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.5 (11th Cir. 2022) (en banc).

The plaintiffs also fail to cite this Court's *Ondo* decision, the most applicable circuit precedent about qualifying as a quasi-suspect class. They have good reason to downplay *Ondo*, given its holding that the Supreme Court "has never defined a suspect

or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or biological gender." 795 F.3d at 609. Individuals become transgender when their internal perception of their sex changes. That perception can change. Cantor Decl., R.47-9, PageID#1055–57; Levine Decl., R.47-11, PageID#1284–89, 1320–28; Nangia Decl., R.47-12, PageID#1413–26; Laidlaw Decl., R.47-10, PageID#1199–1202. And it is not "definitively ascertainable at the moment of birth." *Ondo*, 795 F.3d at 609. Finally, the plaintiffs are hard-pressed to claim that they "require[] 'extraordinary protection from the majoritarian political process,'" *id.* (citation omitted), when the full weight of the United States is behind them, as are nearly half of the States and all manner of advocacy groups.

### 2. No matter the level of scrutiny, SB 150 survives review.

In discussing whether SB 150 satisfies heightened scrutiny, the plaintiffs take refuge in the clear-error standard. Br.42. But the district court did not hold a hearing before entering its preliminary injunction. It reviewed a cold paper record—just like this Court is doing. Under this Court's precedent, if a district court's preliminary injunction is "made on the basis of a paper record, without an evidentiary hearing," the Court is "in as good a position as the district judge to determine the propriety of granting a preliminary injunction." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995) (citation omitted).

Even still, this is not the typical case with conflicting expert testimony in which a factfinder settles a battle of the experts subject to clear-error review by this Court.

This instead is a case in which Kentucky's General Assembly exercised its police power to prohibit a treatment for children after considering the same medical and scientific disputes the plaintiffs raise here. This litigation is not a forum to relitigate the issues the plaintiffs lost at the statehouse in Frankfort. As noted above, Kentucky's legislature has "*wide discretion* to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163 (emphasis added). That there may be medical and scientific disagreement about how best to treat children with gender dysphoria is not a reason to defer to the district court under clear-error review. Such disagreement is a reason to defer to the Kentucky General Assembly's sovereign judgment.

In any event, and respectfully, the district court did not meaningfully consider the evidence that the Commonwealth provided below. In accepting the plaintiffs' view of the science, the court merely adopted the medical-interest-group amicus brief submitted below as gospel without discussing the Commonwealth's contrary expert testimony. Mem. Op., R.61, PageID#2302. The district court did not discuss the Commonwealth's experts *at all*—other than a general reference to reviewing "the evidence submitted." *Id.* The court did briefly mention the recent experience of European countries, but summarily dismissed those "quoted studies" merely because those countries do not "ban[] the treatments entirely, as SB 150 would do." *Id.* at PageID#2307. No doubt, clear-error review is "deferential," but it is not "nugatory." *Indmar Prods. Co. v. Comm'r*, 444 F.3d 771, 778 (6th Cir. 2006). Clear error exists when factual findings are "made without properly taking into account substantial evidence to the contrary." *Id.* (citation

omitted). The district court's wholesale adoption of the plaintiffs' narrative without so much as an acknowledgement of the Commonwealth's experts, much less an explanation of why they are wrong, warrants no deference.[3]

If the district court had taken full account of the record, it would have determined that using puberty blockers to treat gender dysphoria in children causes harm, some of it irreversible. Laidlaw Decl., R.47-10, 1204, 1210–19, 1256–57; *see also* Cantor Decl., R.47-9, PageID#1098–1110; Levine[4] Decl., R.47-11, PageID#1283, 1290, 1324–28, 1331, 1341–52. Boosting hormone levels beyond healthy ranges likewise leads to irreversible harm. *Id.* at PageID#1220–31, 1243–44, 1247, 1256–57; *see also* Cantor Decl., R.47-9, PageID#1098–1110; Levine Decl., R.47-11, PageID#1283, 1290, 1324–28, 1331, 1341–52.

---

[3] That a legal error infects the district court's fact-finding is another reason to discount it. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984). In particular, the district court failed to account for the discretion of Kentucky's legislature to regulate the practice of medicine in areas of medical and scientific uncertainty. *See Gonzales*, 550 U.S. at 163.

[4] The plaintiffs try to discredit Dr. Levine. Br.44–45. But he has treated patients with gender dysphoria, including children, and was previously a chairman of WPATH before it "bec[a]me dominated by politics and ideology, rather than by scientific process." Levine Decl., R.47-11, PageID#1280, 1304. The district court, moreover, made no credibility findings against Dr. Levine. *See Doe v. Ladapo*, --- F. Supp. 3d ---, 2023 WL 3833848, at *2 (N.D. Fla. June 6, 2023) (finding that Dr. Levine "addressed the issues conscientiously, on the merits, rather than as a biased advocate"), *appeal filed* No. 23-12159 (11th Cir.).

The plaintiffs assert that simply stopping puberty blockers will allow normal puberty to resume and that doctors can manage the associated risks. Br.11. But they compare apples to oranges in claiming that data about using puberty blockers to treat other conditions supports using puberty blockers to treat gender dysphoria. "This statement fails to recognize the very different effects of [puberty blockers] in early childhood versus during adolescence." Laidlaw Decl., R.47-10, PageID#1215. The plaintiffs do not explain how stopping puberty blockers "allow[s] a developing adolescent's bone density to adequately recover" lost growth. *Id.* at PageID#1218. Nor do they acknowledge that "brain maturation may be . . . permanently disrupted by puberty blockers." Cantor Decl., R.47-9, PageID#1100–01. The Endocrine Society itself has recognized that "pubertal suppression 'may include . . . unknown effects on brain development.'" Levine Decl., R.47-11, PageID#1344 (citation omitted). Even the medical interest groups in this case acknowledge that the effects of puberty blockers to treat gender dysphoria are only "*generally* reversible." AAPBr.13 (emphasis added). So although the plaintiffs claim that "[n]ot a single credible scientific study supports" the conclusion that treating gender dysphoria with puberty blockers leads to irreversible harm, Br.43, the proof cannot be missed.

The plaintiffs run into similar problems with their claims about using hormones to treat gender dysphoria. Tellingly, the plaintiffs carefully hedge their position here by qualifying that "long-term hormone treatment does not *necessarily* impair fertility" and that "withdrawal of hormone therapy is *generally* successful in achieving fertility." Br.12

(emphasis added). A loss of fertility is far from the only harm SB 150 prevents by prohibiting hormones to treat gender dysphoria. For example, using testosterone to treat gender dysphoria can also cause "irreversible changes to the vocal cords," hirsutism (abnormal hair growth), and "[c]hanges to the genitourinary system." Laidlaw Decl., R.47-10, PageID#1224.

Despite all these harms from puberty blockers and hormones, the plaintiffs insist that the drugs will alleviate a child's mental-health condition. But trying to fix a mental-health condition with attempted physical transformation is no panacea and causes irreversible harms. Levine Decl., R.47-11, PageID#1283–84, 1328–52, 1361–63; Cantor Decl., R.47-9, PageID#1020, 1070–80, 1088–1110; Laidlaw Decl., R.47-10, PageID#1221, 1225, 1241–42.

The plaintiffs' criticisms of Dr. Cantor do not land. He is an expert in "evaluating scientific claims and methods." Cantor Decl., R.47-9, PageID#1011. His expertise is evaluating whether a particular claim is supported by evidence.[5] To this end, Dr. Cantor explained why the studies cited by the plaintiffs and their amici are flawed and do not actually support their positions. *Compare* AAP Br.17–18, *with* Cantor Decl., R.47-9,

---

[5] The plaintiffs criticize Dr. Cantor's credibility too, Br.44, despite the district court not doing so. But a lack of experience in treating gender dysphoria has no bearing on his ability to use his "expertise in the science of assessment" and "research methodology" to ascertain whether scientific claims about gender dysphoria are evidenced-based. Cantor Decl., R.47-9, PageID#1010–13.

PageID#1018–19, 1048, 1051, 1073–74, 1089–97, 1101, 1103, 1109, 1125–27, 1129–33; *compare also* Cal.Br.4–5, *with* Cantor Decl., R.47-9, PageID#1033, 1095, 1128–29.

The Court need not take Dr. Cantor's word for it. Just two years ago, the federal government observed that "[t]here is a lack of current evidence-based guidance for care of children and adolescents who identify as transgender, particularly regarding the benefits and harms of pubertal suppression, medical affirmation with hormone therapy, and surgical affirmation." Resp. Mot. PI Ex. 4, R.47-4, PageID#545. And European nations have described using puberty blockers and hormones to treat children with gender dysphoria as experimental, have found that "the risk of puberty suppressing treatment . . . and gender-affirming hormonal treatment currently outweigh the possible benefits," have concluded that there is "insufficient evidence for the use of puberty blockers and cross sex hormone treatments in young people," and are "only commission[ing treatment] in the context of a formal research protocol." Resp. Mot. PI, R.47, PageID#507–08 (summarizing this evidence); *see also* Resp. Mot. PI Ex. 2, R.47-2, PageID#525–26; Cantor Decl., R.47-9, PageID#1016–25, 1040–48, 1082–87; Laidlaw Decl., R.47-10, PageID#1246–48. Although these countries continue to allow treatments in some respects,[6] this does not constrain Kentucky's sovereign authority to prohibit such treatments within its borders.

---

[6] Denmark recently considered a "total ban." Bernard Lane, *Doubt in Denmark*, Gender Clinic News (Aug. 13, 2023), https://perma.cc/3DAK-E5SD.

Even WPATH and the Endocrine Society recognize the limitations of their standards and the evidence supporting them, including in their disclaimers. Cantor Decl., R.47-9, PageID#1049–54, 1074, 1085–87, 1113–16; Levine Decl., R.47-11, PageID#1304–13; Laidlaw Decl., R.47-10, PageID#1231–41. Their standards recently warranted nothing more than a "very low" GRADE rating. Cantor Decl., R.47-9, PageID#1045–46; Levine Decl., R.47-11, PageID#1330–31. And their recommended treatments are not FDA approved.

Although the plaintiffs dismiss alternative treatments outright, other countries are prioritizing psychological care, which WPATH itself recommended at one point. Levine Decl., R.47-11, PageID#1293–1300, 1306–09, 1357–64; Nangia Decl., R.47-12, PageID#1410, 1426–37, 1471–85, 1492–96; Cantor Decl., R.47-9, PageID#1016, 1032, 1035, 1061–62, 1076–80, 1088–97; Laidlaw Decl., R.47-10, PageID#1247; Resp. Mot. PI, R.47, PageID#507–08, 511–14; Resp. Mot. PI, R.47-3, PageID#539. Alternative treatments are preferable because there is no way to determine whether a child's gender dysphoria will persist or desist, since there are no biological markers for it. Cantor Decl., R.47-9, PageID#1055–57, 1063–65, 1080–81, 1117–19, 1125–26; Levine Decl., R.47-11, PageID#1281–82, 1284–89, 1292, 1313–21; Laidlaw Decl., R.47-10, PageID#1199–1207, 1211, 1242–43, 1256.

In fact, providing the treatments prohibited by SB 150 may well cause children to persist. Levine Decl., R.47-11, PageID#1327–28. Puberty blockers "may be offered beginning at the onset of puberty," AAPBr.12, but "most childhood-onset cases desist

18

during the course of puberty." Cantor Decl., R.47-9, PageID#1061–62, 1065; Levine Decl., R.47-11, PageID#1320–28, 1365. Even the federal government admits that adolescents can desist from gender dysphoria. U.S.Br.7 (asserting that puberty blockers "provide[] time for adolescents to better understand their gender identity and to see whether their gender dysphoria persists"). In addition, many adolescents are now suffering from "rapid onset gender dysphoria" in which "[c]ases commonly appear to occur within clusters of peers in association with increased social media use and among people with autism or other mental health issues." Levine Decl., R.47-11, PageID#1321–24; Nangia Decl., R.47-12, PageID#1421–22; Cantor Decl., R.47-9, PageID#1068–69. Alternative treatments can get at the root of what is causing gender dysphoria. Levine Decl., R.47-9, PageID#1291–99, 1319, 1322, 1328, 1351–62; Nangia Decl., R.47-12, PageID#1415–37, 1440–54, 1457, 1459–64, 1468, 1471–85, 1487–88; Cantor Decl., R.47-9, PageID#1019, 1035–38, 1076–80, 1088–89, 1121, 1129–31.

In sum, whatever level of scrutiny applies, SB 150 satisfies it. Protecting Kentucky's children from harm is an interest—indeed, a duty—of the highest order. SB 150 accomplishes just that.

### C. The plaintiffs have not established standing sufficient to receive a preliminary injunction.

The plaintiffs try to avoid demonstrating standing by noting that the Commonwealth did not raise the issue below. This Court, however, specifically directed the parties to brief the issue and can reach it regardless of preservation. *See Fair Elections Ohio*

*v. Husted*, 770 F.3d 456, 461 n.2 (6th Cir. 2014) (addressing non-jurisdictional standing without it being "specifically raised").

If the Court addresses standing, it should hold that on this record the plaintiffs have not established redressability sufficient to receive a preliminary injunction given the two distinct ways in which SB 150 can be enforced—through license and certification revocation and a private right of action. Ky. Rev. Stat. § 311.372(4), (5). The plaintiffs counter that SB 150 does not provide a private right of action. Br.25. But that is wrong, as the United States acknowledges. U.S.Br.13. The law allows a "civil action to recover damages for injury suffered" for violating distinct provisions of SB 150 and provides a statute of limitations. Ky. Rev. Stat. § 311.372(5). The plaintiffs also argue that SB 150's private right of action will not be enforceable if this lawsuit succeeds. Br.26. That is wrong too. The viability of SB 150's private right of action does not turn on whether the Court enjoins the defendants here from revoking licenses and certifications. The plaintiffs lastly suggest that one plaintiff with standing is enough for all the plaintiffs to secure injunctive relief. Br.27. The Commonwealth recently lost that very argument. *Kentucky v. Yellen*, 54 F.4th 325, 341 n.12 (6th Cir. 2022).

## II. The other preliminary-injunction factors favor the Commonwealth.

Because SB 150 is constitutional, the remaining preliminary-injunction factors mostly follow in line. Indeed, the plaintiffs nowhere dispute that the likelihood of success on the merits is the factor that usually drives the analysis in a constitutional challenge to state law. *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 560 (6th Cir. 2021).

On irreparable harm, the plaintiffs claim that they will be harmed without the treatments prohibited by SB 150. And they reference the affidavits from some (but not all) of the parent-plaintiffs about their children's treatments. But Kentucky's General Assembly balanced these alleged harms against the benefits to children in Kentucky from prohibiting these treatments. In other words, Kentucky's "elected representatives made the[] precise cost-benefit decisions" at the heart of the harm question. *L.W.*, 73 F.4th at 421. And as summarized above, Kentucky had very good reasons to make the judgment call it did. In addition, the plaintiffs are wrong to imply that SB 150 means that doctors "must terminate treatment altogether." *See* Br.16. SB 150 in fact allows continuing treatments for children already receiving them without providing an end date as long as the treatments are "systematically reduced" over time. Ky. Rev. Stat. § 311.372(6). Stated differently, SB 150 provides children who were already receiving the prohibited treatments with an open-ended time in which to work with their medical providers to develop a new treatment plan.

The plaintiffs are incorrect to discount the harm to the Commonwealth from not enforcing SB 150 as a mere "constructive form of harm." Br.54. Kentucky's sovereign interest in enforcing SB 150 is not abstract. It "sounds in deeper, constitutional considerations." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1010 (2022); *see also Doe 1 v. Thornbury*, --- F.4th ---, 2023 WL 4861984, at *1 (6th Cir. July 31, 2023). All the more so given that, in the judgment of Kentucky's General Assembly, SB 150 protects children in Kentucky from irreversible harm. The rule in this circuit is that

non-enforcement of state law counts as irreparable harm. *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020). And the public interest follows from that conclusion. *Id.*

One final point. As noted at the outset, this consolidated appeal has drawn the participation of the vast majority of the States. Whatever else can be said about the States' differing views, there can be no doubt that they are actively debating whether prescribing puberty blockers and hormones to treat gender dysphoria helps or harms children. In fact, in the short time since *L.W.*, two States have prohibited these treatments. Commw.Br.18; Rick Rojas & Anna Bets, *North Carolina Bans Transgender Care for Minors as Republicans Override Veto*, N.Y. Times (Aug. 16, 2023), https://perma.cc/6EDC-HA2W. The States are not the only participants in this public discourse. For example, AAP, which filed an amicus brief supporting the plaintiffs, just "commission[ed] a fresh look at the evidence" supporting its views, "following similar efforts in Europe that found uncertain evidence for [the treatments'] effectiveness in adolescents." Azeen Ghorayshi, *Medical Group Back Youth Gender Treatments but Calls for Research Review*, N.Y. Times (Aug. 3, 2023), https://perma.cc/W753-A5EN. This debate is far from over, and the public interest favors fostering it.

## III.   At the very least, the preliminary injunction should be narrowed.

The plaintiffs argue that "an injunction limited to [them] would fail to provide [them] with the relief to which they are entitled and would be impracticable." Br.55. Take each argument in turn.

The plaintiffs claim that they are "entitled" to a preliminary injunction extending to non-parties simply because they assert that SB 150 is facially unconstitutional. But this framing of their claim does not dictate whether the district court properly extended the preliminary injunction to non-parties. For one thing, at this early stage, the Court is not deciding whether SB 150 is in fact facially unconstitutional, only the likelihood of a constitutional violation. *See Arizona v. Biden*, 40 F.4th 375, 381 (6th Cir. 2022). For another, that the plaintiffs believe that SB 150 is facially unconstitutional does not overcome the "substantial questions about federal courts' constitutional and equitable powers" to extend injunctive relief to non-parties. *See Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023).

Even still, on this record the plaintiffs have not shown that SB 150 is facially unconstitutional. To make this high showing, they "must establish that no set of circumstances exists under which the statute would be valid." *L.W.*, 73 F.4th at 414 (cleaned up) (citation omitted). In this preliminary posture, all we have are short affidavits from four of the parent-plaintiffs describing the circumstances facing their children at particular ages. Jane Doe 1 Decl., R.17-4, PageID#280–82; John Doe 2 Decl., R.17-5, PageID#283–85; John Doe 3 Decl., R.17-6, PageID#286–88; Jane Doe 5 Decl., R.17-7, PageID#289–91. And according to the unverified complaint, one of the children-plaintiffs is not even taking the prohibited treatments. Compl., R.2, PageID#16, 29. Thus, even if the plaintiffs can establish a likely constitutional violation, at best they can show it based on only their particular circumstances. The plaintiffs simply cannot

claim that their unique circumstances capture the situation facing every child in Kentucky's 120 counties.

The plaintiffs' final argument is that they will be unable to receive puberty blockers and hormones without a statewide injunction. Br.57. But there is no record evidence to back up this assertion. No declaration from a parent-plaintiff even implies as much, nor is there a declaration from a Kentucky doctor to this effect. All the plaintiffs offer is a declaration from one parent-plaintiff that his child's "endocrinologist has informed us that she will no longer be able to treat JM Doe 3 once the Treatment Ban goes into effect on June 29 and will instead have to refer us out-of-state." John Doe 3 Decl., R.17-6, PageID#288. This statement in no way suggests that JM Doe 3's doctor will insist on a statewide injunction before providing treatment. The plaintiffs' lack of evidence on this score distinguishes their favored case in which a party-specific injunction would have been "illusory indeed" for the plaintiffs. *Washington v. Reno*, 35 F.3d 1093, 1104 (6th Cir. 1994).

## CONCLUSION

The Court should reverse the preliminary injunction or, at the least, narrow it so that it applies only to the plaintiffs.

Respectfully submitted by,

<u>*s/ Matthew F. Kuhn*</u>
Daniel Cameron                                      Office of the Kentucky Attorney General
 *Attorney General of Kentucky*            700 Capital Avenue, Suite 118
Victor B. Maddox                                Frankfort, Kentucky 40601
 *Deputy Attorney General*                  (502) 696-5300
Matthew F. Kuhn                              Matt.Kuhn@ky.gov
 *Solicitor General*
Alexander Y. Magera                          *Counsel for the Commonwealth of Kentucky*
 *Assistant Solicitor General*

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(g) and 6th Cir. R. 32, I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,274 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Garamond font using Microsoft Word.

*s/ Matthew F. Kuhn*

**CERTIFICATE OF SERVICE**

I certify that on August 17, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<em>s/ Matthew F. Kuhn</em>